> Ladies and gentlemen, deals.  Yes, ma'am, yes, ma'am,
> yes, sir, to all of you.  I have dealt with
> [co-defendant 1] and I have dealt with [co-defendant
> 2].  I did that as an Assistant State Attorney.  I did
> that the best I knew how.  But, ladies and gentlemen,
> sometimes you have to deal with sinners to get the
> devil [referring to Mr. Moore].  And I would submit to
> you what the State did was we dealt with this sinner
> and we dealt with this sinner to get **this devil**
> [referring to Mr. Moore].

(R. 1277) (emphasis added).  The prosecutor made a similar

reference during the penalty-phase argument (T. 1520).  At

no time did defense counsel object to these improper

arguments.

Not only did the prosecution inflame the passions of

the jury by referring to Mr. Moore as "the devil" and his

co-defendants as "sinners," but the prosecutor also injected

personal opinion and nonrecord evidence into her argument.

In the above excerpt, the prosecutor vouched for her own

credibility by suggesting to the jury that she had done her

job by giving the co-defendants what they deserved without

revealing what exactly the "deals" were and how those deals

compared to what the prosecution was seeking for Mr. Moore.[7]

---

[7]Co-defendant Carlos Clemons plead guilty to third
degree murder and attempted armed robbery and received
juvenile sanctions.  Co-defendant Vincent Gaines plead
guilty to accessory after the fact and attempted armed
robbery and received 3 1/2 years with time served.

46

In sum, the State described Mr. Moore's neighborhood as "hell," referred to everyone who lived in that neighborhood as "sinners," and equated Mr. Moore with "the Devil".  These references were not fair comment on the facts shown by the record, pandered to the jury's fears and painted an inflammatory picture of Mr. Moore.

**Exhaustion of Ground IX in state courts:**

1) **Did you raise Ground IX in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground IX in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99, 4/6/00

      ii. **Whether you received an evidentiary hearing:** No

      iii. **Result:** Summarily denied

      iv. **Date of Result:** 8/4/00; rehearing denied 9/8/00

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

      i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

47

ii. **Date appeal filed, result of appeal, date of result:** Affirmed on 3/7/02, <u>Moore v. State</u>, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02

3) **Have you raised Ground IX in any other petition, application, or motion filed in the state courts of Florida?** No

### GROUND X

**THE ADMISSION OF TESTIMONY BY LARRY DAWSEY THAT MR. MOORE WAS IN POSSESSION OF A FIREARM TWO DAYS AFTER JOHNNY PARRISH'S DEATH VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND THE FLORIDA SUPREME COURT'S DIRECT APPEAL HARMLESS ERROR ANALYSIS DID NOT MEET CONSTITUTIONAL STANDARDS.**

At trial, over vigorous objection from defense counsel (T711-713), the State was permitted to present the testimony of Larry Dawsey, a neighborhood acquaintance of Mr. Moore. Dawsey testified that a couple of days after Parrish's death, he ran into Mr. Moore at a Chinese supermarket in the neighborhood (T711). According to Dawsey, Mr. Moore said "he was going to kill someone because he was tired of everybody telling him he killed that man" (T714). Dawsey testified that Mr. Moore showed him a "black, brown-like" pistol while making the statement (T714). Dawsey could not identify the gun, but said he <u>thought</u> it was a .38 with a long barrel (T714-715).

48

Dawsey's entire testimony was irrelevant and immaterial and served only to depict Mr. Moore as a gun-toting bad man with a propensity for murder.

Because the count of possession of a firearm by a convicted felon did not go to the jury, the State could not have been presenting the evidence that Mr. Moore had a gun two days after the murder to prove an element of a charge against Mr. Moore.   Furthermore, absolutely no proof was presented that the gun about which Dawsey testified was the murder weapon.   In addition, the statement Mr. Moore allegedly made while brandishing the weapon had no bearing on any issue in the case, and was therefore irrelevant, bad-character evidence that should have been excluded.

On direct appeal, the Florida Supreme Court agreed that Dawsey's testimony was irrelevant because it "could only show that Moore was upset because people were accusing him of committing the crime or that he regularly carried a gun. Neither piece of information helps establish whether or not he killed the victim."   Moore v. State, 701 So. 2d at 549. However, the court found the error in admitting Dawsey's testimony harmless "[b]ecause there was direct evidence from other witnesses that Moore possessed a gun on the actual day

of the murder and direct evidence that Moore shot the
victim." Id. at 550.   Thus, due process was violated.

**Exhaustion of Ground X in state courts:**

1)   **Did you raise Ground X in the Florida Supreme Court on
a direct appeal of your conviction?** Yes

2)   **After your conviction, did you raise Ground X in the
state circuit court that sentenced you by filing a
motion under Florida Rule of Criminal Procedure 3.850?**
No

  a)   **If your answer is "yes", then state:**

   i.   **Date motion filed:** N/A

   ii. **Whether you received an evidentiary
hearing:** N/A

   iii. **Result:** N/A

   iv. **Date of Result:** N/A

  b)   **If your Rule 3.850 Motion was denied, did you file
an appeal of that denial with the Supreme Court of
Florida?** N/A

   i.   **If you failed to appeal the denial of your
Rule 3.850 motion, explain briefly why:** N/A

   ii.  **Date appeal filed, result of appeal, date of
result:** N/A

3)   **Have you raised Ground X in any other petition,
application, or motion filed in the state courts of
Florida?** No

## GROUND XI

**MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN HIS DIRECT APPEAL.**

50

Mr. Moore's direct appeal counsel failed to raise numerous meritorious issues.  Because there is a reasonable probability of a different outcome had the issues been raised, appellate counsel's deficient performance prejudiced Mr. Moore.  The following subsections detail the omitted issues.

**A.    APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE CLAIM THAT MR. MOORE'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE STATE UNCONSTITUTIONALLY USED ITS PEREMPTORY CHALLENGES TO STRIKE JURORS BECAUSE OF RACE WHILE CLAIMING RACE-NEUTRAL REASONS.**

The State used its peremptory challenges in such a way as to deny Mr. Moore his rights to a trial by an impartial jury drawn from a representative cross section of the community under the Sixth and Fourteenth Amendment of the United States Constitution.  The State used its peremptory challenges to exclude jurors who merely had misgivings about the death penalty, jurors that could not be excluded for cause.  The State excluded an identifiable segment of the population who have unfavorable (to the prosecutor) attitudes about the death penalty and thereby denied Mr. Moore his rights to a trial by an impartial jury drawn from a representative cross-section of the community.  In doing so, the State unconstitutionally, and with discriminatory

51

intent, excluded members of the African-American community from serving on Mr. Moore's jury.

