PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. 2254

Prisoner's Name:          Thomas James Moore

Prisoner's Number:        116335

Place of Confinement:     Union Correctional Institution
                          Raiford, Florida


IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THOMAS JAMES MOORE,

     Petitioner,

v.

MICHAEL D. CREWS,[1]                    CASE NO.
     Secretary, Florida              3:06-cv-127-J-34
     Department of Corrections,

     Respondent,

and

PAM BONDI,
     Attorney General,

     Additional Respondent.


_____/


<u>AMENDED PETITION</u>

<u>Introduction</u>

---

[1]Both the Secretary for the Florida Department of
Corrections and the Attorney General have changed since Mr. Moore
filed his initial petition before this Court on February 10,
2006.  Previously, the defendants were listed as James v. Crosby,
Jr., and Charles J. Crist, Jr., respectively.  (Doc. 1, at 1).

1

Mr. Moore initially filed his habeas petition in this Court on February 10, 2006. At that time, he also filed a motion to hold proceedings in abeyance while he exhausted constitutional claims that were contained in a Rule 3.851 motion that he had filed in state court on January 27, 2006, on the basis of newly discovered evidence. On April 12, 2006, this Court granted the motion and held the above-entitled matter in abeyance pending exhaustion.

Thereafter, an evidentiary hearing was ordered on Mr. Moore's Rule 3.851 motion in state circuit court. The evidentiary hearing was conducted on March 22, 2011. After the state circuit court entered an order denying relief in early 2012, Mr. Moore appealed to the Florida Supreme Court.[2] On November 27, 2013, the Florida Supreme Court issued an opinion affirming the denial of Rule 3.851 relief. *Moore v. State*, 132 So.3d 718 (Fla. 2013). Mr. Moore filed a timely motion for rehearing which was denied on February 27, 2014. The Florida Supreme Court issued its mandate on March 17, 2014.

On April 8, 2014, Mr. Moore filed a motion to reopen the

---

[2]After the evidentiary hearing, an issue arose regarding reimbursement of court-appointed registry counsel of investigative fees that exceeded the statutory cap. When the circuit court refused to order reimbursement for investigative fees that exceeded the statutory cap, an appeal was taken to the Florida Supreme Court. In the course of its opinion reversing and ordering reimbursement of the investigative fees, the Florida Supreme Court discussed the facts of Mr. Moore's case at length. *McClain v. Atwater*, 110 So.3d 892 (Fla. 2013).

above-entitled matter and sought leave to prepare and file an amended habeas petition. On July 17, 2014, this Court granted the motion and directed the amended petition to be filed on or before September 17, 2014.  Pursuant to this Court's directive, this amended petition is filed at this time.

<u>STATE COURT HISTORY REGARDING THE JUDGMENT AND SENTENCE</u>

1.  **Name and location of court which entered the judgment of conviction under attack and state court case number(s):**

    Circuit Court of the Fourth Judicial Circuit, Duval County, Florida, Case No. 93-1659-CF.

2.  **Date of judgments and convictions:**

    Found guilty on October 29, 1993; jury recommendation of death on November 3, 1993; sentenced by judge on December 2, 1993.

3.  **Length of sentence:**

    Sentence of death; two life sentences; one thirty (30) year sentence; and one ten (10) year sentence.

4.  **Sentencing judge:**

    Honorable John D. Southwood.

5.  **Nature of offense or offenses for which you were convicted:**

    First-degree murder, armed burglary, arson of a dwelling; attempted robbery with a firearm, and conspiracy to commit robbery with a firearm.

6.  **What was your plea?**

    Not guilty.

7.  **Type of trial:**

    Jury trial.

**8.   Did you testify at trial?**

Yes.

**9.   Did you appeal from the judgment of the conviction?**

Yes.

**10.   If you did appeal, answer the following:**

A)   Name of court: Florida Supreme Court.

B)   Result: Affirmed.

C)   Date of result: 10/02/07, *Moore v. State*, 701 So.2d 545 (Fla. 1997), rehearing denied on 11/18/97.

**If you filed a second appeal or filed a petition for certiorari in the Florida Supreme Court or the United Supreme Court, give details:**

Certiorari was denied by the United States Supreme Court on April 20, 1998. *Moore v. Florida*, 523 U.S. 1083 (1998).

**11.   Did you file any postconviction motions under either Florida Rule of Criminal Procedure 3.800 or 3.850 with the state trial court or any other postconviction motions or petitions for writ of habeas corpus with the state trial court or state appellate court to this judgment and conviction?**

Yes.

**12.   If you did file any matters within the realm of question 11, answer the following as to each motion or petition.**

**A) The type of motion/petition filed; B) Date motion/petition filed; C) Name of court; D) Result; E) Date of Result**

1. Motion for Post Conviction Relief #1

A)   Rule 3.850 Motion.

B)   3/26/99, amended on 6/22/99, 9/20/99, and 4/06/00.

C)   Circuit Court of the Fourth Judicial Circuit, Duval

4

County.

D)    Summarily denied, with circuit court striking 4/06/00 amendment.

E)    8/04/00; rehearing denied 9/08/00.

2.    State Habeas Writ #1

A)    Petition for writ of habeas corpus

B)    4/02/01

C)    Florida Supreme Court

D)    Denied

E)    3/07/02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02.

3.    Motion for Postconviction Relief #2

A)    Rule 3.850 Motion

B)    7/19/02

C)    Circuit Court of the Fourth Judicial Circuit, Duval County

D)    Denied

E)    12/30/02; rehearing denied 2/25/03.

4.    State writ #2

A)    Petition for writ of habeas corpus

B)    5/13/04

C)    Florida Supreme Court

D)    Denied

E)    12/16/04, summary order of denial, *Moore v. Crosby*, FSC Case No. SC04-834; rehearing denied 3/21/05.

5.    State writ #3

A)   Petition for writ of habeas corpus

B)   3/23/05

C)   Florida Supreme Court

D)   Denied, rehearing pending

E)   10/18/05, summary order of denial, *Moore v. Crosby*, FSC Case No. 05-498; rehearing denied 2/13/06.

6.   Motion for Postconviction Relief #3

A)   Rule 3.850 Motion

B)   1/27/06; amended 7/31/08, 8/14/09, 9/26/09, 4/06/11

C)   Circuit Court of the Fourth Judicial Circuit, Duval County

D)   Denied 1/04/12

E)   1/22/12; rehearing denied 2/02/12.

13.   **If your motion or petition described in paragraph 12 was denied, did you file an appeal of that denial with the appropriate state appellate court?**

Yes

**As to each motion or petition indicate:**

   **A)Name of court where appeal filed; B) Date appeal filed; C) Result; D) Date of Result**

1.   Motion for Postconviction Relief #1

A)   Florida Supreme Court

B)   Notice of appeal filed.

C)   Affirmed

D)   3/07/02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02.

2.   Motion for Postconviction Relief #2

A)   Florida Supreme Court

B)   Notice of appeal filed on 3/20/03.

C)   Affirmed

D)   6/7/04, summary order, *Moore v. State*, FSC Case No. SC03-489; rehearing denied 10/8/04.

3.   Motion for Postconviction Relief #3

A)   Florida Supreme Court

B)   Notice of appeal filed on 3/01/12

C)   Affirmed

D)   11/27/13, *Moore v. State*, 132 So.3d 718 (Fla. 2013); rehearing denied 2/27/14.

**14. State concisely every ground on which you claim you are being held unlawfully.  Summarize briefly the facts supporting each ground.**

## STATEMENT OF EXHAUSTION

In accordance with this Court's order dated November 4, 2004, Petitioner herein describes how each ground in the federal petition was exhausted in the state court:

Ground I was raised in Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So. 2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So. 2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584

7

(2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot."

Ground II was raised in Mr. Moore's direct appeal. *Moore v. State*, 701 So.2d 545 (Fla. 1997). Ground II was also raised in Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So. 2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So. 2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot."

Ground III was raised in Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So. 2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So. 2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot."

Ground IV was raised as Claim IV of Mr. Moore's second

8

petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So. 2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So. 2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot." After the court denied the petition, but while a motion for rehearing was pending, the Supreme Court issued *Roper v. Simmons*. Mr. Moore immediately filed a motion seeking an opportunity to submit briefing regarding the impact of *Roper v. Simmons* on Claim IV. The Florida Supreme Court denied the motion "without prejudice to the issue being raised in a separate proceeding." *Moore v. Crosby*, Order dated 3/21/05, Case No. SC04-834. Mr. Moore then raised this claim in his third habeas corpus petition filed in the Florida Supreme Court on March 23, 2005. Though that petition was denied on October 18, 2005; rehearing was denied on February 13, 2006.

Ground V was raised in Mr. Moore's direct appeal. *Moore v. State*, 701 So.2d 545 (Fla. 1997). Ground V was also raised in Mr. Moore's first habeas petition filed in the Florida Supreme Court on April 2, 2001. The petition was denied on March 7, 2002, *Moore*

9

*v. State*, 820 So. 2d 199 (Fla. 2002); rehearing was denied on June 20, 2002.

Ground VI was raised in Mr. Moore's initial Rule 3.850 motion, which was filed on March 26, 1999, and amended on June 22, 1999, September 20, 1999, and April 6, 2000.  The circuit court summarily denied the motion on August 4, 2000, and denied rehearing on September 8, 2000.  On appeal, the Florida Supreme Court affirmed.  *Moore v. State*, 820 So. 2d 199 (Fla. 2002).

Ground VII was raised in Mr. Moore's initial Rule 3.850 motion, which was filed on March 26, 1999, and amended on June 22, 1999, September 20, 1999, and April 6, 2000. The circuit court summarily denied the motion on August 4, 2000, and denied rehearing on September 8, 2000. On appeal, the Florida Supreme Court affirmed. *Moore v. State*, 820 So.2d 199 (Fla. 2002).

Ground VIII, as set forth in the original petition was raised in Mr. Moore's initial Rule 3.850 motion, which was filed on March 26, 1999, and amended on June 22, 1999, September 20, 1999, and April 6, 2000. The circuit court summarily denied the motion on August 4, 2000, and denied rehearing on September 8, 2000. On appeal, the Florida Supreme Court affirmed. *Moore v. State*, 820 So.2d 199 (Fla. 2002). However, the amended version of the claim was not presented to the state in Mr. Moore's initial Rule 3.850 motion, but was presented in the raised in Mr. Moore's third Rule 3.850 motion filed on January 27, 2006. An evidentiary

10

hearing was conducted on certain aspect of the factual allegations of the claim relating to co-defendants, Clemons and Gaines, and statements attributed to them individuals jailed with them in 1993, while the remainder of the claim concerning Randy Jackson was summarily denied and no evidentiary development was permitted. On appeal, the Florida Supreme Court affirmed on November 27, 2013. *Moore v. State*, 132 So.3d at 729-34.

Ground IX was raised in Mr. Moore's initial Rule 3.850 motion, which was filed on March 26, 1999, and amended on June 22, 1999, September 20, 1999, and April 6, 2000. The circuit court summarily denied the motion on August 4, 2000, and denied rehearing on September 8, 2000. On appeal, the Florida Supreme Court affirmed. *Moore v. State*, 820 So.2d 199 (Fla. 2002).

Ground X was raised in Mr. Moore's direct appeal, and found to be harmless error. *Moore v. State*, 701 So.2d 545 (Fla. 1997).

Ground XI was raised in Mr. Moore's initial state habeas petition, which was filed on April 2, 2001, and denied on March 7, 2002. *Moore v. State*, 820 So. 2d 199 (Fla.2002).

Ground XII was raised in Mr. Moore's initial Rule 3.850 motion, which was filed on March 26, 1999, and amended on June 22, 1999, September 20, 1999, and April 6, 2000. The circuit court summarily denied the motion on August 4, 2000, and denied rehearing on September 8, 2000. On appeal, the Florida Supreme Court affirmed. *Moore v. State*, 820 So.2d 199 (Fla. 2002).

Ground XIII was raised in Mr. Moore's second Rule 3.850 motion, which was filed on July 19, 2002, and was summarily denied on December 30, 2002. On appeal, the Florida Supreme Court affirmed on June 7, 2004, in a summary order. *Moore v. State*, FSC Case No. SC03-489.

Ground XIV as to Randy Jackson was raised in Mr. Moore's third Rule 3.850 motion, which was filed on January 27, 2006. As to the portion of the claim relating Randy Jackson, it was denied by the state circuit on the basis of Mr. Moore's first collateral counsel's failure to raise the claim in the first motion to vacate. As to the Randy Jackson portion of the claim, the Florida Supreme Court affirmed on appeal saying: "Neither trial counsel nor initial postconviction counsel raised this issue." *Moore v. State*, 132 So.3d at 724. It also held that "this Court has not recognized a claim of ineffective assistance of postconviction counsel." *Id.* As to the portion of this claim relating to Carlos Clemons and Vincent Gaines, the claim was presented to the state courts in the amended Rule 3.850 motion filed on or about April 6, 2011, and was based upon the testimony and evidence the State presented at the March 22, 2011, evidentiary hearing. Though the circuit court allowed the amendment to the Rule 3.850 motion, it denied the portions of this claim relating to Mr. Clemons and Mr. Gaines without granting Mr. Moore an evidentiary hearing. On appeal on November 27, 2013, the Florida Supreme Court affirmed

12

the denial of the claim without an evidentiary hearing finding that Mr. Moore failed to prove the claim even though an evidentiary hearing was not granted on the claim first pled on or about April 6, 2011.

Ground XV was raised in Mr. Moore's third Rule 3.850 motion, which was filed on January 27, 2006. An evidentiary hearing was conducted on certain aspects of the *Brady/Giglio* components of the claim relating to co-defendants, Clemons and Gaines. Other portions of the claim that related to Clemons and Gaines which were pled in an amended motion to vacate on or about April 6, 2011 and were premised upon the testimony and evidence the State presented at the March 22, 2011, evidentiary hearing, were denied without evidentiary development being permitted. Finally, the portions of the *Brady/Giglio* this claim that related to other witnesses was summarily denied without an evidentiary hearing; in fact, Mr. Moore was precluded from calling witnesses as to these aspects of the claim. On appeal, the Florida Supreme Court affirmed as to the various aspects of this claim and the circuit court's rulings. *Moore v. State*, 132 So.3d at 729-34.

Ground XVI was raised in Mr. Moore's third Rule 3.850 motion, which was filed on January 27, 2006. An evidentiary hearing was conducted in state court, and the circuit court denied relief. On appeal, the Florida Supreme Court affirmed. *Moore v. State*, 132 So.3d at 733.

13

## BRIEF STATEMENT OF UNDERLYING FACTS

On the afternoon of Thursday, January 21, 1993, Johnny Parrish's house in Jacksonville, Florida, was discovered ablaze. When the fire was extinguished, Mr. Parrish's body was found inside. He had been shot and killed before the fire began.

Petitioner, Thomas Moore, had been friends with Mr. Parrish, who was his neighbor.[3] Following the discovery of Mr. Parrish's body, on Friday, January 22nd, Mr. Moore tipped off the police that he had seen Carlos Clemons[4] and Vincent Gaines[5] hanging out near Mr. Parrish's house shortly before the homicide. (T. 1114).[6]

_____

[3]In January of 1993, Mr. Moore was nineteen-years-old (T. 1468).Mr. Moore was born April 20, 1973.

[4]Mr. Clemons's date of birth is May 6, 1979 (3PC-R. 856). Thus, at the time of the homicide in January of 1993, he was a little over three months short of his 14th birthday.

[5]Mr. Gaines's date of birth is March 14, 1976 (3PC-R. 868). Thus, at the time of the homicide in January of 1993, he was a little over two months shy of his 17th birthday.

[6]According to the stipulated evidence at trial, Mr. Moore placed a call to police at 4:00 PM on January 22, 1993. Det. O'Steen returned the call at 9:00 PM that same day and spoke with Mr. Moore. According to Det. O'Steen's note, Mr. Moore advised that he had been with a number of individuals drinking moonshine outside Mr. Parrish's house (Mr. Parrish was known to make and sell moonshine). Mr. Clemons and Mr. Gaines (aka "Slim" according to Det. O'Steen's note) were among those who were outside Mr. Parrish's house. When everyone else left, Mr. Clemons and Mr. Gaines went across the street from Mr. Parrish's house. About 30 minutes later, Mr. Parrish's house was on fire (T. 1155-56).
Detective Conn, who was the lead detective on the case, left town at around noon on Friday, January 22, 1993 (T. 1154). In her absence, Det. O'Steen returned Mr. Moore's call (T. 1155). Det. Conn found Det. O'Steen's note regarding his conversation with Mr. Moore when she returned the following Monday morning (T.

14

According to Mr. Moore, he had spoken to Mr. Parrish that day and warned him about Mr. Clemons and Mr. Gaines:

> A:   I said, 'Them there boys, they have got a gun because they are - - there were chasing Little Terry earlier today.'  And Michael Dean said, 'Yeah, they sure do.'  So, Mr. Parrish say, 'Well, they had better not come around here because I have got one too.'

(T. 1104). When law enforcement followed up on Mr. Moore's tip, Carlos Clemons and Vincent Gaines turned the tables on Mr. Moore; they claimed that they were assisting Mr. Moore rob Mr. Parrish when he (Moore) shot and killed Mr. Parrish.  Both Mr. Clemons and Mr. Gaines were arrested and housed in the juvenile pod of the Duval County Jail.

On February 18, 1993, Mr. Moore was indicted on six counts.[7] His trial began on October 25, 1993, and he was found guilty of

---

1154-55). She interviewed Mr. Clemons on January 29, 1993, seven days after Mr. Moore's phone call. On January 29th, Det. Conn took Mr. Clemons out of school and transported him to the police station, where she read him his *Miranda* rights and gave him a statement at about 4:00 PM (T. 927-30, 952).

After obtaining a statement from Mr. Clemons, the police arrested Mr. Moore (T. 943-44). Mr. Moore's arrest was broadcast on the evening news (T. 944). When Mr. Gaines was located and advised of his rights on January 30, 1993, he mentioned that he had seen the news report regarding Mr. Moore's arrest (T. 938-39, 943-45). Initially, Mr. Gaines "denied any knowledge of Mr. Parrish's death and any involvement with Mr. Parrish's death." (T. 952). After he was advised that the police had obtained a statement from Mr. Clemons and that Mr. Clemons had stated that Mr. Gaines's "involvement was standing out on the corner" (T. 955), Mr. Gaines provided a statement "that he only stood on the corner, that he heard Carlos [Clemons] and Thomas [Moore] were going to get money from the old man." (T. 955).

[7]The sixth count, possession of a firearm by a convicted felon was not submitted to the jury (R. 428-32).

first-degree murder, attempted armed robbery, conspiracy to commit robbery, armed burglary, and arson on October 29, 1993 (T. 1378-82). Mr. Moore's trial was a credibility battle between Carlos Clemons and Vincent Gaines on one hand and Thomas Moore, who testified and swore to his own innocence,[8] on the other.

---

[8]The State also called Randy Jackson and Chris Shorter in an effort to impeach Mr. Moore's testimony while also bolstering the credibility of Clemons and Gaines.

