IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THOMAS JAMES MOORE,

  Petitioner,

v.

MICHAEL D. CREWS,      CASE NO.
  Secretary, Florida     3:06-cv-127-J-34
  Department of Corrections,

  Respondent,

and

PAM BONDI,
  Attorney General,

  Additional Respondent.
_____/

## AMENDED MEMORANDUM OF LAW
## IN SUPPORT OF THE AMENDED PETITION

  Petitioner, **THOMAS JAMES MOORE**, by and through his

undersigned counsel, hereby submits his amended memorandum of law

in support of his amended petition for habeas relief.[1]

## I. STANDARD OF REVIEW UNDER THE AEDPA

**A. Introduction**

  Section 2254(d) of the Anti-Terrorism and Effective Death

---

[1] Because this Court limited the limited the supporting
memorandum of law to 50 pages, Mr. Moore is unable to address all
of the claims presented in his Amended Petition within this
Amended Memorandum of Law. *See* Order of Appointment, *Moore v.
Crosby*, Case No. 3:04-MC-41-J-99, Doc. 2 at 3 (Nov. 4, 2004).

Penalty Act ("AEDPA") states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of that claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d) (West Supp. 1998); *Bui v. Haley*, 321 F.3d 1304, 1314 (11th Cir. 2003). Under these provisions of the "AEDPA", a federal court in habeas proceedings must grant deference to state court adjudications unless the decision was contrary to or an unreasonable application cf clearly established federal law or was based on an unreasonable determination of the facts. However, deference is not accorded to the state court that did not decide a necessary federal question. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim de novo.").[2] Deference is not due when

---

[2]    "Where the state court did not reach the merits of the claim, however, federal habeas review is not subject to the deferential standard that applies under AEDPA to any claim that was adjudicated on the merits in State court proceedings, and instead, the claim is reviewed *de novo*." *Ferrell v. Hall*, 640 F.3d 1199, 1224 (11th Cir. 2011) (quoting *Cone v. Bell,* 129 S.Ct. 1769, 1784 (2009)):

the state court fact finding procedures did not comport with federal law. *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("We agree with petitioner that no deference is due. The state court's failure to provide the procedures mandated by *Ford* constituted an unreasonable application of clearly established law as determined by this Court."). Deference is also not accorded when the state court decision was not just "incorrect or erroneous [but] objectively unreasonable." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Deference is also not accorded when the state court decision rested on an unreasonable determination of fact. *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008)(en banc)("the petitioner has met the requirement of § 2254(d)(2) by showing the state courts made an unreasonable factual determination, we review Jones' claim de novo, without deference to the Georgia Supreme Court's decision.").

**B.    The Application of Section 2254 (d).**

      **1.    "Clearly established law as determined by the Supreme Court of the United States."**

---

        In deciding whether a state court actually reached the merits of a claim, the Supreme Court has also instructed us that we should presume 'the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.' There is an 'indication ... to the contrary' where, for example, the state court has denied the petitioner's claim on only one prong of the *Strickland* test, and, therefore, we review *de novo* the prong that the state court never reached.

*Id.*

3

An examination of § 2254 (d)(1) reveals that the "threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was *clearly established*" at "the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362 (2000) (emphasis added).

In *Williams*, the claim at issue was trial counsel's ineffective assistance. There, the US Supreme Court explained, "[i]t is past question that the rule set forth in *Strickland*[ *v. Washington*, 466 U.S. 668 (1984)] qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Williams*, 529 U.S. 362. As to claims under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995), as of 1995 "the cumulative materiality rule was 'clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of § 2254(d)(1)." *Smith v. Sec'y Dep't of Corrs.*, 572 F.3d 1327, 1348 n.12 (11th Cir. 2009). As to claims under *Giglio v. United States*, 405 U.S. 150 (1972), "clearly established federal law" has long condemned the "deception of a court and jurors by the presentation of known false evidence" as a violation of due process. *Guzman v. Sec'y Dep't of Corrs.*, 663 F.3d 1336, 1347 (11th Cir. 2011).

**2.   The "contrary to" clause.**

After identifying the "clearly established" law, the *Williams* Court explained that the statutory language of both the

4

"contrary to" clause and the "unreasonable application" clause of section 2254(d)(1) must be given effect.  Accordingly, habeas relief was warranted:

> if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. 362.

In *Williams*, the Supreme Court noted two ways in which a state court decision could be "contrary to ... clearly established federal law."  First, the decision is "contrary to clearly established federal law" if the state court does not correctly identify and articulate the legal principles that govern the claim. *Id*. The second way in which a state court decision may be "contrary to ... clearly established federal law" is "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Id*. at 1519-20. This does not require that the facts of the two cases be identical, but only that they be "materially indistinguishable." *Id*.

### 3.   The "unreasonable application" clause.

Under the "unreasonable application" clause, relief should issue "if the state court identifies the correct governing legal

5

principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. 362. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively unreasonable*." *Id.*(emphasis added); *see also Porter v. McCollum*, 130 S. Ct. 447 (2009) (noting that a federal court considering a *Strickland* claim must consider whether the state court "unreasonably applied" *Strickland* in its holding).

### 4.   "An unreasonable determination of the facts."

A state court's decision is also entitled to no deference if it is shown that the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(2). *Jones v. Walker*, 540 F.3d 1277, 1288 (11th Cir. 2008)(en banc)("the petitioner has met the requirement of § 2254(d)(2) by showing the state courts made an unreasonable factual determination, we review Jones' claim de novo, without deference to the Georgia Supreme Court's decision.").

### C.   Evidentiary Hearing under AEDPA.

Section 2254(e)(2) as amended by the AEDPA governs evidentiary hearings in federal habeas corpus cases. In *Breard v. Greene*, 118 S.Ct. 1352 (1998), the Supreme Court reiterated that the language of § 2254(e)(2) precluded a habeas petitioner

from being afforded an evidentiary hearing only "if he 'has failed to develop the factual basis of [the] claim in State court proceedings.'" *Id.* at 1355 (citation omitted).  A majority of the circuits which have addressed the issue have held in accordance with this principle that the "failure to develop" language of § 2254 (e)(2) does not mean that a hearing is precluded if a habeas petitioner requested, but was denied, an evidentiary hearing by the state courts.[3]

Thus, the federal court, in determining whether a habeas petitioner should be afforded an evidentiary hearing, must first analyze whether the petitioner has failed to develop the factual basis of the claim in state court. *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998). In those instances where the habeas

---

[3]    *See, e.g., McDonald v. Johnson*, 139 F. 3d 1056, 1059 (5th Cir. 1998) (holding that "a petitioner cannot be said to have 'failed to develop' a factual basis for his claim unless the undeveloped record is a result of his own decision or omission"); *Burris v. Parke*, 116 F. 3d 256, 258-59 (7th Cir.) ("To be attributable to a 'failure' under federal law the deficiency in the record must reflect something the petitioner did or omitted"), *cert. denied*, 118 S.Ct. 462 (1977); *Jones v. Wood*, 114 F.3d 1002, 1013 (9th Cir. 1997) ("Where, as here, the state courts simply failed to conduct an evidentiary hearing, the AEDPA does not preclude a federal hearing on otherwise exhausted habeas claims"); *Love v. Morton*, 112 F.3d 131, 136 (3rd Cir. 1997) (finding § 2254(e)(2) inapplicable where "factors other than the defendant's action prevented a factual record from being developed"); *Miller v. Champion*, 161 F.3d 1249, 1253 (10th Cir. 1998) ("We now join every other circuit that has confronted this question and hold that where, as here, a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so, § 2254(e)(2) does not apply").

petitioner has not 'failed' to develop the factual basis in state court, the federal court essentially looks to pre-AEDPA law - that is, the standards set forth in *Townsend v. Sain* – to determine the need for an evidentiary hearing.[4] Thus, Mr. Moore "is entitled to receive an evidentiary hearing so long as his allegations, if true and if not contravened by the existing record, would entitle him to habeas relief." *Miller*, 161 F.3d at 1253.[5] *See Pope v. Sec'y Dep't of Corrs.*, 680 F.3d 1271, 1288 (11th Cir. 2012) ("After all, while AEDPA promotes principles of comity, comity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort.'")

---

[4]     Under *Townsend*, a federal court is *required* to hold an evidentiary hearing "[i]f (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the factfinding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend*, 372 U.S. at 313.