During selection of the jury, Mr. Moore's counsel objected to several of the State's peremptory challenges because they were not motivated by racially-neutral reasons. The court, despite evidence to the contrary, found the State's reasons to be racially-neutral (R. 354-62).  These findings constituted fundamental error.

**1.   Venireman Dunbar**

The State exercised a peremptory strike on venireman Dunbar, a black male (R. 348).  During a Neil[8] inquiry, the State gave as its "race neutral" reason for striking venireman Dunbar, the fact that Mr. Dunbar is the brother-in-law of a criminal defense attorney who State's co-counsel had cases against (R. 356).  The court ruled that this reason was "racially neutral" (R. 358).  The court's ruling ignored several facts about this venireman which contradicted the State's "race neutral" reason.

First, when asked whether he had discussed cases with his brother-in-law, venireman Dunbar answered that he did not and had never discussed "any general philosophy about

---

[8]State v. Neil, 457 So.2d 481 (Fla. 1984).

the criminal justice system" (R. 185).  In fact, venireman
Dunbar stated that the death penalty was warranted in some
cases (R. 284) and that there was nothing in his feelings
about the death penalty that would impair his ability to
vote for death if it was deemed appropriate (R. 210).  As
Mr. Moore's trial counsel correctly pointed out, "there was
no inquiry by the State at any time as to whether or not Mr.
Dunbar's relationship as an in-law would have raised any
specter of impartiality or partiality toward Defendant . . .
[i]n fact, the State didn't even make an inquiry of their
own" (R. 356).  This supports the conclusion that the true
reason the State struck Mr. Dunbar was because of his race
and any reason to the contrary is disingenuous.

Second, the Court's Neil inquiry ruling on venireman
Dunbar ignored the fact that another juror (venirewoman
Fross), who was white and who the State did not object to
(R. 345), knew "real well" (R. 181) a former Public Defender
who "handles capital cases" (R. 358).  Like venireman
Dunbar, venirewoman Fross did not discuss the work of her
former Public Defender friend (R. 182).

Except for the fact that venireman Dunbar was black and
venirewoman Fross was white, there is nothing to distinguish
the two, who were otherwise similarly situated with respect

53

to their respective relationships with criminal defense
attorneys.   There is simply no race-neutral reason for
striking Mr. Dunbar and accepting Mrs. Fross as a juror.
The reason set forth by the State in striking venireman
Dunbar was, quite simply, a sham.   The court's ruling that
"[r]ace had nothing to do with it" (R. 358) ignored the
record.

### 2.   Venirewoman Pitts

The State exercised a peremptory challenge on
venirewoman Pitts, a black female (R. 350)   The State said
its "race neutral" reason for striking her was that she
seemed "very reluctant," could not give her feelings on the
death penalty when asked, stated she felt it was the judge's
role to do the sentencing and said "she did not want to be
involved in giving an advisory sentence" (R. 359).

In fact, when the State asked venirewoman Pitts about
the death penalty and giving a recommendation as to the
appropriate sentence, she agreed that she would have no
problem with the death penalty as long as "the merits of the
case hold in value" (R. 210) and that she would follow the
court's instructions (R. 211).   Venirewoman Pitts stated
that she agreed with the statement that the death penalty is
appropriate in some cases (R. 211).   Additionally, when

asked by the court if she could make a recommendation to the court of death or life without the possibility of parole for twenty-five years, venirewoman Pitts stated that she could (R. 291).

Although venirewoman Pitts expressed reservations about the death penalty (as most jurors do), she merely expressed that, depending on the facts of a particular case, she would or would not vote to impose the death penalty. The majority of the jurors on the venire expressed this same judgement about imposing the death penalty. That is, the death penalty would not be automatically imposed, but rather, consideration would be given to the particular facts of the case (i.e., the aggravating and mitigating circumstances.) Certainly, this cannot be a "race-neutral reason" as this reason is merely what qualifies one to be a juror.

### 3.   **Venirewoman Washington**

The State exercised a peremptory challenge on venirewoman Washington, a black female (R. 354). The State said its "race neutral" reason for the strike was that "she did have a problem with the death penalty" (R. 361). The court found this to be a race-neutral reason even though, as the court stated, "she could follow the law" (R. 362).

Although venirewoman Washington expressed reservations
about the death penalty (as most jurors do), she merely
expressed that, depending on the facts of a particular case,
she would or would not vote to impose the death penalty.
The majority of the jurors on the venire expressed this same
judgment about imposing the death penalty.  That is, the
death penalty would not be automatically imposed, but
rather, consideration would be given to the particular facts
of the case (i.e., the aggravating and mitigating
circumstances.)  Certainly, this cannot be a "race-neutral
reason" as this reason merely qualifies one to be a juror.

Venirewoman Washington stated twice on the record that
there are cases where she could conceive of recommending the
death penalty once she found a person guilty of first degree
murder (R. 213, 298-99).  By striking venirewoman
Washington, the State used its peremptory challenges to
exclude a juror who merely had misgivings about the death
penalty, a juror that could not be excluded for cause.
There was nothing about venirewoman Washington's answers
that disqualified her from serving on Mr. Moore's jury.

**4.    Venirewoman Carter**

The State exercised a peremptory challenge on
venirewoman Carter, a black female (R. 365).  The State said

56

its "race neutral" reason for striking her was that "she had
problems with . . . the death penalty," although she stated
that she felt like she could follow the law (R. 365).   The
State's reason in striking venirewoman Carter is the same
reason used to justify striking venirewoman Washington.
Appellate counsel's failure to raise this issue on direct
appeal was deficient performance that deprived Mr. Moore of
a new trial.

**B.    APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE
AND ARGUE THE CLAIM THAT MR. MOORE WAS DENIED HIS RIGHT
TO A FAIR TRIAL WHEN THE STATE WAS ALLOWED PRETRIAL
ACCESS TO THE CRIMINAL HISTORY RECORDS OF POTENTIAL
JURORS FOR USE IN VOIR DIRE.**

Mr. Moore filed a motion to prohibit the State from
using criminal records of prospective jurors during voir
dire and alternatively for disclosure of those criminal
records (Vol. II, p. 207).   After argument, the Court
ordered the State to turn over any criminal history records
of potential jurors it had to the defense (R. 91-94).[9]   The
prejudice suffered by Mr. Moore by the State's use of
juror's criminal history records cannot be cured by
disclosure.