Mr. Jackson, who had felony convictions for crimes involving dishonesty, testified that while he was incarcerated in the Duval County jail in early 1993, he encountered Mr. Moore who told him that he had killed Mr. Parrish (T. 963-67). But, he did not tell law enforcement about this alleged confession until a week and a half before he gave his testimony at Mr. Moore's trial, eight months later (T. 968). He also claimed that he had no grudge against Mr. Moore even though in February of 1991, he had reported to the police that on February 10, 1991, Mr. Moore "struck [him] over the head with a pistol. After a scuffle [Mr. Jackson] fled at which time several shots were fired." (T. 973-77; 3PC-R. 8). As a result, of Mr. Jackson's February 10, 1991, statements to the police regarding Jackson's claim Mr. Moore assaulted, Mr. Moore was arrested on February 11, 1991. On March 15, 1991, the charges based upon Mr. Jackson's allegations were dropped, as reflected in the online docket of the Duval County Clerk of Court. *See State v. Moore*, Case No. 91-2718.

At the 2011 evidentiary hearing, Mr. Moore called private investigator, Dan Ashton to testify regarding his contact with Mr. Jackson (PC-R. 827). When a hearsay objection was sustained, Mr. Ashton testified in a proffer that Mr. Jackson had told him that "he wanted to be paid for his testimony, that he was previously paid for his testimony by the State, that his brother and father were also paid for their testimony, and that if I showed him the money he would tell me what I wanted to know." (3PC-R. 832). During the cross of Mr. Ashton and not as a part of Mr. Moore's proffer, the State chose to ask Mr. Ashton "who on behalf of the State paid Randy Jackson?" (3PC-R. 833). The State elicited testimony from Mr. Ashton that in fact Mr. Jackson had not identified who paid him, he had simply "said they paid me, they paid me every time I came to court. And I said who is 'they'"... If I could have gotten a name from him, I clearly would have." (R. 833-34).

Mr. Shorter, who was a close-friend-almost-family to Mr.

Both Clemons and Gaines were charged as Mr. Moore's co-defendants in the murder of Mr. Parrish.[9] A penalty phase proceeding was conducted on November 3, 1993 (T. 1386). A its conclusion, the jury recommended death by a 9-3 vote (T. 1553). On December 2, 1993, Mr. Moore was sentenced to death.[10] (T. 1580-82).

---

Clemons and friends with Mr. Gaines, had a felony conviction and acknowledged that Mr. Moore owed him money for failing to sell some drugs for Mr. Shorter (T. 1014). In cross, Mr. Shorter denied that Mr. Moore owed "over $3,000 for drugs that [he] ha[d] advanced him" and denied that he was dealing drugs for two big name dealers (T. 1014-15). However, Mr. Shorter did acknowledge he was unemployed in January of 1993 (T. 1013). Though he testified that Mr. Moore told him that he did the murder the day of the homicide (T. 1022), in his initial contact with the police (Detective Hickson) a few days after the murder, Mr. Shorter refused to give the police a written statement (T. 1024), and maintained that "[he] didn't know too much about [the homicide]" (T. 1016). According to Mr. Shorter's testimony he "didn't choose to share [Mr. Moore's alleged confession] with the police" (T. 1016) ("No, not at that point."). It was not until February 4, 1993, that he agreed to give Det. Conn a sworn statement (T. 1006). However in the oral interview with Det. Conn before the sworn statement was given, Mr. Shorter maintained that he had no discussion with Mr. Moore about Mr. Parrish's homicide (T. 1025-27). In his testimony, he indicated that the oral statement to Det. Conn was "false" (T. 1027). According to Mr. Shorter, Det. Conn convinced him to change his story and say that Mr. Moore confessed to him the day of the murder (T. 1022, 1027).

At the 2011 evidentiary hearing, Mr. Moore's mother recounted how some years after Mr. Moore's conviction, Mr. Shorter approached her at a gas station while she was pumping gas and said: "I don't mean no harm, but I had to do what I had to do because I had to think about my children." (3PC-R. 738). He tried to go over specifics with Mr. Moore's mother, "but [she] was afraid of him. [She] wouldn't talk to him." (3PC-R. 741).

[9]Mr. Clemons was charged with second degree murder and attempted armed robbery (T. 809-10). Mr. Gaines was also charged with second degree murder and attempted armed robbery (T. 552).

[10]For the remaining counts, Mr. Moore received two life sentences, one 30-year sentence, and one 10-year sentence.

Mr. Moore appealed to the Florida Supreme Court. The court affirmed the convictions and sentence of death over a dissent. *Moore v. State*, 701 So.2d at 549. The court did unanimously find guilt phase error in the State's presentation of a witness, Larry Dawsey, who testified that he had seen Mr. Moore several days after Parrish's death and that Mr. Moore had shown him a long nose .38 gun and said, "If they don't stop saying that I killed the victim, somebody is going to be dead for real." (T. 712). The court, however, concluded that the error was harmless, noting "Because there was direct evidence from the other witnesses that Moore possessed a gun on the actual day of the murder and direct evidence that Moore shot the victim, there is no reasonable possibility that the error contributed to the conviction here." *Moore v. State*, 701 So. 2d at 550.[11]

## GROUNDS FOR RELIEF

### GROUND I

#### MR. MOORE'S CONVICTION FOR ARMED BURGLARY VIOLATES HIS RIGHTS TO DUE PROCESS AND TO

---

[11]Justice Anstead dissented from the Florida Supreme Court's affirmance of Mr. Moore's judgment and sentence.  Besides concluding that reversible error occurred during the penalty phase of Mr. Moore's trial, Justice Anstead wrote: "I am troubled in this case because two of the most important aspects of our review, sufficiency of the evidence and proportionality of the death sentence, have not been briefed. Because these are fundamental issues that we must confront, I would require the parties to brief these issues rather than considering them without briefing." *Moore v. State*, 701 So. 2d at 552. In fact, the Initial Brief served on Mr. Moore's behalf on December 15, 1995, was 29 pages in length.

**NOTICE AND A MEANINGFUL OPPORTUNITY TO BE
HEARD, AS WELL AS THE FIFTH, SIXTH, EIGHTH,
AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION, AND THE INVALIDITY OF
THE ARMED BURGLARY CONVICTION REQUIRES
VACATING MR. MOORE'S CONVICTION FOR FIRST-
DEGREE MURDER.**

One of the charges against Mr. Moore was armed burglary.

Regarding this charge, the indictment alleged:

> THOMAS JAMES MOORE on the 21st day of January, 1993, .
> . . did unlawfully enter or remain in a structure, to-
> wit: a dwelling . . . with the intent to commit an
> offense therein, to-wit, Robbery, and while in the
> course of committing the offense was armed with a
> dangerous weapon, to-wit: a firearm, contrary to the
> provisions of Section 810.02, Florida Statutes.

(Rl. 4). In closing at the guilt/innocence phase, the State

argued that although Mr. Moore had permission to enter Mr.

Parrish's house, he committed burglary by remaining in the house

without permission:

> You are going to hear also about burglary. This one is
> a little bit tricky because the law requires that the
> defendant remain in a structure. It's actually enter or
> remain in a structure owned by or in the possession of
> Mr. Johnny [Parrish]. And that he did not have the
> permission to enter or remain in the structure by Mr.
> Johnny. Mr. Johnny didn't give him permission, and at
> the time of remaining in the structure he had an intent
> to commit a crime, robbery. Why it's tricky is that the
> law says you can enter in it or remain in, and we know
> that this defendant was allowed to come in by Mr.
> Johnny. But the reason why he is guilty of burglary is
> because at the time that he remained in, when he pulled
> that gun on Mr. Johnny to get his goods from him, he no
> longer had Mr. Johnny's consent to be in that residence
> and to harm him. And the law states that either
> entering or remaining in the residence with intent to
> commit this crime is burglary.

(R12. 1215-16). The court instructed the jury consistently with

19

the State's argument:

> Before you can find the defendant guilty of burglary,
> the State must prove the following three elements
> beyond a reasonable doubt:
>
> 1. Thomas James Moore remained in a structure owned by
> or in the possession of John Edward Parrish;
>
> 2. Thomas James Moore did not have the permission or
> consent of John Edward Parrish, or anyone authorized to
> act for him, to remain in the structure at the time;
>
> 3. At the time of remaining in the structure Thomas
> James Moore had a fully-formed conscious intent to
> commit the offense of robbery in that structure.

(Rl3. 1359). The jury found Mr. Moore guilty of armed burglary as

charged (Rl3. 1382).

In Florida, a burglary conviction is invalid when "initial

entry into the victim's residence was consensual and there was no

evidence . . . of a burglary other than the commission of crimes

within the residence." *State v. Ruiz*, 863 So. 2d 1205, 1208 (Fla.

2003); *Delgado v. State*, 776 So. 2d 233 (Fla. 2000).[12] Put

another way, "evidence of a crime committed inside [a] dwelling .

. . of another cannot, in and of itself, establish the crime of

burglary." *Ruiz*, 863 So. 2d at 1211. This definition of burglary

applied at the time of Mr. Moore's conviction was set forth in

*Delgado* and *Ruiz*. This definition describes exactly the situation

in Mr. Moore's case: the entry into Mr. Parrish's home was

---

[12]The crime at issue in *Delgado* occurred in 1990. Thus in
*Delgado*, the issue was the substantive criminal, i.e. the
definition of what constituted the crime of burglary, at the time
of the 1990 double homicide.

consensual, and there was no evidence of burglary other than the crimes committed in the home. The State conceded as much in its closing argument, and the court instructed the jury that the basis of the burglary charge was "remaining in." Mr. Moore's burglary conviction is invalid. *Bunkley v. Florida*, 538 U.S. 835 (2003).

Because his burglary conviction is invalid, Mr. Moore is entitled to a new trial. Mr. Moore was prosecuted for first-degree murder under both premeditated and felony murder theories. The State argued both theories (R12. 1213- 14), and argued that either attempted robbery or burglary could provide the basis for felony murder (Rl2. 1214). The jury was instructed on both of these theories and was instructed that attempted robbery and/or burglary could form the basis for a felony murder conviction (R13. 1346-48). The jury returned a general verdict finding Mr. Moore guilty of first-degree murder (R13. 1346-48, 1381). In these circumstances, the invalidity of Mr. Moore's burglary conviction requires vacating his first-degree murder conviction. *Yates v. United States*, 354 U.S. 298 (1957); *Fitzpatrick v. State*, 859 So. 2d 486, 490-91 (Fla. 2003). Habeas relief is warranted.

**Exhaustion of Ground I in state courts:**

**1) Did you raise Ground I in the Florida Supreme Court on a direct appeal of your conviction?** No.

**2)  After your conviction, did you raise Ground I in the state**

circuit court that sentenced you by filing a motion under
Florida Rule of Criminal Procedure 3.850? No.

**a) If your answer is "yes", then state:**
   **I. Date motion filed:** N/A

   **ii. Whether you received an evidentiary
   hearing:** N/A.

   **iii. Result:** N/A.

   **iv. Date of Result:** N/A.

**b) If your Rule 3.850 Motion was denied, did you file an
appeal of that denial with the Supreme Court of Florida?**
N/A.

   **I. If you failed to appeal the denial of your Rule 3.850
   motion, explain briefly why:** N/A

   **ii.     Date appeal filed, result of appeal, date of
   result:** N/A.

**3) Have you raised Ground I in any other petition, application,
or motion filed in the state courts of Florida?** Yes. Ground I
was raised in Mr. Moore's second petition for a writ of
habeas corpus filed in the Florida Supreme Court on May 13,
2004. The court denied the petition on the merits in a
summary order issued on December 16, 2004, stating: "Thomas
James Moore has filed a petition for writ of habeas corpus,
raising claims based on *Delgado v. State*, 776 So.2d 233 (Fla.
2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan
v. State*, 754 So.2d 1, 30 (Fla. 1999), and *Ring v. Arizona*,
536 U.S. 584 (2002). The petition is hereby denied. The
State's motion to dismiss is hereby denied as moot."

## GROUND II

THE TRIAL COURT'S LIMITATIONS ON CROSS-
EXAMINATION OF STATE'S WITNESSES DEPRIVED MR.
MOORE OF HIS SIXTH AMENDMENT CONFRONTATION
RIGHTS.

Mr. Moore's convictions and death sentence arose from the

death of John Parrish on January 21, 1993 (R. 3-5). Mr. Parrish's

body was discovered when neighbors noticed a fire in his house
(T. 688-89). The medical examiner testified that Mr. Parrish had
been shot twice and was dead before the fire began (T. 736-38).

Several witnesses called by the State at trial testified that
earlier in the afternoon, they had seen Mr. Moore talking to
Carlos Clemons and Vincent Gaines (T. 457; 602-03, 632-33, 656).
Some minutes before the fire, gunshots were heard (T. 489-90).

### A.  Limits on cross of Gaines

Gaines testified that Mr. Moore told him and Clemons
that they could get money from Mr. Parrish (T. 542-44). Gaines
agreed to be the lookout (T. 545-56). After standing on the
corner for about seven minutes, Gaines heard two shots and saw
Clemons come out of Mr. Parrish's house, go back in and come out
again (T. 547-48). Gaines testified that Clemons told him that
Mr. Moore shot Mr. Parrish twice in the chest (T. 549-50). Over
defense objection to hearsay, Gaines was also allowed to testify
that Clemons said he went back into Mr. Parrish's house because
Mr. Moore pointed a gun at him and told him they were not done
yet (T. 586-87, 591).

On cross, the defense sought to ask Gaines whether he and
Clemons, armed with a gun, had confronted and chased a boy named
Little Terry through the victim's neighborhood earlier on the day
the victim was shot. Defense counsel proffered the questions at
sidebar, but the trial court refused to allow the bulk of the

questions, saying that Gaines had already testified that he was not with Clemons at that time of day (T. 566-68).[13]

The Little Terry incident at issue on which cross of Gaines was cutoff was critical to the defense theory that Clemons, not Mr. Moore, killed Mr. Parrish and that Gaines and Clemons were lying (T. 1260). The incident also was crucial for impeachment since Gaines denied the incident took place (T. 568-69), while Clemons admitted chasing Little Terry but denied having a gun (T. 829), and witness Willie Reese said Gaines and Clemons chased Little Terry but did not mention whether or not they had a gun (T. 609-13). Indeed, Mr. Moore testified that Gaines and Clemons chased Little Terry with a gun (T. 1094). Little Terry testified that Gaines and Clemons chased him and that Clemons started to pull out a gun (T. 1189-90). The trial court's limitations on cross-examination denied the defense the opportunity to develop the defense theory and to present impeachment of Gaines in a case that was a credibility battle between Mr. Moore on one hand and Gaines and Clemons on the other.

**B.  Limits on cross of Clemons**

Clemons testified that Mr. Moore said he and Gaines could get

---

[13]In 2011, Gaines was called to testify at an evidentiary hearing in the state circuit court. In his 2011 testimony, Gaines testified that he had been with Clemons and had chased Little Terry, but he denied that they had a gun at the time (3PC-R. 877-78). Gaines' 2011 testimony flatly contradicted his trial testimony and the basis for the trial court's curtailment of cross-examination of Gaines on this matter.

money from Mr. Parrish (T. 787). According to Clemons, Mr. Moore told Gaines to be the lookout and told Clemons to go into the house with him (T. 790). Clemons asserted the neither he nor Gaines had a gun that day (T. 791). Clemons testified that Mr. Parrish invited him and Mr. Moore into Mr. Parrish's house and offered them moonshine (T. 792-93). Clemons claimed that after they tasted it, Mr. Moore pulled out a gun and asked Mr. Parrish for money (T. 796). Mr. Parrish said nothing, and Mr. Moore shot him in the chest (T. 796). According to Clemons, he turned to leave the house and heard a second shot (T. 800). When Clemons started out the front door, Mr. Moore stopped him, pointed the gun at him and said, "We are not finished yet" (T. 804). Clemons ran out the door and caught up with Gaines, who was running down the street (T. 804).

In cross, the defense attempted to ask Clemons what he did with the gun he had in his possession on the day the victim was shot (T. 826). The trial court refused to allow the question, saying, "There is no evidence of that anywhere" (T. 826). Yet, Little Terry testified that earlier that day, Gaines and Clemons had chased him and that Clemons started to pull out a gun (T. 1189-90).

After the objection was sustained, the defense then asked a series of questions, during which Clemons admitted that he and Gaines had chased Little Terry down the street (T. 829). With

25

this foundation, the defense again sought to cross Clemons about the gun. But, when defense counsel asked, "Now, is it your testimony that you were not armed with a firearm at that time?", the trial court sustained an objection and refused to allow the question (T. 828). Again, the Little Terry incident, which was part of Mr. Moore's testimony and why he claimed to have warned Parrish about Clemons and Gaines, was critical to the defense's efforts to impeach Clemons and Gaines, and by impeaching them, corroborate Mr. Moore's testimony regarding the matter.

## C.  Limits on cross of Earl Mattox

The State called an arson investigator, Earl Mattox, to testify about the origin of the fire in Mr. Parrish's house. Mattox testified that the fire originated at two separate points in the house and was caused by arson (T. 905). In Mattox's opinion, the fires were set by lighting a combustible material such as clothing or paper (T. 912).

In cross, the defense asked whether any accelerants or flammable liquids, such as gasoline, were present. Mattox answered no (T. 917-20). Defense counsel then asked: "If you have any question at all in your mind as to whether or not some sort of flammable liquid has been used, you have available to you, do you not, the Office of the Florida Fire College Laboratories; is that right?" (T. 920). Mattox answered yes, and defense counsel then asked, "And they have gaschromatography machines--". At this

point, the State interrupted the defense with an objection as to
relevance, which the trial court quickly sustained (T. 920).
Defense counsel asked to proffer the proposed questioning, but
the trial court refused to allow the proffer (T. 920). The trial
court denied the defense motion for mistrial (T. 921).

The defense attempt to cross-examine Mattox regarding
the absence of accelerants in the fire and the scientific
methods of ensuring that no accelerants were used was
crucial to impeaching the credibility of State witness
Christopher Shorter, who testified that Mr. Moore confessed
he had killed Mr. Parrish (T. 1000). Shorter claimed that
Mr. Moore said he had used a lawn mower in the house to set
the fire, taking the top off the mower and using the
gasoline as an accelerant (T. 1003). The best way for the
defense to show that Shorter was lying was to establish
conclusively through Mattox that the fire was not started
with gasoline from a lawn mower. However, the trial court
cut off the cross of Mattox, leaving the defense unable to attack
Shorter's credibility on this crucial point that demonstrated his
testimony was not true.

Through the limits placed upon defense counsel's cross of
Gaines, Clemons and Mattox, Mr. Moore was deprived of his Sixth
Amendment right of confrontation. Mr. Moore was prejudiced by the
curtailment of his right of confrontation. Habeas relief is

27

warranted.

**Exhaustion of Ground II in state courts:**

1) **Did you raise Ground II in the Florida Supreme Court on a direct appeal of your conviction?** Yes

2) **After your conviction, did you raise Ground II in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

    a) **If your answer is "yes", then state:**
      **I.  Date motion filed:** N/A

      **ii. Whether you received an evidentiary hearing:** N/A

      **iii. Result:** N/A

      **iv. Date of Result:** N/A

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

      **I.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

      **ii.      Date appeal filed, result of appeal, date of result:** N/A

3) **Have you raised Ground II in any other petition, application, or motion filed in the state courts of Florida?** Yes. Ground II was raised in Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So.2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So.2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot."