[5]     Here, while there was an evidentiary hearing in 2011, the circuit court unreasonably limited the scope of that hearing such that several factual disputes have never been resolved. "It is well established that a habeas petitioner is entitled to an evidentiary hearing on a claim if he or she alleges facts that, if proved at the hearing, would entitle petitioner to relief." *Meeks v. Singletary*, 963 F.2d 316, 319 (11th Cir. 1992) (quoting *James v. Singletary*, 957 F.2d 1562, 1573 n.17 (11th Cir. 1992)). *See also Bertolotti v. Dugger*, 883 F.2d 1503, 1509 (11th Cir. 1989) (noting that a federal evidentiary hearing "often is necessary in a first federal habeas petition").

(quoting *Williams v. Taylor*, 529 U.S. 420, 430 (2000)).

## II.   GROUNDS FOR RELIEF[6]

### GROUND I

**MR. MOORE'S CONVICTION FOR ARMED BURGLARY VIOLATES HIS RIGHTS TO DUE PROCESS AND TO NOTICE AND A MEANINGFUL OPPORTUNITY TO BE HEARD, AS WELL AS THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND THE INVALIDITY OF THE ARMED BURGLARY CONVICTION REQUIRES VACATING MR. MOORE'S CONVICTION FOR FIRST-DEGREE MURDER.**

In *Delgado v. State*, 776 So.2d 233, 239-40 (Fla. 2000), the Florida Supreme Court wrote: "The question before this Court is whether the Legislature intended to criminalize the particular conduct in this case as burglary when it added the phrase 'remaining in' to the burglary statute." The Court noted "Florida's current definition of burglary was enacted in 1975. See ch. 74-383, section 31, Laws of Fla. The previous definition did not contain the 'remaining in' language. *See* § 810.01, Fla. Stat. (1973)." *Id.* at 240 n.4. Thus, the Florida Supreme Court in *Delgado* was asked to determine the statutory definition of the

---

[6]     The memorandum of law in support of the habeas petition filed in 2006 had a section regarding the state court proceedings not having been full and fair and not entitled to deference. Since 2006, additional state court proceedings have been conducted in which additional public records were provided and a limited evidentiary hearing was conducted. As a result, undersigned counsel has decided that in this amended memorandum of law, the better way to address any inadequacy in the fairness of the state court proceedings is when addressing specific claims and the state court proceedings as to a specific claim.

crime of burglary under legislation adopted in 1975. After noting

that the criminal code's definition of a criminal offense was to

be strictly construed, the Florida Supreme Court held:

> Applying this principle to the present case, the most
> favorable interpretation of Florida's burglary statute
> is to hold that the "remaining in" language applies
> only in situations where the remaining in was done
> surreptitiously. This interpretation is consistent with
> the original intention of the burglary statute. In the
> context of an occupied dwelling, **burglary was not
> intended to cover the situation where an invited guest
> turns criminal or violent.** Rather, **burglary was
> intended to criminalize** the conduct of a suspect who
> terrorizes, shocks, or surprises the unknowing
> occupant.

*Id.* at 240 (emphasis added).

In *Delgado*, the question as to the statutory definition of

burglary arose in the context of two homicide convictions that

rested on felony-murder with the underlying felony being

burglary. The crimes occurred in 1990. In reversing the felony-

murder convictions, the Florida Supreme Court held that: "in

order to give meaning to the entire burglary statute (the

'remaining in' clause and the 'unless' clause), the 'remaining

in' clause should be limited to the defendant who surreptitiously

remains." *Delgado v. State*, 776 So.2d at 240. Given this

construction of the burglary statute, the court concluded that

Mr. Delgado's convictions of felony-murder could not stand:

> The jury in this case was instructed that a defendant
> can be found guilty of burglary, even if the initial
> entry was consensual, if the victims later withdrew
> their consent. This theory of burglary was also relied
> on by the State as the underlying felony to support the

> felony murder charge. Pursuant to our analysis in
> today's opinion, such a theory of burglary (and felony
> murder) is legally inadequate.

*Id.* at 242.

Despite the fact that the issue in *Delgado* required it to construe the meaning of the statutorily defined criminal offense of burglary, the Florida Supreme Court in its opinion said: "This opinion will not, however, apply retroactively to convictions that have become final." *Id.* at 241. The criminal activity at issue in *Delgado* occurred on August 30, 1990. Thus, the definition of the crime of burglary adopted by the Florida Supreme Court on August 24, 2000, was applied to conduct occurring on August 30, 1990, as Mr. Delgado was given the benefit of that the Florida Supreme Court's determination that "[i]n the context of an occupied dwelling, **burglary was not intended to cover the situation where an invited guest turns criminal or violent.**"

In *State v. Ruiz*, 863 So.2d 1205 (Fla. 2003), the Florida Supreme Court held that under *Delgado* a burglary conviction based upon conduct occurring in 1995 and in 1998 must be vacated when "initial entry into the victim's residence was consensual and there was no evidence . . . of a burglary other than the commission of crimes within the residence." *Ruiz*, 863 So.2d at 1208.

In *Fitzpatrick v. State*, 859 So.2d 486 (Fla. 2003), the

11

Florida Supreme Court applied the *Delgado* construction of the statutorily defined offense of burglary to a February 8, 1980, crime. Mr. Fitzpatrick had been charged in 1996 with first degree murder. His trial in 2000 resulted in a conviction. The Florida Supreme Court reversed on the basis of *Delgado* saying:

> The trial judge in the instant case instructed the jury on premeditated murder and felony murder with robbery and burglary as the underlying felonies. The jury returned a general verdict finding Fitzpatrick guilty of first-degree murder. Appellant argues that reversal of his conviction is warranted because the jury may have relied upon an erroneous definition of burglary as the basis for the felony murder conviction. We agree.

*Fitzpatrick*, 859 So.2d at 490.

In Mr. Moore's case, the entry into Mr. Parrish's home was consensual according to Carlos Clemons, and there is no evidence of burglary other than the crimes committed in the home. The State conceded as much in its closing argument,[7] and the trial judge instructed the jury that the basis of the burglary charge was "remaining in" (T. 1359).

Mr. Moore is entitled to relief because his conviction stands in violation of the Due Process Clause in light of *Delgado* which adopted a construction of the substantive law that defined the criminal offense of burglary. That substantive law, i.e. the

---

[7]     "[W]e know that this defendant was allowed to come in by Mr. Johnny. But the reason why he is guilty of burglary is because at the time that he remained in, when he pulled that gun on Mr. Johnny to get his goods from him, he no longer had Mr. Johnny's consent to be in that residence and to harm him" (T. 1215).

definition of burglary, was applied in *Delgado* to allegedly criminal conduct in 1990, and in *Fitzpatrick* to allegedly criminal conduct in 1980. In Mr. Moore's case, the allegedly criminal conduct occurred in 1993.

The Florida Supreme Court's refusal to give Mr. Moore the benefit of substantive law, i.e. the definition of the criminal offense of burglary, that was found to apply to conduct alleged to constitute burglary in 1990 in *Delgado* and in 1980 in *Fitzpatrick*, is contrary to well-established federal law.[8]

In *Fiore v. White*, 531 U.S. 225 (2001), the United States Supreme Court wrote:

> After Fiore's conviction became final, the Pennsylvania Supreme Court interpreted the statute for the first time, and made clear that Fiore's conduct was not within its scope. However, the Pennsylvania courts refused to grant Fiore collateral relief. We granted certiorari in part to decide when, or whether, the Federal Due Process Clause requires a State to apply a new interpretation of a state criminal statute retroactively to cases on collateral review.

*Fiore*, 531 U.S. at 226. The US Supreme Court concluded that:

> the question is simply whether Pennsylvania can, consistently with the Federal Due Process Clause, convict Fiore for conduct that its criminal statute, as properly interpreted, does not prohibit.

*Fiore*, 531 U.S. at 228. As to that question, the US Supreme Court answered:

---

[8]     The Florida Supreme Court denied Mr. Moore's claim premised upon the construction of the statutorily defined criminal offense of burglary on December 16, 2004. *See Moore v. Crosby*, Case No. SC04-834 (December 16, 2004).

> This Court's precedents make clear that Fiore's
> conviction and continued incarceration on this charge
> violate due process. We have held that the Due Process
> Clause of the Fourteenth Amendment forbids a State to
> convict a person of a crime without proving the
> elements of that crime beyond a reasonable doubt. *See
> Jackson*, 443 U.S., at 316, 99 S.Ct. 2781; *In re
> Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d
> 368 (1970). In this case, failure to possess a permit
> is a basic element of the crime of which Fiore was
> convicted.

*Fiore*, 531 U.S. at 228-29. Accordingly, "[t]he simple, inevitable

conclusion is that Fiore's conviction fails to satisfy the

Federal Constitution's demands." *Id*. at 229. *See Bunkley v.

Florida*, 538 U.S. 835 (2003).

Nearly two years before denying Mr. Moore's claim based on

*Delgado* and *Fitzpatrick*, the Florida Supreme Court in *State v.