---

[9]The file of Mr. Moore's trial attorney in this case
does not reveal that these criminal history records
were ever provided.

As averred by Mr. Moore in his motion:

Every week, the State Attorney's Office . . . is permitted by the Jacksonville Sheriff's Office to obtain copies of criminal arrest records of all prospective jurors for the coming trial week, for use by the assistant state attorneys during jury selection in criminal cases.

The defense is not given access to these records by prosecuting attorneys.

The Jacksonville Sheriff's Office will not provide the same service . . . to defense counsel, nor will it permit access to its records for defense to conduct such an investigation independently.

For the defense to duplicate the investigation of the State Attorney's Office . . . would be both costly and time consuming and would require funds not available to an indigent defendant through the Public Defender's Office.

The compiled criminal history data supplied to the State by the Sheriff's Office is not limited to felony convictions or other convictions which would be a valid basis for a challenge under Section 40.013, Florida Statutes.

(Vol. II, p. 207-208).  The above described "informal" practice is not authorized by law, gives the prosecution an unfair advantage, and violated Mr. Moore's rights to a fair trial.

The purpose of voir dire is to protect the fairness of the trial by ensuring an impartial and qualified jury.  The Sixth Amendment's underlying goal of jury impartiality applies to both the State and to the defendant.  The only

legitimate use of potential jurors' criminal history record by the State, then, is when there is a reasonable basis for believing that the criminal history record may contain information that is pertinent to a potential juror's selection and that is unlikely to be disclosed through voir dire or through juror questionnaires.

In Mr. Moore's case, the potential jurors' were never questioned about whether or not they had ever been arrested, had ever been convicted of a crime or anything which might be revealed in a criminal history report and which might cause one to be biased against the State.  Absent the contrary, it can only be assumed that potential jurors' criminal history records were used in such a way as to eliminate jurors without cause (or by illegitimate causes) or at least targeted for elimination by the State.  Allowing Mr. Moore access to these same criminal history records does not cure this unfairness.  Access to the records can never provide an adequate remedy to the State's illegal use of the information to strike a juror for cause when no basis for one exists.  Appellate counsel's failure to raise this issue in Mr. Moore's direct appeal was deficient performance that deprived Mr. Moore of a new trial.

59

C.   **THE TRIAL COURT ERRED IN ADMITTING VICTIM IMPACT EVIDENCE IN THE PENALTY PHASE WHICH DID NOT FALL WITHIN THE STANDARD SET FORTH IN SECTION 921.141(7), FLORIDA STATUTES (1992), AND VIOLATED MR. MOORE'S DUE PROCESS RIGHT TO A FAIR TRIAL.**

At the penalty phase of the proceedings, over vigorous objection by defense counsel, the trial court permitted the State to present victim impact evidence through the testimony of the victim's daughter, Doris Parrish (T1464-1467).  Ms. Parrish testified, "My dad was a good man.  He never bothered nobody.  And he was very free hearted, you know.  He loved everybody" (T1466).  This testimony was improper victim impact evidence which deprived Thomas Moore of his due process right to a fair trial.

Section 921.141(7), F.S., allows victim impact evidence only if it is "designed to demonstrate the victim's uniqueness as an individual human being, and the resultant loss to the community's members by the victim's death."  In the instant case, the daughter's testimony amounted to a mere pronouncement that her father was a good, decent person.  She said that he didn't bother people and he loved everybody (T1466).  What makes him "unique" in the community?  That question cannot be answered because there was no testimony about the community or the "uniqueness" of any of its members, including Mr. Parrish.  Because the

60

testimony of the victim's daughter was a commentary on the
good character of the victim rather than a demonstration of
his unique value to his community, the victim impact
evidence violated §921.141(7), F.S., and was improperly
admitted.

**D.   MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE OF
APPELLATE COUNSEL WHERE COUNSEL FAILED TO ASSERT
FUNDAMENTAL ERROR WHERE THE COURT ALLOWED THE
SENTENCING JURY TO HEAR SUBSTANTIVELY IRRELEVANT, BUT
EXTREMELY PREJUDICIAL, DETAILS OF A "PRIOR VIOLENT
FELONY" AGGRAVATING CIRCUMSTANCE, VIOLATING THE EIGHTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.**

During Mr. Moore's penalty phase proceedings, and in
support of the aggravating circumstance that Mr. Moore had
previously been convicted of a felony involving the use or
threat of violence, the State introduced two judgments and
sentences of Mr. Moore's prior felony convictions, of which
the Court took judicial notice and received in evidence (R.
1458-59).   Thereafter, the State called Detective L.H. Goff
to testify to the details of Mr. Moore's prior felony
convictions:

> Q (by the State)   Let me direct your attention,
> Detective Goff, to December 10th, 1983; Did you work
> with the Sheriff's Office at that time?
>
> A     Yes, ma'am, I was.
>
> Q     Where were you assigned then?

A    At that time I was assigned to the robbery
division as a detective.

Q    Detective, were you assigned on that date to
investigate a robbery, armed robbery, in Case No.
89-9116 involving the defendant Thomas Moore?

A    Yes, I was.

Q    Could you please tell the jurors anything about
the victim in that case?

(R. 1461).  At this point, defense counsel objected on

hearsay grounds.  The court did not rule on the objection

and allowed the State to continue:

Q (by the State)  Could you please tell the
jurors about the victim?

A    Yes, ma'am.  This was a white female, 23
years old, named Cynthia Hyman that was
robbed on that date.

Q    Did you arrest the defendant Thomas
Moore in connection with that armed robbery?

A    Mr. Moore was arrested and charged with
that robbery, yes, ma'am.

Q    Did anyone identify the defendant Thomas
Moore in connection with that armed robbery?

A    Yes, Cynthia Hyman identified Thomas
Moore as being the suspect with the pistol.

Q    **Suspect with what**?

A    **The pistol**.

(R. 1462) (emphasis).  Allowing the State to introduce and

the jury to hear this evidence was error.  This evidence was

62

irrelevant to the aggravating circumstance to which it was
purportedly connected and was highly prejudicial.  This
error rose to the level of fundamental error.