## GROUND III

28

**MR. MOORE'S RIGHT OF CONFRONTATION WAS
VIOLATED AT THE PENALTY PHASE OF HIS CAPITAL
TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.**

Before trial, the defense filed a "Demand For Notice Of Intent To Rely On Hearsay" (R. 364A-365). The motion requested that the State be required "to advise the defendant with reasonable particularity of any hearsay statements or evidence that it intends to introduce" in the penalty phase (R. 364A). The motion pointed out that Section 921.141(1) "allows the Court to receive 'any such evidence' which the Court deems to 'have probative value' (including hearsay) providing that the defendant be afforded 'a fair opportunity to rebut any hearsay statements'" (R. 364A). The motion then argued that this relaxed rule regarding hearsay impaired the defense's ability to prepare to rebut any hearsay evidence without notice of what that evidence would be:

> 2. The undersigned counsel is familiar with the limited exceptions to the prohibitions against hearsay contained in the Rules of Evidence. Accordingly, he is able to conduct discovery and prepare for trial in such fashion as to anticipate what evidence will be received. However, relaxation of the rule against hearsay wholly undermines his ability to anticipate the evidence to be presented by the State. Persons might be allowed to testify regarding matters as to which they had no direct personal knowledge.

> 3. If the defendant is to have a fair opportunity to rebut such evidence, he must have notice of such hearsay well in advance of its presentation.

> 4. To deny this request would be to the prejudice of

the defendant and would be a violation of the Fifth,
Sixth, Eighth and Fourteenth Amendments to the United
States Constitution.

(R. 365). The defense argued this motion before the penalty phase
began (T. 1388-92). The court denied the motion, finding it did
not have the authority to require the State to give advance
notice of its evidence and noting that "there may be a relaxation
of the admissibility of hearsay" (T. 1392).

In its case at the penalty phase, the State introduced Mr.
Moore's prior convictions for armed robbery and aggravated
battery (T. 1458-59). After introducing the convictions into
evidence, the State called Det. Goff, a detective with the Duval
County Sheriff's Office. Over a hearsay objection, the State was
permitted to elicit testimony regarding the victim of the armed
robbery: "This was a white female, 23 years old, named Cynthia
Hyman that was robbed on that date" (T. 1452). Det. Goff
elaborated, "Yes, Cynthia Hyman identified Thomas Moore as being
the suspect with the pistol" (T. 1452). In cross, Det. Goff
conceded that Mr. Moore was 15 years old at the time of the armed
robbery[14] and in the company of two others, one who was "a few
days younger" than Mr. Moore and another "who was 17" (T. 1453).

In its closing, the State then urged the jury to find the
prior violent felony conviction aggravator, arguing, "[t]he
defendant has been previously convicted of another capital

---

[14]Mr. Moore was born April 20, 1973 (R14. 1468).

30

offense, or of a felony involving the use of threat of violence to some person" (T. 1525). To support this aggravator, the State relied upon the judgment and sentence it had introduced into evidence and upon Det. Goff's testimony (T. 1525-26). The State pointed out to the jury that the judgment and sentence from the armed robbery revealed that Mr. Moore "was given a chance at that young age to be placed on community control. And that was the sentence for this crime" (T. 1525). The State then observed that Mr. Moore "violated that community control" when he was convicted of aggravated assault on April 23, 1991 (T. 1525).[15]  The State placed emphasis upon the prior convictions as aggravating circumstances, arguing, "Two prior violent felonies committed by this defendant before he was 19 years old. The legislature says that is aggravation. That is a reason that you can recommend the death penalty against Thomas Moore" (T. 1526).

The State's presentation of testimonial hearsay at the penalty phase violated Mr. Moore's constitutional right to confront his accusers. The State was permitted to present the testimony of a police officer regarding what witnesses had said about the facts and circumstances underlying prior convictions that the State was presenting as aggravating circumstances. Further, the State was permitted to go beyond the fact that Mr.

---

[15]This conviction occurred three days after Mr. Moore's eighteenth birthday for a crime occurring on January 30, 1991, nearly three months before his eighteenth birthday.

Moore was previously convicted and argue other facts not
contained in the judgments and sentences which the State
introduced. These occurrences were in clear violation of the
Confrontation Clause. Habeas relief is warranted.

**Exhaustion of Ground III in state courts:**

1) **Did you raise Ground III in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground III in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   a) **If your answer is "yes", then state:**
      **I. Date motion filed:** N/A

      **ii. Whether you received an evidentiary hearing:** N/A

      **iii. Result:** N/A

      **iv. Date of Result:** N/A

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

      **I. If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

      **ii.    Date appeal filed, result of appeal, date of result:** N/A

3) **Have you raised Ground III in any other petition, application, or motion filed in the state courts of Florida?** Yes. Ground III was raised in Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus, raising claims based on *Delgado v. State*, 776 So.2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan*

*v. State*, 754 So.2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot."

## GROUND IV

**BASING AN AGGRAVATING CIRCUMSTANCE ON PRIOR CONVICTIONS FOR CRIMINAL ACTIVITY COMMITTED WHEN MR. MOORE WAS FIFTEEN AND SEVENTEEN YEARS OLD VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION UNDER *ROPER V. SIMMONS*, 543 U.S. 551 (2005).**

In its case at the penalty phase, the State introduced Mr. Moore's prior convictions for armed robbery and aggravated battery (T. 1458-59). After introducing the convictions into evidence, the State called Detective Goff, a detective with the Duval County Sheriff's Office. Over a defense hearsay objection, the State was permitted to elicit testimony regarding the victim of the armed robbery: "This was a white female, 23 years old, named Cynthia Hyman that was robbed on that date" (T. 1452). Detective Goff further explained, "Yes, Cynthia Hyman identified Thomas Moore as being the suspect with the pistol" (T. 1452). In cross-examination, Detective Goff acknowledged that Mr. Moore was 15 years old at the time of the armed robbery and that he was in the company of two others, one who was "a few days younger" than Mr. Moore and another "who was 17" (T. 1453).

A second prior conviction was presented. This conviction was for an aggravated battery that occurred on January 30, 1991, nearly three months before Mr. Moore's eighteenth birthday.

33

In closing argument, the State then urged the jury to find the prior violent felony conviction aggravator, arguing, "[t]he defendant has been previously convicted of another capital offense, or of a felony involving the use of threat of violence to some person" (T. 1525). To support this aggravator, the State relied upon the judgments and sentences it had introduced into evidence. The State pointed out to the jury that the judgment and sentence from the armed robbery revealed that Mr. Moore "was given a chance at that young age to be placed on community control. And that was the sentence for this crime" (T. 1525). The State then observed that Mr. Moore "violated that community control" when he was convicted of aggravated assault on April 23, 1991 (T. 1525).[16]  The State placed emphasis upon the prior convictions as aggravating circumstances, arguing, "Two prior violent felonies committed by this defendant before he was 19 years old. The legislature says that is aggravation. That is a reason that you can recommend the death penalty against Thomas Moore" (T. 1526).

The State relied upon Mr. Moore's acts at the age of fifteen (15) and at the age of seventeen (17) to establish the prior conviction of a crime of violence aggravating circumstance. The State's use of these convictions for crimes committed when Mr.

---

[16]Again, this conviction was for a crime occurring on January 30, 1991, nearly three months before Mr. Moore's eighteenth birthday.

34

Moore was a minor means that his death sentence rests upon an acts by Mr. Moore when he was juvenile. The use of prior convictions premised upon acts committed by the defendant when he was under the age of eighteen violates *Roper v. Simmons*, 543 U.S. 551 (2005), and the Eighth Amendment. Habeas relief is warranted.

**Exhaustion of Ground IV in state courts:**

1) **Did you raise Ground IV in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground IV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   a) **If your answer is "yes", then state:**
   I.  **Date motion filed:** N/A

   ii. **Whether you received an evidentiary hearing:** N/A

   iii. **Result:** N/A

   iv. **Date of Result:** N/A

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

   I.  **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

   ii.  **Date appeal filed, result of appeal, date of result:** N/A

3) **Have you raised Ground IV in any other petition, application, or motion filed in the state courts of Florida?** Yes. Ground III was raised as Claim IV of Mr. Moore's second petition for a writ of habeas corpus filed in the Florida Supreme Court on May 13, 2004. The court denied the petition on the merits in a summary order issued on December 16, 2004, stating: "Thomas James Moore has filed a petition for writ of habeas corpus,

35

raising claims based on *Delgado v. State*, 776 So.2d 233 (Fla. 2002), *Crawford v. Washington*, 124 S.Ct. 1354 (2004), *Brennan v. State*, 754 So.2d 1, 30 (Fla. 1999), and *Ring v. Arizona*, 536 U.S. 584 (2002). The petition is hereby denied. The State's motion to dismiss is hereby denied as moot." After the court denied the petition, but while a motion for rehearing was pending, the Supreme Court issued *Roper v. Simmons*. Mr. Moore immediately filed a motion seeking an opportunity to submit briefing regarding the impact of *Roper v. Simmons* on Claim IV. The Florida Supreme Court denied the motion "without prejudice to the issue being raised in a separate proceeding." *Moore v. Crosby*, Order dated 3/21/05, Case No. SC04-834. Mr. Moore then raised this claim in his third habeas corpus petition filed in the Florida Supreme Court on March 23, 2005. That petition was denied on October 18, 2005, and a rehearing was denied on February 13, 2006.

### GROUND V

**THE PROSECUTOR'S PENALTY PHASE CLOSING ARGUMENT, WHICH USED MITIGATION EVIDENCE AS NON-STATUTORY AGGRAVATING EVIDENCE, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During the State's closing argument at the penalty phase conducted before a jury, the prosecutor argued:

> I would submit to you that the Defense put on a lot of mitigation. They brought in, as I told you, all of the wonderful people who had known this defendant his entire life, who nurtured him, who loved him, who spent holidays with him, who said that he was treated just like their son, their brother, their cousin. That he did well in school. That he played football. That he had a normal life. And, ladies and gentlemen, it may sound like mitigation, but to me it's the most - well, I would submit to you that it's the most aggravating factor of all. That he alone -

(T. 1527).[17]

_____

[17]The mitigating evidence presented to the jury included the fact Thomas Moore was raised by a single parent (T. 1472); that his father was shot and killed when he was seven (T. 1476); that

Defense counsel objected and asked to approach the bench, but the judge refused to allow it (T. 1527). Defense counsel then asked to voice his objection at the end of the argument, which the judge allowed (T. l527).

The prosecutor continued her argument as follows:

> Ladies and gentlemen, look at these photographs that the defense put in. They show a young man who was loved, they show a young man who gave love and got love. It could be mitigation that he was that type of person, but I would submit to you that is all the more reason that he should not have committed any of these crimes; because he did grow up in a decent, loving environment . . .

(T. 1527-1528).

Defense counsel again asked to approach the bench, was denied permission, and reserved his objection to the close of argument (T. 1528-1529). Then, he vigorously objected to the prosecutor's use of mitigation evidence as an aggravating factor, and the trial court overruled the objection (T. 1549).

A capital defendant is entitled to present mitigating evidence. A State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *McCoy v. North Carolina*, 494 U.S. 433, 441 (1990). "Once this low threshold for relevance is met, the '*Eighth Amendment* requires that the jury be able to consider and give effect to' a capital defendant's mitigating evidence."

---

he was given adult responsibilities at a young age; that he suffered constantly from migraine headaches (T. 1479).

*Tennard v. Dretke*, 542 U.S. 274, 285 (2004), quoting *Boyde v. California*, 494 U.S. 370, 377-78 (1990). Indeed in *Tennard*, the US Supreme Court rejected a requirement that mitigating evidence must show that the criminal conduct was attributable to some severe permanent condition. However here, the prosecutor went beyond contending that the mitigating evidence should not or could not be considered mitigating; she argued the mitigation was actually aggravation when in fact under Florida law aggravating circumstances are limited to those set forth in the statute. She opined that the mitigating evidence presented by the defense "to me it's the most - well, I would submit to that it's the most aggravating factor of all." (T. 1527). This argument simply violated the Eighth Amendment. Habeas relief is warranted.

**Exhaustion of Ground V in state courts:**

1) **Did you raise Ground V in the Florida Supreme Court on a direct appeal of your conviction?** Yes

2) **After your conviction, did you raise Ground V in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   a) **If your answer is "yes", then state:**
      **I.  Date motion filed:** N/A

      **ii. Whether you received an evidentiary hearing:** N/A

      **iii. Result:** N/A

      **iv. Date of Result:** N/A

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?**

N/A

    **I.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

    **ii.  Date appeal filed, result of appeal, date of result:** N/A

**3)  Have you raised Ground V in any other petition, application, or motion filed in the state courts of Florida?** Yes. Ground V was raised in Mr. Moore's first habeas petition filed in the Florida Supreme Court on April 2, 2001. The petition was denied on March 7, 2002, *Moore v. State*, 820 So. 2d 199 (Fla. 2002), and rehearing was denied on June 20, 2002.

<u>GROUND VI</u>

**MR. MOORE WAS DENIED HIS RIGHTS UNDER *AKE V. OKLAHOMA* AT THE GUILT AND PENALTY PHASES OF HIS CAPITAL TRIAL WHEN COUNSEL INEFFECTIVELY UNDER *STRICKLAND V. WASHINGTON* FAILED TO PROVIDE THE NECESSARY BACKGROUND INFORMATION TO MR. MOORE'S MENTAL HEALTH CONSULTANT AND FAILED TO OBTAIN OTHER NECESSARY EXPERT ASSISTANCE.**

Mr. Moore was entitled to competent expert assistance at both phases of his capital trial. Specifically, Mr. Moore was entitled to a professionally competent, court-funded evaluation to determine his mental status at the time of the offense, to determine his mental status at trial, and to determine whether mitigating circumstances existed in his case. Trial counsel had a duty to ensure Mr. Moore received competent assistance.

**A.  Mr. Moore Was Deprived of a Competent, Court-funded Mental Health Evaluation.**

Dr. Harry Krop was appointed by the Court to conduct a confidential evaluation of Mr. Moore in connection with this

case. Prior to the examination, Dr. Krop was provided with the homicide continuation report of this case, as well as some of Mr. Moore's criminal records, for consideration in evaluating Mr. Moore. Dr. Krop was also provided a **paragraph length** summary of Mr. Moore's "social history" written by Mr. Moore's trial counsel. The purpose of the evaluation, according to Mr. Moore's trial counsel, was "primarily for . . . a penalty phase assessment."

Dr. Krop conducted a psychological evaluation of Mr. Moore on August 19, 1993. The purpose of the evaluation, as Dr. Krop understood it, was "to determine possible mitigating factors related to allegations that he [Mr. Moore] committed First Degree Murder." Dr. Krop concluded that Mr. Moore's history of alcohol and drug abuse "appear to be mitigating factors." Dr. Krop requested that he be able to review all of Mr. Moore's prior criminal records and prison records, including PSI's, as well as current jail records and any available school records to explore additional mitigating factors. Dr. Krop also wanted to review records pertaining to Mr. Moore's father's murder and to interview family members to obtain additional background information to further supplement and have a complete and accurate evaluation. However, Dr. Krop was not provided these things, and no further evaluation was performed.

The evaluation performed by Dr. Krop on Mr. Moore was

incomplete and unreliable and failed to comport with due process
in several ways: 1) the evaluation was based on a reported social
history that was incomplete and unreliable; 2) the evaluation
failed to take into account Mr. Moore's medical history, which
would have revealed that Mr. Moore suffered symptoms consistent
with toxic chemical exposure; 3) the evaluation failed to take
into account Mr. Moore's medical history, which would have
revealed that Mr. Moore suffered various types of head trauma;
and 4) the evaluation was performed for purposes of mitigation
only, when a competent evaluation would have revealed issues
related to the guilt phase of trial.

### B. Mr. Moore Was Deprived of the Assistance of Other Critical Experts Necessary to Ensure that the Trial was a Reliable Fact-finding Process.

Trial counsel failed to obtain the assistance of other
experts necessary to ensure a reliable fact-finding process.
During Mr. Moore's trial, the State presented a fire expert to
testify regarding the fire that had occurred in the victim's
house after the murder had occurred. However, evidence and
records in the defense attorney's possession contradicted much of
this expert's testimony. Trial counsel did not effectively expose
these inconsistencies to the jury. More importantly, trial
counsel failed to retain a fire expert to review these
inconsistencies and present testimony to rebut the State's fire
expert. Mr. Moore was prejudiced by this deficiency because the

inconsistencies were relevant to many aspects of the State's case: l} the times certain events occurred, as testified to by several State witnesses; 2) the inconsistent testimony of co-defendant Clemons; and 3) other witness testimony. Because of trial counsel's deficiency, the jury was unable to make reliable findings of fact.

The State also presented the testimony of medical examiner Dr. Bonifacio Floro. Dr. Floro testified regarding, among other things, bullet trajectories and the manner in which the victim died. However, evidence and records in the defense attorney's possession contradicted much of this expert's testimony. Trial counsel was ineffective in failing to expose these contradictions during Dr. Floro's testimony, contradictions which cast serious doubt on the factual story presented to the jury by the State. Furthermore, trial counsel was ineffective for not retaining an independent medical examiner who could provide a professionally trained opinion to the jury regarding the relevance of these contradictions to Mr. Moore's defense. Again, because of trial counsel's deficiency, the jury was unable to make reliable findings of fact.

Mr. Moore's trial counsel also had in his possession evidence and records which indicated Mr. Moore, on the day of the incident, was functioning with serious mental deficiencies due to the consumption of various drugs. Trial counsel was deficient for

not retaining the services of a pharmacologist or other qualified expert to testify to the effects of these various drugs, especially after the one expert retained by the defense informed counsel of the mitigating value of this information. Furthermore, had counsel sufficiently investigated, he would have discovered that Mr. Moore was using large amounts of cocaine on the day in question right up to the time of the incident. Mr. Moore's postconviction counsel located witnesses who could testify to this, some of whom were known to defense counsel at the time of the trial. These circumstances further compounds trial counsel's ineffectiveness for not obtaining a qualified drug-use expert.

Counsel's failure to fully utilize Mr. Moore's rights under *Ake v. Oklahoma* constituted deficient performance. *See Hinton v. Alabama*, 134 S.Ct. 1081 (2014). As a result, Mr. Moore was prejudiced at both the guilt and penalty phases of his trial. Habeas relief is warranted.

**Exhaustion of Ground VI in state court:**

1) **Did you raise Ground VI in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction did you raise Ground VI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

   a) **If your answer is "yes", then state:**

   i. **Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99 and 4/06/00.

   ii. **Whether you received an evidentiary**

**hearing:** No

    **iii.  Result:** Summary denial

    **iv.   Date of Result:** 8/04/00; rehearing denied 9/08/00.

**b)   If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

**i.  If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

**ii.  Date appeal filed, result of appeal, and date of result:** Notice of appeal filed on 4/02/01; relief denied 3-07-02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02.

**3)   Have you raised ground VI in any other petition, application, or motion filed with the state courts of Florida?** No

**GROUND VII**

    **MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING PHASE OF HIS TRIAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

Mr. Moore's counsel failed to fully investigate and develop crucial evidence in mitigation. This substantial and compelling mitigating evidence was easily available and accessible to trial counsel, but was not investigated and prepared for presentation to either the jury or the judge. As a result, Mr. Moore was sentenced to death by a judge and jury who heard little of the available mitigation that was essential to an individualized capital sentencing determination. *See Porter v. McCollum*, 558 U.S. 30 (2009).

Had defense counsel adequately investigated and prepared, he could have presented and argued to the jury a wealth of statutory and non-statutory mitigating factors. Thomas Moore was sentenced to die by a judge and jury who knew very little about him. Mitigating evidence was available to demonstrate that the rosy picture of Thomas Moore's childhood and upbringing presented by defense counsel was far from the horrid reality that Mr. Moore lived with. Instead, Mr. Moore's upbringing was filled with degrading and senseless violence. Mr. Moore's childhood was filled with despair over the loss of a father who he barely knew. He constantly looked to the streets for a replacement which inevitably led to trouble he was too young to prevent.