Klayman*, 835 So. 2d 248, 252 (Fla. 2002), attempted to follow

*Fiore v. White*. The Florida Supreme Court concluded that under

*Fiore*, a "clarification" of the criminal law was required to "be

applied in all cases," while a "change" was not. According to the

*Klayman* decision:

> A clarification is a decision of this Court that says
> what the law has been since the time of enactment. To
> determine whether a decision clarifies a statute, we
> first look to the decision itself to discern its
> intent. If the decision is silent or ambiguous on this
> point, we then look to the underlying statute to
> discern its intent. Where the Legislature cedes no
> discretion to the courts either directly or indirectly
> but instead employs definitive language that ordinarily
> requires no judicial construction, the Legislature
> intends that the statute be applied as enacted. A
> decision by this Court confirming the original intent
> is a clarification of extant law.

14

*Id*. at 253 (footnotes omitted).[9]

However one week after issuing the decision in *Klayman*, the Florida Supreme Court issued *Bunkley v. State*, 833 So.2d 739 (Fla.2002), *vacated*, 538 U.S. 835 (2003). In *Bunkley*, the Florida Supreme Court abandoned the principles set forth in *Klayman*, writing:

> This Court's decision in *L.B.* is not a jurisprudential upheaval under *Witt*, for *L.B.* was not a " major constitutional change of law." Rather, *L.B.* was a routine statutory construction case wherein this Court construed and refined the phrase "common pocketknife" in the face of evolving circumstances in the field. The decision thus "affords new or different" guidelines for Florida courts to use in applying the statute and is an evolutionary refinement in the law.

*Bunkley v. State*, 833 So.2d at 745-46. In *State v. Barnum*, 921 So.3d 513 (Fla. 2005), the Florida Supreme Court indicated that *Klayman* was unworkable and its articulation of the meaning of *Fiore v. White* had in essence been rejected in *Bunkley*. *See Hollingshead v. State*, 80 F.3d 424 (Fla. 4th DCA 2012).

The failure to apply the burglary statute consistently and uniformly and to give Mr. Moore the benefit of the construction of the burglary statute set forth in *Delgado* was arbitrary within the meaning of the Eighth and Fourteenth Amendments. *Furman v.*

---

[9]    In *Delgado*, 776 So.2d at 239-40, the Florida Supreme Court wrote: "The question before this Court is whether the Legislature intended to criminalize the particular conduct in this case as burglary when it added the phrase 'remaining in' to the burglary statute." Thus on its face, *Delgado* was a determination of what the legislature meant when it adopted the statutory definition of burglary in 1975.

*Georgia*, 408 U.S. 238 (1972).  While other defendants have received the benefit of the correct construction of the burglary statute, Mr. Moore has arbitrarily been denied that benefit.

"An essential principle of due process is that a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed.  v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "[F]undamental fairness is the hallmark of the procedural protections afforded by the Due Process Clause." *Ford v. Wainwright*, 477 U.S. 399, 424 (1986)(Powell, J., concurring in part and concurring in the judgment).

In *Hall v. Florida*, 134 S.Ct. 1986, 2001 (2014), the US Supreme Court held:

> The death penalty is the gravest sentence our society
> may impose. Persons facing that most severe sanction
> must have a fair opportunity to show that the
> Constitution prohibits their execution. Florida's law
> contravenes our Nation's commitment to dignity and its
> duty to teach human decency as the mark of a civilized
> world.

*See Johnson v. Mississippi*, 486 U.S.578, 584 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case.").

Mr. Moore was prosecuted for first-degree murder under both premeditated and felony murder theories. The State argued both theories (T. 1213-14), and argued that burglary could serve as the underlying felony for a felony murder conviction (T. 1214). The events at issue occurred in 1993, three years after the allegedly criminal conduct that was at issue in *Delgado*. The crime could not mean something different in 1993 than it did in 1990. Substantive criminal law cannot hopscotch in the fashion approved by the Florida Supreme Court here.

Employing the *Delgado* construction of burglary, Mr. Moore's first degree murder conviction must be vacated. *Yates v. United States*, 354 U.S. 298 (1957); *Fitzpatrick v. State*, 859 So. 2d at 490-91. The Court in *Fitzpatrick* held that *Yates* clearly applied:

> Here, the question is whether reversal is required where the jury was instructed on premeditated murder and felony murder, and where felony murder, in turn, was based on alternate underlying felonies, one of which is legally insufficient.  We hold that the extra analytical step required in the instant case does not alter the impact of the *Yates* rule.  We have before us a multi-part theory of prosecution, one part of which is legally inadequate, and a general jury verdict. From this information, we cannot possibly discern whether the jury convicted Fitzpatrick based on the legally sufficient grounds of premeditated murder or felony murder based on robbery, or the inadequate charge of felony murder based on burglary.  It is precisely this type of uncertainty that *Yates* rejects. We are therefore compelled to reverse Fitzpatrick's conviction, vacate his sentence, and remand the case for a new trial.

*Fitzpatrick*, 859 So. 2d at 490.  Since Mr. Moore's case presents this identical factual scenario, the Florida Supreme Court's

17

decision denying Mr. Moore's claim was contrary to, and involves an unreasonable application of, clearly established federal law as explained in *Fiore*. **Habeas relief is warranted.**

## GROUND II

### THE TRIAL COURT'S LIMITATIONS ON CROSS-EXAMINATION OF STATE WITNESSES DEPRIVED MR. MOORE OF HIS SIXTH AMENDMENT CONFRONTATION RIGHTS.

"There are few subjects, perhaps, on which [the Supreme] Court and other courts have been more nearly unanimous than in their expression of belief that the right of confrontation is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. Texas*, 380 U.S. 400, 404-05 (1965). In *Pointer v. Texas*, the US Supreme Court ruled that the Sixth Amendment's Confrontation Clause applied to state criminal prosecutions precisely because it is a "fundamental right" essential to a fair trial. The purpose of the Confrontation Clause is the "promotion of the integrity of the fact finding process." *White v. Illinois*, 502 U.S. at 356 (quoting *Coy v. Iowa*, 487 U.S. 1012 (1988)).

On direct appeal, Mr. Moore challenged the trial court's limitations on the cross-examination of three State witnesses: Vincent Gaines, Carlos Clemons and Earl Mattox. The issues regarding Gaines and Clemons were raised in the first argument of Mr. Moore's initial brief, and the issue regarding Mattox was raised in the second argument. *Moore v. State*, 701 So. 2d at 548.

18

The Florida Supreme Court rejected the constitutional claim, "find[ing] no abuse of discretion." *Id.* at 549. The direct appeal decision is contrary to, and involves an unreasonable application of, clearly established federal law.[10] The right to cross-examination is a fundamental constitutional right under the Sixth Amendment, a right which is subject to *de novo* review, not an abuse of discretion standard of review. *Pointer*, 380 U.S. at 404-05.

The proposed cross-examination was intended to support the defense theory that Gaines and Clemons committed the murder and to impeach the testimony of State witnesses Gaines, Clemons and Shorter. From Gaines's testimony in 2011, we now know that his testimony was false on the very point that Mr. Moore's counsel sought to pursue in cross. Clearly, the preclusion of cross had a substantial and injurious effect in that it kept the jury from learning that Gaines's testimony was not truthful. Habeas relief is warranted.

<u>**GROUND III**</u>

> **MR. MOORE'S RIGHT OF CONFRONTATION WAS VIOLATED AT THE PENALTY PHASE OF HIS CAPITAL TRIAL, IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES**

---

[10]   In his second state habeas petition, Mr. Moore pointed out to the Florida Supreme Court that it improperly applied an abuse of discretion standard of review on direct appeal. The court denied the petition on the merits without discussion. *Moore v. Crosby*, Case No. SC04-834, summary order (Fla. Dec. 16, 2004).

CONSTITUTION.

In Mr. Moore's case, the State presented law enforcement officers to testify regarding what witnesses had told him in the course of investigating criminal activity allegedly committed by Mr. Moore. At Mr. Moore's penalty phase, the State was permitted to present the testimony of a police officer regarding what witnesses had said about the facts and circumstances underlying prior convictions that the State was presenting as aggravating circumstances. Further, the State was permitted to go beyond the fact that Mr. Moore was previously convicted and argue on the basis of hearsay facts not contained in the judgments and sentences which the State introduced. These occurrences were in clear violation of the Confrontation Clause.