The aggravating factor to which Detective Goff's
testimony purports to relate reads:

> The defendant was previously convicted of another
> capital felony or of a felony involving the use or
> threat of violence to the person.

(Fla. Stat. 921.141(5)(b).  Detective Goff's testimony was
not relevant to whether Mr. Moore was convicted of anything.
At most, this is evidence of a prior bad act.  This
testimony only showed that Mr. Moore was arrested for
allegedly robbing a white woman with a firearm, which is
prejudicial and denied Mr. Moore his right to a fair
sentencing.  The fact of a prior felony conviction involving
the use or threat of violence to another person had already
been proved beyond a reasonable doubt upon judicial notice
of Mr. Moore's prior conviction and sentence.  There was no
need, other than to inflame the minds and passions of the
jurors, to reveal that Mr. Moore had been arrested for
allegedly robbing a white woman with a firearm.  In
addition, trial counsel already noticed the court that the
statutory mitigating circumstance of "no significant history

of prior criminal history" had been waived (Vol. III, p. 487).

**E.  APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE CLAIM THAT MR. MOORE WAS DENIED HIS RIGHT TO A FAIR SENTENCING WHEN THE TRIAL COURT DENIED HIS REQUEST FOR AN INSTRUCTION THAT THE JURY MAY CONSIDER MERCY IN ITS SENTENCING DECISION.**

Defense counsel requested the following instruction:

> Mere sympathy which is purely an emotional response to what you have heard should not influence your decision in any way.  However, if sympathy arises as part of a reasoned moral response to mitigation placed before you, you may consider that in your decision about the appropriate penalty.

(Vol. III, p. 452).  This instruction was denied by the trial court (R. 1435).

**F.  MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE COUNSEL FAILED TO BRIEF AND ARGUE THE CLAIM THAT MR. MOORE'S SENTENCE OF DEATH IS NOT PROPORTIONATE WITH THE PUNISHMENT RECEIVED BY OTHER DEFENDANTS WHO COMMITTED SIMILAR CRIMES AND PRESENTED LIKE AGGRAVATORS AND LIKE MITIGATORS AT TRIAL.**

With knowledge of the Florida Supreme Court's mandatory duty to undertake proportionality review of sentences of death on direct appeal, it is ineffective, indeed, for appellate counsel not to brief and argue the issue of whether or not a sentence of death is proportional.  The Florida Supreme Court was never made aware and perhaps never considered cases in its proportionality review of this case

64

which tend to show that Mr. Moore's sentence of death is, in fact, not proportional.

In support of its sentence of death, the sentencing court found three statutory aggravators: (1) that Mr. Moore was previously convicted of a felony involving the use, or threat to use, violence to the person, §921.141(5)(b), Florida Statutes; (2) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest, §921.141(5)(e), Florida Statutes; and (3) the capital felony was committed for pecuniary gain, §921.141(5)(f), Florida Statutes.  The court attached "great weight" to these aggravating factors (Vol. III, p. 501-03).

In mitigation, the court attached "slight weight" to Mr. Moore's age at the time of the crime and attached "no significance or value" to testimony regarding Mr. Moore's character (Vol. III, p. 503-04).

On direct appeal, without briefing from appellate counsel, the Florida Supreme Court "reviewed" Mr. Moore's death sentence and determined that Mr. Moore's sentence of death is proportionate. <u>Moore</u> at 551.  In support of this finding, the court cited cases in which the death penalty was imposed and subsequently upheld on direct appeal, where there were two aggravating factors, two statutory mitigating

circumstances, and three non-statutory mitigating
circumstances,[10] and where there were two aggravating
factors and some non-statutory mitigating factors.[11]   <u>Moore</u>,
701 So. 2d at 551-52.

First, this proportionality review was inadequate
because it boiled the review down to a mere counting of
numbers ("two aggravating factors . . . two statutory
mitigating circumstances . . . and three nonstatutory
mitigating circumstances").  If proportionality analysis is
to have any meaning at all, then it must take into
consideration "the totality of the circumstances present"
and not merely count the number of aggravating and
mitigating circumstances.

Youth is a statutory mitigating circumstance in
Florida.  Section 921.141(6)(g).  The sentencing court
failed to take into account the defendant's age in other
than a chronological sense.  Mr. Moore was nineteen when the
crime for which he received the death penalty was committed.
The sentencing court gave this mitigating circumstance only

---

[10]<u>Pope v. State</u>, 679 So.2d 710 (Fla. 1996).

[11]<u>Melton v. State</u>, 638 So.2d 927 (Fla. 1994) and
<u>Consalvo v. State</u>, 21 Fla. L. Weekly S423 (Fla. Oct. 3,
1996).

"slight weight" because "[t]he Defendant has exhibited a criminal maturity beyond his age" (Vol. III, p. 503). Whatever the term "criminal maturity" may mean, its use in dismissing this statutory mitigator must be tempered by the fact that this concept does not take into account lack of maturity and responsible judgment.

During the penalty phase, the court was made aware that Thomas Moore was raised by a single parent (R. 1472); that his father was shot and killed when he was seven (R. 1476); that he was given adult responsibilities at a young age; that he suffered constantly from migraine headaches (R. 1479); and that he was treated as an adult in the criminal justice system when he was 15 (R. 1489). In addition, evidence adduced at trial revealed that Mr. Moore and the victim had begun to share in the victim's moonshine when Mr. Moore was at a young age (R. 1090). This drinking continued up to the time of the crime. This evidence tends to show that Mr. Moore grew up without a father figure and that he was forced to become an "adult" at a much greater pace and in a much abbreviated time period than would be required in ordinary and typical childhood.

The Florida Supreme Court has consistently recognized drug addiction, alcoholism, and other substances which

diminish a defendant's ability to make rational decisions as
powerful mitigation.  Thomas Moore drank moonshine regularly
with the victim (R. 1089-90) and was invited to drink and
did drink moonshine with the victim on the day of this
homicide (R. 1101).  Mr. Moore also smoked marijuana on the
day of the crime (R. 1108).  The sentencing court did not
take these facts into account in sentencing Thomas Moore to
death.

The Florida Supreme Court has held that equally
culpable co-defendants should receive equal punishment and
that when a more culpable co-defendant receives a lesser
sentence, a sentence of death should not be imposed on the
less culpable defendant.