### A. Counsel Failed to Investigate and Present the Devastating Impact of Long-Term Lead Poisoning to the Jury Deciding Mr. Moore's Guilt and Punishment.

Mr. Moore was exposed to harmful and potentially deadly hazardous waste in and around his neighborhood while growing up. Several neighborhoods within Jacksonville were built on incinerator ash that tests show contains arsenic, lead, and cancer-causing dioxin.[18] One of these sites is less than a mile from the house where Mr. Moore was raised.

While growing up, Mr. Moore suffered from repeated migraine headaches and month-long bouts of vomiting. These frequently

---

[18]*The Florida Times-Union*,"City dumped toxins on 4 neighborhoods", July 27, 1999.

occurring conditions suffered by Mr. Moore are symptomatic of chronic exposure to lead. Mr. Moore's exposure to lead was of such an extent that it adversely affected Mr. Moore's learning ability, damaged his nervous system, and caused serious problems with his metabolism. Expert testimony was available and would have shown that these adverse conditions affected the proper functioning of Mr. Moore's brain before, during, and after the time of this incident, in that his capacity for reflection and\or premeditated thought was severely diminished.

> **B.  Counsel Failed to Investigate and Present Mitigating Evidence Regarding the Long-Term Effects of Mr. Moore's Substance Abuse on His Mental State Before, During, and After the Crime.**

Mitigating evidence regarding Mr. Moore's history of substance abuse, his extreme level of intoxication the day of the crime, and the effect this substance abuse had on his mental state leading up to the day of the crime, as well as on the day of the crime, was also readily available and should have been presented to inform the judge and jury. During the penalty phase, Mr. Moore's trial counsel completely failed to use plentiful and available evidence of Mr. Moore's serious substance abuse problem, as well as his extreme level of intoxication at the time of the offense. Evidence of this was already in trial counsel's possession. However, much more was readily available had counsel conducted a reasonable investigation.

Had it been presented, this evidence would have: 1) negated

or weakened the aggravating factors the jury considered and the trial court found; 2) provided statutory mitigators[19] to present and argue to the jury; and, 3) supplied a wealth of nonstatutory mitigation for the judge and jury to consider. Expert testimony was available then to explain the physical and psychological damage of Mr. Moore's substance abuse. Furthermore, expert testimony would have been available to counsel that could have been used to explain to the jury how Mr. Moore's intoxicated state on the day of the murder constituted an extreme mental disturbance in his mind, and/or substantially impaired his capacity to conform his conduct to the requirements of the law.

Counsel failed to investigate and that failure deprived Mr. Moore of having an informed jury sentence him. When Mr. Moore attempted to present this claim in collateral proceedings in state court, he was represented by state-provided collateral counsel who failed to provide effectively present Mr. Moore's penalty phase ineffectiveness claim. As a result, the Florida Supreme Court found the claim procedurally barred in light of counsel's inadequate and ineffectual attempt to plead the claim. Collateral counsel's performance as to this claim was itself ineffective under *Trevino v. Thaler*, 133 S.Ct. 1911 (2013). Accordingly, evidentiary development is warranted, and thereafter

---

[19]*See* Florida Statutes, section 921.141 (6)(b) and (6)(f). Trial counsel did not request that the jury be instructed on these statutory mitigators.

47

habeas relief.

**Exhaustion of Ground VII in the state courts:**

1)      **Did you raise Ground VII in the Florida Supreme Court on a direct appeal of your conviction?**  No

2)      **After your conviction did you raise Ground VII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?**  Yes

    a)   **If your answer is "Yes", then state:**

       **i.  Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99 and 4/06/00.

       **ii.  Whether you received an evidentiary hearing:** No

       **iii. Result:** Found to be inadequately pled.

       **iv. Date of Result:** 8/04/00; rehearing denied 9/08/00.

    b)   **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

       **i.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

       **ii.  Date appeal filed, result of appeal, and date of result:**  Notice of appeal filed on 4/02/01; relief denied; 3-07-02, *Moore v. State*, 820 So. 2d 199 (Fla.2002); rehearing denied 6/20/02.

3)      **Have you raised Ground VII in any other petition, application, or motion filed in the state courts of Florida?** No

<u>**GROUND VIII**</u>

    **MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL PRETRIAL AND AT THE GUILT/INNOCENCE PHASE OF HIS TRIAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND**

**FOURTEENTH AMENDMENTS.**

At the 2011 evidentiary hearing, Mr. Moore called David Hallback to testify. Mr. Hallback testified that in the summer of 1993 he was incarcerated in the juvenile pod with Carlos Clemons who had previously known (3PC-R. 700-01). Mr. Hallback testified that Mr. Clemons told Mr. Hallback that Mr. Moore was not there when the crime occurred (3PC-R. 705) ("He left before all this had happened.").

The State elicited testimony in cross that Mr. Hallback, who was Mr. Moore's first cousin, told his grandmother in 1993 about the conversation with Mr. Clemons (3PC-R. 714-15). The State brought out in cross that Mr. Hallback's grandmother then told the attorneys representing Mr. Moore, and that shortly thereafter two men who indicated they were representing Mr. Moore arrived at the jail to talk with Mr. Hallback about his conversation with Mr. Clemons (3PC-R. 715-16, 727).[20]

The presiding judge questioned Mr. Hallback and elicited testimony that in 1993 at the time of his conversation with two individuals who indicated that they were with the public defender's office representing Mr. Moore, Mr. Hallback was also being represented the "same Public Defender's Office right here

_____

[20]The individuals who saw Mr. Hallback on behalf of Mr. Moore and talked to him about Mr. Clemons' statement told Mr. Hallback that "they would get back in touch" and instructed him "not to discuss this information with anybody else" (3PC-R. 715). However, they never did get in touch with him again (3PC-R. 719).

in Jacksonville" (3PC-R. 729). Thus, the public defender's office represented both Mr. Moore and Mr. Hallback, and as to a decision regarding whether to use Mr. Hallback at Mr. Moore's trial, there would have existed at least a potential conflict of interest.

Subsequently a handwritten note was introduced that was obtained from the public defender's files in Mr. Moore's case as Def. Ex. 3 (3PC-R. 276). The handwritten note is dated either "7-2-93" or "9-2-93," either way before Mr. Moore's trial. The handwritten note contains David Hallback's name, case number, address, and mother's name. The note then provides:

> - Says that Carlos Clemons was with [illegible] cell block (Feb. or so).
>
> - Clemons was telling them what happened.
>
> - **Said Thomas didn't do it.**

(3PC-R. 276) (emphasis added).

In addition to David Hallback, Mr. Moore presented the testimony of Raimundo Hogan, Mandell Rhodes, and Charles Simpson, each of whom testified that he was in the juvenile pod with either Mr. Clemons, Mr. Gaines, or both in 1993. Mr. Simpson, Mr. Hogan and Mr. Rhodes all indicated that they did not know Mr. Moore and had no reason to try to help him. Had trial counsel followed up on the information provided by David Hallback in the summer of 1993, these witnesses could have been located at that time in advance of Mr. Moore's trial.

Mr. Moore's collateral counsel in the 1999-2003 time frame

was John Jackson, who was in possession of trial counsel's file
and was aware of this note's presence in that file. In fact, Mr.
Jackson had sought to speak with Mr. Hallback regarding the
information in this note because it indicated that Mr. Hallback
had some information about some statements that Mr. Clemons had
made indicating that "Thomas didn't do it" (3PC-R. 812). However,
Mr. Jackson was unsuccessful in finding the Mr. Hallback referred
to in the note (3PC-R. 807). He also failed to ask trial counsel
about this note. And he failed to ask Mr. Moore about this note.
Indeed, the note itself indicated that Mr. Hallback was in the
same cell block as Carlos Clemons, who was a juvenile and house
in a juvenile pod. Thus, Mr. Hallback was obviously a juvenile in
1993. Mr. Jackson's failure to find the witness identified in
trial counsel's file as having overheard Carlos Clemons say that
"Thomas didn't do it" was deficient performance within the
meaning of *Trevino v. Thaler*, 133 S.Ct. 1911 (2013).

Following the evidentiary hearing, Mr. Moore submitted a
written closing argument in which he wrote:

> To the extent that Mr. Moore's trial counsel was aware
> or should have been aware of individuals who knew of
> exculpatory statements made by Mr. Clemons, but failed
> to learn of such statements or conduct follow up
> investigation upon such statements because counsel's
> office represented the witnesses in their own criminal
> cases, counsel's performance was deficient because of a
> known or unknown conflict of interest.

(3PC-R. 388).

In its order denying Rule 3.851 relief, the circuit court

wrote: "With regard to the claim of ineffective assistance of counsel, such claim is untimely and procedurally barred." (3PC-R. 394). This ruling was affirmed by the Florida Supreme Court when Mr. Moore appeal. *Moore v. State*, 132 So.3d at 722 n.3 ("To the extent that Moore is attempting to raise an ineffective assistance of counsel claim within this second successive postconviction motion, we affirm the postconviction court's ruling that such a claim is untimely.").[21]

Of course, Mr. Jackson made clear that he had no strategic reason for failing to adequately investigate a note indicating that a witness told Mr. Moore's trial counsel that Carlos Clemons had stated that Mr. Moore had not committed the murder. In the State's cross of Mr. Jackson, the following testimony was elicited: "But in spite of any other evidence pointing to this defendant's guilt, you still would have pursued all these lines of investigation that you just mentioned, correct?" (3PC-R. 813). Mr. Jackson responded: "I don't want to say always, but most likely." (3PC-R. 813).

And, of course had collateral counsel adequately investigated and located Mr. Hallback, counsel would have then known to talk

---

[21]Of course, the US Supreme Court has held that as to the presentation of a claim of ineffective assistance of trial counsel, a criminal defendant has at least an equitable right to effective representation by collateral counsel in litigating the trial ineffectiveness claim. *Trevino v. Thaler*, 133 S.Ct. 1911 (2013; *Martinez v. Ryan*, 132 S.Ct. 1309 (2012).

to other individuals in the juvenile pod with Carlos Clemons.
Indeed, trial counsel should have been talking to those
individuals who were incarcerated with Clemons and Gaines in
light of the information received from Mr. Hallback. In fact,
evidence was presented that shows that this would have been
productive. At the 2011 evidentiary hearing, a second handwritten
note from the public defender's file was introduced as Def. Ex. 1
(3PC-R. 268).  This second note was date in early 1994[22] and
reflected that someone from the public defender's office
interviewed Charles Simpson. This document had the following
notation "conf. w/ Charles Simpson re: gun." It also includes the
notation "Carlos had some tie-in w/ the gun." Reference was also
made to "Carlos + Vincent Gaines."

Charles Simpson was also called to testify at the 2011
evidentiary hearing, along with Raimundo Hogan and Mandell
Rhodes. They, along with Mr. Hallback, testified that they were
in the juvenile pod with either Mr. Clemons, Mr. Gaines, or both
in 1993. Had trial counsel followed up on the information
provided by David Hallback in the summer of 1993, these witnesses
could have been located at that time in advance of Mr. Moore's

---

[22]The date on the note shows that trial counsel failed to
timely follow up on Mr. Hallback's information. The interview
with Mr. Simpson was after Mr. Moore had been convicted and
sentenced to death.

trial.[23]

The State through its cross of Mr. Hallback established that he had spoken with someone on behalf of Mr. Moore's public defender well before Mr. Moore's trial. The handwritten note in the public defender's file verify that Mr. Hallback informed Mr. Moore's counsel that Mr. Clemons had told him and others in the juvenile pod that Mr. Moore did not commit the murder. Yet follow up was not conducted before Mr. Moore's trial. Mr. Hallback was not interviewed further, and no other interview of inmates in the juvenile pod occurred until after Mr. Moore's trial.[24] Trial counsel's performance was deficient.

The resulting prejudice is apparent from the four witnesses from the juvenile pod who were not all part of one story or one alleged conversation. Each had a different story to tell; each had different contact with Mr. Clemons and Mr. Gaines. Mr.

---

[23]The State was unable to dispute that these four individuals were present in juvenile pod with Mr. Clemons and Mr. Gaines in 1993. Mr. Clemons recalled that Mr. Hallback was in the pod, and Mr. Gaines recalled Mr. Simpson and Mr. Hogan. Neither Mr. Clemons nor Mr. Gaines could dispute that Mr. Rhodes was present. Indeed, Mr. Moore's investigator, Dan Ashton, got Mr. Rhodes' name from Mr. Simpson who Mr. Gaines acknowledged was there. There are documents from 1993 and 1994 demonstrating that Mr. Hallback and Mr. Simpson had tried to tell their story then. This was not some recent fabrication to help Mr. Moore. Moreover, trial counsel was aware of Mr. Hallback and Mr. Simpson and failed to present their testimony at Mr. Moore's trial.

[24]The obvious explanation for this failure was the inherent conflict arising from the public defender's office representing both Mr. Hallback and Mr. Moore, evidence that the presiding judge elicited when he questioned Mr. Hallback (3PC-R. 729).

Hallback only talked with Mr. Clemons. Mr. Hogan's information
came primarily from Mr. Gaines. Mr. Rhodes had spoken to both Mr.
Gaines and Mr. Clemons, but the only information that he got,
*i.e.* that Mr. Clemons was the shooter, he got from Mr. Clemons.
And Mr. Simpson had encountered Mr. Clemons and Mr. Gaines out on
the street right before Mr. Parrish's homicide and knew that
their group was in possession of a chrome .38 gun, which had been
pulled on Mr. Simpson. According to Mr. Simpson, Mr. Clemons
acknowledged while they were incarcerated together that he was
the shooter and that the older guy was taking the fall. Yet
despite the disparate ways that each man learned his bit of
information, the information when considered cumulatively, as
required under federal law, fits together to tell a coherent and
exculpatory story that undermines confidence in the outcome under
the proper *Strickland* analysis. *See Porter,* 130 S.Ct. at 453-54
(instructing courts to consider the totality of the available
evidence "both that adduced at trial, and the evidence adduced in
the habeas proceeding").

Indeed, immediately after hearing the testimony on March 22,
2011, the circuit court judge stated:

> I have to make a decision as to whether or not—I don't
> necessarily have to determine the truthfulness of any
> or all of these witnesses. I will tell everybody, for
> what it's worth, **that all of this testimony concerns
> me. Okay?** I'm not at this point in time ready to
> absolutely disregard all of the testimony I've heard. I
> may. **But the cumulative effect concerns me**.... So for
> whatever that's worth to you.

*McClain v. Atwater*, 110 So.3d 892, 896 (Fla. 2013) (emphasis added). Thereupon, written closings were scheduled and the proceedings were concluded. Mr. Moore was taken back to the jail and his collateral counsel left to Jacksonville to return to his office. At that time, the State Attorney decided to arrest Mr. Moore on new murder charges in a 1990 murder of a prostitute. The only link to Mr. Moore was an alleged 9 loci match to a male DNA profile taken from a vaginal swab. The arrest of Mr. Moore on the new murder charges was trumpeted by Jacksonville's news media and was well known within the hall of the Duval County Courthouse. While the murder charges were pending, the judge who presided at the evidentiary hearing and had been troubled by the evidence was apparently no longer troubled when he issued an order denying relief in January of 2012 (3PC-R. 414-15). Then on October 24, 2012, a jury found Mr. Moore not guilty of all charges in the 1990 homicide case (Reply Brief at 8, *Moore v. State*, Case No. SC12-459).[25]

As the presiding judge's initial reaction demonstrated, Mr. Moore was in fact prejudiced by the failure to develop and present readily available evidence that Mr. Clemons and Mr. Gaines were not testifying truthfully at the guilt phase portion

---

[25]Clearly, Mr. Moore's arrest in the 1990 murder case after the presiding judge in Mr. Moore's death case expressed genuine concern was designed to prejudice Mr. Moore and encourage the denial of his Rule 3.851 motion.

of Mr. Moore's trial. Indeed, the resulting prejudice also impacted the penalty phase proceeding as well, since the State's case for a death sentence was premised upon the credibility of Clemons and Gaines. Confidence in the outcome of both the guilt and penalty phases must be undermined by counsel's deficient performance outline in this claim.

In addition to the deficient performance in failing to follow up on the information from Mr. Hallback, trial counsel also rendered deficient performance in failing to be familiar with the police reports regarding Randy Jackson's allegations against Mr. Moore and the time of those allegation in relationship to the Timothy Bunkley incident. Because counsel had failed to learn from the police reports that the Bunkley incident occurred before Mr. Jackson's allegations that Mr. Moore hit him in the head with the hammer, counsel was unprepared for the State's deliberately deceptive contention that the Bunkley incident happened later in time and showed that Mr. Jackson bore Mr. Moore no ill will.

Mr. Moore was prejudiced by counsel's failure to thwart the State's misrepresentations that blunted the defense's attack on Randy Jackson's credibility. When considered cumulatively with counsel's failure as to Mr. Hallback's information, confidence in the reliability of the guilt and penalty phase verdicts is undermined.

Further, collateral counsel at the initial review collateral

proceeding rendered deficient performance under *Trevino v. Thaler* in failing to read the police reports and notice the prosecutor's deliberate deception in presenting evidence and making argument reversing the order of the events in order to thwart the attack on Jackson's credibility in testifying against Mr. Moore.

Trial counsel was ineffective. Habeas relief is warranted.

**Exhaustion of Ground VIII in the state courts:**

1) **Did you raise Ground VIII in the Florida Supreme Court on a direct appeal of your conviction?**  No

2) **After your conviction did you raise Ground VIII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?**  Not this particular ineffectiveness claim.

   a) **If your answer is "Yes", then state:** N/A

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

      **i.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

      **ii.  Date appeal filed, result of appeal, and date of result:** Affirmed, 3-07-02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02, but this particularly ineffectiveness claim was not presented then.

3) **Have you raised Ground VIII in any other petition, application, or motion filed in the state courts of Florida?**  Yes.

   a) **If your answer is "Yes", then state:**

      **i.  Date motion filed: 1**/27/06; amended 7/31/08, 8/14/09, 9/26/09, and 4/06/11.

**ii.   Whether you received an evidentiary hearing:** Yes

**iii.  Result:** Found to be procedurally barred.

**iv. Date of Result:** 1/04/12; rehearing denied 2/02/12.

**b)   If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

**i.  If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

**ii.   Date appeal filed, result of appeal, and date of result:** Notice of appeal filed on 3/02/12; relief denied; 11-27-13, *Moore v. State*, 132 So.3d 718 (Fla. 2013); rehearing denied 2/27/14.

## GROUND IX

UNCHALLENGED PROSECUTORIAL ARGUMENT DURING MR. MOORE'S TRIAL AND SENTENCING PROCEEDINGS VIOLATED THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. DEFENSE COUNSEL'S FAILURE TO OBJECT TO THESE BLATANTLY IMPROPER COMMENTS CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL.

**A.   The Prosecution Inappropriately and Prejudicially Repeatedly Referred to Mr. Moore as "The Devil" in Closing Argument.**

During the State's guilt-phase rebuttal argument, the prosecutor improperly and prejudicially referred to Mr. Moore as "the devil" (T. 1262):

> Crime conceived in hell will not have any angels as witnesses. And, ladies and gentleman, as true as that statement is, Grand Park is hell. And that man right there is the devil.