The Eleventh Circuit held in *Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982), that "the right to cross-examine adverse witnesses applies to capital sentencing hearings." *See Muhammad v. Sec'y Dep't of Corrs*., 733 F.3d 1065, 1076 (Fla. 2013) (majority opinion concluded that hearsay was admissible in capital penalty phase). In *Proffitt*, the Eleventh Circuit observed that "[b]ecause the death penalty ... is permanent and irrevocable, the procedures by which the decision to impose a capital sentence is made bring into play constitutional limitations not present in other sentencing decisions." *Id*. at 1253. The Eleventh Circuit concluded that "the

right to cross-examine adverse witnesses applies to capital sentencing hearings." *Proffitt*, 685 F.2d at 1254. *Proffitt* also took note the US Supreme Court's decisions finding the need for extra procedural protections in capital cases in order to enhance reliability. *Id*. In *Gardner v. Florida*, 430 U.S. 349 (1977), the US Supreme Court banned the sentencer in a capital case from relying on information not disclosed to the defendant or his attorney.[11] *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984) ("A capital sentencing proceeding like the one involved in this case, however, is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's role at trial — to ensure that the adversarial testing process works to produce a just result under the standards governing decision."); *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case."); *Hall v. Florida*, 134 S.Ct. at 2001 ("The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to

---

[11]This was to insure that death sentences could not be imposed on the basis of information that the capital defendant had been afforded no opportunity to rebut.

show that the Constitution prohibits their execution.").[12]

At Mr. Moore's penalty phase, Det. Goff testified that the victim of the armed robbery "was a white female, 23 years old, named Cynthia Hyman that was robbed on that date" (R14. 1452). Det. Goff further explained, "Yes, Cynthia Hyman identified Thomas Moore as being the suspect with the pistol" (R14. 1452). This testimony was based upon statements made by Cynthia Hyman who Mr. Moore could not confront. The introduction of this testimony had a substantial and injurious effect. It introduced Ms. Hyman's race, and the prior criminal activity that was being presented was when Mr. Moore was juvenile. Because the introduction violated Sixth Amendment principles, the state court's failure to acknowledge the mistake was an unreasonable application of federal law and habeas relief is warranted.

### GROUND IV

**BASING AN AGGRAVATING CIRCUMSTANCE ON PRIOR CONVICTIONS FOR CRIMINAL ACTIVITY COMMITTED WHEN MR. MOORE WAS FIFTEEN AND SEVENTEEN YEARS OLD VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION UNDER *ROPER V. SIMMONS*, 543 U.S. 551 (2005).**

In *Roper v. Simmons*, 543 U.S. 551 (2005), the United States

---

[12] In *Pointer v. Texas*, 380 U.S. at 403, the US Supreme Court ruled that the Sixth Amendment's Confrontation Clause applied to state criminal prosecutions precisely because it is a "fundamental right" essential to a fair trial. The purpose of the Confrontation Clause is the "promotion of the integrity of the fact finding process." *White v. Illinois*, 502 U.S. at 356 (quoting *Coy v. Iowa*, 487 U.S. 1012 (1988)).

22

Supreme Court held that the Eighth Amendment precluded the
imposition of the death penalty on juvenile offenders. In
reaching this conclusion, the Court wrote:

> Because the death penalty is the most severe
> punishment, the Eighth Amendment applies to it with
> special force. *Thompson*, 487 U.S., at 856, 108 S.Ct.
> 2687 (O'CONNOR, J., concurring in judgment). Capital
> punishment must be limited to those offenders who
> commit "a narrow category of the most serious crimes"
> and whose extreme culpability makes them "the most
> deserving of execution." *Atkins*, *supra*, at 319, 122
> S.Ct. 2242. This principle is implemented throughout
> the capital sentencing process. States must give narrow
> and precise definition to the aggravating factors that
> can result in a capital sentence. *Godfrey v. Georgia*,
> 446 U.S. 420, 428–429, 100 S.Ct. 1759, 64 L.Ed.2d 398
> (1980) (plurality opinion). * * *
>
> Three general differences between juveniles under 18
> and adults demonstrate that juvenile offenders cannot
> with reliability be classified among the worst
> offenders. First, as any parent knows and as the
> scientific and sociological studies respondent and his
> amici cite tend to confirm, "[a] lack of maturity and
> an underdeveloped sense of responsibility are found in
> youth more often than in adults and are more
> understandable among the young. These qualities often
> result in impetuous and ill-considered actions and
> decisions." *Johnson*, *supra*, at 367, 113 S.Ct. 2658; *see
> also Eddings*, *supra*, at 115–116, 102 S.Ct. 869 ("Even
> the normal 16-year-old customarily lacks the maturity
> of an adult"). It has been noted that "adolescents are
> overrepresented statistically in virtually every
> category of reckless behavior." Arnett, Reckless
> Behavior in Adolescence: A Developmental Perspective,
> 12 Developmental Rev. 339 (1992). In recognition of the
> comparative immaturity and irresponsibility of
> juveniles, almost every State prohibits those under 18
> years of age from voting, serving on juries, or
> marrying without parental consent. *See* Appendixes B–D,
> *infra*.
>
> The second area of difference is that juveniles are
> more vulnerable or susceptible to negative influences
> and outside pressures, including peer pressure.

*Eddings*, *supra*, at 115, 102 S.Ct. 869 ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage"). This is explained in part by the prevailing circumstance that juveniles have less control, or less experience with control, over their own environment. *See* Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1014 (2003) (hereinafter Steinberg & Scott) ("[A]s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting").

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed. See generally E. Erikson, Identity: Youth and Crisis (1968).

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson*, *supra*, at 835, 108 S.Ct. 2687 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *See Stanford*, 492 U.S., at 395, 109 S.Ct. 2969 (Brennan, J., dissenting). The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson*, *supra*, at 368, 113 S.Ct. 2658; *see also* Steinberg & Scott 1014 ("For most teens, [risky or antisocial] behaviors are

> fleeting; they cease with maturity as individual
> identity becomes settled. Only a relatively small
> proportion of adolescents who experiment in risky or
> illegal activities develop entrenched patterns of
> problem behavior that persist into adulthood").

*Roper v. Simmons*, 543 U.S. at 569-70.

The prior convictions of violent offenses aggravating circumstance rested entirely upon criminal conduct committed by Mr. Moore when he was juvenile. One prior was committed when Mr. Moore was 15 years old, the other when he was 17 years old. The actions of Mr. Moore when he was a juvenile was used to convince the jury to recommend a death sentence.[13] It was one of three aggravating circumstances that the State relied upon to argue that the numerous mitigating circumstances should not result in a life recommendation. Indeed, Mr. Moore's juvenile offenses fed the prosecutor's inappropriate argument that Mr. Moore was "the devil" (T. 1277, 1520). The introduction of Mr. Moore's convictions of crimes committed when he was a juvenile was Eighth Amendment error under *Roper v. Simmons*. The Florida Supreme Court's order dated October 18, 2005, denying Mr. Moore's claim under *Roper v. Simmons* was contrary to or an unreasonable

---

[13]     On direct appeal, the Florida Supreme Court found error in the admission of testimony that Mr. Moore was seen with a gun a few days after the homicide, a gun that had no known connection to the homicide. This error was found harmless beyond a reasonable doubt by the Florida Supreme Court. However without the introduction of Mr. Moore's actions as a juvenile and in light of the mitigating evidence that was presented, clearly a different result would have occurred on direct appeal.

application clear federal law. *Moore v. Crosby*, Case No. SC05-498
(October 18, 2005). Habeas relief is warranted.

GROUND V

**THE PROSECUTOR'S PENALTY PHASE CLOSING ARGUMENT, WHICH USED MITIGATION EVIDENCE AS NON-STATUTORY AGGRAVATING EVIDENCE, VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

As to Ground V of the amended petition, the trial judge's
refusal to allow Mr. Moore's counsel to object and place the
grounds for his objection on the record violated the Eighth
Amendment. In *Hall v. Florida*, 134 S.Ct. 1986, 2001 (2014), the
US Supreme Court held:

> The death penalty is the gravest sentence our society
> may impose. Persons facing that most severe sanction
> must have a fair opportunity to show that the
> Constitution prohibits their execution. Florida's law
> contravenes our Nation's commitment to dignity and its
> duty to teach human decency as the mark of a civilized
> world.

The prosecutor's argument based upon her experience that Mr.
Moore's mitigating evidence was in fact "the most aggravating
factor of all" violated Mr. Moore's Eighth Amendment right to
present mitigating evidence.[14] The state court procedure in
precluding Mr. Moore from presenting his claim was itself Eighth

---

[14]     "Once this low threshold for relevance is met, the
'*Eighth Amendment* requires that the jury be able to consider and
give effect to' a capital defendant's mitigating evidence."
*Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *Boyde v.
California*, 494 U.S. 370, 377-78 (1990)).

26

Amendment error. *See Johnson v. Mississippi*, 486 U.S. 578, 584.