In this case, the jury was instructed that it could
find Mr. Moore guilty of either first degree premeditated
murder or first degree felony murder (R. 1346-48).  However,
the verdict form does not indicate the basis of the jury's
guilty verdict.  If the jury found Mr. Moore guilty of first
degree murder under a felony murder theory, then Mr. Moore
and his co-defendant are equally culpable in the sense that
it cannot be said the jury found, beyond a reasonable doubt,
that Mr. Moore pulled the trigger of the gun that killed the
victim.  It is equally plausible that Mr. Moore's

co-defendant pulled the trigger.  If this is the case, then
Mr. Moore and his co-defendant are equally culpable under
the theory of felony murder.  It is disproportionate,
indeed, for Mr. Moore to be on death row while his
co-defendant walks the streets.

Mr. Moore's co-defendant, Carlos Clemons, initially
plead guilty to second degree murder and attempted armed
robbery with the understanding that he would receive
juvenile sanctions contingent upon testifying truthfully at
Mr. Moore's trial.  However, this plea deal was illegal
because under §39.022(5)(c)(1), a juvenile charged with
violation of a law punishable by life is not eligible to
receive juvenile sanctions.  This plea offer was
subsequently withdrawn, and Mr. Clemons testified at Mr.
Moore's trial.  Following Mr. Moore's trial, Mr. Clemons
plead guilty again, this time to third degree murder and
armed robbery, allowing him to receive juvenile sanctions.
Specifically, Mr. Clemons received commitment to the custody
of the Department of Health and Rehabilitative Services for
an indeterminate term not to exceed Mr. Clemons' nineteenth
birthday with community control after his release.

There is no definitive finding that Mr. Moore, in fact,
pulled the trigger.  Because this fact is essential in

69

justifying the disparate sentences received by Mr. Moore and his co-defendant, the Florida Supreme Court should have considered the co-defendant's sentence in determining whether Mr. Moore's sentence of death is proportional.

The Florida Supreme Court has reversed death sentences on proportionality review in cases involving multiple murder victims.  The circumstances surrounding Mr. Moore's case involve a single victim.  Appellate counsel's deficient performance prejudiced Mr. Moore.

**G.    MR. MOORE WAS DENIED HIS RIGHT TO A FAIR SENTENCING BECAUSE THE JURY INSTRUCTIONS IMPROPERLY SHIFTED THE BURDEN TO MR. MOORE TO PROVE THE APPROPRIATENESS OF A LIFE SENTENCE IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS.  APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE THE CLAIM ON DIRECT APPEAL.**

The jury instructions at Mr. Moore's capital penalty phase required that Mr. Moore prove life was the appropriate sentence, and the jury's and judge's consideration of mitigating evidence was limited to mitigation "sufficient to outweigh" aggravation.  Mr. Moore's jury was instructed to sentence him to death unless he proved: "mitigating circumstances sufficient to outweigh the aggravating circumstances" (R. 1458); "sufficient mitigating circumstances exist to outweigh any aggravating circumstance found to exist" (R. 1543); and "mitigating circumstances . .

70

. that outweigh the aggravating circumstances" (R. 1544).

Mr. Moore's attorney requested the proper standard in a

proposed jury instruction (Vol. III, p. 441).   The motion

was denied (R. 1446).   The jury was never instructed that

they could find death only if the aggravating circumstances

outweighed the mitigating circumstances.   In fact, Mr.

Moore's requests that the penalty phase instructions be

cured were denied (Vol. III, p. 447-469).

**H.    MR. MOORE WAS ABSENT FROM CRITICAL STAGES OF HIS TRIAL
        IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH
        AMENDMENTS TO THE UNITED STATES CONSTITUTION. APPELLATE
        COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISED THIS
        ISSUE ON DIRECT APPEAL.**

During a June 23, 1993, pretrial conference (See Volume

V, p. 24), the trial court mentioned "some discussions on

the record yesterday with counsel" regarding an agreement to

continue Mr. Moore's case:

>        THE COURT:  Thomas Moore is
> Case-No.93-1659.  It's currently set for
> trial on July 12th.  We had some discussions
> on the record yesterday with Counsel -- the
> defendant wasn't present. -- about the
> inability because of discovery to be ready
> for trial by July 12th.  We seemingly, I
> guess agreed to some type of continuance.

Id.  It is obvious, on the face of the record, that Mr.

Moore was absent from this critical stage of the trial.  Mr.

Moore's absence during this critical stage violated his
Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Furthermore, had Mr. Moore been present and fully
advised of the reasons his attorney wanted to continue his
trial, he would have withdrawn his waiver of the right to a
speedy trial.  Mr. Moore had signed a form waiving his right
to a speedy trial.  However, he signed the form on May 11,
1993, based upon totally different reasons than the
"discovery" problems alleged to the trial court on June 22nd
by defense counsel.  For unknown reasons, and without Mr.
Moore's knowledge, defense counsel chose not to file the
waiver until after the June 22nd unreported hearing.

Defense counsel should have objected to the proceeding
in his client's absence but ineffectively failed to do so.
Regardless, defense counsel failed to advise his client of
the reasons he waived speedy trial at the unreported hearing
held on the 22nd, in violation of his duty to involve an
accused in any decision to waive speedy trial rights.

Worse still, defense counsel failed to advise Mr. Moore
of the consequences of waiving his right to a speedy trial
before filing it with the court.  This unnecessary delay put
Mr. Moore's trial on hold for over four months.  During this
time, the State managed to "discover" several witnesses, or

72

"discover" additional testimony from witnesses previously
spoken to.  The new testimony discovered by the State also
included details of confessions Mr. Moore can establish were
false.

Mr. Moore's absence during these critical stages of his
trial also violated his Fifth, Sixth, Eighth, and Fourteenth
Amendment rights.  Appellate counsel's failure to obtain the
complete record, including a transcript of the June 22nd
proceedings, was deficient performance that prejudiced Mr.
Moore.

**I.    MR. MOORE WAS DENIED A PROPER APPEAL FROM HIS
CONVICTION AND SENTENCE OF DEATH IN VIOLATION OF THE
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION DUE TO OMISSIONS IN THE RECORD.
APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO
DISCOVER AND REMEDY THIS OMISSION.**

Transcripts of the June 22, 1993 "on the record"
discussions mentioned by the court during the June 23, 1993
proceeding are not contained in the record on appeal.  This
incomplete record prevented a proper direct appeal to the
Florida Supreme Court, prevented Mr. Moore from properly
pleading his postconviction claims and receiving a proper
review of those claims, and is preventing Mr. Moore from
fully presenting his habeas claims to this Court.
Furthermore, the missing record prevented undersigned

counsel from providing effective assistance in

postconviction.