(T. 1262) (emphasis added). The prosecutor later returned to this

theme:

> Ladies and gentlemen, deals. Yes, ma'am, yes, ma'am,
> yes, sir, to all of you. I have dealt with
> [co-defendant 1) and I have dealt with [co-defendant
> 2). I did that as an Assistant State Attorney. I did
> that the best I knew how. But, ladies and gentlemen,
> sometimes you have to deal with sinners to get the
> devil [referring to Mr. Moore]. And I would submit to
> you what the State did was we dealt with this sinner
> and we dealt with this sinner to get **this devil**
> [referring to Mr. Moore].

(T. 1277) (emphasis added). The prosecutor made a similar

reference during the penalty-phase argument (T. 1520). At no time

did defense counsel object to these improper arguments.

### B.   The Prosecution Referred to the State's Deals with Mr. Moore's Co-Defendants Without Describing the Details of those Deals or How the Co-Defendants' Punishments Compared with Mr. Moore's Potential Sentence of Death.

Not only did the prosecution inflame the passions of the jury

by referring to Mr. Moore as "the devil" and his co-defendants as

"sinners," but the prosecutor also injected personal opinion and

nonrecord evidence into her argument. She vouched for her own

credibility by suggesting to the jury that she had done her job

by giving the co-defendants what they deserved without revealing

what exactly the "deals" were and how those deals compared to

what the prosecution was seeking for Mr. Moore.

In sum, the State described Mr. Moore's neighborhood as

"hell," referred to everyone who lived in that neighborhood as

"sinners," and equated Mr. Moore with "the Devil". These

references were not fair comment on the facts shown by the

60

record, pandered to the jury's fears and painted an inflammatory picture of Mr. Moore. And, these comments improperly injected religion into the proceedings. Habeas relief is warranted.

**Exhaustion of Ground IX in state courts:**

1) **Did you raise Ground IX in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground IX in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99, 4/6/00

      ii. **Whether you received an evidentiary hearing:** No

      iii. **Result:** Summarily denied

      iv. **Date of Result:** 8/4/00; rehearing denied 9/8/00

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

      i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

      ii. **Date appeal filed, result of appeal, date of result:** Affirmed on 3/7/02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02

3) **Have you raised Ground IX in any other petition, application, or motion filed in the state courts of Florida?** No

<u>GROUND X</u>

THE ADMISSION OF TESTIMONY BY LARRY DAWSEY
THAT MR. MOORE WAS IN POSSESSION OF A FIREARM
TWO DAYS AFTER JOHNNY PARRISH'S DEATH

61

> **VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS
> TO THE UNITED STATES CONSTITUTION, AND THE
> FLORIDA SUPREME COURT'S DIRECT APPEAL
> HARMLESS ERROR ANALYSIS DID NOT MEET
> CONSTITUTIONAL STANDARDS.**

At trial, over vigorous objection from defense counsel (T. 711-713), the State was permitted to present the testimony of Larry Dawsey, a neighborhood acquaintance of Mr. Moore. Dawsey testified that a couple of days after Parrish's death, he ran into Mr. Moore at a Chinese supermarket in the neighborhood (T. 711). According to Dawsey, Mr. Moore said "he was going to kill someone because he was tired of everybody telling him he killed that man" (T. 714). Dawsey testified that Mr. Moore showed him a "black, brown-like" pistol while making the statement (T. 714). Dawsey could not identify the gun, but said he thought it was a .38 with a long barrel (T. 714-715).

Dawsey's entire testimony was irrelevant and immaterial and served only to depict Mr. Moore as a gun-toting bad man with a propensity for murder.

Because the count of possession of a firearm by a convicted felon did not go to the jury, the State could not have been presenting the evidence that Mr. Moore had a gun two days after the murder to prove an element of a charge against Mr. Moore. Furthermore, absolutely no proof was presented that the gun about which Dawsey testified was the murder weapon. In addition, the statement Mr. Moore allegedly made while brandishing the weapon

had no bearing on any issue in the case, and was therefore irrelevant, bad-character evidence that should have been excluded, supportive the prosecutor's improper argument that Mr. Moore was "the devil."

On direct appeal, the Florida Supreme Court agreed that Dawsey's testimony was irrelevant because it "could only show that Moore was upset because people were accusing him of committing the crime or that he regularly carried a gun. Neither piece of information helps establish whether or not he killed the victim." *Moore v. State*, 701 So. 2d at 549. However, the court found the error in admitting Dawsey's testimony harmless "[b]ecause there was direct evidence from other witnesses that Moore possessed a gun on the actual day of the murder and direct evidence that Moore shot the victim." Id. at 550. However, no consideration was given to the improper admission of this evidence in conjunction with the prosecutor's argument that Mr. Moore was "the devil" or to how this bad-character evidence impacted the penalty phase. Thus, the Fifth, Sixth, Eighth and Fourteenth Amendments were violated. Habeas relief is warranted.

**Exhaustion of Ground X in state courts:**

1) **Did you raise Ground X in the Florida Supreme Court on a direct appeal of your conviction?** Yes

2) **After your conviction, did you raise Ground X in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

63

**a)  If your answer is "yes", then state:**

    **i.  Date motion filed:** N/A

    **ii. Whether you received an evidentiary
    hearing:** N/A

    **iii. Result:** N/A

    **iv. Date of Result:** N/A

**b)  If your Rule 3.850 Motion was denied, did you file an
    appeal of that denial with the Supreme Court of Florida?**
    N/A

    **i.  If you failed to appeal the denial of your Rule 3.850
       motion, explain briefly why:** N/A

    **ii.   Date appeal filed, result of appeal, date of
        result:** N/A

**3)  Have you raised Ground X in any other petition, application,
    or motion filed in the state courts of Florida?** No

**GROUND XI**

**MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE
OF COUNSEL IN HIS DIRECT APPEAL.**

Mr. Moore's direct appeal counsel's performance was deficient
in that he failed to raise numerous meritorious issues. Because
there is a reasonable probability of a different outcome had the
issues been raised, appellate counsel's deficient performance
prejudiced Mr. Moore. The following subsections detail the
omitted issues.

    **A.  Appellate Counsel was Ineffective for Failing to
    Raise the Claim that Mr. Moore's Sixth and Fourteenth
    Amendment Rights Were Violated When the State
    Unconstitutionally Used Its Peremptory Challenges to
    Strike Jurors Because of Race While Claiming Race-**

64

**Neutral Reasons.**

The State used its peremptory challenges in such a way as to deny Mr. Moore his rights to a trial by an impartial jury drawn from a representative cross section of the community under the Sixth and Fourteenth Amendment of the United States Constitution. The State used its peremptory challenges to exclude jurors who merely had misgivings about the death penalty, jurors that could not be excluded for cause. The State excluded an identifiable segment of the population who have unfavorable (to the prosecutor) attitudes about the death penalty and thereby denied Mr. Moore his rights to a trial by an impartial jury drawn from a representative cross-section of the community. In doing so, the State unconstitutionally, and with discriminatoryintent, excluded members of the African-American community from serving on Mr. Moore's jury.

During selection of the jury, Mr. Moore's counsel objected to several of the State's peremptory challenges because they were not motivated by racially-neutral reasons. The court, despite evidence to the contrary, found the State's reasons to be racially-neutral (T. 354-62). These findings constituted fundamental error.

### 1.  Venirman Dunbar

The State exercised a peremptory strike on venireman Dunbar, a black male (T. 348). During an inquiry pursuant to *State v.*

65

*Neil*, 457 So.2d 481 (Fla. 1984), the State gave as its "race neutral" reason for striking venireman Dunbar: the fact that Mr. Dunbar is the brother-in-law of a criminal defense attorney who State's co-counsel had cases against (T. 356). The court ruled that this reason was "racially neutral" (T. 358). The court's ruling ignored several facts about this venireman which contradicted the State's "race neutral" reason.

First, when asked whether he had discussed cases with his brother-in-law, venireman Dunbar answered that he did not and had never discussed "any general philosophy about the criminal justice system" (T. 185). In fact, venireman Dunbar stated that the death penalty was warranted in some cases (T. 284) and that there was nothing in his feelings about the death penalty that would impair his ability to vote for death if it was deemed appropriate (T. 210). As Mr. Moore's trial counsel correctly pointed out, "there was no inquiry by the State at any time as to whether or not Mr. Dunbar's relationship as an in-law would have raised any specter of impartiality or partiality toward Defendant . . . [i]n fact, the State didn't even make an inquiry of their own" (T. 356). This supports the conclusion that the true reason the State struck Mr. Dunbar was because of his race and any reason to the contrary is disingenuous.

Second, the Court's *Neil* inquiry ruling on venireman Dunbar ignored the fact that another juror (venirewoman Fross), who was

66

white and who the State did not object to (T. 345), knew "real well" (T. 181) a former Public Defender who "handles capital cases" (T. 358). Like venireman Dunbar, venirewoman Fross did not discuss the work of her former Public Defender friend (T. 182).

Except for the fact that venireman Dunbar was black and venirewoman Fross was white, there is nothing to distinguish the two, who were otherwise similarly situated with respect to their respective relationships with criminal defense attorneys. There is simply no race-neutral reason for striking Mr. Dunbar and accepting Mrs. Fross as a juror. The reason set forth by the State in striking venireman Dunbar was, quite simply, a sham. The court's ruling that "[r]ace had nothing to do with it" (T. 358) ignored the record.

## 2. Venirewoman Pitts

The State exercised a peremptory challenge on venirewoman Pitts, a black female (T. 350) The State said its "race neutral" reason for striking her was that she seemed ~very reluctant," could not give her feelings on the death penalty when asked, stated she felt it was the judge's role to do the sentencing and said "she did not want to be involved in giving an advisory sentence" (T. 359).

In fact, when the State asked venirewoman Pitts about the death penalty and giving a recommendation as to the appropriate sentence, she agreed that she would have no problem with the

death penalty as long as "the merits of the case hold in value" (T. 210) and that she would follow the court's instructions (T. 211). Venirewoman Pitts stated that she agreed with the statement that the death penalty is appropriate in some cases (T. 211). Additionally, when asked by the court if she could make a recommendation to the court of death or life without the possibility of parole for twenty-five years, venirewoman Pitts stated that she could (T. 291).

Although venirewoman Pitts expressed reservations about the death penalty (as most jurors do), she merely expressed that, depending on the facts of a particular case, she would or would not vote to impose the death penalty. The majority of the jurors on the venire expressed this same judgement about imposing the death penalty. That is, the death penalty would not be automatically imposed, but rather, consideration would be given to the particular facts of the case (i.e., the aggravating and mitigating circumstances.) Certainly, this cannot be a "race-neutral reason" as this reason is merely what qualifies one to be a juror.

### 3.  Venirewoman Washington

The State exercised a peremptory challenge on venirewoman Washington, a black female (T. 354). The State said its "race neutral" reason for the strike was that "she did have a problem with the death penalty" (T. 361). The court found this to be a

68

race-neutral reason even though, as the court stated, "she could follow the law" (T. 362).

Although venirewoman Washington expressed reservations about the death penalty (as most jurors do), she merely expressed that, depending on the facts of a particular case, she would or would not vote to impose the death penalty. The majority of the jurors on the venire expressed this same judgment about imposing the death penalty. That is, the death penalty would not be automatically imposed, but rather, consideration would be given to the particular facts of the case (i.e., the aggravating and mitigating circumstances.) Certainly, this cannot be a "race-neutral reason" as this reason merely qualifies one to be a juror.

Venirewoman Washington stated twice on the record that there are cases where she could conceive of recommending the death penalty once she found a person guilty of first degree murder (T. 213, 298-99). By striking venirewoman Washington, the State used its peremptory challenges to exclude a juror who merely had misgivings about the death penalty, a juror that could not be excluded for cause. There was nothing about venirewoman Washington's answers that disqualified her from serving on Mr. Moore's jury.

### 4. Venirewoman Carter

The State exercised a peremptory challenge on venirewoman

Carter, a black female (T. 365). The State said its "race neutral" reason for striking her was that "she had problems with . . . the death penalty," although she stated that she felt like she could follow the law (T. 365). The State's reason in striking venirewoman Carter is the same reason used to justify striking venirewoman Washington. Appellate counsel's failure to raise this issue on direct appeal was deficient performance that deprived Mr. Moore of a new trial.

**B. Appellate Counsel was Ineffective for Failing to Raise and Argue the Claim that Mr. Moore was Denied His Right to a Fair Trial When the State Was Allowed Pretrial Access to the Criminal History Records of Potential Jurors for Use in Voir Dire.**

Mr. Moore filed a motion to prohibit the State from using criminal records of prospective jurors during voir dire and alternatively for disclosure of those criminal records (R. 207). After argument, the Court ordered the State to turn over any criminal history records of potential jurors it had to the defense (T. 91-94).[26]  The prejudice suffered by Mr. Moore by the State's use of juror's criminal history records cannot be cured by disclosure.

As averred by Mr. Moore in his motion:

> Every week, the State Attorney's Office . . . is permitted by the Jacksonville Sheriff's Office to obtain copies of criminal arrest records of all

---

[26]The file of Mr. Moore's trial attorney in this case does not reveal that these criminal history records were ever provided.

prospective jurors for the coming trial week, for use
by the assistant state attorneys during jury selection
in criminal cases.

The defense is not given access to these records by
prosecuting attorneys.

The Jacksonville Sheriff's Office will not provide the
same service . . . to defense counsel, nor will it
permit access to its records for defense to conduct
such an investigation independently.

For the defense to duplicate the investigation of the
State Attorney's Office . . . would be both costly and
time consuming and would require funds not available to
an indigent defendant through the Public Defender's
Office.

The compiled criminal history data supplied to the
State by the Sheriff's Office is not limited to felony
convictions or other convictions which would be a valid
basis for a challenge under Section 40.013, Florida
Statutes.

(R. 207-208). The above described "informal" practice is not

authorized by law, gives the prosecution an unfair advantage, and

violated Mr. Moore's rights to a fair trial.

The purpose of voir dire is to protect the fairness of the

trial by ensuring an impartial and qualified jury. The Sixth

Amendment's underlying goal of jury impartiality applies to both

the State and to the defendant. The only legitimate use of

potential jurors' criminal history record by the State, then, is

when there is a reasonable basis for believing that the criminal

history record may contain information that is pertinent to a

potential juror's selection and that is unlikely to be disclosed

through voir dire or through juror questionnaires.

In Mr. Moore's case, the potential jurors' were never questioned about whether or not they had ever been arrested, had ever been convicted of a crime or anything which might be revealed in a criminal history report and which might cause one to be biased against the State. Absent the contrary, it can only be assumed that potential jurors' criminal history records were used in such a way as to eliminate jurors without cause (or by illegitimate causes) or at least targeted for elimination by the State. Allowing Mr. Moore access to these same criminal history records does not cure this unfairness. Access to the records can never provide an adequate remedy to the State's illegal use of the information to strike a juror for cause when no basis for one exists. Appellate counsel's failure to raise this issue in Mr. Moore's direct appeal was deficient performance that deprived Mr. Moore of a new trial.

> **C. The Trial Court Erred in Admitting Victim Impact Evidence in the Penalty Phase Which Did Not Fall Within the Standard Set Forth in § 921.141(7), Florida Statutes (2002), and Violated Mr. Moore's Due Process Right to a Fair Trial.**

At the penalty phase of the proceedings, over vigorous objection by defense counsel, the trial court permitted the State to present victim impact evidence through the testimony of the victim's daughter, Doris Parrish (T. 1464-67). Ms. Parrish testified, "My dad was a good man. He never bothered nobody. And he was very free hearted, you know. He loved everybody" (T.

1466). This testimony was improper evidence that was not relevant to any aggravating circumstance and thus deprived Thomas Moore of a fair penalty phase proceedings consistent with the Eighth Amendment.

Section 921.141(7), F.S., does permit victim impact evidence only if it is "designed to demonstrate the victim's uniqueness as an individual human being, and the resultant loss to the community's members by the victim's death." However, it isn't evidence relevant to the aggravating circumstances to be weighed against the mitigating circumstances. Its admission violated the Eighth Amendment

> **D. Mr. Moore was Denied the Effective Assistance of Appellate Counsel Where Counsel Failed to Assert Fundamental Error Where the Court Allowed the Sentencing Jury to Hear Substantively Irrelevant But Extremely Prejudicial Details of a "Prior Violent Felony" Aggravating Circumstance, Violating the Eighth and Fourteenth Amendments to the United States Constitution.**

During Mr. Moore's penalty phase proceedings, and in support of the aggravating circumstance that Mr. Moore had previously been convicted of a felony involving the use or threat of violence, the State introduced two judgments and sentences entered against Mr. Moore (T. 1458-59). Thereafter, the State called Det. Goff to testify to the details of Mr. Moore's prior felony convictions:

> Q   Let me direct your attention, Detective Goff, to December 10th, 1983; Did you work with the Sheriff's

73

Office at that time?

A   Yes, ma'am, I was.

Q   Where were you assigned then?

A   At that time I was assigned to the robbery division as a detective.

Q   Detective, were you assigned on that date to investigate a robbery, armed robbery, in Case No. 89-9116 involving the defendant Thomas Moore?

A   Yes, I was.

Q   Could you please tell the jurors anything about the victim in that case?

(T. 1461). At this point, defense counsel objected on hearsay grounds. The court did not rule on the objection, but permitted the State to continue:

Q   Could you please tell the jurors about the victim?

A   Yes, ma'am. This was a white female, 23 years old, named Cynthia Hyman that was robbed on that date.

Q   Did you arrest the defendant Thomas Moore in connection with that armed robbery?

A   Mr. Moore was arrested and charged with that robbery, yes, ma'am.

Q   Did anyone identify the defendant Thomas Moore in connection with that armed robbery?

A   Yes, Cynthia Hyman identified Thomas Moore as being the suspect with the pistol.

Q   **Suspect with what?**

A   **The pistol.**

(T. 1462) (emphasis added). Allowing the State to introduce and the jury to hear this evidence violated the Confrontation Clause.

74

The aggravating factor to which Det. Goff's testimony purports to relate was:

> The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.

(Fla. Stat. 921.141(5) (b). Det. Goff's testimony that the victim was white was not relevant to the aggravating circumstance. This hearsay testimony showed that Mr. Moore, a black man, was arrested for allegedly robbing a white woman with a firearm.

**E. Appellate Counsel was Ineffective for Failing to Raise the Claim that Mr. Moore was Denied His Right to a Fair Sentencing When the Trial Court Denied His Request for an Instruction that the Jury May Consider Mercy in Its Sentencing Decision.**

Defense counsel requested the following instruction:

> Mere sympathy which is purely an emotional response to what you have heard should not influence your decision in any way. However, if sympathy arises as part of a reasoned moral response to mitigation placed before you, you may consider that in your decision about the appropriate penalty.

(R. 452). This instruction was denied by the trial court (T. 1435). Yet, appellate counsel failed to challenge the trial court's ruling in this regard.