Habeas relief is warranted.

**GROUND VIII**

> **MR. MOORE WAS DENIED THE EFFECTIVE ASSISTANCE
> OF COUNSEL PRETRIAL AND AT THE
> GUILT/INNOCENCE PHASE OF HIS TRIAL IN
> VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND
> FOURTEENTH AMENDMENTS.**

Mr. Moore attempted to present this claim in state court

proceedings on a successive Rule 3.851 motion because Mr. Moore's

collateral counsel in his first Rule 3.851 proceedings rendered

ineffective assistance at the initial review collateral

proceedings of his claim under *Strickland v. Washington*, 466 U.S.

668 (1984), that his trial counsel rendered ineffective

assistance in violation of the Sixth Amendment. In its order

denying the successive Rule 3.851 motion, the circuit court

wrote: "With regard to the claim of ineffective assistance of

counsel, such claim is untimely and procedurally barred." (3PC-R.

394). The Florida Supreme Court affirmed this ruling on appeal.

*Moore v. State*, 132 So.3d at 722 n.3 ("To the extent that Moore

is attempting to raise an ineffective assistance of counsel claim

within this second successive postconviction motion, we affirm

the postconviction court's ruling that such a claim is

untimely.").

The United States Supreme Court held in *Trevino v. Thaler*,

133 S.Ct. 1911, 1921 (2013), that in a state like Florida that

27

encourages appellants to not raise *Strickland* claims on direct
appeal when *Evitts v. Lucey* guarantees effective representation,
but instead in collateral proceedings when there is no Sixth
Amendment right to effective representation, there is an
equitable right to effective collateral counsel in the initial
review of a *Strickland* claim.[15] A violation of this equitable
right constitutes cause that defeats a procedural default or
procedural bar of the *Strickland* claim. Here, Mr. Moore's
collateral counsel during proceedings on his first Rule 3.851
motion had in his possession a note in trial counsel's files
showing that trial counsel was aware of a witness who claimed
that Clemons, the State's star witness, had admitted in the
juvenile pod of the county jail that Mr. Moore was not present
and did not commit the murder. (3PC-R. 812) ("Thomas didn't do
it"). This was evidence of Mr. Moore's innocence, as well as
evidence impeaching the State's case. It clearly came from David
Hallback, a person who had been in the juvenile pod with Mr.
Clemons. This pretty clearly established Mr. Hallback's age, he
was a juvenile in 1993. Yet, Mr. Jackson could not figure out how
to locate Mr. Hallback and speak with him about his claim that

---

[15]     A capital defendant in Florida is discouraged from
raising a non-record *Strickland* claims on direct appeal. *See*
*Nixon v. State*, 572 So. 2d 1336 (Fla. 1990) (deferring ruling on
an ineffective-trial-counsel claim until further record
development in collateral proceedings after the court remanded
the case for an evidentiary hearing regarding an
ineffective-appellate-counsel claim).

Mr. Clemons admitted to him that Mr. Moore "didn't do it." **The note also suggested that Mr. Clemons had been talking in the juvenile pod and that others who had been there may have heard something. Mr. Jackson failed to investigate.[16]**

### A. Trial Counsel Was Ineffective In Violation of *Strickland* For Failing to Follow-up With And Present David Hallback As a Defense Witness.

At the 2011 evidentiary hearing, Mr. Moore called David Hallback to testify. Mr. Hallback testified that in the summer of 1993, he was incarcerated in the same juvenile pod as Carlos Clemons, who he had previously known (3PC-R. 700-01). Mr. Hallback testified that Mr. Clemons told Mr. Hallback that Mr. Moore was not present when the crime occurred (3PC-R. 705) ("He left before all this had happened.").

The State through its cross established that attorneys representing Mr. Moore spoke with Mr. Hallback about what Mr. Clemons had told him. Documentary evidence in the form of a handwritten note from trial counsel's files confirmed Mr. Hallback had spoken to trial counsel well before Mr. Moore's trial (3PC-R. 276). The dated note states:

---

[16] John Jackson even had possession of a second handwritten note from the public defender's file dated in early 1994, which reflected that someone from the public defender's office had interviewed Charles Simpson. This document had the following notation: "conf. w/ Charles Simpson re: gun." It also included the notation, "Carlos had some tie-in w/ the gun." Reference was also made to "Carlos + Vincent Gaines" (3PC-R. 268). Yet, Jackson did not follow up.

- Says that Carlos Clemons was with [illegible] cell block (Feb. or so).

- Clemons was telling them what happened.

- Said Thomas didn't do it.

(3PC-R. 276).

### 1. Deficient Performance: Failure to Conduct a Thorough Investigation

It is axiomatic that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984)). That is, "counsel has a duty to make reasonable investigations." *Id*. In this case, trial counsel was handed a defense witness on a silver platter but failed to follow up with the witness or any of the information he provided or could have provided. Counsel's failure to follow-up on an interview that yielded a finding that "Clemons was telling them what happened" and "said Thomas [Moore] didn't do it" was not based on "reasonable professional judgment." Rather, counsel's failure to follow up with David Hallback was the result of pure "inattention" or a conflict of interest in that the public defender's office also represented Mr. Hallback. *Id*. at 526.

Here, the content of the note found in trial counsel's file regarding their pre-trial interview of David Hallback combined

with Mr. Hallback's 2011 testimony regarding his knowledge from 1993 shows that there was a wealth of evidence available had counsel investigated the his information. Through Mr. Hallback, counsel could have discovered Raimundo Hogan,[17] Mandell Rhodes,[18] and Charles Simpson, each of whom testified that he was in the juvenile pod with either Mr. Clemons, Mr. Gaines, or both in 1993. Mr. Simpson, Mr. Hogan and Mr. Rhodes all indicated in

---

[17]    Raimundo Hogan testified in 2011 that he had been in the juvenile pod with Mr. Gaines in 1993 and spoken with him:

> Well, he [Gaines] just said that him and Clemons did a little robbery, dude got killed. I didn't know the victim at all. Then like two or three days later we talked more. That's when he went to telling me about exactly who did what . . . he told me that him and Clemons robbed the dude, Clemons shot him, and then I asked him, you know, what you all going to do. He said they were going to put it on somebody else. I'm like, uh, well, you all really want to do that. He was like, we ain't got no choice, because the dude they're going to blame it on, he's a nobody.

(3PC-R. 764-65). Later when Mr. Hogan saw Mr. Clemons, he asked Mr. Clemons "about it and I asked him did he really shoot the dude and he said yeah" (3PC-R. 766). All Mr. Clemons told Mr. Hogan was "that he shot the dude and that was it and he going with Gaines on putting it on Moore" (3PC-R. 766).

[18]    Mr. Rhodes testified in 2011 about what Mr. Clemons had told him when they were together in the juvenile pod in 1993:

> Since - - from what I understand, the State already gave him an escape route being that he was the youngest, they feel like he couldn't have did nothing like that, he had to be misled, you know, stuff like that. So he went with the story they basically gave him, blame it all on the oldest guy.

(3PC-R. 751). Mr. Clemons told Mr. Rhodes that he, Clemons, "was the one who did it" (3PC-R. 750).

their 2011 testimony that they did not know Mr. Moore and had no reason to try to help him.

Trial counsel's failure to follow up on the information provided by Mr. Hallback was unreasonable and constituted deficient performance.

### 2. Trial Counsel Was Operating Under A Conflict of Interest.

The circuit court questioned Mr. Hallback and elicited testimony that in 1993, at the time of his conversation with the two individuals who indicated that they were with the public defender's office representing Mr. Moore, Mr. Hallback was also being represented by the "same Public Defender's Office right here in Jacksonville" (3PC-R. 729). Thus, the public defender's office represented both Mr. Moore and Mr. Hallback. While a conflict of interest may explain the practical reason why no follow-up interview of Mr. Hallback was conducted, it does not excuse the failure to investigate Mr. Moore's case and certainly does not constitute a strategic reason. *See Cooper v. Sec'y*, *Dep't. of Corr.*, 646 F.3d 1328, 1351 (11th Cir. 2011) ("The question under *Strickland* is whether [ ] trial counsel 'conducted an adequate background investigation or reasonably decided to end the background investigation when [they] did.'") (quoting *Johnson v. Sec'y, DOC*, 643 F.3d 907, 931-32 (11th Cir. 2011).

### 3. Trial Counsel's Deficient Performance Was Prejudicial.

The US Supreme Court has explained that "[t]o assess the probability of a different outcome under *Strickland*, we consider the totality of the available [ ] evidence – both that adduced at trial and the evidence adduced in the habeas proceeding." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (quoting *Porter v. McCollum*, 130 S. Ct. 447, 453-54 (2009)). *Strickland* requires a "probing and fact-specific analysis" that takes into account the impact of the particular evidence on the universe of evidence presented at trial *and* postconviction proceedings.