**Exhaustion of Ground XI in state court:**

1)   **Did you raise Ground XI in the Florida Supreme Court on a direct appeal of your conviction?**  No

2)   **After your conviction did you raise Ground XI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   **a) If your answer is "yes", then state:**

      **i.  Date motion filed:** N/A

      **ii.  Whether you received an evidentiary hearing:** N/A

      **iii. Result:** N/A

      **iv.  Date of Result:** N/A

   **b)  If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

      **i.  If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

      **ii.  Date appeal filed, result of appeal, and date of result:** N/A

3)   **Have you raised ground XI in any other petition, application, or motion filed with the state courts of Florida?** Yes; state habeas petition filed 4/02/01 with the Florida Supreme Court; denied 3/07/02, <u>Moore v. State</u>, 820 So. 2d 199 (Fla.2002); rehearing denied 6/20/02.

GROUND XII

**THE JURY RECEIVED INADEQUATE GUIDANCE
CONCERNING THE AGGRAVATING CIRCUMSTANCES.
FLORIDA'S STATUTE SETTING FORTH THE
AGGRAVATING CIRCUMSTANCES TO BE CONSIDERED IN
A CAPITAL CASE IS FACIALLY VAGUE AND
OVERBROAD IN VIOLATION OF THE EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.**

Mr. Moore's jury did not receive complete and accurate instructions defining the aggravating circumstances in a constitutionally narrow fashion.  The jury was instructed on three aggravating factors.  The jury was not advised on the elements of the aggravating factors which the State had to prove beyond a reasonable doubt.  As a result, the jury was given unbridled discretion to return a death recommendation. Specifically relying upon the tainted death recommendation, the judge sentenced Mr. Moore to death.

At the conclusion of the penalty phase, the trial court instructed Mr. Moore's jury on three (3) aggravating factors.  Those instructions were:

> 1.   The defendant has previously been convicted of another capital offense or of a felony involving the use or threat of violence to some person.  For the purposes of this case the crimes of aggravated battery and armed robbery are felonies involving the use or threat of violence to another person.

> 2.   The crime for which the defendant is to be sentenced was committed for the purpose of

75

avoiding or preventing a lawful arrest or
effecting an escape from custody.

    3.    The crime for which the defendant is to
be sentenced was committed for financial gain.

(T. 1544). In imposing a death sentence the trial court
found the presence of all three aggravating factors (T.
1583-4).

A Florida penalty phase jury is a co-sentencer under
Florida law and therefore must receive constitutionally
adequate instructions on aggravating circumstances. The
jury was instructed "that the crime for which the defendant
is to be sentenced was committed for financial gain" (T.
1505). However, Mr. Moore's jury received no limiting
instructions on the aggravator of "pecuniary gain."

This was Eighth Amendment error and it was not harmless
beyond a reasonable doubt, especially considering that the
jury was instructed on, and the Court found, that the murder
was committed for the purpose of avoiding arrest.
Furthermore, it was improper for the jury to be instructed
on, and the Court to find, both the pecuniary gain
aggravator and the avoid arrest aggravator where they are
premised upon different primary motives for the homicide.

**Exhaustion of Ground XII in state court:**

76

1) **Did you raise Ground XII in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction did you raise Ground XII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

    a) **If your answer is "yes", then state:**

        i. **Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99 and 4/06/00.

        ii. **Whether you received an evidentiary hearing:** No

        iii. **Result:** Summary denial

        iv. **Date of Result:** 8/04/00; rehearing denied 9/08/00.

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

    i. **If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

    ii. **Date appeal filed, result of appeal, and date of result:** Affirmed 3-07-02, <u>Moore v. State</u>, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02.

3) **Have you raised ground XII in any other petition, application, or motion filed with the state courts of Florida?** No

### GROUND XIII

**FLORIDA STATUTE § 921.141 VIOLATES <u>RING V. ARIZONA</u>.**

Section 921.141, Fla. Stat., violates <u>Ring v. Arizona</u>, 122 S. Ct. 2428 (2002), because 1) death is not authorized by a finding of guilt of first-degree murder, 2) jury findings are not unanimous, 3) the jury is not required to find "sufficient" aggravators beyond a reasonable doubt, §921.141(2), Fla. Stat., and 4) the jury is not required to find insufficient mitigators to outweigh aggravators beyond a reasonable doubt, §921.141(3), Fla. Stat. <u>State v. Whitfield</u>, 107 S.W.3d 253, 258-61 (Mo. 2003). Other <u>Ring</u> violations occurred because 1) the jurors' sentencing role was denigrated, (*see* R. 199, 1457, 1543, 1544, 1545, 1546, 1547, 1548), 2) the elements of capital murder were not charged in the indictment, <u>Jones v. United States</u>, 526 U.S. 227 (1999), and 3) Mr. Moore was required to proved that mitigators outweighed aggravators. <u>Mullaney v. Wilbur</u>, 421 U.S. 684, 698 (1975). <u>Ring</u> applies to Mr. Moore under <u>Fiore v. White</u>, 531 U.S. 225, 226 (2001).

**Exhaustion of Ground XIII in state courts:**

1) **Did you raise Ground XIII in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground XIII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

   a) **If your answer is "yes", then state:**

78

    **i.  Date motion filed:** 7/19/02

    **ii. Whether you received an evidentiary hearing:** No

    **iii. Result:** Summary denial

    **iv. Date of Result:** 12/30/02; rehearing denied 2/25/03

**b)  If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

    **i.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

    **ii. Date appeal filed, result of appeal, date of result:** Notice of appeal filed 3/20/03; affirmed 6/7/04, summary order, <u>Moore v. State</u>, FSC Case No. SC03-489; rehearing denied 10/8/04.