**F. Mr. Moore was Denied the Effective Assistance of Appellate Counsel Where Counsel Failed to Brief and Argue the Claim that Mr. Moore's Sentence of Death is Not Proportionate with the Punishments Received by Other Defendants Who Committed Similar Crimes and Presented Like Aggravators and Like Mitigators at Trial.**

While the Florida Supreme Court has mandatory duty to

undertake proportionality review of sentences of death on direct appeal, appellate counsel failure to brief and argue the issue of whether or not a sentence of death is proportional was deficient performance nonetheless. *See Wilson v. Wainwright*, 474 So.2d 1162, 1165 (Fla. 1985) ("It is true that we have imposed upon ourselves the duty to independently examine each death penalty case. However, we will be the first to agree that our judicially neutral review of so many death cases, many with records running to the thousands of pages, is no substitute for the careful, partisan scrutiny of a zealous advocate. It is the unique role of that advocate to discover and highlight possible error and to present it to the court, both in writing and orally, in such a manner designed to persuade the court of the gravity of the alleged deviations from due process. Advocacy is an art, not a science. We cannot, in hindsight, precisely measure the impact of counsel's failure to urge his client's best claims."). In Mr. Moore's case, appellate counsel did provide the "partisan scrutiny of a zealous advocate" and demonstrate why Mr. Moore's sentence of death was, in fact, not proportional.

In support of its sentence of death, the sentencing court found three statutory aggravators: (1) that Mr. Moore was previously convicted of a felony involving the use, or threat to use, violence to the person, §921.141(5) (b), Florida Statutes; (2) the capital felony was committed for the purpose of avoiding

76

or preventing a lawful arrest, §921.141(5)(e), Florida Statutes; and (3) the capital felony was committed for pecuniary gain, §921.141(5)(f), Florida Statutes. The court attached "great weight" to these aggravating factors (R. 501-03). In mitigation, the court attached "slight weight" to Mr. Moore's age at the time of the crime and attached "no significance or value" to testimony regarding Mr. Moore's character (R. 503-04).

On direct appeal, without briefing from appellate counsel, the Florida Supreme Court "reviewed" Mr. Moore's death sentence and determined that Mr. Moore's sentence of death is proportionate. *Moore*, 701 So. 2d at 551. In support of this finding, the court cited cases in which the death penalty was imposed and subsequently upheld on direct appeal, where there were two aggravating factors, two statutory mitigating circumstances, and three non-statutory mitigating circumstances,[27] and where there were two aggravating factors and some non-statutory mitigating factors.[28]  *Moore*, 701 So. 2d at 551-52. *Roper v. Simmons*, 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'").

---

[27]*Pope v. State*, 679 So.2d 710 (Fla. 1996).

[28]*Melton v. State*, 638 So.2d 927 (Fla. 1994); *Consalvo v. State*, 21 Fla. L. Weekly 8423 (Fla. Oct. 3, 1996) .

Proportionality review should have been argued to be more than a mere counting of numbers ("two aggravating factors . . . two statutory mitigating circumstances . . . and three nonstatutory mitigating circumstances"). To have meaning, proportionality analysis must take into whether the defendant was "the most deserving of execution." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002).

Youth is a statutory mitigating circumstance in Fla. Stat. § 921.141(6)(g). The sentencing court gave Mr. Moore's age short shrift. Mr. Moore was 19 when the crime for which he received the death penalty was committed; 15 and 17 at the time of his priors that were used as aggravation. The sentencing court gave Mr. Moore's age only "slight weight" as a mitigator because "[t]he Defendant has exhibited a criminal maturity beyond his age" (R. 503). Whatever the term "criminal maturity" may mean, its use in dismissing this statutory mitigator demonstrates that the sentencer did not take into account lack of maturity and responsible judgment. *Roper v. Simmons*, 543 U.S. at 570 ("From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.").

During the penalty phase, the court was made aware that Thomas Moore was raised by a single parent (T. 1472); that his father was shot and killed when he was seven (T. 1476); that he

78

was given adult responsibilities at a young age; that he suffered constantly from migraine headaches (T. 1479); and that he was treated as an adult in the criminal justice system when he was 15 (T. 1489).

The Florida Supreme Court has consistently recognized drug addiction, alcoholism, and other substances as mitigation. Mr. Moore drank moonshine regularly with the victim (T. 1089-90) and was invited to drink and did drink moonshine with the victim on the day of this homicide (T. 1101). Mr. Moore also smoked marijuana on the day of the crime (T. 1108). Appellate counsel failed to highlight facts to the Florida Supreme Court.

Mr. Moore's co-defendant, Carlos Clemons, initially plead guilty to second degree murder and attempted armed robbery with the understanding that he would receive juvenile sanctions contingent upon testifying truthfully at Mr. Moore's trial. However, this plea deal was to be illegal under §39.022(5)(c)(1), which provides that a juvenile charged with violation of a law punishable by life is not eligible to receive juvenile sanctions. This plea was vacated, and Mr. Clemons testified at Mr. Moore's trial. Following Mr. Moore's trial, Mr. Clemons received commitment to the custody of the Department of Health and Rehabilitative Services for an indeterminate term not to exceed Mr. Clemons' nineteenth birthday with community control after his release.

The circumstances surrounding Mr. Moore's case involve a single victim. Under the Eighth Amendment, Mr. Moore's crime did not make him "the most deserving of execution." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). Appellate counsel's failure to demonstrate that by highlighting the relevant facts from a proportionality perspective was deficient performance that prejudiced Mr. Moore.

> **G.   Mr. Moore was Denied His Right to a Fair Sentencing Because the Jury Instructions Improperly Shifted the Burden to Mr. Moore to Prove the Appropriateness of a Life Sentence in Violation of the Eighth and Fourteenth Amendments. Appellate Counsel was Ineffective for Failing to Raise the Claim on Direct Appeal.**

The jury instructions at Mr. Moore's capital penalty phase required that Mr. Moore prove life was the appropriate sentence, and the jury's and judge's consideration of mitigating evidence was limited to mitigation "sufficient to outweigh" aggravation. Mr. Moore's jury was instructed to sentence him to death unless he proved: "mitigating circumstances sufficient to outweigh the aggravating circumstances" (T. 1458); "sufficient mitigating circumstances exist to outweigh any aggravating circumstance found to exist" (T. 1543); and "mitigating circumstances ... that outweigh the aggravating circumstances" (T. 1544). Mr. Moore's attorney requested the proper standard in a proposed jury instruction (R. 441). The motion was denied (T. 1446). The jury was never instructed that they could find death only if the

aggravating circumstances outweighed the mitigating circumstances. In fact, Mr. Moore's requests that the penalty phase instructions be cured were denied (R. 447-469). **Appellate counsel's performance was deficient in failing to present this issue on direct appeal.**

> **H.   Mr. Moore was Denied a Proper Appeal from His Conviction and Sentence of Death in Violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution Due to Omissions in the Record. Appellate Counsel was Ineffective for Failing to Discover and Remedy This Omission.**

During a June 23, 1993, pretrial conference (See Volume V, p. 24), the trial court mentioned "some discussions on the record yesterday with counsel" regarding an agreement to continue Mr. Moore's case:

> THE COURT:  Thomas Moore is Case-No.93-1659. It's currently set for trial on July 12th. We had some discussions on the record yesterday with Counsel -- the defendant wasn't present. -- about the inability because of discovery to be ready for trial by July 12th. We seemingly, I guess agreed to some type of continuance.

*Id*. It is obvious, on the face of the record, that Mr. Moore was absent from this critical stage of the trial, a waiver of speedy trial. Mr.Moore's absence during this critical stage violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Furthermore, had Mr. Moore been present and fully advised of the reasons his attorney wanted to continue his trial, he would not have waived his right to a speedy trial. Mr. Moore had signed

a form waiving his right to a speedy trial. However, he signed the form on May 11, 1993, based upon totally different reasons than the "discovery" problems alleged to the trial court on June 22nd by defense counsel. And in fact, defense counsel chose not to file the waiver until an agreement was reached at the June 22nd  unreported hearing, as the judge noted on June 23, 1993.[29]

While defense counsel should have objected to the proceeding in his client's absence, appellate counsel should have insured that the record was complete and a transcript of the hearing was prepared or asked for the record to be reconstructed. Had appellate counsel pursued the matter, he would have then been aware of Mr. Moore's absence from a critical stage and able to raised the issue.

Mr. Moore's absence during these critical stages of his trial violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Appellate counsel's failure to obtain the complete record, including a transcript of the June 22nct proceedings, and raised the issue in the direct appeal was deficient performance that prejudiced Mr. Moore.

Mr. Moore's appellate counsel was ineffective. Habeas relief

---

[29]Defense counsel failed to advise Mr. Moore of the consequences of waiving his right to a speedy trial before filing it with the court. This unnecessary delay put Mr. Moore's trial on hold for over four months. During this time, the State managed to "discover" several witnesses, or "discover" additional testimony from witnesses previously spoken to.

is warranted.

**Exhaustion of Ground XI in state court:**

1) **Did you raise Ground XI in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction did you raise Ground XI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   **a) If your answer is "yes", then state:**

   **i.   Date motion filed:** N/A

   **ii.   Whether you received an evidentiary      hearing:** N/A

   **iii. Result:** N/A

   **iv.   Date of Result:** N/A

   **b)   If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

   **i.   If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

   **ii.   Date appeal filed, result of appeal, and date of result:** N/A

3) **Have you raised ground XI in any other petition, application, or motion filed with the state courts of Florida?** Yes; state habeas petition filed 4/02/01 with the Florida Supreme Court; denied 3/07/02, *Moore v. State*, 820 So. 2d 199 (Fla.2002); rehearing denied 6/20/02.

<u>GROUND XII</u>

**THE JURY RECEIVED INADEQUATE GUIDANCE CONCERNING THE AGGRAVATING CIRCUMSTANCES. FLORIDA'S STATUTE SETTING THE AGGRAVATING CIRCUMSTANCES TO BE CONSIDERED IN A CAPITAL CASE IS FACIALLY VAGUE AND OVERBROAD IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Mr. Moore's jury did not receive complete and accurate instructions defining the aggravating circumstances in a constitutionally narrow fashion. The jury was instructed on three aggravating factors. The jury was not advised on the elements of the aggravating factors which the State had to prove beyond a reasonable doubt. As a result, the jury was given unbridled discretion to return a death recommendation. The death recommendation was tainted by this error in violation of the Eighth Amendment. *Espinosa v. Florida*, 505 U.S. 1079 (1992).

At the conclusion of the penalty phase, Mr. Moore's jury was instructed on three aggravating factors, as follows:

> 1. The defendant has previously been convicted of another capital offense or of a felony involving the use or threat of violence to some person. For the purposes of this case the crimes of aggravated battery and armed robbery are felonies involving the use or threat of violence to another person.
>
> 2. The crime for which the defendant is to be sentenced was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.
>
> 3. The crime for which the defendant is to be sentenced was committed for financial gain.

(T. 1544). In imposing a death sentence the trial court found the presence of all three aggravating factors (T. 1583-4).

A Florida penalty phase jury is a co-sentencer under Florida law and therefore must receive constitutionally adequate instructions on the aggravating circumstances. The jury was instructed "that the crime for which the defendant is to be

84

sentenced was committed for financial gain" (T. 1505). However, Mr. Moore's jury received no limiting instructions regarding the requirement that the primary purpose of the crime was "pecuniary gain." In light of the requirement that the primary purpose of the crime for the second aggravator be "avoiding arrest," it is clear that the crime could not have to primary purposes.

This was Eighth Amendment error and it was not harmless beyond a reasonable doubt, especially considering that the jury was instructed on, and the Court found, that the murder was committed for the purpose of avoiding arrest. Furthermore, it was improper for the jury to be instructed on, and the Court to find, both the pecuniary gain aggravator and the avoid arrest aggravator where they are premised upon different primary motives for the homicide. Habeas relief is warranted..

**Exhaustion of Ground XII in state court:**

**1)  Did you raise Ground XII in the Florida Supreme Court on a direct appeal of your conviction?**  No

**2)  After your conviction did you raise Ground XII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

**a) If your answer is "yes", then state:**

**i.  Date motion filed:** 3/26/99; amended 6/22/99, 9/20/99 and 4/06/00.

**ii.  Whether you received an evidentiary      hearing:** No

**iii. Result:** Summary denial

85

**iv.   Date of Result:** 8/04/00; rehearing denied 9/08/00.

**b)   If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

**i.   If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

**ii.   Date appeal filed, result of appeal, and date of result:** Affirmed 3-07-02, *Moore v. State*, 820 So. 2d 199 (Fla. 2002); rehearing denied 6/20/02.

**3)   Have you raised ground XII in any other petition, application, or motion filed with the state courts of Florida?** No

**GROUND XIII**

**FLORIDA STATUTE § 921.141 VIOLATES *RING V. ARIZONA*.**

Section 921.141, Fla. Stat., violates *Ring v. Arizona*, 122 S. Ct. 2428 (2002), because 1) death is not authorized by a finding of guilt of first-degree murder, 2) jury findings are not unanimous, 3) the jury is not required to find "sufficient" aggravators beyond a reasonable doubt, §921.141(2), Fla. Stat., and 4) the jury is not required to find insufficient mitigators to outweigh aggravators beyond a reasonable doubt, §921.141(3), Fla. Stat. *State v. Whitfield*, 107 S.W.3d 253, 258-61 (Mo. 2003). Other *Ring* violations occurred because 1) the jurors' sentencing role was denigrated, (*see* R. 199, 1457, 1543, 1544, 1545, 1546, 1547, 1548), 2) the elements of capital murder were not charged in the indictment, *Jones v. United States*, 526 U.S. 227 (1999), and 3) Mr. Moore was required to proved that mitigators

86

outweighed aggravators. *Mullaney v. Wilbur*, 421 U.S. 684, 698

(1975). *Ring* applies to Mr. Moore under *Fiore v. White*, 531 U.S.

225, 226 (2001).

**Exhaustion of Ground XIII in state courts:**

1) **Did you raise Ground XIII in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction, did you raise Ground XIII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes

    a) **If your answer is "yes", then state:**
      **i. Date motion filed:** 7/19/02

      **ii. Whether you received an evidentiary hearing:** No

      **iii. Result:** Summary denial

      **iv. Date of Result:** 12/30/02; rehearing denied 2/25/03

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

      **i. If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

      **ii. Date appeal filed, result of appeal, date of result:** Notice of appeal filed 3/20/03; affirmed 6/7/04, summary order, *Moore v. State*, FSC Case No. SC03-489; rehearing denied 10/8/04.

3) **Have you raised Ground XIII in any other petition, application, or motion filed in the state courts of Florida?** No.

<u>**GROUND XIV**</u>

**THE STATE INTENTIONALLY PRESENTED FALSE AND/OR MISLEADING EVIDENCE AND KNOWINGLY MADE FALSE AND/OR MISLEADING ARGUMENTS AT MR.**

MOORE'S TRIAL AND FAILED TO CORRECT THE FALSE
AND/OR MISLEADING TESTIMONY AND/OR ARGUMENT
IN VIOLATION OF THE SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS OF THE UNITED STATES
CONSTITUTION.

**A.  Randy Jackson**

Randy Jackson was called as a witness by the State at Mr.
Moore's trial. The State elicited testimony from Mr. Jackson in
which he claimed that on or about January 29, 1993, Mr. Moore
told Mr. Jackson while they were incarcerated together in the
county jail that he, Mr. Moore, had killed Mr. Parrish (T. 965-
67). According to Mr. Jackson, he was put in county jail on
January 2, 1993, and remained there while he served a four month
sentence (T. 964). In cross, the defense elicited testimony from
Mr. Jackson regarding an altercation that he had with Mr. Moore
in which Mr. Jackson claimed that Mr. Moore hit him with a hammer
(T. 971). This testimony was elicited to demonstrate animosity
between Mr. Moore and Mr. Jackson. Regarding this altercation,
Mr. Jackson claimed he did not remember that he had advised the
police that Mr. Moore had hit him with a gun and that Mr. Moore
had shot at him with a gun (T. 972-73). On re-direct of Jackson,
the State elicited the following: "Do you know a man named
Timothy Brinkley?" "Yes, ma'am." "Do you remember you and Mr.
Moore having contact with Timothy Brinkley after he hit you in
the head with the hammer?" "Yes, ma'am." (T. 980).

However, the evidence presented by the State that the

88

"hammer" incident happened after the "Timothy Brinkley" incident was false and the State knew it was false. The State used this false evidence to argue that whatever animosity had existed was merely passing. However, Mr. Jackson was arrested on March 22, 1991, for a battery upon Timothy Bunkley that occurred on January 30, 1991. Mr. Moore had been previously charged with battery of Timothy Bunkley on February 26, 1991. At that time, Mr. Moore was already in jail pursuant to an arrest and booking report, dated February 11, 1991, that reflects an arrest on that date on the basis of Randy Jackson's allegation that on February 10, 1991, Mr. Moore "struck victim over the head with a pistol. After a scuffle the victim fled at which time several shots were fired." Thus the incident involving Bunkley occurred before the February 10, 1991 incident.

During the State's cross of Mr. Moore, the State elicited the following: "Isn't it true, sir, that approximately two weeks after you hit Randy Jackson on the head you and Randy Jackson got arrested for committing a crime together?" "I don't know how long it was. It was about in that time frame." "If I showed you the police report would that help?"[30] "Yes." "Does that sound about right to you (tendering)" "Yes. I just mentioned that, you know,

---

[30]Clearly, the prosecutor had the police report in question. The police report clearly shows that the altercation between Mr. Moore and Randy Jackson that ended their friendship occurred weeks after the Timothy Bunkley battery.

it sounds about that, that sounds about that time frame." (T. 1140).

In the State's closing, the prosecutor continued the deliberate deception: "you heard that two weeks after that incident of being hit in the head the two of them were back consorting together, getting arrested for something else" (T. 1233-34). In the State's rebuttal closing, the deception continued: "this stuff about Randy and him not being friends, - - - even after them getting into this little altercation where Randy Jackson took the gun or a hammer, whatever, - - - they still went out together and got arrested together. They are still friends." (T. 1276). The State knowingly and intentionally deceived the jury. Mr. Moore and Mr. Jackson were not arrested together. They were arrested separately, nearly a month apart, for actions that occurred well in advance of the "hammer" incident. Because the State wanted to blunt the defense's argument that Jackson had an axe to grind and a motive to make up a story that Mr. Moore admitted the murder to him, the State claimed that Jackson and Mr. Moore were together as pals during the Bunkley incident and that the Bunkley incident was after the altercation between Jackson and Mr. Moore that led Jackson to claim that Mr. Moore hit him in the head with a hammer and had Mr. Moore arrested.

Due process requires a prosecutor to stand up and correct

misrepresentations made by a State's witness. Due process also precludes prosecutors from engaging in deliberate obfuscation and deceit. Here, the State never stood up and acknowledged the presentation of false testimony, but instead relied upon the false testimony to make a false and misleading argument to Mr. Moore's jury. A criminal defendant has the right to assume that a prosecutor would not engage in such prohibited conduct. A criminal defendant must be afforded an opportunity to present his constitutional claim once he discovers that the prosecutor presented false and/or misleading evidence and/or argument. Under Florida law, when it requires non-record evidence to demonstrate the prosecutor's due process violation, the constitutional claim must presented in collateral proceedings. Under the logic of *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), there exists an equitable right to effective collateral counsel in his initial collateral review of a constitutional claim. To the extent that Mr. Moore's collateral in his initial review collateral proceeding failed to read the police report in question and discover the prosecutor's deliberate deception, collateral counsel's performance was deficient and constituted cause under *Trevino*. The resulting procedural bar found by the state courts is the resulting prejudice to Mr. Moore.