Here, the resulting prejudice of counsel's failure to follow-up with their initial, pre-trial interview of David Hallback is apparent from the witnesses from the juvenile pod. Each witness had a different story to tell; each had different contact with Mr. Clemons and Mr. Gaines. Despite the disparate ways that each man learned his bit of information, the information when considered cumulatively (as required under federal law as the proper *Strickland* analysis) fits together to tell a coherent and exculpatory story that undermines confidence in the outcome. *See Porter,* 130 S.Ct. at 453-54 (instructing courts to consider the totality of the available evidence "both that adduced at trial, and the evidence adduced in the habeas proceeding").

Indeed, immediately after hearing the testimony on March 22, 2011, the circuit court judge stated:

> I have to make a decision as to whether or not—I don't necessarily have to determine the truthfulness of any

33

> or all of these witnesses. I will tell everybody, for
> what it's worth, **that all of this testimony concerns
> me. Okay?** I'm not at this point in time ready to
> absolutely disregard all of the testimony I've heard. I
> may. **But the cumulative effect concerns me....** So for
> whatever that's worth to you.

*McClain v. Atwater*, 110 So.3d 892, 896 (Fla. 2013) (emphasis

added).[19] Thereupon, written closings were scheduled and the

proceedings were concluded.[20]

As the circuit court's initial reaction demonstrated,

confidence in the reliability of the outcome was and is

undermined by the wealth of evidence that could have been

presented had counsel investigated the lead provided by Mr.

Hallback. The resulting prejudice also impacted the penalty phase

proceeding as well, as the State's case for a death sentence was

---

[19]   The decision in *McClain v. Atwater* concerned
reimbursement of registry counsel for his investigative expenses
in Mr. Moore's case in connection with the 2006 motion to vacate
and the 2011 evidentiary hearing. Within the Florida Supreme
Court's opinion in that decision appears details of Mr. Moore's
case.

[20]   Mr. Moore was returned to the jail and his collateral
counsel returned to his office. At that time, the State Attorney
had Mr. Moore arrested on new murder charges regarding a 1990
murder of a prostitute. The only link to Mr. Moore was an alleged
9 loci match to a male DNA profile taken from a vaginal swab. The
arrest of Mr. Moore on the new murder charges was trumpeted by
Jacksonville's news media and was well known within the halls of
the Duval County Courthouse. While the murder charges were
pending, the judge who presided at the evidentiary hearing and
had been troubled by the evidence was no longer troubled and
issued an order denying relief in January of 2012 (3PC-R. 414-
15). Later on October 24, 2012, a jury found Mr. Moore not guilty
of all charges in the 1990 homicide case (Reply Brief at 8, *Moore
v. State*, Case No. SC12-459).

premised upon the credibility of Clemons and Gaines. Confidence in the outcome of both the guilt and penalty phases must be undermined by counsel's deficient performance as outlined in this claim.

### B. Trial Counsel's Failure to Familiarize Themselves With Police Reports Constituted Deficient Performance that Prejudicially Affected the Outcome of Mr. Moore's Trial.[21]

In addition to the above, trial counsel also rendered deficient performance in failing to be familiar with the police reports regarding Randy Jackson's claim that Mr. Moore had hit him in the head with a hammer and regarding the Timothy Bunkley incident. As to a *Giglio* claim based on the police reports, the Florida Supreme Court found, "[t]he postconviction court denied this claim, holding that the claim was procedurally barred because 'the facts . . . were readily available to trial counsel at the time of the trial, as they were contained in police reports which existed in 1991.'" *Moore v. State*, 132 So.3d 718 (Fla. 2013)). But of course, that's the problem. Trial counsel failed to review the reports sufficiently to know that the State was deliberately deceiving the jury.

Randy Jackson and Mr. Moore were both involved in an attack on Timothy Bunkley around January 30, 1991. Around February 10,

---

[21]    This claim overlaps with Ground XIV which focuses on violations of *Giglio v. United States*, 373 U.S. 83 (1963), at Mr. Moore's trial.

1991, Mr. Jackson and Mr. Moore had an altercation between the two of them. The State, however, reversed the chronology in order to argue that whatever animosity that existed between Mr. Moore and Mr. Jackson was brief and passing, and thus the jury could believe Randy Jackson's testimony that Mr. Moore had confessed to him. Because counsel failed to learn from the police reports that the Bunkley incident had occurred before Mr. Jackson's allegations that Mr. Moore hit him in the head with the hammer, counsel was unprepared for the State's deliberate deception in her questioning of witnesses and in her closing argument.

When considered cumulatively with counsel's failure as to Mr. Hallback's information, confidence in the reliability of the guilt and penalty phase verdicts is undermined. *See Porter*, 130 S.Ct. at 453-54 (*Strickland* claims require the courts to consider the totality of the evidence). Habeas relief is warranted.

### C. Collateral Counsel Was Ineffective in Violation of the *Trevino* Line of Cases For Failing to Investigate and Present Trial Counsel's Errors in the Initial Postconviction Litigation.

Under *Trevino*, Mr. Moore's equitable right to effective collateral representation was violated. Collateral counsel's failure to adequately investigate was unreasonable. *See Trevino v. Thaler*, 133 S. Ct. at 1921 (holding "[a] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial, if in the initial-

36

review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective") (quoting *Martinez v. Ryan*, 132 S.Ct. 1309, 1322 (2012)).

The failures of postconviction and trial counsel were intertwined: both failed to follow-up with a critical witness who could have testified in support of Mr. Moore's innocence, could have led counsel to additional witnesses who would have further bolstered the defense's case, and could have leant significant support to Mr. Moore's credibility in a case that was essentially a battle between his credibility and the credibility of his two co-defendants, Carlos Clemons and Vincent Gaines. Given the importance of effective defense counsel to the justice system, the United States Supreme Court recognized an exception to "modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Trevino*, 133 S. Ct. at 1917.

Collateral counsel at the initial review collateral proceeding also violated Mr. Moore's equitable right to effective collateral counsel. He failed to read the police reports and notice that trial counsel should have combat the prosecutor's deliberate deception in presenting evidence and making argument reversing the order of the events in order to thwart the attack on Jackson's credibility in testifying against Mr. Moore. Trial

counsel was ineffective within the meaning of *Strickland*.
Collateral counsel's failure to investigate and present the
readily available evidence of the *Strickland* violation outlined
herein, was deficient performance that constituted cause under
*Trevino* to overcome the state court procedural bar. The prejudice
to Mr. Moore is readily apparent. Habeas relief is warranted.

**GROUND XIV**

> **THE STATE INTENTIONALLY PRESENTED FALSE
> AND/OR MISLEADING EVIDENCE AND KNOWINGLY MADE
> FALSE AND/OR MISLEADING ARGUMENTS AT MR.
> MOORE'S TRIAL AND FAILED TO CORRECT THE FALSE
> AND/OR MISLEADING TESTIMONY AND/OR ARGUMENT
> IN VIOLATION OF THE SIXTH, EIGHTH AND
> FOURTEENTH AMENDMENTS OF THE UNITED STATES
> CONSTITUTION.**

"As long ago as *Mooney v. Holohan*, 294 U.S. 103 (1935), the
Supreme Court made clear that deliberate deception of a court and
jurors by the presentation of known false evidence is
incompatible with 'rudimentary demands of justice.'" *Guzman v.
Sec'y Dep't of Corrs.*, 663 F.3d 1336, 1347 (11th Cir. 2011).
"When police or prosecutors conceal significant exculpatory or
impeaching material in the State's possession, it is ordinarily
incumbent on the State to set the record straight." *Banks v.
Dretke*, 540 U.S. 668, 675-76 (2004). A rule "declaring
'prosecutor may hide, defendant must seek,' is not tenable in a
system constitutionally bound to accord defendants due process."
*Id*. at 696. "Prosecutors' dishonest conduct or unwarranted

38

concealment should attract no judicial approbation." *Id*. The State "may not subvert the truth-seeking function of the trial by obtaining a conviction or sentence based on deliberate obfuscation of relevant facts." *Garcia v. State*, 622 So.2d 1325, 1331 (Fla. 1993). If a State's witness misrepresents a material fact, the prosecutor is obligated to stand up and correct the witness' misstatement. *Giglio v. United States*, 405 U.S. at 153; *Napue v. Illinois*, 360 U.S. 264 (1959).