**3)  Have you raised Ground XIII in any other petition, application, or motion filed in the state courts of Florida?** No

## GROUND XIV

**THE STATE INTENTIONALLY PRESENTED FALSE EVIDENCE AND ENGAGED IN FALSE ARGUMENT AT MR. MOORE'S TRIAL AND FAILED TO REVEAL ITS DECEPTION IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

Randy Jackson was called as a witness by the State at Mr. Moore's trial.  The State elicited testimony from Mr. Jackson in which he claimed that on or about January 29, 1993, Mr. Moore told Mr. Jackson while they were

79

incarcerated together in the county jail that he, Mr. Moore, had killed Mr. Parrish (R. 965-67). According to Mr. Jackson, he was put in county jail on January 2, 1993, and remained there while he served a four month sentence (R. 964). In cross-examination, the defense elicited testimony from Mr. Jackson regarding an altercation that he had with Mr. Moore in which Mr. Jackson claimed that Mr. Moore hit him with a hammer (R. 971). This testimony was elicited to demonstrate animosity between Mr. Moore and Mr. Jackson. Regarding this altercation, Mr. Jackson claimed he did not remember that he had advised the police that Mr. Moore had hit him with a gun and that Mr. Moore had shot at him with a gun (R. 972-73). On re-direct of Jackson, the State elicited the following: "Do you know a man named Timothy Brinkley?" "Yes, ma'am." "Do you remember you and Mr. Moore having contact with Timothy Brinkley after he hit you in the head with the hammer?" "Yes, ma'am." (R. 980).

However, the evidence presented by the State that the "hammer" incident happened after the "Timothy Brinkley" incident was false and the State knew it was false. The State used this false evidence to argue that whatever animosity had existed was merely passing. However, Mr. Jackson was arrested on March 22, 1991, for a battery upon

80

Timothy Bunkley that occurred on January 30, 1991.  Mr. Moore had been previously charged with battery of Timothy Bunkley on February 26, 1991.  At that time, Mr. Moore was already in jail pursuant to an arrest and booking report, dated February 11, 1991, that reflects an arrest on that date on the basis of Randy Jackson's allegation that on February 10, 1991, Mr. Moore "struck victim over the head with a pistol.  After a scuffle the victim fled at which time several shots were fired."  Thus the incident involving Bunkley occurred before the February 10th incident.

During the State's cross-examination of Mr. Moore, the State elicited the following: "Isn't it true, sir, that approximately two weeks after you hit Randy Jackson on the head you and Randy Jackson got arrested for committing a crime together?" "I don't know how long it was.  It was about in that time frame." "If I showed you the police report would that help?" "Yes." "Does that sound about right to you (tendering)" "Yes.  I just mentioned that, you know, it sounds about that, that sounds about that time frame."  (R. 1140).

In the State's closing, the jury was intentionally deceived: "you heard that two weeks after that incident of being hit in the head the two of them were back consorting

81

together, getting arrested for something else" ( R. 1233-34).  In the State's rebuttal closing, the deception of the jury continued: "this stuff about Randy and him not being friends, - - - even after them getting into this little altercation where Randy Jackson took the gun or a hammer, whatever, - - - they still went out together and got arrested together.  They are still friends." ( R. 1276). The State knowingly and intentionally deceived the jury. Mr. Moore and Mr. Jackson were not arrested together.  They were arrested separately, nearly a month apart, for actions that occurred well in advance of the "hammer" incident.

Due process requires a prosecutor to stand up and correct misrepresentations made by a State's witness.  Here, the State never stood up and acknowledged the presentation of false testimony nor the submission of false and misleading argument to Mr. Moore's jury.  A criminal defendant has the right to assume that a prosecutor would not engage in such prohibited conduct.  Accordingly, a criminal defendant's reliance upon such a right cannot erect a procedural bar.  A criminal defendant must be afforded an opportunity to present his constitutional claim once he discovers that the prosecutor presented false and/or misleading evidence and/or argument.

Where it is shown that the State intentionally misled the defense and/or the trier of fact, the due process violation warrants a reversal unless the State proves that the violation was harmless beyond a reasonable doubt.  Here, the prosecutor's presentation of false and/or misleading evidence and/or argument to support Mr. Jackson's credibility cannot be harmless beyond a reasonable doubt. Mr. Jackson claimed that Mr. Moore confessed this crime to him.  To rebut the defense's claim that Mr. Jackson carried a personal grudge against Mr. Moore that gave him a motive to lie, the State resorted to deliberate deception.  It cannot be said that there is no reasonable doubt that a conviction would have resulted without Mr. Jackson's testimony.  But for the State's deliberate deception the jury may have well decided to disregard Mr. Jackson's testimony.  Further, the very fact that the State was forced to resort to such deception is evidence of the significance that the State attached to Mr. Jackson's testimony.  The State's decision to engage in such conduct undermines its credibility and the reliability of its entire case.  Federal habeas relief is warranted.

**Exhaustion of Ground XIV in state court:**

1)   **Did you raise Ground XIV in the Florida Supreme Court on a direct appeal of your conviction?**  No

2)   **After your conviction did you raise Ground XIV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

  a) **If your answer is "yes", then state:**

   i.   **Date motion filed:** 1/27/06

   ii.  **Whether you received an evidentiary hearing:** The motion is pending in state circuit court.

   iii. **Result:** N/A

   iv.  **Date of Result:** N/A

  b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

   i.   **If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

   ii.  **Date appeal filed, result of appeal, and date of result:** N/A

3)   **Have you raised ground XIV in any other petition, application, or motion filed with the state courts of Florida?** No.

## GROUND XV

**MR. MOORE WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AS WELL AS HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE EITHER THE STATE FAILED TO DISCLOSE EVIDENCE WHICH WAS MATERIAL AND EXCULPATORY IN NATURE AND/OR**

84

**PRESENTED MISLEADING EVIDENCE AND/OR DEFENSE COUNSEL UNREASONABLY FAILED TO DISCOVER AND PRESENT EXCULPATORY EVIDENCE, AND/OR NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT AN INNOCENT MR. MOORE WAS CONVICTED UPON THE BASIS OF FALSE EVIDENCE AND ARGUMENT.**

On the day of Mr. Parrish's death, Vincent Gaines and Carlos Clemons were in possession of a chrome plated .38. They chased Little Terry around Grand Park with the gun. They had pulled this gun on others before the day of the murder.

Recently, undersigned counsel learned that Carlos Clemons has made inculpatory statements to an acquaintance with whom he has been incarcerated that Thomas Moore was not involved in the murder. As soon as undersigned counsel learned that Mr. Clemons had made statements he followed up on the information that he had received. In the follow up investigation, various individuals were contacted and individuals that those individuals suggested were contacted. As a result, undersigned counsel has learned that Mr. Clemons has bragged about getting away with murder. Mr. Clemons has indicated that he, Carlos Clemons, was the one who killed Mr. Parrish and that Mr. Moore was not present. These statements made to others constitute admissions

85

Case 3:06-cv-00127-MMH   Document 1-2   Filed 02/10/06   Page 41 of 47 PageID 41

against penal interest and/or impeachment of Mr. Clemons'
trial testimony against Mr. Moore.