Where it is shown that the State intentionally misled the defense and/or the trier of fact, the due process violation

warrants a reversal unless the State proves that the violation was harmless beyond a reasonable doubt. Here, the prosecutor's presentation of false and/or misleading evidence and/or argument to support Mr. Jackson's credibility cannot be harmless beyond a reasonable doubt, certainly when considered cumulative with the other due process violations set forth herein. Mr. Jackson claimed that Mr. Moore confessed this crime to him. To rebut the defense's claim that Mr. Jackson carried a personal grudge against Mr. Moore that gave him a motive to lie, the State resorted to deliberate deception. It cannot be said that there is no reasonable doubt that a conviction would have resulted without Mr. Jackson's testimony. But for the State's deliberate deception the jury may have well decided to disregard Mr. Jackson's testimony. Further, the very fact that the State was forced to resort to such deception is evidence of the significance that the State attached to Mr. Jackson's testimony. The State's decision to engage in such conduct undermines its credibility and the reliability of its entire case.

However, this was not the only time the State relied upon deliberate deception at Mr. Moore's trial. Cumulative consideration of the State's use of deliberately false and/or misleading evidence and argument is required.

## B. Carlos Clemons

At Mr. Moore's 1993 trial, the State called Carlos Clemons, a

92

co-defendant, to testify that he observed Mr. Moore commit the homicide. He was the only witness who claimed to have observed the homicide. His credibility was a central issue at the trial. The theory of the defense was that Mr. Moore was innocent and that, in fact, Mr. Clemons with the assistance of Vincent Gaines actually committed the homicide. At the 1993 trial, Mr. Clemons testified that in March of 1993 that he had entered into a plea agreement with the State:

> Q   Did there come a time when you entered into plea negotiations with me [Angela Corey] - - or with my office through me?
>
> A   No, ma'am.  Yes, ma'am.
>
> Q   Okay.  Were you able to consult with Ms. Watson [his court appointed counsel] about that?
>
> A   Yes, ma'am.
>
> Q   What was your agreement for the plea that you were going to enter?  What did you agree to do?
>
> A   To plea for juvenile sanctions and testify.
>
> Q   And do what?
>
> A   And go home on home detention.
>
> Q   What were you supposed to do when you testified?
>
> A   Tell - - testify truthfully.
>
> Q   Testify what?
>
> A   Truthfully.
>
> Q   Okay.  Did you agree to that deal to plead to second degree murder and attempted armed robbery for juvenile sanctions?

A   Yes, ma'am.

Q   For truthful testimony?

A   Yes, ma'am.

(T. 809-10).  The March 1993 deal that Clemons discussed was a

deal that provided for a plea to second degree murder and

attempted armed robbery.  On cross, Mr. Clemons testified:

Q   And when you entered into your plea agreement
back on March 25th you were immediately released from
the jail later on that day, right?

A   Yes, sir.

Q   You were sent home and put on home detention
where they put an ankle bracelet on you, right?

A   Yes, sir.

Q   Part of your agreement in that was that you
were going to be a good fellow, right?

A   Yes, sir.

Q   You weren't going to get in any more trouble,
right?

A   (No response.)

Q   You even told Ms. Corey you were going to be a
good fellow, didn't you?

A   Yes, sir.

Q   You weren't a good fellow while you were home
on detention, were you?

A   No, sir.

Q   You smoked marijuana, right?

A   No, sir.

Q   You didn't smoke any marijuana while you were

94

on home detention?

    A   No, sir.

    Q   So, I take it when they took a urine sample from you in August and it came up positive for marijuana, that was just a mistake?

    A   I was around it.

    Q   You were around people smoking marijuana in your home while you were on home detention on a second degree murder charge, sir?

    A   Yes, sir.

(T. 818-19).[31]  In his 1993 trial testimony, Mr. Clemons indicated that the March 1993 plea agreement was determined to be illegal days before Mr. Moore's trial and that, as a result, it was vacated:

    Q   Did something happen to that plea agreement?

    A   Yes, ma'am.

    Q   What happened?

    A   They said it was an illegal agreement.

    Q   Illegal under the law?

    A   Yes, ma'am.

    Q   What did you do?

    A   Took the plea back.

    Q   Took the plea back?

---

[31]In his 1993 testimony, Mr. Clemons had indicated during the direct examination that he was returned to jail after "I smoked marijuana with my sister" on August 23, 1993 (T. 811).  He remained incarcerated in the jail until his testimony in late October of 1993 (T. 811).

A    Yes.

Q    As of right now what kind of charges are you facing?

A    Second degree murder, attempted armed robbery.

Q    What jail are you in; adult jail or juvenile jail?

A    Adult.

Q    **Have I made any promises at all about what your sentence is going to be?**

A    **No ma'am.**

Q    What did I tell you I would do if you didn't tell the truth?

A    Give me life in prison.

Q    **Did Judge Southwood make you any promises to testify here today**?

A    **No, ma'am.**

Q    **Do you have any idea or thoughts about what he is going to do to you if and when you are tried or you enter a plea**?

A    **No, ma'am.**

Q    Do you even know what charges you are going to be offered to plea on or what you are going to be tried on?

A    No, ma'am.

Q    **Why are you testifying if you don't have a deal?**

A    **It's the right thing to do.**

Q    I'm sorry?

A    **It's the right thing to do.**

96

(T. 812-13) (emphasis added). According to his 1993 testimony, Mr. Clemons had no deal with the State and did not know what he might be able to plead to and/or what his sentence would be.  Mr. Clemons claimed that there was no plea agreement in effect.

On cross-examination, Mr. Clemons testified:

> Q   Okay.  You expect and you hope, don't you - - let me ask you.  You hope that whenever something is worked out for you it will be close to the same thing you had originally signed up for, don't you?
>
> A   Yes, sir.
>
> Q   And I guess you figure if you don't cooperate with the State now you are not going to be in their good graces, are you?
>
> A   I don't know.

(T. 823).

In 1993, Mr. Clemons testified under oath before Mr. Moore's jury that he had no agreement with the State at the time of his testimony and no knowledge of what if anything he would receive from the State as a result of his testimony. He told Mr. Moore's jury that he was testifying without a deal with the State because "It's the right thing to do." The prosecutor urged the jury to believe Mr. Clemons because:

> Carlos Clemons **without any deals** - - and he took the stand **without any deals**.  He gave a statement to the police without any deals instantly.  He never denied his involvement.  **He took the stand without any deals.**  You saw his attorney sitting here.  And he told you he has never said anything different than what you heard here in this courtroom.

(T. 1221)(emphasis added).[32]

At the March 22, 2011, evidentiary hearing, the State called Carlos Clemons back to the witness stand.[33]  Early in the direct examination, the presiding judge inquired:

> THE COURT: All right.  Can you tell me or ask him, either one, what was the deal for him to testify?
>
> MS. COREY: I'll go over that, Your Honor.  Thank you for the reminder.
>
> THE COURT: Just for my recollection.

(3PC-R. 860).  The State thereupon elicited the following testimony from Mr. Clemons regarding the "deal" for his 1993 testimony at Mr. Moore's trial about which the judge had just

---

[32]The prosecutor also argued:

> Carlos Clemons goes into a program the very next day.  He does not talk to Vincent.  They don't even see each other until after they have given their statements.  And I don't know if they have seen each other even since then.  But they do not get together and make up their statements and put it together before they talked to the police.  Carlos is in the program, some sort of juvenile program.

(T. 1230).  However in Mr. Gaines' 2011 testimony, he testified that Mr. Clemons was in the juvenile pod at the same time he was in 1993 (3PC-R. 878).  Mr. Gaines further testified that he was able to talk with Mr. Clemons during that time and that they did "talk about [their] case" (3PC-R. 879).

[33]His testimony was offered by the State in response to four witnesses called by Mr. Moore who testified that while they were incarcerated with Carlos Clemons and Vincent Gaines in the Duval County Jail, Mr. Clemons and Mr. Gaines made statements indicating that Mr. Moore had not been involved in the homicide of Mr. Parrish, but that he was the person that they had chosen to take the fall for the crime that they committed.

inquired:

> Q    Now you had a lawyer representing you?
>
> A    Yes, ma'am.
>
> Q    Was that Ms. Watson?
>
> A    Yes, ma'am.
>
> Q    Denise Watson. **Can you relate to the Court your memory of the plea agreement between you and Ms. Watson and the State of Florida?**
>
> A    **That I would go to a juvenile facility, either from -- till I turn 18 or 21.  It didn't really speculate.**
>
> Q    Okay.  What charges did you enter a plea to?
>
> A    Manslaughter.

(3PC-R. 860-61) (emphasis added).[34] Thus, the testimony presented

by the State on March 22, 2011, was the contrary to Mr. Clemons's

trial testimony that he had no deal with the State when he

---

[34]It is important to recognize that Mr. Moore's trial prosecutor was the attorney representing the State at the 2011 evidentiary hearing was asked Mr. Clemons what his "memory of the plea agreement" was. She was the prosecutor who would have entered into the plea agreement with Mr. Clemons. In her questioning of Mr. Clemons in 2011, she elicits the testimony. She does not show surprise when Mr. Clemons testified that there had been a plea agreement. She then elicited the terms of the plea agreement. She did not suggest in any way that Mr. Clemons's testimony diverged from her recall. Indeed in presenting the testimony, the prosecutor adopted Mr. Clemons's testimony regarding the plea agreement as truthful and accurate. And, the trial prosecutor and Mr. Clemons were the individuals in the courtroom on March 22, 2011, who were in the best position to know what the deal had been to obtain Mr. Clemons's testimony when the judge inquired as to "the deal" (3PC-R. 860). At no time on March 22, 2011, or since has the trial prosecutor challenged the accuracy of the testimony that she elicited from Mr. Clemons.

testified before Mr. Moore's jury in 1993.[35] On cross at the 2011 hearing, Mr. Clemons testified as follows:

> Q   Now, I believe you were asked on direct that you understood that if you didn't testify truthfully you would go to jail?
>
> A   Yes, sir.
>
> Q   Was that pursuant to the plea agreement?
>
> A   No, sir.  It was  - - they already knew.
>
> Q   You already knew that.  Is that what you said?
>
> A   Yes, sir.
>
> Q   But was there an agreement to testify truthfully in the case?
>
> A   Yes, sir.
>
> Q   And what were the terms of the plea agreement?  Do you recall?
>
> A   I just know I was going to a juvenile facility and didn't state no time.  It just --
>
> Q   So in exchange for testifying against Mr. Moore you would be able to plead to manslaughter and go to a juvenile facility?
>
> A   Yes, sir.
>
> Q   That was your understanding?

---

[35]It was the State that chose to present this testimony regarding the deal that Mr. Clemons had in place at the time he testified at Mr. Moore's trial. Certainly, the State did not reveal this deal at the time of Mr. Moore's trial. In fact, the prosecutor in closing argument repeatedly emphasized that Mr. Clemons had testified without a deal. Prior to Mr. Clemons's deposition on February 24, 2011, neither Mr. Moore nor his collateral counsel had been told of Mr. Clemons's deal with the State.

A     Yes, sir.

* * *

Q   In terms of the plea agreement - - in terms of the plea agreement, if it came out now that you testified untruthfully at the trial against Mr. Moore in 1993, what would happen?

A   I'm not sure.

Q   Okay.  Are you - - if it came out now that you testified untruthfully, do you know whether the plea agreement could be revoked?

A   I'm not - - I'm pretty sure.

(3PC-R. 864-65).[36]

Clearly, the 2011 testimony reflects the terms of an agreement entirely different from the March 1993 agreement that was vacated as illegal before Mr. Moore's trial. The March 1993 agreement had provided for Mr. Clemons to plead as charged to second degree murder and armed robbery. According to Mr. Clemons' 2011 testimony, the agreement in effect when he testified at the 1993 trial provided for a plea to a lesser included offense - manslaughter. Thus, the undisclosed agreement in effect when Mr.

---

[36]After the March of 2011 hearing had concluded, Mr. Moore filed a motion to amend his pending Rule 3.851 motion in the state habeas court to include a *Giglio* claim premised upon the testimony given by Mr. Clemons when called as a witness by the State. This motion to amend was filed on April 6, 2011 (3PC-R. 279). The State did not respond separately to the motion to amend, but included a section in its post-hearing memorandum titled: "Moore's Untimely and Inconsequential 2011 Motion to Amend" (3PC-R. 350). However, the circuit court granted Mr. Moore leave to amend to include the *Giglio* claims based upon the 2011 testimony from Mr. Clemons and Mr. Gaines, but denied the claim without conducting an evidentiary hearing on it.

Clemons testified at Mr. Moore's trial was even more favorable to Mr. Clemons than the one vacated as illegal. According to Mr. Clemons' 2011 testimony, after testifying against Mr. Moore, Mr. Clemons served about two years in a juvenile institution on a plea to manslaughter (3PC-R. 865).

The State's failure to disclose the deal at the time of Mr. Moore's trial and its presentation of testimony that there was no deal, as well as its arguments that Mr. Clemons testified without deal, violated due process. *Giglio v. United States*, 405 U.S. 150 (1972); *Guzman v. Sec'y Dep't of Corrs.*, 663 F.3d 1336 (11th Cir. 2011). This constitutional error was not harmless beyond a reasonable doubt on its own. That conclusion is reinforced when it is considered cumulative with the other instances of deliberate deception by the State.

## C.  Vincent Gaines

At Mr. Moore's 1993 trial, the State called Vincent Gaines, a co-defendant, to testify that while he acted as a lookout, he observed Mr. Moore and Mr. Clemons enter Mr. Parrish's house.  He testified after hearing two shots, he saw Mr. Clemons run from the house (T. 545, 548).[37]  A significant feature of Mr. Moore's

---

[37]In his closing argument to the jury in 1993, Mr. Moore's trial attorney focused upon Vincent Gaines' relationship with Mr. Clemons and his history of lying for him:

> Vincent Gaines.  Carlos Clemons' best friend and closest friend.  They see each other daily.  Vincent Gaines actually lived with Carlos on weekends.  His

defense at the 1993 trial was that Mr. Gaines had been in the company of Mr. Clemons earlier on the day of the homicide when the two chased an individual known as Little Terry with a gun.[38] This was significant to the defense because Mr. Moore testified as to his knowledge of the incident which caused him to warn Mr. Parrish about Mr. Clemons and Mr. Gaines and what they had been up to (T. 1104).[39]  In his testimony, Mr. Gaines disputed that such an incident involving Little Terry had occurred earlier that day:

> Q    Mr. Gaines isn't it true that around midday, -

---

> partner in crime.  Both this case and before.  The tie between these two is so close that Gaines will lie to the authorities for Carlos if he thinks that it will help Carlos or himself.  And he told you that.  And he admitted to you that he would lie to help Carlos out. And he is a man of his word in that regard.  Because he's done it before.  He is so practiced and has become so accustomed to lying for Carlos that he even lies about whether Carlos was in school that day.

(T. 1252).

[38]In his 1993 trial testimony, Mr. Clemons testified that on the day of Mr. Parrish's homicide, he and Vincent Gaines may have had a run-in with Little Terry (T. 827, "I think so.").

[39]Mr Moore's testimony was that on the day of Mr. Parrish's homicide, Mr. Moore spoke to Mr. Parrish, his friend, and told him what Mr. Clemons and Mr. Gaines had been up to that day:

> A    I said, "Them there boys, they have got a gun because they are - - there were chasing Little Terry earlier today."  And Michael Dean said, Yeah, they sure do."  So, Mr. Parrish say, "Well, they had better not come around here because I have got one too."

(T. 1104).

- in other words before school got out, - - you were
with Mr. Clemons and the two of you left Flag Street to
go over to Grand Park?

A   No, sir.

* * *

Q   Mr. Gaines, around noontime or shortly
thereafter on the date of Mr. Parrish's death, did you
go to Grand Park with Carlos Clemons?

A   No, sir.

Q   At about that same time did you observe Mr.
Clemons with a chrome-plated .38 in his possession?

A   No, sir.

Q   Did you see a young fellow whose nickname is
Little Terry that day?

A   Not that I remember.

(T. 568-69).[40] When Mr. Moore's trial counsel sought to delve

into Mr. Gaines's credibility on this issue, the judge cut him

off and precluded further questioning because Mr. Gaines had

testified the incident did not happen (T. 565-68).[41]

---

[40]During this questioning by Mr. Moore's counsel, a sidebar
was held at which the trial judge imposed limits upon counsel's
cross-examination of Mr. Gaines as to the Little Terry incident.
The judge indicated that when Mr. Gaines testified that he wasn't
there when the Little Terry incident happened, counsel had to
accept the answer (T. 566, "You asked him was he there at that
time.  He testified he wasn't even there.  I mean, I can't make
him testify to what you want him to testify to.").

[41]At the 1993 trial, State Attorney Corey had told Mr.
Moore's jury during her rebuttal closing argument:

Now, I will tell you Vincent Gaines is not very bright.
I will say he is as dumb as a rock would be more
appropriate.  And that may sound insensitive, ladies

104

In Mr. Moore's direct appeal to this Court, the first issue raised concerned the judge imposed limitations upon the cross-examination of Mr. Gaines and Mr. Clemons regarding the incident with Little Terry. This is a testament to the significance that the Little Terry incident played in the credibility battle between Mr. Gaines and Mr. Clemons on one side and Mr. Moore on the other. The Initial Brief filed in this Court explained:

> The incident in which GAINES and CLEMONS chased Little Terry through the neighborhood with a gun **was critical to the defense theory of the case - that CLEMONS, not Appellant MOORE - killed PARRISH, and that GAINES and CLEMONS were lying.** (T1260). The incident also was crucial for impeachment as GAINES denied the incident took place at all (T568-569), while CLEMONS admitted chasing Little Terry but denied having a gun at all that day, (T829), and witness Willie Reese said GAINES and CLEMONS chased Little Terry but didn't mention whether they had a gun or not (T609-613). The Appellant, MOORE, testified that GAINES and CLEMONS chased Little Terry with a gun, (T1094), and Little Terry himself testified that Gaines and CLEMONS chased him, and that CLEMONS started to pull out a gun. (T1189-1190).
>
> Because the incident was critical to the defense theory and for impeachment of key State witnesses GAINES and CLEMONS, the trial court's refusal to allow defense counsel to fully explore the incident on cross-examination of GAINES and CLEMONS was an abuse of discretion and reversible error.

(Initial Brief, *Moore v. State*, Case No. 82,925, at 8-9)

---

and gentlemen, but you saw him for yourself. But the State doesn't pick its witnesses.

(T. 1271). But while the State impugned his intelligence, it stood behind his credibility, after all it elicited testimony from Mr. Gaines that if he failed to testify truthfully the State "can take [the plea agreement] back" (T. 555-56).

(emphasis added).  This Court found no error in the judge imposed limitation on the cross of Mr. Gaines.  In doing so, this Court relied upon the trial judge's finding that Mr. Gaines testified that he wasn't there.  *Moore v. State*, 701 So. 2d at 549.

On March 22, 2011, the State called Mr. Gaines back to the witness stand.[42]  At that time, the State elicited testimony from Mr. Gaines that he had not told Mr. Moore's investigator (who he acknowledged seeing in 2005 and 2006) that he and Mr. Clemons had chased Little Terry with a chrome-plated .38 (3PC-R. 870). According to Mr. Gaines' direct testimony when he spoke with Mr. Moore's investigator on those two occasions, he told him the "[s]ame thing that I testified against in court" (3PC-R. 870).  In cross, Mr. Gaines contradicted his trial testimony and explained that he was in fact with Mr. Clemons when Little Terry was chased at Grand Park:

> Q    Now, you were asked about whether you had told an investigator about having a gun and chasing Little Terry.  Do you recall that?