The Florida Supreme Court failed to reasonably apply the principles the well-established federal law and failed to consider the cumulative effect of the prosecutor's deliberate deception of Mr. Moore's jury. *Cone v. Bell*, 129 S.Ct. 1769, 1773, 1783 (2009); *e.g.*, *Moore v. State*, 132 So.3d 718, 723 (Fla. 2013)("We review each alleged *Giglio* violation individually)"). Moreover, the state court failed to grant Mr. Moore an evidentiary hearing on his *Giglio* claims pled in his April 6, 2011, motion to amend pending motion to vacate, or in the alternative, motion to vacate. Mr. Moore was not granted evidentiary development as to the testimony that the State presented at the March 22, 2011, evidentiary hearing. It was at the 2011 hearing that the State revealed that Mr. Clemons had a deal with the State in place when he testified at Mr. Moore's trial, contrary to his trial testimony.

### A.  The State Knowingly Presented False or Misleading

**Evidence that It Failed to Correct at Mr. Moore's Trial in Violation of *Giglio* When The State Failed to Correct Carlos Clemons's False Testimony Regarding His Deal With the State.**

On March 22, 2011, the State called Mr. Clemons to testify at the Rule 3.851 evidentiary hearing.[22]  Early in the direct examination of Mr. Clemons in 2011, the presiding judge inquired:

> THE COURT:      All right.  Can you tell me or ask him, either one, what was the deal for him to testify?
>
> MS. COREY:      I'll go over that, Your Honor.  Thank you for the reminder.

(3PC-R. 860). Mr. Clemons testified that when he testified at Mr. Moore's trial in 1993, he had a deal that in exchange for his testimony he would be permitted to plead to "manslaughter," a lesser included offense of the crime with which he had been charged, *i.e.* second degree murder, and be sentenced as a juvenile (3PC-R. 30). Mr. Clemons made it extremely clear that under the "agreement" his ability to plead to a lesser included offense was tied to testifying at Mr. Moore's trial:

> Q      But was there an agreement to testify

---

[22]After the March of 2011 hearing had concluded, Mr. Moore filed a motion to amend his pending Rule 3.851 motion in the state habeas court to include a *Giglio* claim premised upon the testimony given by Mr. Clemons when called as a witness by the State. This motion to amend was filed on April 6, 2011 (3PC-R. 279). The State did not respond separately to the motion to amend, but included a section in its post-hearing memorandum titled: "Moore's Untimely and Inconsequential 2011 Motion to Amend" (3PC-R. 350). However, the circuit court granted Mr. Moore leave to amend to include the *Giglio* claims based upon the 2011 testimony from Mr. Clemons and Mr. Gaines.

                            truthfully in the case?

              A           Yes, sir.

              Q           And what were the terms of the plea agreement?
                          Do you recall?

              A           I just know I was going to a juvenile facility
                          and didn't state no time.  It just --

              Q           **So in exchange for testifying against Mr. Moore
                          you would be able to plead to manslaughter and
                          go to a juvenile facility?**

              A           **Yes, sir.**

(3PC-R. 864-65) (emphasis added).[23] Thereafter, Mr. Moore sought

to present a *Giglio* claim based upon this testimony.

     In denying Mr. Moore's relief upon his *Giglio* claim as to Mr.

Clemons,[24] the circuit court wrote:

              This Court finds it necessary to first clarify the
              time-line with regard to Mr. Clemmons' plea agreements.
              On March 25, 1993, in Duval County Case Number 16-1993-
              CF-1658, Mr. Clemmons entered into a plea agreement.
              On October 25, 1993, days before the Defendant's trial,

     ───────────────────

     [23]In his 2011 testimony, Mr. Clemons agreed that in exchange
for his testimony, he "would be able to plead to manslaughter"
(3PC-R. 864-65).  Thus, his testimony is not that he had entered
a plea in his own case when he testified in 1993 at Mr. Moore's
trial, but that he "would be able to".

     [24]In his order denying relief, the presiding judge had
permitted Mr. Moore over the State's objection to amend his Rule
3.851 motion to include a *Giglio* claim based upon Mr. Clemons'
testimony in March of 2011.  The judge explained: "Although the
State argues that the Defendant's violation of Rule 3.851's
spirit has 'grown from the egregious to the absurd,' this Court
will nonetheless address the Defendant's newly raised claims **as
the Defendant could file these claims within one year of
discovery.**" (3PC-R. 404) (emphasis added) (footnote omitted).
The State did not appeal this ruling and thus is precluded from
challenging it in Mr. Moore's appeal.

> Mr. Clemmons withdrew his plea of guilty.  On December 3, 1993, just over a month after the Defendant's trial, Mr. Clemmons was permitted to withdraw his plea of not guilty and enter a guilty plea.  This Court finds it necessary to point out that during the evidentiary hearing, when Mr. Clemmons testified regarding his plea agreement, he was never asked to clarify whether he was referring to the plea agreement entered into before or after the Defendant's trial.

(3PC-R. 405). Of course, the problem with this is that Mr. Moore was denied an evidentiary hearing on this claim.

The finding that "the testimony at the evidentiary hearing was ambiguous" was unreasonable. The trial prosecutor who knew whether there was a deal was the same prosecutor who then presented the testimony that there was a deal at the 2011 hearing and did not contest the testimony or try to clear it up or change it. The record clearly shows that the deal entered was different than the earlier deal that had been vacated as illegal before Mr. Moore's trial. The Florida Supreme Court's finding that the testimony was "ambiguous" was an unreasonable finding of fact.

The existence of a deal with the State was contrary to Mr. Clemons' testimony at the 1993 trial and contrary to the State's closing argument. The Florida Supreme Court's finding as to materiality of the *Giglio* violation ignored the record, specifically the prosecutor's closing argument. She repeatedly told the jury that Mr. Clemons was credible and should be believed because he was testifying "without any deals:"

> Carlos Clemons **without any deals** - - and he took the stand **without any deals**.  He gave a statement to the

42

> police **without any deals** instantly.  He never denied
> his involvement.  He took the stand **without any deals**.
> You saw his attorney sitting here.  And he told you he
> has never said anything different than what you heard
> here in this courtroom.

(T. 1221)(emphasis added).

The Florida Supreme Court further compounded its application of *Giglio* to this case by continuing the circuit court's error of misapplying the legal standard under *Giglio*. Without making any factual determination as to whether Mr. Clemons's trial testimony was false, the circuit court then said:

> Even if Mr. Clemmons' statement that he had previously
> testified pursuant to a plea agreement was before the
> jury, it would not have affected the jury's verdict,
> nor would it probably produce an acquittal on retrial.

(3PC-R. 405). This standard is contrary to or an unreasonable application of federal law. *Guzman v. Sec'y Dept. of Corrs.*, 663 F. 3d 1336, 1348, 1351-53 (11th Cir. 2011). *See also Smith v. Sec'y, Dep't. of Corrs.*, 572 F.3d 1327, 1333 (11th Cir. 2009) (noting the two categories of *Brady* violations, "each with its own standard for determining whether the undisclosed evidence is material and merits a new trial.").

The State's case rested substantially on Mr. Clemons' credibility. Mr. Clemons was the <u>only</u> witness to claim to be present, to witness Mr. Moore fire the gun, and to see Mr. Moore shoot Mr. Parrish.[25]  Both the Florida Supreme Court and the

---

[25]In order to convict Mr. Moore, the jury had to be convinced beyond a reasonable doubt that his account was untrue and that

lower court ignored the fact that the trial prosecutor would have known of "the deal" when she allowed the testimony to go uncorrected and when she relied upon the absence of a deal in her closing argument.[26] Knowledge of the truth would have "impugned not only [the prosecutor's] veracity but the character of the entire [prosecution]." *Guzman v. Sec'y Dept. of Corrs.*, 668 F.3d at 1353. For that reason, "[t]he 'could have' standard" required under *Giglio* "requires a new trial **unless the prosecution persuades the court that the false testimony was 'harmless beyond a reasonable doubt.**" *Smith*, 572 F.3d at 1333.

> **B.   The State Knowingly Presented False or Misleading Evidence that It Failed to Correct at Mr. Moore's Trial in Violation of *Giglio* When The State Allowed Vincent Gaines to Testify Falsely That He Had Not Chased Terry Ashley (aka "Little Terry") With A Gun Shortly Before the Crime.**

As to Vincent Gaines's false testimony at Mr. Moore's trial, the state courts failed to grant an evidentiary hearing on Mr.

---

Mr. Clemons' account was correct.  Evidence that Mr. Clemons sat in the witness box and, after swearing to tell the truth, lied to the jury as to the existence of a deal and the benefit that he would receive for his testimony certainly creates a reasonable possibility that the jury would have reasonable doubt – especially in the face of Mr. Moore's sworn testimony that he did not commit the murder.  Not only did Clemons lie to the jury, the prosecutors who entered the agreement with Mr. Clemons allowed him to do so.  This in turn impeached the good faith of the prosecutors in making the State's case against Mr. Moore.