During this follow-up investigation, individuals were
discovered who had been incarcerated with Vincent Gaines in
addition to Carlos Clemons.  These individuals also advised
that Mr. Gaines has told others that Mr. Moore was set up to
take the fall for Mr. Gaines and Mr. Clemons.  According to
statements attributed to Mr. Gaines, he and Mr. Clemons were
working together to put all the blame on Mr. Moore.  Mr.
Gaines bragged to others about his involvement with Mr.
Clemons and their getting away with murder and getting such
a light sentence by blaming Mr. Moore.  When Gaines was
confronted with the statements made by Clemons, he did
acknowledge that Clemons had stolen the .38 out of a Black
Mustang approximately three weeks before the murder.  These
inculpatory statements made to others constitute admission
against penal interest and/or impeachment of Mr. Gaines'
trial testimony against Mr. Moore.

In the followup investigation, undersigned counsel
learned that Audrey McCray was threatened by law enforcement
with the loss of custody of her newborn son if she did not
testify for the State against Mr. Moore.  Out of fear, she
testified the way that she did; out of fear, she did not

86

tell any of Mr. Moore's attorneys about these threats. Only now has Ms. McCray disclosed this information for the first time. When Chris Shorter told her about clothes that Mr. Moore supposedly gave him, she did not believe it was true. The State did not disclose that it had threatened Ms. McCray and/or that she feared for the loss of custody of her son. This information was withheld in violation of due process. Where exculpatory evidence is not timely disclosed, a new trial is warranted where the non-disclosure undermines confidence in the reliability of the jury's verdict rendered without the benefit of the exculpatory evidence.

To the extent that the State asserts that trial counsel was not diligent in seeking to obtain the exculpatory evidence, then trial counsel rendered ineffective assistance of counsel that prejudiced Mr. Moore in that counsel permitted an innocent Mr. Moore to be convicted of a crime that he did not commit.

**Exhaustion of Ground XV in state court:**

1) **Did you raise Ground XV in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction did you raise Ground XV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   **a) If your answer is "yes", then state:**

87

    i.  **Date motion filed: 1/27/06**

    ii.  **Whether you received an evidentiary
hearing:** The motion is pending in state circuit
court.

    iii. **Result:** N/A

    iv.  **Date of Result:** N/A

  **b)  If your Rule 3.850 Motion was denied, did you file
an appeal of that denial with the Supreme Court of
Florida?** N/A

    i.  **If you failed to appeal denial of your Rule
3.850 motion, explain briefly:** N/A

    ii.  **Date appeal filed, result of appeal, and date
of result:** N/A

**3)  Have you raised ground XV in any other petition,
application, or motion filed with the state courts of
Florida?** No.

### GROUND XVI

**MR. MOORE'S CONVICTION STANDS IN VIOLATION OF
DUE PROCESS GIVEN THAT NEW EVIDENCE
ESTABLISHES THAT HE IS ACTUALLY INNOCENT OF
THE CRIME.**

The conviction of an innocent man and the imposition of

a death sentence violates the Eighth and Fourteenth

Amendments to the United States Constitution.  Considering

that the State's main witnesses have made statements that

they committed the murder and put the blame on Mr. Moore in

88

order to get a sweet deal from the State, Mr. Moore can make

a compelling case of actual innocence.

   In considering Mr. Clemons and Mr. Gaines' new

statements (as set forth in Ground XV), the evidence

provides reasonable doubt as to Mr. Moore's conviction and

meets the "no reasonable juror test".

Mr. Moore presents herein a colorable claim of actual

innocence.  Habeas relief is warranted.

**Exhaustion of Ground XVI in state court:**

1) **Did you raise Ground XVI in the Florida Supreme Court on a direct appeal of your conviction?**  No

2) **After your conviction did you raise Ground XVI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** 1/27/06

      ii. **Whether you received an evidentiary hearing:** The motion is pending in state circuit court.

      iii. **Result:** N/A

      iv. **Date of Result:** N/A

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

      i. **If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

89

       ii.  **Date appeal filed, result of appeal, and date of result:** N/A

3)  **Have you raised ground XV in any other petition, application, or motion filed with the state courts of Florida?** No.

15.  **Have you previously filed any petitions, applications, or motions with respect to your judgment and conviction in any federal court?**  No.

16.  **If your answer to 15 was "yes," give the following information: 1) Name of court; 2) Nature of proceedings and date action filed; 3) Grounds raised.**  N/A.

17.  **Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?** No.

18.  **If you have previously filed a petition for writ of habeas corpus related to this conviction and sentence in federal court, you must first move in the appropriate court of appeal for an order authorizing the federal district court to consider the application. Have you filed such a motion?**  N/A.

19.  **Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:**

    a)  **At preliminary hearing:**

       Charles Coffer, assistant public defender, Fourth Judicial Circuit.

    b)  **At arraignment and plea:**

       Same.

    c)  **At trial:**

90

Same.

**d)  At sentencing:**

Same.

**e)  On appeal:**

Bill Salmon, Gainesville, FL.

**f)  In any post-conviction proceeding:**

Capital Collateral Representative kna/ Capital Collateral Regional Counsel; Martin J. McClain, Registry counsel.

**g)  On appeal from any adverse ruling in post-conviction proceeding:**

Capital Collateral Representative kna/ Capital Collateral Regional Counsel.

**20.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** Yes.

**21.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No, death.

**a)  If so, give name and location of court which imposed sentence to be served in the future:** N/A.

**b)  Date and length of sentence to be served in the future:** N/A.

**c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?** N/A.

91

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Motion has been furnished by United States mail, first-class postage prepaid, to all counsel of record on February $\underline{10}$, 2006.

MARTIN J. MCCLAIN
Attorney at Law
Florida Bar No. 0754773
141 NE 30th Street
Wilton Manors, FL 33334
(305) 984-8344

COUNSEL FOR PETITIONER

Copies furnished to:

Meredith Charbula
Assistant Attorney General
Office of the Attorney General
The Capitol PL01
Tallahassee, FL 32399-1050