---

[42]Mr. Gaines' testimony was offered by the State in response to the four witnesses called by Mr. Moore who testified that while they were incarcerated with Mr. Clemons and Mr. Gaines in the Duval County Jail in 1993, Mr. Clemons and Mr. Gaines made statements indicating that Mr. Moore had not been involved in the homicide of Mr. Parrish, but was the person that they had chosen to take the fall for the crime. Mr. Gaines was also called to the stand to contest the testimony of Daniel Ashton, an investigator for Mr. Moore, who had testified that in 2005 and 2006, he spoke with Mr. Gaines. Mr. Ashton testified that during the interviews, Mr. Gaines told him that he had been present for the Little Terry incident and that Mr. Clemons was in fact armed with a chrome .38 at the time that Little Terry was chased (3PC-R. 828-30).

A     Yes, I recall that.

Q     Did that come up in the discussion with the investigator at all?

A     Yes, it did.

Q     And what did you tell the investigator about the Little Terry incident?

A     **I told him we chased Little Terry but we didn't have a gun.**

Q     So when you say "we" --

A     Me and Carlos.

Q     Was that the same day as the murder?

A     I can't recall.

Q     Okay.  And you were chasing Little Terry why?

A     I think we was just bullying him.

Q     Okay.  Were you threatening him?

A     Just bullying him, chasing him.

Q     Well, is bullying the same thing as threatening?

A     You can say we was bullying.

Q     Did you have any weapon of any kind?

A     No, I didn't.

Q     Okay. But you definitely recall chasing Little Terry?

A     Yes, I do.

Q     And you recall Mr. Clemmons was part of that?

A     Right.

(3PC-R. 877-78) (emphasis added).  This testimony was in direct

conflict with Mr. Gaines' testimony at Mr. Moore's 1993 trial. Though Mr. Ashton, an investigator for Mr. Moore, interviewed Mr. Gaines in 2005 and 2006 and was advised by Mr. Gaines that he and Mr. Clemons had chased Little Terry with a chrome-plated .38, it was not until the State actually presented Mr. Gaines as a witness at the 2011 evidentiary hearing that there was any action by the State that could be construed as an acknowledgment or admission that Mr. Gaines's trial testimony was false. By presenting Mr. Gaines' testimony in this regard, the State adopted Mr. Gaines' 2005/2006 disclosure that he and Mr. Clemons indeed chased Little Terry back in January of 1993. In so doing, the State, by offering his testimony in 2011 and relying on it, implicitly conceded that his contrary testimony at Mr. Moore's 1993 trial was false.[43]

---

[43]During the State's 2011 cross of Mr. Moore's collateral investigator, Dan Ashton, the State introduced Mr. Ashton's notes from his second interview of Mr. Gaines, dated January 4, 2006 (3PC-R. 841). These notes were introduced as substantive evidence by the State and stated that Mr. Gaines had informed Mr. Ashton that "a male courtroom bailiff told him that Angela Corey [the prosecuting attorney] was pissed at him for lying" during Mr. Moore's trial (3PC-R. 841). Mr. Gaines explained to Mr. Ashton that "the only thing he lied about was chasing Little Terry with a gun" (3PC-R. 841-42). Thus, according to the uncontradicted evidence *presented by the State*, the prosecuting attorney at Mr. Moore's trial knew that Mr. Gaines' testimony denying that he and Mr. Clemons chased Little Terry earlier in the day before Mr. Parrish was shot and killed was false.

Mr. Ashton's notes, which constituted uncontradicted substantive evidence presented by the State, also indicated that Mr. Gaines had "stated the gun was stolen from a black Mustang at the Imperial Estates Apartments. The gun was stolen from Tat's, T-A-T aprostrophe s, uncle. And I said unknown name. Vincent

Through its presentation of false and/or misleading evidence and argument at Mr. Moore's trial, the State violated due process. *Giglio v. United States*, 405 U.S. 150 (1972); *Guzman v. Sec'y Dep't of Corrs.*, 663 F.3d 1336 (11th Cir. 2011). This constitutional error when properly evaluated clearly had a substantial and injurous effect on the outcome of Mr. Moore's trial, both at the guilt and penalty phases. Accordingly, habeas relief is warranted.

**Exhaustion of Ground XIV in state court:**

1) **Did you raise Ground XIV in the Florida Supreme Court on a direct appeal of your conviction?** No

2) **After your conviction did you raise Ground XIV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

   **a) If your answer is "yes", then state:**

   **i.  Date motion filed: 1/27/06;** amended 7/31/08, 8/14/09, 9/26/09, and 4/06/11.

   **ii.  Whether you received an evidentiary hearing**: An evidentiary hearing was not permitted on the claim.

   **iii. Result:** Found to be procedurally barred in part and found to not warrant an evidentiary hearing in part.

   **iv. Date of Result:** 1/04/12; rehearing denied 2/02/12.

---

Gaines claims to have no further information on the gun or where it ended up. He heard that when Carlos Clemons was booked into the county jail that he had a .38 shell in his pocket." (3PC-R. 841). The notes also indicated that Mr Gaines had, not only been present for the Little Terry incident, but had seen that Mr. Clemons was in fact armed with a chrome .38 at the time that Little Terry was chased (3PC-R. 840).

b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

   i.   **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

   ii.  **Date appeal filed, result of appeal, and date of result:** Notice of appeal filed on 3/02/12; relief denied; 11-27-13, *Moore v. State*, 132 So.3d 718 (Fla. 2013); rehearing denied 2/27/14.

3) **Have you raised ground XIV in any other petition, application, or motion filed with the state courts of Florida?** No.

### GROUND XV

**MR. MOORE WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AS WELL AS HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE EITHER THE STATE FAILED TO DISCLOSE EVIDENCE WHICH WAS MATERIAL AND EXCULPATORY IN NATURE AND/OR PRESENTED MISLEADING EVIDENCE AND/OR DEFENSE COUNSEL UNREASONABLY FAILED TO DISCOVER AND PRESENT EXCULPATORY EVIDENCE AND/OR NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT AN INNOCENT MR. MOORE WAS CONVICTED UPON THE BASIS OF FALSE EVIDENCE AND ARGUMENT.**[44]

In the proceedings on his Rule 3.851 motion filed on January 27, 2006, Mr. Moore presented evidence demonstrating that the State was in possession of favorable evidence that was not provided to Mr. Moore or his trial counsel at the time of his 1993 trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

---

[44]In this amended petition, Mr. Moore has put the ineffective assistance of counsel portion of this claim, Claim XV, into Claim VIII in light of the state court record that has been developed since Mr. Moore's habeas petition was originally filed in 2006.

Mr. Clemons revealed in his 2011 testimony that he had an undisclosed deal with the State at the time that he testified at Mr. Moore's trial in 1993.[45] Mr. Clemons was not just hoping that the State would agree to a favorable disposition of his case if he testified against Mr. Moore. The undisclosed favorable evidence was that he in fact knew and understood that as long as he testified in the manner that satisfied the State, he would pled to manslaughter and go to a juvenile facility, and be assured of release at the latest on his 19th birthday. This deal was even better than the one previously given which had been nullified when Mr. Moore's counsel pointed out that it was illegal. The undisclosed deal was favorable evidence because it could be used by the defense to impeach Mr. Clemons's testimony.[46]

Additional undisclosed favorable information in the State's possession came to light in Mr. Gaines's 2011 testimony. Mr. Gaines admitted that his trial testimony had been false in at least one significant way.

---

[45]Mr. Moore presents his *Giglio* argument premised upon this new evidence in Ground XIV of this Amended Petition. Mr. Moore certainly believes a new trial is warranted on the basis of the *Giglio* violation. But, Mr. Clemons' 2011 testimony also demonstrates that favorable information in the State's possession was not disclosed within the meaning of *Brady v. Maryland*.

[46]The value of the impeachment is reflected in the prosecutor's repeated emphasis upon Mr. Clemons's testimony that he was testifying at Mr. Moore's trial without a deal and with no knowledge of what the disposition of his case would be (T. 1221).

At the 2011, Mr. Moore called his investigator, Daniel Ashton, to testify regarding statements made to whom by Vincent Gaines.[47] Mr. Ashton testified that Mr. Gaines "told me that he and Carlos Clemmons chased Little Terry around the neighborhood with a chrome-plaed .38 which was stolen from a black Mustang from a person named Tat in an apartment complex and that Carlos Clemmons had that .38 when he went into Mr Johnny's house" (R. 185). Mr. Gaines told Mr. Ashton that he "believe[d] the gun that killed Mr. Johnny was a .38 that Carlos had" (R. 187).

During the State's cross of Mr. Ashton, the State introduced Mr. Ashton's notes from his interviews with Mr. Gaines. These notes were in fact read aloud during the cross of Mr. Ashton (3PC-R. 841-42). According to these notes, Mr. Gaines told Mr. Ashton that during Mr. Moore's trial "a male courtroom bailiff told him that Angela Corey [the prosecuting attorney] was pissed at him for lying" (3PC-R. 841). Mr. Gaines told Mr. Ashton that "the only thing he lied about was chasing Little Terry with a gun" (3PC-R. 841-42).[48]

---

[47]It should go without saying that statements made by either Carlos Clemons or Vincent Gaines that were inconsistent with or contradicted their trial testimony would be admissible at trial as impeachment, and to the extent that the statements were against penal interest, they would be admissible substantively.

[48]Mr. Gaines' willingness to testify untruthfully at Mr. Moore's trial corroborates the story that emerged from the juvenile pod witnesses that Mr. Clemons and Mr. Gaines were out to save themselves and if it took pinning the crime on someone else, that was not an obstacle.

112

The State then called Mr. Gaines to testify. He confirmed that he had spoken to Mr. Ashton twice in 2006 and that he had told Mr. Ashton that Gaines had been with Clemons when they chased Little Terry on the day of the Parrish homicide.[49] The fact that his trial testimony had not been true and that a

---

[49]Mr. Gaines in his testimony when called by the State in 2011 admitted that he had told Mr. Ashton that he was in fact with Mr. Clemons when Little Terry was chased at Grand Park:

> Q    Now, you were asked about whether you had told an investigator about having a gun and chasing Little Terry.  Do you recall that?
>
> A    Yes, I recall that.
>
> Q    Did that come up in the discussion with the investigator at all?
>
> A    Yes, it did.
>
> Q    And what did you tell the investigator about the Little Terry incident?
>
> A    I told him we chased Little Terry but we didn't have a gun.
>
>                         * * *
>
> Q    Okay.  But you definitely recall chasing Little Terry?
>
> A    Yes, I do.
>
> Q    And you recall Mr. Clemmons was part of that?
>
> A    Right.

(3PC-R. 877). This admission directly conflicted with Mr. Gaines' testimony at Mr. Moore's trial.  This change in Mr. Gaines' story meant that he confirmed Mr. Moore's trial testimony, as opposed to refuting it.

bailiff told Mr. Gaines that the prosecutor was upset about his dishonesty was undisclosed impeachment. Clearly, Mr. Gaines had been willing to testify untruthfully at Mr. Moore's trial when he testified that he had not been involved in the Little Terry incident. According to evidence at the evidentiary hearing, Mr. Gaines was told by a bailiff that the prosecutor was aware of dishonesty and not happy about it. Yet, this favorable information was not disclosed by the State to Mr. Moore or his trial attorney.

In addition, Mr. Moore called Mr. Ashton to testify regarding *Brady* material that Randy Jackson had disclosed to him, i.e. that the State had paid him for his testimony against Mr. Moore, as well as his father and his brother. However, the state circuit court at the State's urging ruled that Mr. Moore could not called Mr. Jackson or present evidence of this *Brady* material that he had disclosed to Mr. Ashton.[50] While crossing Mr. Ashton, the

---

[50]Mr. Moore's collateral counsel sought to proffer Mr. Jackson's statements to Mr. Ashton. When Judge Southwood ruled that he would not permit a proffer, the State interceded saying, "Judge, if the Court doesn't mind, we would prefer just for purposes of future litigation that they go ahead and proffer [Mr. Jackson's statements to Mr. Ashton]" (3PC-R. 831-32). Thereupon the following was proffered:

> Q    And what did Mr. Jackson relay to you about Mr. Parrish's murder?

> A    What I specifically remember him telling me was that he wanted to be paid for his testimony, that he was previously paid for his testimony by the State, that his brother and father were also paid for their

State elicited testimony regarding Randy Jackson's statements. The State asked Mr. Ashton "who on behalf of the State paid Randy Jackson?" (3PC-R. 833). Mr. Ashton answered that Mr. Jackson simply "said they paid me, they paid me every time I came to court." (3PC-R. 833-34).

Accepting Mr. Jackson's statements as true, the statements constitute *Brady* material. The State did not disclose to Mr. Moore or his trial counsel that it was paying Mr. Jackson, his father, and brother for their testimony against Mr. Moore. However, the circuit court refused to permit evidentiary development as to Randy Jackson's statements. As a result, the state court did not consider this *Brady* material cumulatively with the *Brady* material on which it did conduct an evidentiary hearing.

Mr. Moore also tried to present undisclosed favorable information that had been provided to him by Audra McCray who revealed that she had been threatened by law enforcement. This meant she had undisclosed reasons to curry favor with the State when testifying at Mr. Moore's trial. This constituted *Brady* material. In his Rule 3.851 motion, Mr. Moore alleged:

--------

> testimony, and that if I showed him the money he would tell me what I wanted to know.  And then I remember him making a statement about Thomas, that there were people a lot guiltier than Thomas out on the street, and that was pretty well where the conversation ended, I believe.

(3PC-R. 832).

115

Audra McCray was threatened by law enforcement with the loss of custody of her newborn son if she did not testify for the State against Mr. Moore. Ms. McCray has indicated that out of fear, she testified the way that she did, and that out of fear, she did not tell any of Mr. Moore's prior attorneys about these threats. This information had not been previously available to Mr. Moore's collateral counsel, and counsel had no way of knowing of this information until either the State or Ms. McCray disclosed it. Only now has Ms. McCray disclosed this information for the first time. When Chris Shorter told her about clothes that supposedly Mr. Moore gave him, she did not believe it was true. Before she testified she was advised that she faced jail time and the loss of her son's custody. Clearly as Ms. McCray has now indicated she had reason to curry favor with the State by testifying against Mr. Moore in the fashion that she did. *Davis v. Alaska*, 415 U.S. 308 (1974). The State did not disclose that it had threatened Ms. McCray and/or that she feared for the loss of custody of her son. This information constitutes favorable information within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963), that was withheld by the State.

(3PC-R. 120-21). Ms. McCray's concerns and fears were quite similar to Melvin Jones's fears that his step-daughter may get him charged with sexual assault which he told the prosecutor about in *Smith v. Sec'y Dep't of Corrs*., 572 F.3d 1327, 1343 (11th Cir. 2009)

The circuit court denied relief on Mr. Moore's *Brady* claim arising from the undisclosed threats to Ms. McCray without the benefit of evidentiary development (3PC-R. 403). The circuit court's reasoning was that Mr. Moore did not "specif[y] what things in Ms. McCray's testimony were not true, thereby failing to make out a prima facie allegation under *Brady*" (3PC-R. 403). Of course, specifying "what things in [a witness's] testimony

116

were not true" is not an element of a *Brady* claim. Through its ruling, the circuit court excluded the *Brady* material regarding Ms. McCray from the cumulative materiality required by *Kyles v. Whitley*, 514 U.S. 419 (1995). This undisclosed favorable evidence must also be part of the cumulative analysis required courts considering claims brought under *Strickland* and/or *Brady*. *See Porter*, 130 S.Ct. at 453-54 (noting that *Strickland* claims require the courts to consider the totality of the evidence); *Kyles,* 514 U.S. at 436–37 n. 10 (noting that *Brady* and *Giglio* claims require a consideration of the totality of the evidence when determining materiality).

When the requisite cumulative consideration is given to all of evidence (including that on which evidence was permitted at the 2011 evidentiary hearing, and that on which Mr. Moore was precluded from presenting evidence), a reasonable application of the well-established federal law would inexorably lead to the conclusion that Mr. Moore's case is cast in a whole new light and confidence in the reliability of the guilt and penalty phase verdicts is undermined.  Accordingly, habeas relief is warranted.

**Exhaustion of Ground XIV in state court:**

1) **Did you raise Ground XIV in the Florida Supreme Court on a direct appeal of your conviction?**  No

2) **After your conviction did you raise Ground XIV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

a) **If your answer is "yes", then state:**

**i. Date motion filed: 1/27/06;** amended 7/31/08, 8/14/09, 9/26/09, and 4/06/11.

**ii. Whether you received an evidentiary hearing:** An evidentiary hearing was permitted on some portions of the claim and not on other portions of the claim.

**iii. Result:** Relief was denied on the claim, but no cumulative analysis was conducted as to all portions of the claim.

**iv. Date of Result:** 1/04/12; rehearing denied 2/02/12.

b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

**i. If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A

**ii. Date appeal filed, result of appeal, and date of result:** Notice of appeal filed on 3/02/12; relief denied; 11-27-13, *Moore v. State*, 132 So.3d 718 (Fla. 2013); rehearing denied 2/27/14.

3) **Have you raised ground XIV in any other petition, application, or motion filed with the state courts of Florida?** No.

### GROUND XVI

**MR. MOORE'S CONVICTION STANDS IN VIOLATION OF DUE PROCESS GIVEN THAT NEW EVIDENCE ESTABLISHES THAT HE IS ACTUALLY INNOCENT OF THE CRIME.**

The conviction of an innocent man and the imposition of a death sentence violates the Eighth and Fourteenth Amendments to the United States Constitution. Considering that the State's main

witnesses have made statements that they committed the murder and put the blame on Mr. Moore in order to get a sweet deal from the State, Mr. Moore can make a compelling case of actual innocence.

In considering Mr. Clemons's and Mr. Gaines's 2011 testimony and the other witnesses presented in 2011 and the evidence identified herein, the totality of the evidence establishes reasonable doubt as to Mr. Moore's conviction and meets the "no reasonable juror test".

Mr. Moore presents herein a colorable claim of actual innocence.  Habeas relief is warranted.

**Exhaustion of Ground XVI in state court:**

**1)  Did you raise Ground XVI in the Florida Supreme Court on a direct appeal of your conviction?**  No

**2)  After your conviction did you raise Ground XVI in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No

    **a) If your answer is "yes", then state:**

        **i.  Date motion filed: 1/27/06**

        **ii.  Whether you received an evidentiary    hearing:** The motion is pending in state circuit court.

        **iii. Result:** N/A

        **iv.  Date of Result:** N/A

    **b)  If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A

        **i.  If you failed to appeal denial of your Rule 3.850 motion, explain briefly:** N/A

        **ii.  Date appeal filed, result of appeal, and date of**

119

**result:** N/A

3) **Have you raised ground XV in any other petition, application, or motion filed with the state courts of Florida?** No.

## CONCLUSION AND RELIEF SOUGHT

When the proper analysis is conducted, Mr. Moore must be afforded a new trial and/or penalty phase that is a true adversarial testing that is constitutionally compliant.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Amended Petition for Writ of Habeas Corpus has been furnished to Stephen White, Office of the Attorney General, The Capitol, PL01, Tallahassee, FL 32399, via electronic transmission on September 17, 2014.

/s/ Martin J. McClain
_____

MARTIN J. MCCLAIN
Florida Bar No. 0754773
McClain & McDermott, P.A.
Attorneys at Law
141 NE 30th Street
Wilton Manors, FL 33334
(305) 984-8344
martymcclain@earthlink.net

120