[26]As was explained in *Alcorta v. Texas*, 355 U.S. 28 (1957), due process is violated where prosecutor deliberately "gave the jury the false impression that [witness's] relationship with [defendant's] wife was nothing more than casual friendship").

Moore's *Giglio* claim and failed to conduct a reasonable analysis of the record. According to Mr. Gaines' statement to Mr. Ashton, the State knew his testimony at trial was false, yet did not stand up and correct it.[27]

In denying Mr. Moore's relief upon his *Giglio* claim as to Mr. Gaines,[28] the Florida Supreme Court adopted the circuit court's order, which was premised upon unreasonable factual determinations. The Florida Supreme Court did not even address the materiality of Mr. Moore's claim that Gaines' changed testimony revealed a violation of *Giglio*. Instead, the court stopped its analysis by repeating the circuit court's parroting of the State's blanket denial, simply noting "Moore has failed to establish that the State knew the testimony was false" without

---

[27] Further, the Florida Supreme Court's failure to consider other witnesses' testimony regarding the timing of Gaines' and Clemons' chase of Little Terry was an unreasonable application of *Giglio*, which requires the court to consider the totality of the evidence. *See Guzman*, 663 F.3d at 1355 (finding other witnesses' testimony relevant "because the materiality test for *Brady* violations, of which *Giglio* is an aggravated species, is not a sufficiency of the evidence test") (internal citations omitted).

[28] In the circuit court's order denying relief, the presiding judge had permitted Mr. Moore over the State's objection to amend his Rule 3.851 motion include a *Giglio* claim based upon Mr. Gaines' testimony in March of 2011. The judge explained: "Although the State argues that the Defendant's violation of Rule 3.851's spirit has 'grown from the egregious to the absurd,' this Court will nonetheless address the Defendant's newly raised claims as the Defendant could file these claims within one year of discovery." (3PC-R. 404) (emphasis added) (footnote omitted). The State did not appeal this ruling and thus is precluded from challenging it in Mr. Moore's appeal.

further elaboration. However, an evidentiary hearing was not granted on the *Giglio* claim filed on April 6, 2011, and Mr. Moore was not given an opportunity to establish the claim.

> ### C. The State Knowingly Presented False or Misleading Evidence that It Failed to Correct at Mr. Moore's Trial in Violation of *Giglio* When The State Allowed Randy Jackson To Testify Falsely.[29]

In 2006, Mr. Moore pled his *Giglio* claim regarding the State's use of misleading evidence and argument concerning when Mr. Moore and Randy Jackson had fought in relation to their involvement in a battery of Timothy Brinkley (3PC-R. 6-12). The circuit court did not grant an evidentiary hearing on this *Giglio* allegation; instead, the claim was found "untimely" by the circuit court and denied for that reason (3PC-R. 393). Thus, the claim was procedurally barred. The Florida Supreme Court explicitly relied on the circuit court's finding that Mr. Moore could have asserted his *Giglio* claim regarding Randy Jackson earlier. *Moore v. State*, 132 So.3d at 723. The Florida Supreme Court indicated that "correct information . . . was available to defense counsel during the trial . . . [but n]either trial counsel nor initial postconviction counsel raised this issue."

---

[29]To the extent that Mr. Moore and/or his trial counsel knew or should have known that Jackson's testimony was false, trial counsel was ineffective for failing to reveal the false testimony to the jury charged with determining Mr. Moore's fate as explained in Ground VIII, *supra*.

To the extent that initial postconviction counsel should have raised the *Giglio* claim as to Randy Jackson in the first Rule 3.851 motion, collateral counsel's performance was deficient. Counsel failed to read the police reports that clearly showed that the prosecutor was deliberately deceiving and misrepresenting the facts. If collateral counsel was ineffective in failing to raise a constitutional claim that the defendant was discouraged from raising on direct appeal, any state procedural bar may be overcome.[30]  *See Trevino*, 133 S.Ct. at 1921 (holding "[a] procedural default **will not** bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective") (quoting *Martinez v. Ryan*, 132 S.Ct. 1309, 1322 (2012) (emphasis added). Because initial collateral counsel was ineffective for failing to assert this claim – either as a *Giglio* claim or, in the alternative, as an ineffectiveness-of-trial-counsel claim – this Court may consider the merits of the claim. *See Id*.

D. **Conclusion.**

The state court resolution of Mr. Moore's *Giglio* claims is

---

[30]   Mr. Moore could not raise this *Giglio* claim on direct appeal because the police reports that revealed the prosecutor's deliberate deception were not of record. The constitutional claim could not be presented on direct appeal by counsel with a Sixth Amendment guarantee of effectiveness.

47

not entitled to deference. *See Smith*, 572 F.3d at 1333 (stating standard for determining *Giglio* violations); *Guzman,* 668 F.3d at 1353. When Mr. Moore's *Giglio* claims are properly analyzed, habeas relief is warranted.

### GROUND XV

**MR. MOORE WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AS WELL AS HIS RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS, BECAUSE EITHER THE STATE FAILED TO DISCLOSE EVIDENCE WHICH WAS MATERIAL AND EXCULPATORY IN NATURE AND/OR PRESENTED MISLEADING EVIDENCE AND/OR DEFENSE COUNSEL UNREASONABLY FAILED TO DISCOVER AND PRESENT EXCULPATORY EVIDENCE AND/OR NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT AN INNOCENT MR. MOORE WAS CONVICTED UPON THE BASIS OF FALSE EVIDENCE AND ARGUMENT.**

At the 2011 evidentiary hearing, undisclosed favorable information in the State's possession was demonstrated as to Mr. Clemons and Mr. Gaines. However, the circuit court would not let Mr. Moore present evidence of the undisclosed favorable information regarding other witnesses. Mr. Moore could not present testimony regarding Randy Jackson's claim that the State had paid him, his father, and his brother for the testimony against Mr. Moore at his 1993 trial. Mr. Moore could not present testimony from Audra McCray regarding the threats that she had received from law enforcement in order to induce her to testify against Mr. Moore, nor her fears that she may lose custody of her children that she had shared with the State when agreeing to

testify against Mr. Moore.

Because Mr. Moore was precluded from presenting evidence in support of his *Brady* claims concerning any witnesses other than Mr. Clemons and Mr. Gaines, the state court's analysis of Mr. Moore's *Brady* claims is not entitled to deference. *Smith*, 572 F.3d at 1348. In *Smith*, the Eleventh Circuit found that the Florida Supreme Court had unreasonably determined that the State is not obligated to disclose when a State witness confides fears that someone may accuse him of a crime. The Eleventh Circuit found that the witness' action constituted impeachment because it demonstrated the witness had reason to curry favor with the State. As a result of this unreasonable determination, the entirety of the state court's *Brady* analysis was tainted and not entitled to deference; the unreasonable determination regarding one piece of *Brady* material led to its exclusion, which in turn excluded it from the cumulative materiality analysis required by clearly established federal law.

Here, the state court summarily denied Mr. Moore's *Brady* claim premised upon Randy Jackson's claim that he and his father and brother were paid for their testimony. The state court's action in this regard was unreasonable.

Similarly, the summary denial of the *Brady* claim premised upon Audra McCray's claim that law enforcement had threatened her and that she feared the loss of custody of her children was

unreasonable under *Smith*.

Without properly considering these portions of Mr. Moore's *Brady* claim, the state court's cumulative materiality analysis was contrary to or an unreasonable application of well-established federal law, and not entitled to deference. *Smith*, 572 F.3d at 1348. *See Porter,* 130 S.Ct. at 453-54 (instructing courts to consider the totality of the available evidence "both that adduced at trial, and the evidence adduced in the habeas proceeding"). When proper analysis is given to Mr. Moore's *Brady* claims and the totality of the record, habeas relief is required.

## CONCLUSION

Based on the habeas petition and the legal framework discussed in this memorandum, Mr. Moore submits habeas relief should issue.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing Petitioner's Memorandum of Law in Support of the Amended Petition for Writ of Habeas Corpus has been furnished to Stephen White, Office of the Attorney General, The Capitol, PL01, Tallahassee, FL 32399, via electronic transmission on this the 22nd day of September, 2014.

Respectfully submitted,

/S/ Martin J. McClain

50

MARTIN J. MCCLAIN
Fla. Bar No. 0754773
McClain & McDermott, P.A.
Attorneys at Law
141 N.E. 30th Street
Wilton Manors, Florida 33334
Telephone: (305) 984-8344
FAX: (954)564-5412

Attorney for Petitioner