UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

THOMAS JAMES MOORE,

        Petitioner,

v.                                      Case No. 3:06-cv-127-MMH

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## ORDER

### I. Status

      Petitioner Thomas James Moore, an inmate of the Florida penal system, initiated this action with the assistance of counsel on February 10, 2006, by filing a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1),[1] with a memorandum of law (Memorandum; Doc. 4). Moore proceeds on an Amended Petition (Doc. 15) filed on September 17, 2014, with an amended memorandum of law (Amended Memorandum; Doc. 16). In the Amended Petition, Moore challenges a 1993 state court (Duval County, Florida) judgment of conviction for first-degree murder, attempted armed

_____

[1] For purposes of reference to pleadings, the Court will cite the document page numbers assigned by the Court's electronic docketing system.

robbery, conspiracy to commit robbery, armed burglary, and arson. He raises sixteen grounds for relief. See Amended Petition at 18-120. Respondents submitted a memorandum in opposition to the Amended Petition, see Response (Doc. 26), with exhibits.[2] Moore submitted a brief in reply, see Reply (Doc. 59), with attachments, see Doc. 60. This action is ripe for review.

## II. Relevant Procedural History

On January 21, 1993, the State of Florida charged Moore by indictment with first-degree murder (count one), attempted armed robbery (count two), conspiracy to commit robbery (count three), armed burglary (count four), arson (count five), and possession of a firearm by a convicted felon (count six). Resp. Ex. 1 at 3-4. The State did not pursue a trial on count six. Resp. Ex. 2 at 115. Moore proceeded to a guilt phase trial on the remaining counts, and on October 29, 1993, the jury found Moore guilty of all counts. Resp. Ex. 11 at 428-32. On November 3, 1993, after a penalty phase trial, the jury recommended by a nine-to-three vote that the trial court impose a death sentence as to count one. Resp. Ex. 17 at 480.

---

[2] Respondents have numerically tabbed their exhibits, and, where appropriate, the Court will reference these tabs as "Resp. Ex. [number]."

On December 2, 1993, the trial court issued a sentencing order and found that the State established three aggravating factors of "great weight:" (1) Moore was previously convicted of a felony involving the use, or threat to use, violence; (2) Moore committed the murder for the purpose of avoiding or preventing lawful arrest; and (3) Moore committed the murder for pecuniary gain. Id. at 502-03. It found one statutory mitigating factor of "slight weight:" Moore's age when he committed the murder. Id. at 503. The trial court also assigned "no significance or value" to evidence of Moore's character as a non-statutory mitigating factor. Id. at 503-04. Determining that the statutory aggravating factors greatly outweighed the minimal statutory and non-statutory mitigating factors, the trial court sentenced Moore to death for count one consistent with the jury's recommendation. Id. at 504. Moore received a thirty-year term of imprisonment, with a ten-year minimum mandatory, for count two; a ten-year term of imprisonment, with a five-year minimum mandatory, for count three; a term of life imprisonment, with a fifteen-year minimum mandatory, for count four; and a term of life imprisonment, with a fifteen-year minimum mandatory, for count five. Resp. Ex. 20 at 510-14. The trial court also adjudicated Moore to be a habitual violent felony offender as to

counts two, three, four, and five, and ordered the sentences imposed for those counts to run concurrently with the sentence imposed for count one. Id.

On direct appeal to the Florida Supreme Court, Moore, with the assistance of counsel, filed an initial brief, arguing that the trial court erred when it: limited Moore's cross-examination of two State witnesses, Vincent Gaines and Carlos Clemons, on crucial points of fact (ground one); limited Moore's cross-examination of Captain Earl Mattox, Jr., refused the defense's proffer of questions, and denied a motion for mistrial (ground two); made prejudicial comments in the presence of the jury (ground three); admitted Larry Dawsey's testimony that Moore possessed a firearm two days after the victim's death (ground four); admitted a copy of Clemons's written statement to police (ground five); admitted victim impact evidence during the penalty phase trial (ground six); and permitted the State to use mitigation as non-statutory aggravation during closing arguments (ground seven). Resp. Ex. 21. The State filed an answer brief, Resp. Ex. 22, and Moore filed a reply brief, Resp. Ex. 23. On October 2, 1997, the Florida Supreme Court affirmed Moore's convictions and sentences in a written opinion.[3] Resp. Ex. 24; Moore v. State,

---

[3] Justice Gerald Kogan concurred in the opinion as to the conviction and concurred in result only as to the sentence. Moore v. State, 701 So. 2d 545, 552 (Fla. 1997). Justice Harry Lee Anstead concurred in part and dissented in part, noting that

701 So. 2d 545, 547 (Fla. 1997). The court denied rehearing, and issued the mandate on December 18, 1997, Resp. Ex. 25; Moore, 701 So. 2d at 545.

On February 17, 1998, Moore sought a writ of certiorari from the United States Supreme Court. Resp. Ex. 26. The State filed a brief in opposition. Resp. Ex. 27. On April 20, 1998, the United States Supreme Court denied Moore's petition for writ of certiorari without a written opinion. Resp. Ex. 28; Moore v. Florida, 523 U.S. 1083 (1998).

On March 29, 1999, Moore, with the benefit of counsel, filed a motion for postconviction relief with a special request for leave to amend pursuant to Florida Rule of Criminal Procedure 3.851. Doc. 55-3 at 4-32.[4] On June 22, 1999, Moore filed an amended Rule 3.851 motion with a special request for leave to amend. Resp. Ex. 29 at 300-405. On September 20, 1999, Moore filed a second amended Rule 3.851 motion, again, with special request for leave to amend (Rule 3.851 Motion), arguing that: state agencies' refusals to provide Moore with public records violated his rights to due process and equal protection, and

_____

he would require the parties to brief the sufficiency of the evidence and the proportionality of the death sentence. Id. (Anstead, J., concurring in part and dissenting in part). He also maintained that the trial court should not have rejected the defense's objection to the State using mitigation as non-statutory aggravation during closing arguments. Id.

[4] Respondents did not include Moore's March 26, 1999 Rule 3.851 Motion in their exhibits. Moore subsequently filed the complete postconviction record on appeal.

rendered Moore's postconviction counsel ineffective (ground one); Moore's convictions are materially unreliable due to the cumulative effect of the ineffective assistance of counsel, the State's withholding of exculpatory or impeachment material, newly discovered evidence, and the trial court's erroneous rulings (ground two); newly discovered evidence rendered Moore's convictions constitutionally unreliable (ground three); the State withheld material and exculpatory evidence (ground four); counsel was ineffective during voir dire (ground five); Moore was denied a fair trial when the State misstated the law and facts, as well as made inflammatory and improper comments, during the guilt and penalty phase trials, and counsel was ineffective when he did not object to the comments (ground six); counsel was ineffective when he did not adequately investigate and prepare a voluntary intoxication defense, retain mental health experts, or inform the jury about Moore's mental state at the time of the offenses (ground seven); Moore was denied his rights under Ake v. Oklahoma[5] when counsel did not obtain an adequate mental health evaluation of Moore and failed to provide the necessary background information to the mental health expert (ground eight); counsel was ineffective at the penalty phase trial when he did not adequately

---

[5] 470 U.S. 68 (1986).

investigate and present available mitigating evidence or adequately challenge the State's case (ground nine); Moore is innocent of first-degree murder (ground ten); Moore is innocent of the death penalty (ground eleven); Moore was absent from critical stages of the trial (ground twelve); the jury instructions from the penalty phase trial improperly shifted the burden of demonstrating that a death sentence was inappropriate to Moore, and counsel was ineffective when he did not object to the instructions (ground thirteen); the trial court erroneously instructed the jury on the standard by which it must consider expert testimony (ground fourteen); the jury received inadequate guidance on the consideration of aggravating factors because Florida's capital sentencing statute is facially vague and overbroad (ground fifteen); comments, questions, and instructions misled the jury by diluting its sense of responsibility towards sentencing, and counsel was ineffective when he did not object to the error (ground sixteen); Moore was denied his constitutional rights and the effective assistance of postconviction counsel because of the rule prohibiting his attorneys from interviewing jurors (ground seventeen); execution by electrocution is cruel and unusual punishment (ground eighteen); Florida's capital sentencing statute is unconstitutional on its face and as applied, and to the extent the issue was not preserved at trial, counsel was

ineffective for not preserving it (ground nineteen); Moore was denied his right to a fair and impartial jury as a result of pretrial publicity (ground twenty); the trial court's sentencing order does not reflect independent weighing or reasoned judgment (ground twenty-one); the judge and jury were provided with and relied upon misinformation when sentencing Moore (ground twenty-two); the lack of adequate funding for the Office of Capital Collateral Counsel denied Moore's right to effective representation (ground twenty-three); the State's use of a jailhouse agent violated Moore's constitutional rights, and the State withheld material and exculpatory evidence and/or presented misleading evidence (ground twenty-four); and Moore was denied a proper appeal due to omissions in the record (ground twenty-five). Resp. Ex. 30 at 1-132.

The State filed a response to Moore's Rule 3.851 Motion. Resp. Ex. 31 at 160-217. On April 6, 2000, Moore filed a third amended Rule 3.851 motion. Resp. Ex. 32 at 308-452. The State moved to strike the motion. Resp. Ex. 33 at 490-94. On August 4, 2000, the postconviction court refused to consider the "untimely and unauthorized" third amended Rule 3.851 motion and summarily denied the Rule 3.851 Motion. Resp. Ex. 34 at 529-44.

On April 2, 2001, Moore, through counsel, filed an initial brief on appeal. Resp. Ex. 36. On that same day, Moore also filed a petition for writ of habeas

corpus and an amended petition for writ of habeas corpus (First State Petition), arguing appellate counsel was ineffective when he failed to: discover and remedy omissions in the record (ground one); brief and argue the proportionality of Moore's death sentence (ground two); raise the claim that the State used its peremptory challenges to strike jurors based on race (ground three); assert fundamental error where the jury heard inflammatory, emotional, and prejudicial argument at Moore's guilt and penalty phase trials (ground four); assert fundamental error where the jury heard irrelevant and prejudicial details of a prior violent felony (ground five); raise the claim that the trial court allowed prejudicial victim impact testimony (ground six); raise the claim that the penalty phase jury instructions improperly shifted the burden of proof to Moore (ground seven); assert that the trial court erroneously denied Moore's request for a mercy instruction (ground eight); and brief and argue "the State's impermissible use of the penalty phase when viewed as a whole" (ground nine). Resp. Exs. 40, 41. The State filed an answer brief, Resp. Ex. 37, and a response to Moore's First State Petition, Resp. Ex. 42. Moore filed a reply brief. Resp. Ex. 38. On March 7, 2002, the Florida Supreme Court affirmed the postconviction court's denial of Moore's Rule 3.851 Motion and

denied the First State Petition in a written opinion.[6] Resp. Ex. 39; <u>Moore v. State</u>, 820 So. 2d 199, 202 (Fla. 2002). The court denied Moore's motion for rehearing, and issued the mandate on July 22, 2002, Resp. Ex. 39.

On July 19, 2002, Moore, through counsel, filed a successive Rule 3.851 motion with a special request for leave to amend (Successive Rule 3.851 Motion), asserting Florida's capital sentencing scheme is unconstitutional pursuant to <u>Ring v. Arizona</u>,[7] and asking the Court to vacate Moore's death sentence. Resp. Ex. 44. The State filed a response. Resp. Ex. 45 at 25-48. On December 30, 2002, the postconviction court denied Moore's Successive Rule 3.851 Motion as untimely and facially insufficient, Resp. Ex. 46, and denied his motion for rehearing, Resp. Ex. 48. On June 7, 2004, the Florida Supreme Court affirmed the postconviction court's order denying relief,[8] Resp. Ex. 52, and denied Moore's motion for rehearing on October 8, 2004, Resp. Ex. 54.

On May 11, 2004, Moore filed a second state petition for writ of habeas corpus (Second State Petition), raising four grounds for relief: Moore's conviction for armed burglary violated his right to due process (ground one);

---

[6] Justice Anstead concurred in part and dissented in part as to Moore's claim that the trial court abused its discretion when it refused to order state agencies to comply with his request for additional public records. <u>Moore v. State</u>, 820 So. 2d 199, 210 (Fla. 2002) (Anstead, J., concurring in part and dissenting in part).

[7] 536 U.S. 584 (2002).

[8] Justice Anstead concurred as to result only. Resp. Ex. 52.

Moore's right of confrontation was violated at his penalty phase trial (ground two); in light of <u>Crawford v. Washington</u>,[9] the court should revisit Moore's direct appeal claims about limitations on his cross-examination of witnesses (ground three); and the State's use of Moore's prior violent felony violated <u>Brennan v. State</u>,[10] because he committed the offense when he was fifteen years old (ground four). Resp. Ex. 55. The State moved to dismiss the Second State Petition as unauthorized, Resp. Ex. 56, and Moore filed a response in opposition, Resp. Ex. 57. On December 16, 2004, the Florida Supreme Court denied the Second State Petition, and denied the State's motion to dismiss as moot. Resp. Ex. 58. The Florida Supreme Court subsequently issued a corrected order, Resp. Ex. 60, and denied Moore's motion for rehearing on March 21, 2005, Resp. Ex. 62.

Moore filed a third state petition for writ of habeas corpus (Third State Petition) on March 23, 2005. Resp. Ex. 64. He raised one ground for relief, arguing that the use of Moore's prior conviction to support the prior violent felony aggravator violated <u>Roper v. Simmons</u>,[11] because he committed the offense when he was fifteen years old. <u>Id.</u> The Florida Supreme Court denied

---

[9] 541 U.S. 36 (2004).
[10] 754 So. 2d 1 (Fla. 1999).
[11] 543 U.S. 551 (2005).

Moore's Third State Petition on October 18, 2005, Resp. Ex. 67, and denied his motion for rehearing on February 13, 2006, Resp. Ex. 70.

On January 27, 2006, Moore filed a second successive Rule 3.851 motion with a request for leave to amend. Resp. Ex. 71. Moore filed an amended second successive Rule 3.851 motion (Second Successive Rule 3.851 Motion) on July 31, 2008. Resp. Ex. 76. He raised three grounds for relief: the State intentionally presented false evidence and engaged in false argument in violation of <u>Giglio v. United States</u>[12] (ground one); the State "either . . . failed to disclose evidence which was material and exculpatory in nature and/or presented misleading evidence and/or defense counsel unreasonably failed to discover and present exculpatory evidence and/or newly discovered evidence" (ground two); and new evidence established Moore's innocence (ground three). <u>Id.</u> The State filed a response. Resp. Ex. 77.

On August 17, 2009, Moore filed a third amended successive Rule 3.851 motion (Third Amended Successive Rule 3.851 Motion). Resp. Ex. 79. The postconviction court struck the motion, but granted Moore leave to file an addendum to comply with pleading requirements. Resp. Ex. 84. Moore filed an addendum to his Second Successive Rule 3.851 Motion on September 28, 2009.

---

[12] 405 U.S. 150 (1972).

Resp. Ex. 85. The State filed a response to the addendum. Resp. Ex. 86 at 249-65. Following an evidentiary hearing, Moore filed a Motion to Amend Pending Motion to Vacate, or Alternative Motion to Vacate Convictions (Motion to Amend), which contained new allegations stemming from testimony presented at the hearing. Resp. Ex. 87. On January 4, 2012, the postconviction court denied the claims in Moore's Second Successive Rule 3.851 Motion and the addendum, as well as the claims in his Motion to Amend, Resp. Ex. 90, and denied the motion for rehearing on February 2, 2012, Resp. Ex. 93 at 437. On November 27, 2013, the Florida Supreme Court affirmed the postconviction court's denials of relief in a written opinion, Resp. Ex. 98; <u>Moore v. State</u>, 132 So. 3d 718, 721 (Fla. 2013), and issued the mandate on March 17, 2014, Resp. Ex. 98.

## III. One-Year Limitations Period

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes a one-year statute of limitations on petitions for writ of habeas corpus. Specifically, 28 U.S.C. § 2244 provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

In this case, the parties generally agree as to the dates of the relevant filings. Moore's convictions and sentences became final when the United States

14

Supreme Court denied his petition for writ of certiorari on April 20, 1998. Resp. Ex. 28; see Pugh v. Smith, 465 F.3d 1295, 1299 (11th Cir. 2006) ("If a prisoner petitions the Supreme Court for a writ of certiorari, his conviction becomes final when the Supreme Court denies the petition or affirms the conviction."). Accordingly, Moore had until Tuesday, April 20, 1999, to file a federal habeas petition. He did not file his initial Petition until February 10, 2006. Therefore, the Petition is due to be dismissed as untimely unless he can avail himself of the statutory provisions which extend or toll the limitations period.

The one-year limitations period began to run on Tuesday, April 21, 1998, and ran for 342 days until March 29, 1999, when Moore filed a Rule 3.851 Motion. Doc. 55-3 at 4-32. The Florida Supreme Court affirmed the postconviction court's denial of the Rule 3.851 Motion and denied Moore's First State Petition on March 7, 2002. Resp. Ex. 39; Moore, 820 So. 2d at 202. The mandate issued on July 22, 2002. Resp. Ex. 39.

Moore filed his Successive Rule 3.851 Motion on July 19, 2002. Resp. Ex. 44. The postconviction court denied the Successive Rule 3.851 Motion as untimely and facially insufficient. Resp. Ex. 46. On June 7, 2004, the Florida Supreme Court affirmed the postconviction court's order denying relief, stating:

Thomas James Moore appeals the circuit court's order summarily denying his successive motion to vacate judgment and sentences wherein he challenges the validity of his death sentence under Ring v. Arizona, 536 U.S. 584 (2002). This Court has rejected similar claims in Bottoson v. Moore, 833 So. 2d 693 (Fla.), cert. denied, 537 U.S. 1070 (2002), and King v. Moore, 831 So. 2d 143 (Fla.), cert. denied, 537 U.S. 1067 (2002), and subsequent cases. Furthermore, one of the aggravating circumstances found by the trial court in his case was prior conviction of a violent felony, "a factor which under Apprendi[13] and Ring need not be found by the jury." Jones v. State, 855 So. 2d 611, 619 (Fla. 2003). The circuit court's order is hereby affirmed.

Resp. Ex. 52. The state supreme court denied Moore's motion for rehearing on October 8, 2004. Resp. Ex. 54.

Respondents argue that Moore's Successive Rule 3.851 Motion did not toll the one-year limitations period because the postconviction court denied it as untimely. Response at 24. Therefore, the Successive Rule 3.851 Motion was not "properly filed" pursuant to § 2244(d)(2). Id. at 24-25. Moore replies that while the postconviction court denied his Successive Rule 3.851 Motion as untimely, it also reached the merits of his claim. Reply at 15. He asserts the Successive Rule 3.851 Motion was timely filed, and the Florida Supreme Court affirmed the postconviction court's order on the merits. Id. at 18.

---

[13] Apprendi v. New Jersey, 530 U.S. 466 (2000).

16

A defendant must file a Rule 3.851 motion within one year after his judgment and sentence become final. Fla. R. Crim. P. 3.851(d)(1). However, Rule 3.851 sets forth certain exceptions to the one-year time limitation:

> (2) No motion shall be filed or considered pursuant to this rule if filed beyond the time limitation provided in subdivision (d)(1) unless it alleges:
>
>> (A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or
>>
>> (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) <u>and has been held to apply retroactively</u>, or
>>
>> (C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2) (emphasis added). The United States Supreme Court decided <u>Ring</u> on June 24, 2002. 536 U.S. at 584. When Moore filed his Successive Rule 3.851 Motion on July 19, 2002, <u>Ring</u> had not been held to apply retroactively. <u>See</u> <u>Schriro v. Summerlin</u>, 542 U.S. 348, 358 (2004) (determining <u>Ring</u> does not apply retroactively to cases already final on direct review); <u>Johnson v. State</u>, 904 So. 2d 400, 412 (Fla. 2005) (holding <u>Ring</u> does not apply retroactively in Florida). Therefore, Moore's Successive Rule 3.851 Motion was

17

untimely because his judgment and sentence became final on April 20, 1998, and he did not meet any exceptions to the one-year time limitation.

To the extent Moore argues the Florida Supreme Court determined his Motion was timely filed by considering the merits and the Court therefore should treat it as properly filed, his argument is unavailing. The Eleventh Circuit Court of Appeals has stated:

> [C]onsideration of the merits cannot alone convert a motion for post-conviction relief that no one disputes is time-barred under state law into a properly filed motion for tolling purposes under AEDPA. Cf. Evans v. Chavis, 546 U.S. 189, 126 S.Ct. 846, 852, 163 L.Ed.2d 684 (2006) (noting that a state supreme court order "denying a petition 'on the merits' does not automatically indicate that the petition was timely filed" and that instead "the federal court must decide whether the filing" was timely under state law); Sweet,[14] 467 F.3d at 1318 ("[W]hen a state court unambiguously rules that a post-conviction petition is untimely under state law, we must respect that ruling and conclude that the petition was not 'properly filed' for the purposes of § 2244(d)(2), regardless of whether the state court also reached the merits of one of the claims."); Carey v. Saffold, 536 U.S. 214, 122 S.Ct. 2134, 2141, 153 L.Ed.2d 260 (2002) (stating that when a state court determines that a motion is untimely, "that [is] the end of the matter, regardless of whether it also addressed the merits of the claim, or whether its timeliness ruling was 'entangled' with the merits").

---

14 Sweet v. Sec'y, Dep't of Corr., 467 F.3d 1311 (11th Cir. 2006).

> We are applying a federal statute and are guided by
> congressional intent. We will not allow the tolling of
> AEDPA's limitations period when it is clear that the
> petitioner failed to seek timely review in state court.
> Cf. Carey, 122 S.Ct. at 2141 (observing that the
> "willingness to take [the words 'on the merits'] as an
> absolute bellwether [for timeliness] risks the tolling of
> the federal limitations period even when it is highly
> likely that the prisoner failed to seek timely review in
> the state appellate courts"). To do otherwise would
> "undermine the statutory purpose of encouraging
> prompt filings in federal court in order to protect the
> federal system from being forced to hear stale claims."
> Id.

Gorby v. McNeil, 530 F.3d 1363, 1367-68 (11th Cir. 2008).

Here, Moore did not file a timely Successive Rule 3.851 Motion even
though the Florida Supreme Court chose to consider the merits of Moore's
argument. See Walton v. Sec'y, Fla. Dep't of Corr., 661 F.3d 1308, 1312 (11th
Cir. 2011) ("[F]ederal courts cannot use an adverse merits determination as an
absolute bellwether (as to timeliness). We cannot, for example, "reject [a
state's] time bar simply because a court may opt to bypass the [timeliness]
assessment and summarily dismiss a petition on the merits.") (quotation
marks and internal citations omitted). Accordingly, the Court finds the
Successive Rule 3.851 Motion was not properly filed. As such, the federal one-
year limitations period began to run again on July 23, 2002, the day after the
Florida Supreme Court issued its mandate affirming the postconviction court's

19

denial of Moore's initial Rule 3.851 Motion. Resp. Ex. 39. It ran for 18 days until it expired on August 10, 2002. Therefore, Moore did not timely file his Petition.[15] Nevertheless, because Moore asserted an actual innocence defense at trial and raises such a claim in Ground Sixteen, the Court will consider the merits of Moore's Amended Petition.

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the

---

[15] As Moore concedes in the Reply, the Court need not conduct a "claim by claim timeliness analysis" because his timeliness argument failed based on the tolling provisions in § 2244(d)(2). Reply at 14.

Court. Because the Court can "adequately assess [Moore's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted. To the extent Moore requests further development of the record based on the ineffective assistance of collateral counsel, the Court denies such a request. See Shinn v. Ramirez, 142 S. Ct. 1718, 1734 (2022) ("[U]nder § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel.").

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011) (quotation marks omitted)). As such, federal habeas review of final state court decisions is "'greatly circumscribed' and 'highly deferential.'"

Id. (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011) (quotation marks omitted)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 1192, 1196.

22

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

> Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of

the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[16] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential

review under § 2254(d) generally is limited to the record that was before the

state court that adjudicated the claim on the merits. See Cullen v. Pinholster,

563 U.S. 170, 182 (2011) (stating the language in § 2254(d)(1) "requires an

examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for

prisoners whose claims have been adjudicated in state court." Burt v. Titlow,

---

[16] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016).

134 S. Ct. 10, 16 (2013). "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> ""opportunity to pass upon and correct" alleged
> violations of its prisoners' federal rights." Duncan v.
> Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting Picard v. Connor, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity,"
> the prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan
> v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies
results in a procedural default which raises a potential bar to federal habeas
review. The United States Supreme Court has explained the doctrine of
procedural default as follows:

> Federal habeas courts reviewing the constitutionality
> of a state prisoner's conviction and sentence are guided
> by rules designed to ensure that state-court judgments
> are accorded the finality and respect necessary to
> preserve the integrity of legal proceedings within our
> system of federalism. These rules include the doctrine
> of procedural default, under which a federal court will
> not review the merits of claims, including
> constitutional claims, that a state court declined to

> hear because the prisoner failed to abide by a state
> procedural rule. See, e.g., Coleman,[17] supra, at 747–
> 748, 111 S. Ct. 2546; Sykes,[18] supra, at 84–85, 97 S.
> Ct. 2497. A state court's invocation of a procedural
> rule to deny a prisoner's claims precludes federal
> review of the claims if, among other requisites, the
> state procedural rule is a nonfederal ground adequate
> to support the judgment and the rule is firmly
> established and consistently followed. See, e.g.,
> Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–
> 1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558
> U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417
> (2009). The doctrine barring procedurally defaulted
> claims from being heard is not without exceptions. A
> prisoner may obtain federal review of a defaulted
> claim by showing cause for the default and prejudice
> from a violation of federal law. See Coleman, 501 U.S.,
> at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012). Thus, procedural defaults may

be excused under certain circumstances. Notwithstanding that a claim has

been procedurally defaulted, a federal court may still consider the claim if a

state habeas petitioner can show either (1) cause for and actual prejudice from

the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d

1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

> the procedural default "must result from some
> objective factor external to the defense that prevented
> [him] from raising the claim and which cannot be
> fairly attributable to his own conduct." McCoy v.

---

[17] Coleman v. Thompson, 501 U.S. 722 (1991).
[18] Wainwright v. Sykes, 433 U.S. 72 (1977).

> Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992)
> (quoting Carrier, 477 U.S. at 488, 106 S. Ct. 2639).[19]
> Under the prejudice prong, [a petitioner] must show
> that "the errors at trial actually and substantially
> disadvantaged his defense so that he was denied
> fundamental fairness." Id. at 1261 (quoting Carrier,
> 477 U.S. at 494, 106 S. Ct. 2639).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice,
> there remains yet another avenue for him to receive
> consideration on the merits of his procedurally
> defaulted claim. "[I]n an extraordinary case, where a
> constitutional violation has probably resulted in the
> conviction of one who is actually innocent, a federal
> habeas court may grant the writ even in the absence
> of a showing of cause for the procedural default."
> Carrier, 477 U.S. at 496, 106 S. Ct. at 2649. "This
> exception is exceedingly narrow in scope," however,
> and requires proof of actual innocence, not just legal
> innocence. Johnson v. Alabama, 256 F.3d 1156, 1171
> (11th Cir. 2001).

---

[19] Murray v. Carrier, 477 U.S. 478 (1986).

28

Ward, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

## C. Ineffective Assistance of Trial and Appellate Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that

counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.

With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

expect will often be so, that course should be followed." <u>Strickland</u>, 466 U.S. at 697.

Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under <u>Strickland</u>. <u>See</u> <u>Tuomi v. Sec'y, Fla. Dep't of Corr.</u>, 980 F.3d 787, 795 (11th Cir. 2020); <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264 (11th Cir. 2009). The Eleventh Circuit has instructed:

> In assessing an appellate attorney's performance, we are mindful that "the Sixth Amendment does not require appellate advocates to raise every non-frivolous issue." <u>Id.</u> at 1130-31.[20] Rather, an effective attorney will weed out weaker arguments, even though they may have merit. <u>See</u> <u>id.</u> at 1131. In order to establish prejudice, we must first review the merits of the omitted claim. <u>See</u> <u>id.</u> at 1132. Counsel's performance will be deemed prejudicial if we find that "the neglected claim would have a reasonable probability of success on appeal." <u>Id.</u>

<u>Philmore</u>, 575 F.3d at 1264. Thus, appellate counsel's performance is prejudicial if the omitted claim would have a reasonable probability of success on appeal. <u>Id.</u> at 1265.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, - U.S. at -, 131 S. Ct. at 788. But "[e]stablishing that a state court's

---

[20] <u>Heath v. Jones</u>, 941 F.2d 1126, 1130 (11th Cir. 1991).

application of <u>Strickland</u> was unreasonable under §
2254(d) is all the more difficult. The standards created
by <u>Strickland</u> and § 2254(d) are both highly
deferential, and when the two apply in tandem, review
is doubly so." <u>Id.</u> (citations and quotation marks
omitted). "The question is not whether a federal court
believes the state court's determination under the
<u>Strickland</u> standard was incorrect but whether that
determination was unreasonable - a substantially
higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S.
111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009)
(quotation marks omitted). If there is "any reasonable
argument that counsel satisfied <u>Strickland</u>'s
deferential standard," then a federal court may not
disturb a state-court decision denying the claim.
<u>Richter</u>, - U.S. at -, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v.</u>

<u>Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the

deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds

another layer of deference — this one to a state court's decision — when we are

considering whether to grant federal habeas relief from a state court's

decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such,

"[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v.</u>

<u>Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

## A. Ground One

As Ground One, Moore asserts that his armed burglary conviction violates his right to due process, including notice and a meaningful opportunity to be heard. Amended Petition at 18-19. He contends that under Florida law, "a burglary conviction is invalid when 'initial entry into the victim's residence was consensual and there was no evidence . . . of a burglary other than the commission of crime within the residence.'" Id. at 20 (quoting State v. Ruiz, 863 So. 2d 1205, 1208 (Fla. 2003); Delgado v. State, 776 So. 2d 233 (Fla. 2000)). According to Moore, the State maintained at trial that Moore's entry into the victim's house was consensual, and no evidence of burglary existed other than the crimes committed in the house. Id. at 20-21. Therefore, Moore argues his armed burglary conviction is invalid, as well as his first-degree murder conviction because the State pursued premeditation and felony murder theories, and the jury returned a general verdict. Id.

Moore further contends that in Delgado, the Florida Supreme Court determined "[i]n the context of an occupied dwelling, burglary was not intended

33

to cover the situation where an invited guest turns criminal or violent."[21] Delgado, 776 So. 2d at 240; see Amended Memorandum at 11. However, the opinion did not apply retroactively to convictions that became final before August 24, 2000. Id. at 241. Nevertheless, Moore contends that, in Delgado, the Florida Supreme Court applied its interpretation to criminal conduct that occurred in 1990, and, in Fitzpatrick v. State, 859 So. 2d 486 (Fla. 2003), applied it to an offense that occurred in 1980. Amended Memorandum at 11-12. Moore asserts that "[t]he Florida Supreme Court's refusal to give [him] the benefit of substantive law, i.e. the definition of the criminal offense of burglary that was found to apply to conduct alleged to constitute burglary in 1990 in Delgado and in 1980 in Fitzpatrick, is contrary to well-established federal law," including Fiore v. White, 531 U.S. 225 (2000). Amended Memorandum at 13. According to Moore, while other defendants have received the benefit of a "correct" construction of the burglary statute, Florida courts have arbitrarily denied it to him. Id. at 16.

---

[21] In 2001, the Florida Legislature statutorily abrogated the Delgado decision, as applied to burglary offenses committed after February 1, 2000, and clarified that "for a burglary to occur, it is not necessary for the licensed or invited person to remain in the dwelling, structure or conveyance surreptitiously." Fla. Stat. § 810.015(1), (2); Ch.2001–58, § 1, Laws of Fla., effective May 25, 2001; see Lynch v. State, 2 So. 3d 47, 61 n.8 (Fla. 2008).

Respondents argue that Moore's claim is not cognizable on federal habeas review because it concerns solely state law. Response at 39-40. They note Moore challenges the application of a state court opinion about a state statute, and federal habeas relief does not lie for errors in state law. Id. at 39. Moore replies that he presents a federal claim in that the Florida Supreme Court's retroactivity analysis violates federal law. Reply at 26, 32. Because Moore asserts the Florida Supreme Court's retroactivity analysis violates his federal constitutional rights, the Court finds that Moore raises a claim that is cognizable on federal habeas review.

Moore raised a substantially similar argument as ground one of his Second State Petition. Resp. Ex. 55 at 13-23; the State moved to dismiss, Resp. Ex. at 56; and the Florida Supreme Court denied the Second State Petition on the merits and denied the State's motion to dismiss as moot, Resp. Ex. 58. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not

35

based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the Florida Supreme Court's adjudication of the claim is not entitled to deference, Moore's claim is without merit. In defining the window for those individuals affected by the <u>Delgado</u> decision, the Florida Supreme Court stated: "<u>Delgado</u> applies to burglaries committed before February 1, 2000, which had not been finally adjudicated at the time [the Florida Supreme Court] issued its opinion" on August 24, 2000. <u>Lynch v. State</u>, 2 So. 3d 47, 61 (Fla. 2008). In Moore's case, the Florida Supreme Court affirmed his convictions and sentences in a written opinion on October 2, 1997,  Resp. Ex. 24, and the United States Supreme Court denied Moore's petition for writ of certiorari on April 20, 1998, Resp. Ex. 28. Therefore, although Moore committed armed burglary in 1993, <u>Delgado</u> does not apply to his conviction because it became final before August 24, 2000. <u>See</u> <u>Lynch</u>, 2 So. 3d at 61.

To the extent Moore argues that the Florida Supreme Court erred in its retroactivity analysis, he is not entitled to relief. The Eleventh Circuit Court of Appeals has held that a petitioner "cannot demonstrate a due process violation from the failure to retroactively apply the now-abrogated <u>Delgado</u>

36

interpretation of the Florida burglary statute." <u>Johnson v. Fla. Dep't of Corr.</u>, 513 F.3d 1328, 1335 (11th Cir. 2008). In doing so, it also noted that <u>Fiore</u> does not control the retroactivity analysis because "<u>Delgado</u>, on its face, clearly announced a change in the burglary law rather than a mere clarification." <u>Id.</u> at 1335 n.12. Therefore, Ground One is due to be denied.

## B. Ground Two

Moore asserts the trial court deprived him of his Sixth Amendment right to confront witnesses when it limited his cross-examination of three State witnesses: Vincent Gaines, Carlos Clemons, and Captain Mattox. Amended Petition at 22-28. According to Moore, the trial court refused his proffer of questions and limited his cross-examination of Gaines concerning whether Gaines and Clemons (Moore's co-defendants) confronted and chased Terry Ashley, a neighborhood boy known as Little Terry, with a gun on the day of the murder. <u>Id.</u> at 23-24. Moore further asserts that the trial court did not allow the defense to cross-examine Clemons about whether he had a gun when he chased Ashley and where he hid the gun on the day of the murder. <u>Id.</u> at 24-26. The trial court also refused Moore's proffer of questions and limited his cross-examination of Captain Mattox, the fire marshal, about the use of gas chromatography to detect accelerants at the scene of a fire. <u>Id.</u> at 26-27.

37

Respondents argue that Moore did not exhaust the instant claim because he did not fairly present it as a federal constitutional issue on direct appeal. Response at 34-35. They contend the claim was "entirely focused on state law and it only briefly referenced due process and the Sixth Amendment." Id. at 34. According to Respondents, because Moore cannot return to state court to properly exhaust his claim, it is now procedurally barred. Id. at 35. In his Reply, Moore asserts that he fairly presented a federal claim on direct appeal when he argued the trial court's limitations on cross-examination violated his Sixth Amendment right to confront the witnesses against him. Reply at 55. He further argues that the Florida Supreme Court apparently understood it as a federal claim because its opinion cited to federal and state case law discussing the Sixth Amendment. Id. at 55-56.

The Court finds Moore properly exhausted this claim as he raised its federal nature on direct appeal by arguing the trial court's limitation on the cross-examination of the witnesses violated his "Sixth Amendment and due process rights" to confront his accusers. Resp. Ex. 21 at 11, 13. Moreover, the Florida Supreme Court understood that Moore presented a federal issue because it cited to federal case law noting that the Sixth Amendment does not prevent a trial judge from imposing any limits on defense counsel's cross-

examination of a witness. <u>Moore</u>, 701 So. 2d at 549 (citing <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986)). Based on this record, the Court finds Moore properly exhausted the claim. <u>See</u> <u>Jimenez v. Fla. Dep't of Corr.</u>, 481 F.3d 1337, 1342 (11th Cir. 2007) ("[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.") (citation and quotation marks omitted).

On direct appeal, Moore raised a claim substantially similar to Ground Two, Resp. Ex. 21 at 8-14, and the Florida Supreme Court affirmed Moore's convictions and sentences in a written opinion. <u>Moore</u>, 701 So. 2d at 545. In addressing Moore's claim, the Florida Supreme Court found:

> In issues one and two Moore argues that the trial court improperly limited his cross-examination of three defense witnesses: Gaines, Clemons, and Mattox. Moore's counsel was prohibited from asking Gaines whether he and Clemons had chased a boy named Little Terry while carrying a gun on the day the victim was killed. When counsel asked to make a proffer, the judge said:
>
>> THE COURT: First off, he has already said he didn't see [Clemons], period. Then you kept saying you didn't see him at 10:00, you didn't see him at 12:00– . . . .
>>
>> [DEFENSE ATTORNEY]: What I want to proffer at this point around noontime of that day Mr. Clemons and Mr. [Gaines] entered into the Grand Park area.

39

. . . .

> [DEFENSE ATTORNEY]: And they chased a young fellow named Little Terry, and Clemons was armed with a gun at that time.

> THE COURT: You asked him was he there at that time. He testified he wasn't even there. I mean, I can't make him testify to what you want him to testify to.

The Court refused to allow the questions, stating:

> THE COURT: . . . I don't know if he is lying or telling the truth. He said he wasn't with him. Now, you know, you can ask him, you know, 11:30, how about 11:00, 11:40, you can go on and on. It doesn't prove anything. What you have got is—you have got his testimony now. If you want to prove he is lying, [so be it].

> [DEFENSE ATTORNEY]: Yes, sir.

> THE COURT: Let's get on with it. But not through him.

Defense counsel was allowed to ask if Gaines went to the park with Clemons, if Gaines saw Clemons with a gun, and if Gaines saw Little Terry. Gaines answered "no" to all three questions.

When Clemons testified, defense counsel asked what he had done with the gun he possessed on the day of the murder. The judge sustained the State's objection, stating that there was no evidence that Clemons

actually possessed a gun then. After Clemons denied possessing a gun that day, defense counsel asked a series of questions about Little Terry. Defense counsel then asked again whether or not Clemons was armed. The court sustained the State's objection, stating that the question was repetitive.

Captain Mattox, an arson investigator with the Jacksonville Fire Department, testified that there were no accelerants present in the fire set at Parrish's house. Defense counsel asked whether the department had access to the Office of the Florida Fire College Laboratories if there was some question as to whether flammable liquids had been used. After Mattox answered "yes," defense counsel asked if those laboratories had gas chromatography machines. The judge sustained the State's objection as to the relevance of the question. Defense counsel was prohibited from making a proffer of the question, and the court denied defense counsel's request for a mistrial.

Moore's claim that it was error to limit the cross-examination of these three witnesses is without merit. The United States Supreme Court has stated that "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); see also State v. Ford, 626 So. 2d 1338, 1347 (Fla. 1993). Limitation of cross-examination is subject to an abuse of discretion standard. See, e.g., Geralds v. State, 674 So. 2d 96, 100 (Fla.), cert. denied, 519 U.S. 891, 117 S.Ct. 230, 136 L.Ed.2d 161 (1996); Jones v. State, 580 So. 2d 143, 145 (Fla. 1991). Here, the judge clearly

41

> spelled out his reasons for limiting the cross-
> examination: in each instance the questions were
> either repetitive or irrelevant. We find no abuse of
> discretion.

Id. at 548-49 (alterations in original).

To the extent that the Florida Supreme Court denied relief as to this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, it does not have merit. A Sixth Amendment Confrontation Clause violation arises when a criminal defendant is unable to "expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." Van Arsdall, 475 U.S. at 678-79 (quoting Davis v. Alaska, 415 U.S. 308, 318 (1974)). The right of confrontation is subject to limitation by the trial court "based on concerns

42

about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant . . . [T]he Confrontation Clause guarantees an <u>opportunity</u> for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." <u>Id.</u> at 678 (emphasis in original).

Here, the trial court did not improperly limit the cross-examination of Gaines, Clemons, and Captain Mattox, because counsel's questions to them were repetitive. When counsel sought to ask Gaines about whether he and Clemons went to Grand Park at noon when the incident with Little Terry occurred, Gaines had already testified that he did not meet with Clemons that morning or "until school got out that day." Resp. Ex. 5 at 564-68. In sustaining the State's objection, the trial court noted that counsel had asked Gaines four times whether he saw Clemons on the morning of the murder. <u>Id.</u> at 568. Similarly, Clemons had already testified on cross-examination that he did not have a gun on the day of the murder when counsel sought to ask him whether he had a gun when he and Gaines chased Little Terry that same day.[22] <u>Id.</u> at 826-27, 828. Nevertheless, any error was harmless because the defense called

---

[22] Although Gaines could not recall chasing Little Terry on the day of the murder, Clemons testified that he and Gaines chased Little Terry that day. Resp. Ex. 5 at 568-69, 827.

43

Terry Ashley as a witness who testified that he saw Gaines and Clemons on the morning of the murder and that Clemons had a gun. Resp. Ex. 6 at 1189-90.

Counsel's question for Captain Mattox also proved repetitive. Counsel sought to ask Captain Mattox about "the absence of accelerants in the fire and the scientific methods of ensuring that no accelerants were used" to impeach Christopher Shorter, a State witness who testified that Moore confessed to him and told him that he used gasoline from a lawn mower to set fire to the victim's house. Amended Petition at 27. However, on direct examination and cross-examination, Captain Mattox testified that he did not detect the presence of any accelerants, and he did not find a container suggestive of flammable liquid at the scene. Resp. Ex. 5 at 913, 917-20. Because any question about gas chromatography would have been repetitive, the trial court did not err when it limited the cross-examination of Captain Mattox.[23] Moore is not entitled to federal habeas relief on Ground Two.

---

[23] Notably, counsel still had the opportunity to extensively cross-examine Gaines, Clemons, and Captain Mattox. Resp. Ex. 5 at 557-85, 813-49, 915-23.

## C. Ground Three

As Ground Three, Moore contends that the trial court violated his Sixth Amendment right to confront witnesses when it permitted the State to elicit hearsay testimony during the penalty phase trial about Moore's prior violent felony. Amended Petition at 29-31. According to Moore, Detective L.H. Goff testified about "what witnesses had said about the facts and circumstances" of Moore's prior conviction for armed robbery. Id. at 30. Moore raised a substantially similar claim as ground two of his Second State Petition, Resp. Ex. 55 at 24-36; the State moved to dismiss, Resp. Ex. at 56; and the Florida Supreme Court denied Moore's Second State Petition on the merits and denied the State's motion to dismiss as moot, Resp. Ex. 58.

To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, Moore is not entitled to relief. To the extent Moore argues that the admission of Detective Goff's testimony violated Crawford v. Washington, 541 U.S. 36 (2004), such a claim does not have merit. In Whorton v. Bockting, 549 U.S. 406, 421 (2007), the United States Supreme Court determined that Crawford did not apply retroactively to cases on collateral review. Since Moore's convictions and sentences became final on April 20, 1998, well before March 8, 2004, Crawford does not apply to his case.

Further, the Florida Supreme Court has held that the State may offer hearsay testimony about a defendant's prior violent felonies during penalty phase proceedings if he has a fair opportunity to rebut the testimony. See, e.g., Bowles v. State, 804 So. 2d 1173, 1184 (Fla. 2001); Hudson v. State, 708 So. 2d 256, 261 (Fla. 1998); Waterhouse v. State, 596 So. 2d 1008, 1016 (Fla. 1992). The Eleventh Circuit, relying on United States Supreme Court precedent, has similarly held that hearsay is admissible at capital sentencing when the defendant has an opportunity to rebut the hearsay. See Muhammad v. Sec'y, Fla. Dep't of Corr., 733 F.3d 1065, 1077 (11th Cir. 2013). Here, Moore had a

46

fair opportunity to rebut Detective Goff's testimony on cross-examination. Resp. Ex. 12 at 1462-63. Accordingly, Moore is not entitled to federal habeas relief on the claim raised in Ground Three.

## D. Ground Four

Next, Moore contends that the use of offenses that he committed when he was a minor to support the prior violent felony aggravator violated the Eighth Amendment and Roper v. Simmons.[24] Amended Petition at 33. According to Moore, the State used as prior violent felonies an armed robbery that Moore committed when he was fifteen years old and an aggravated battery that Moore committed when he was seventeen years old. Id. Moore argues his death sentence impermissibly relies on criminal acts that he committed as a juvenile. Id. at 35. Moore raised this claim as the sole ground of his Third State Petition, Resp. Ex. 64, and, on October 18, 2005, the Florida Supreme Court denied Moore's Third State Petition, Resp. Ex. 67.

To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential

---

[24] In Roper, the United States Supreme Court determined the Eighth and Fourteenth Amendments prohibit the imposition of a death sentence for a defendant who was under eighteen years old when his crime was committed. 543 U.S. at 578-79.

standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, the claim does not have merit. Roper does not apply to Moore because he committed the first-degree murder (for which he received a death sentence) when he was approximately nineteen years old. Resp. Ex. 1 at 3-4. He does not point "to any other Supreme Court precedent that even suggests that a prior conviction from youth may not form the basis for an aggravating factor in a capital case." Melton v. Sec'y, Fla. Dep't of Corr., 778 F.3d 1234, 1237 (11th Cir. 2015). Accordingly, the Florida Supreme Court's determination was not contrary to or an unreasonable application of clearly established federal law, and Moore is not entitled to habeas relief.

### E. Ground Five

As Ground Five, Moore contends the State's closing argument at his penalty phase trial violated his rights under the Eighth and Fourteenth Amendments when the State asked the jury to consider the mitigating evidence as non-statutory aggravating evidence. Amended Petition at 36; Amended Memorandum at 26-27. According to Moore, although counsel objected to the State's comments, the trial court overruled his objection. Id. at 37. Moore argues that pursuant to McKoy v. North Carolina, 494 U.S. 433, 441 (1990), the State cannot bar the consideration of mitigating evidence, and Florida law limits aggravating circumstances to those set forth in the capital sentencing statute. Id. at 37-38. Therefore, Moore contends that the State's comments were improper. Id. at 38.

The record reflects Moore raised a substantially similar claim on direct appeal, Resp. Ex. 21 at 26-28, and the Florida Supreme Court affirmed Moore's convictions and sentences in a written opinion, Resp. Ex. 24. In addressing this claim, the Florida Supreme Court found:

> As to his final issue, Moore argues that the State improperly asked the jury to use mitigation as aggravation in its penalty-phase closing argument. We find no merit to this issue. Moore questions the following statement from the State's closing argument:

> I would submit to you that the Defense put
> on a lot of mitigation. They brought in, as
> I told you, all of the wonderful people who
> had known this defendant his entire life,
> who had nurtured him, who loved him,
> who spent holidays with him, who said
> that he was treated just like their son,
> their brother, their cousin. That he did
> well in school. That he played football.
> That he had a normal life. And, ladies and
> gentlemen, it may sound like mitigation,
> but to me it's the most—well, I would
> submit to you that it's the most
> aggravating factor of all.

Defense counsel objected to the content of the statement at the close of the arguments, but the judge overruled the objection. Wide latitude is permitted in arguing to a jury. Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982). It is within the judge's discretion to control the comments made to a jury, and we will not interfere unless an abuse of discretion is shown. Occhicone v. State, 570 So. 2d 902, 904 (Fla. 1990); Breedlove, 413 So. 2d at 8. The judge properly instructed the jury that closing argument should not be considered as evidence in the case or as the instruction on the law. He went on to instruct the jury that the only aggravating factors it was allowed to consider were those specifically defined by him; the judge also gave the correct instruction on mitigation. We do not find that prosecutor's comments to be of such a nature as to taint the jury's recommendation of death; accordingly there was no abuse of discretion. See Crump v. State, 622 So. 2d 963, 972 (Fla. 1993); Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985).

50

<u>Moore</u>, 701 So. 2d at 551.[25]

To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the

---

[25] Justice Anstead dissented, writing:

> I cannot agree with the majority that it was permissible for the State to tell the jury that the appellant's entire case for mitigation was "the most aggravating factor of all" in determining whether appellant should be sentenced to death. This assertion constitutes a violation of this Court's consistent and repeated admonitions that the only matters that may be asserted in aggravation are those set out in the death penalty statute. <u>Grossman v. State</u>, 525 So. 2d 833 (Fla.1988); <u>Floyd v. State</u>, 497 So. 2d 1211 (Fla. 1986); <u>Drake v. State</u>, 441 So. 2d 1079 (Fla.1983); <u>Purdy v. State</u>, 343 So. 2d 4 (Fla. 1977). A jury can hardly be expected to engage in a reasoned process of balancing aggravation and mitigation when it has been told by the State that it can and should add the defendant's evidence of mitigation to the aggravation side of the scales, especially when this assertion is given legitimacy by the trial court's rejection of an objection.

<u>Moore</u>, 701 So. 2d at 552 (Anstead, J., concurring in part and dissenting in part).

51

evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, it does not have merit. Moore objects to the following comments:

> What is the quality of the aggravation and the quality of the mitigation? I would submit to you that the Defense put on a lot of mitigation. They brought in, as I told you, all of the wonderful people who had known this defendant his entire life, who nurtured him, who loved him, who spent holidays with him, who said that he was treated just like their son, their brother, their cousin. That he did well in school. That he played football. That he had a normal life. And, ladies and gentlemen, it may sound like mitigation, but to me it's the most – well, I would submit to you that it's the most aggravating factor of all. . . .

> . . . .

> Ladies and gentlemen, look at these photographs that the Defense put in. They show a young man who was loved, they show a young man who gave love and got love. It could be mitigation that he was that type of person, but I would submit to you that is all the more reason that he should not have committed any of these crimes; because he did grow up in a decent, loving environment. He knew right from wrong. He had a home, a safe place to go to. He had people who worked and made money. He was taken care of. He did not have to work for a living. He did not have to kill Mr. Johnny Parrish to get money from him. But he did and he chose to do that. And because he did, and because

52

> he committed a crime which eliminated a witness, did the crime for financial gain, and had already committed two prior violent felonies, then, ladies and gentlemen, that aggravation outweighs the mitigation by any stretch of the imagination.

Resp. Ex. 14 at 1526-28 (emphasis added). Even assuming the comments were improper, the Court finds that they were brief and presented in the context of the State's permissible argument that the jury should evaluate the quality of the defense's mitigating evidence and give such evidence minimal weight in relation to the significant aggravating factors.

While Moore cites to McKoy and Tennard v. Dretke, 542 U.S. 274 (2004), to support his assertion that the closing argument was improper, those cases are distinguishable from Moore's case. In McKoy, the United States Supreme Court evaluated North Carolina's capital sentencing scheme and concluded that its requirement that jurors could consider only unanimously found mitigating circumstances in determining whether to impose a death sentence "impermissibly limit[ed] jurors' consideration of mitigating evidence." 494 U.S. at 444. The Tennard Court determined that petitioner was entitled to a certificate of appealability on his claim that Texas's sentencing scheme did not provide him with a sufficient manner of presenting evidence of his IQ as mitigating evidence where the trial court instructed the jury to consider the

53

appropriate punishment by considering two "special issues:" deliberateness and future dangerousness. 542 U.S. at 276. In Moore's case, the trial court did not prevent him from presenting mitigating evidence, and neither the trial court, nor the State, precluded the jury from considering such evidence. Rather, the trial court instructed jurors that the only aggravating circumstances it could consider were the prior violent felony, avoid arrest, and pecuniary gain aggravators. Resp. Ex. 16 at 444. The jury instructions also delineated the mitigating circumstances, and the trial court instructed the jury that if it found the State had established one or more aggravating circumstances, it "should consider <u>all the evidence</u> tending to establish one or more mitigating circumstances." <u>Id.</u> at 445 (emphasis added). The instructions directed that the jury's ultimate determination should be based on the "evidence" that it had heard during the guilt phase trial and the penalty phase trial. <u>Id.</u> at 444. The jury presumably followed the trial court's instructions. <u>See</u> <u>Adams v. Wainwright</u>, 709 F.2d 1443, 1447 (11th Cir. 1983) ("A jury is presumed to follow jury instructions."). On this record, Moore has failed to demonstrate the error, if any, substantially influenced the jury's decision to impose a death sentence. Therefore, Moore is not entitled to habeas relief on Ground Five.

### F. Ground Six

As Ground Six, Moore alleges trial counsel was ineffective when he: (A) denied Moore an adequate mental health examination in violation of <u>Ake v. Oklahoma</u>,[26] and (B) did not obtain the assistance of other experts. Amended Petition at 39-43. In Subclaim A, Moore alleges that trial counsel was ineffective when he did not provide records to the court-appointed mental health expert, Dr. Harry Krop. Amended Petition at 39. According to Moore, Dr. Krop evaluated Moore on August 19, 1993, primarily for a penalty phase assessment as requested by counsel. <u>Id.</u> at 40. Dr. Krop determined Moore's history of alcohol and drug abuse appeared to qualify as mitigating factors, but he requested further information to explore additional mitigators. <u>Id.</u> Moore contends Dr. Krop requested Moore's criminal records, prison records, jail records, and school records, as well as records pertaining to Moore's father's murder and information from family members. <u>Id.</u> He avers that counsel never provided these records to Dr. Krop. <u>Id.</u> Moore asserts the evaluation failed to comport with due process because it: relied on an incomplete and unreliable

---

[26] In <u>Ake</u>, the United States Supreme Court determined that if a criminal defendant demonstrates that his sanity will be a significant factor at trial, the State must ensure the defendant has access to a competent psychiatrist who will examine him and assist in the preparation and presentation of the defense. 470 U.S. at 83.

social history; did not account for Moore's medical history, "which would have revealed that [] Moore suffered symptoms consistent with toxic chemical exposure" and that he suffered from various types of head trauma; and was performed only for mitigation purposes. <u>Id.</u>

As Subclaim B, Moore argues that counsel was ineffective when he did not obtain the assistance of other experts, including a fire expert, an independent medical examiner, and a pharmacologist. <u>Id.</u> at 41-43. According to Moore, the fire expert would have reviewed the inconsistencies in Captain Mattox's testimony. <u>Id.</u> at 41-42. He alleges an independent medical examiner could have provided "a professionally trained opinion" regarding bullet trajectories and the manner in which the victim died that contradicted "the evidence and records." <u>Id.</u> at 42. Moore contends a pharmacologist would have testified about the effects of various drugs, including cocaine, that Moore used on the day of the murder. <u>Id.</u> at 41-42.

With respect to the alleged <u>Ake</u> violation in Subclaim A, Respondents argue such a claim is procedurally barred. Response at 72-74. According to Respondents, Moore raised a similar claim in his Rule 3.851 Motion, and the Florida Supreme Court found the claim to be procedurally barred because Moore should have raised it on direct appeal. <u>Id.</u> at 72-73. They assert the

56

Florida Supreme Court's decision rests on an independent and adequate state ground, so Subclaim A is procedurally barred. Id. at 73-74. Respondents further contend that Moore never raised Subclaim B in state court. Id. at 74-75. Because Moore did not properly exhaust Subclaim B and he cannot return to state court, it too is procedurally barred. Id. at 76.

In his Reply, Moore clarifies that Subclaim A "is premised upon ineffective assistance of counsel." Reply at 73. He contends that, to the extent the Florida Supreme Court barred his ineffective assistance of counsel claim for failure to raise it on direct appeal, such a bar is not regularly or consistently applied because he could not present an ineffective assistance of counsel claim on direct appeal. Id.

The record shows that Moore raised Subclaim A in his Rule 3.851 Motion. Resp. Ex. 30 at 33. Moore again raised Subclaim A, with considerably more detail, and Subclaim B in his Third Amended Rule 3.851 Motion. Resp. Ex. 32 at 340-48. The postconviction court refused to consider Moore's "untimely and unauthorized" Third Amended Rule 3.851 Motion. Resp. Ex. 34 at 530. It denied Subclaim A as pled in Moore's Rule 3.851 Motion, stating in pertinent part:

> The defendant claims that he was not provided with an adequate mental health evaluation, and that

57

> counsel was ineffective in providing his mental health experts with adequate background information with which to conduct an adequate mental health evaluation. The defendant also claims that counsel failed to present available mitigating evidence, to challenge the State's evidence and to make eight[h] amendment arguments. The defendant entirely fails to provide any facts in support of these allegations. This Court finds these claims to be facially insufficient as a matter of law. Kennedy, supra.[27]

Id. at 536.

Moore raised both Subclaims A and B as ground seven on appeal from the postconviction court's denial of relief. Id. at 56-63. The Florida Supreme Court affirmed, stating in pertinent part:

> Claims (5), (6), (7), and (11) are procedurally barred because they could and should have been raised on direct appeal. See Hardwick v. Dugger, 648 So. 2d 100, 105 (Fla. 1994) (denying postconviction relief where defendant failed to raise issues of omissions in the record and absence from critical stage of trial on direct appeal); see also Harvey v. Dugger, 656 So. 2d 1253 (Fla. 1995) (holding that "issues that could have been, but were not, raised on direct appeal are not cognizable through collateral attack").

Moore, 820 So. 2d at 203 n.4. On this record, it appears that the Florida Supreme Court's procedural bar on Subclaim A does not rest on an adequate state ground. See Card v. Dugger, 911 F.2d 1494, 1516 (11th Cir. 1990) (noting

---

[27] Kennedy v. State, 547 So. 2d 912 (Fla. 1989).

that a procedural bar must be adequate in that "it must not be applied in an arbitrary or unprecedented fashion"); Brown v. Sec'y, Dep't of Corr., 200 F. App'x 885, 887 (11th Cir. 2006) ("The question here is whether federal claims are barred by procedural default when the state court incorrectly applies its own procedural default law. The answer is no.").[28] As Moore clarifies in the Reply, he raised an ineffective assistance of counsel claim premised on Ake. Under Florida law, claims of ineffective assistance of counsel generally may not be raised on direct appeal.[29] See, e.g., Bruno v State, 807 So. 2d 55, 63 (Fla. 2001).

Nevertheless, the claim in Subclaim A has no merit. The Court initially notes that neither the trial court nor counsel violated Moore's rights pursuant to Ake. Moore admits the trial court appointed a mental health expert, Dr. Krop, to assist his defense. Such an appointment satisfied Ake's mandate. See Ake, 470 U.S. at 83 ("This is not to say, of course, that the indigent defendant

---

[28] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[29] An ineffective assistance of counsel claim is cognizable on direct appeal where the record demonstrates ineffectiveness on its face. Wuornos v. State, 676 So. 2d 972, 974 (Fla. 1996). In this case, the record on appeal does not demonstrate on its face that counsel was ineffective.

has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed. . . .").

At the penalty phase trial, Moore's mother, Wilhelmina Moore, testified that his father's murder occurred when Moore was eight years old. Resp. Ex. 13 at 1476. A neighbor testified that Moore seemed to have difficulty accepting his father's death. Id. at 1510. Moore did not have much contact with his father because he had another family. Id. at 1470, 1476. However, Moore's paternal aunt testified that Moore was treated as part of the family. Id. at 1504.

Multiple witnesses testified  Moore was exceptionally smart and did not have any abnormal behavioral issues in school. Id. at 1473-74, 1479, 1482, 1492, 1512. Wilhelmina Moore testified she provided a safe and loving home for Moore, and did not keep guns in the house. Id. at 1487-88. The jury learned that Moore helped his grandfather when he suffered from a stroke. Id. at 1513-14, 1517. Witnesses portrayed Moore as helpful and respectful. Id. at 1474, 1496, 1503, 1509, 1512-13, 1517-18.

On this record, Moore cannot demonstrate that counsel performed deficiently when he failed to provide additional records to Dr. Krop. Counsel's apparent strategy during the penalty phase trial was to humanize Moore by

portraying him as a respectable and kind individual who had a loving family. To the extent Moore proposes additional information from the records would have revealed a difficult upbringing, addiction, or head trauma that affected his behavior, presentation of such evidence would have undermined the defense's strategy and confused the jury. Further, considering the testimony of Moore's family and neighbors, any allegation that the provision of additional records to Dr. Krop would reveal more mitigating information constitutes speculation. Speculation cannot form the basis of an ineffective assistance of counsel claim. See Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, speculative, or unsupported claims cannot support an ineffective assistance of counsel claim).

To the extent Moore argues counsel was ineffective when he failed to ask Dr. Krop to ascertain mitigation for the guilt phase trial, specifically regarding Moore's use of drugs and alcohol on the day of the murder, Moore is not entitled to relief. At trial, counsel pursued a defense of actual innocence, wherein Moore testified that he did not shoot the victim. See generally Resp. Ex. 6. A voluntary intoxication defense or testimony about the effects of drugs or alcohol on Moore's behavior on the day of the murder would have confused the jury, or

61

the jury could have seen it as a concession by the defense. Accordingly, Moore's ineffective assistance of counsel claim does not have merit.

As to Subclaim B, Moore did not properly exhaust this claim. Although he presented the claim in his initial brief on the appeal of his unsuccessful Rule 3.851 Motion, he failed to present it to the postconviction court in a procedurally correct manner. See Boerckel, 526 U.S. at 845 ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). Because any future attempt to exhaust this claim would be futile, it is procedurally defaulted. In an effort to avoid the bar, Moore cites Martinez v. Ryan, 566 U.S. 1 (2012), and argues that collateral counsel's ineffective assistance constitutes cause and prejudice to overcome the procedural bar. Reply at 74. The Eleventh Circuit has explained the holding of Martinez as follows:

> In Martinez, the U.S. Supreme Court enunciated a narrow exception to the general rule that the lack of an attorney or attorney error in state post-conviction proceedings does not establish cause to excuse the procedural default of a substantive claim. 566 U.S. at 8, 13-14, 132 S.Ct. at 1315, 1318. The Supreme Court, however, set strict parameters on the application of this exception. It applies only where (1) state law requires a prisoner to raise ineffective-trial-counsel claims during an initial collateral proceeding and

> precludes those claims during direct appeal; (2) the
> prisoner failed to properly raise ineffective-trial-
> counsel claims during the initial collateral proceeding;
> (3) the prisoner either did not have counsel or his
> counsel was ineffective during those initial state
> collateral proceedings; and (4) failing to excuse the
> prisoner's procedural default would result in the loss
> of a "substantial" ineffective-trial-counsel claim. Id. at
> 14, 132 S.Ct. at 1318; see also Arthur v. Thomas, 739
> F.3d 611, 629 (11th Cir. 2014) (setting forth the
> Martinez requirements).

Lambrix v. Sec'y, Fla. Dep't of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). A

claim is substantial if it "has some merit." Martinez, 566 U.S. at 14. For

purposes of determining whether postconviction counsel was ineffective, a

petitioner "must show more than the mere fact [counsel] failed to raise

potentially meritorious claims; he must show that no competent counsel, in the

exercise of reasonable professional judgment, would have omitted those

claims." Hittson v. GDCP Warden, 759 F.3d 1210, 1263 (11th Cir. 2014)

(emphasis in original).

On the record before the Court here, the Court determines that even if

Moore can demonstrate that postconviction counsel's ineffective assistance

caused his procedural default, he cannot show that the underlying ineffective

assistance of counsel claim is substantial. Moore asserts counsel was

ineffective when he failed to retain a pharmacologist. However, as the Court

previously noted, counsel pursued a defense of actual innocence at trial. <u>See generally</u> Resp. Ex. 6. Testimony from a pharmacologist about the effects of drugs on Moore's behavior on the day of the murder would have confused the jury, especially in the context of Moore's own testimony that he did not shoot the victim or conspire with Clemons and Gaines to rob the victim. Therefore, counsel was not deficient when he failed to retain a pharmacologist to testify at the guilt phase trial. <u>See</u> <u>Haliburton v. Sec'y for Dep't of Corr.</u>, 342 F.3d 1233, 1244 (11th Cir. 2003) ("Counsel must be permitted to weed out some arguments to stress others and advocate effectively.").

Moore also contends counsel was ineffective when he failed to obtain a fire expert. Even assuming counsel performed deficiently, no prejudice resulted from his performance because Captain Mattox's testimony did not harm the defense. Christopher Shorter, a key State witness and Moore's neighbor, testified that Moore confessed to the murder. Resp. Ex. 5 at 999-1000. According to Shorter, Moore used trash and removed the top from a lawn mower, presumably for gasoline, to set the victim's house on fire. <u>Id.</u> at 1003. However, Captain Mattox testified that he did not detect the presence of any accelerants, such as gasoline, at the scene. <u>Id.</u> at 913, 919. He did not recover any container suggestive of flammable liquid and did not find an overturned

64

lawnmower. <u>Id.</u> at 920-21. Therefore, counsel's failure to retain a fire expert did not prejudice the defense. As to Moore's claim that counsel was ineffective when he did not retain an independent medical examiner, counsel's allegedly deficient performance did not prejudice the defense because counsel extensively cross-examined the medical examiner, Dr. Bonafacio Floro. <u>Id.</u> at 745-68.

Notably, Moore's claim about the testimony of expert witnesses is speculative because he does not specify the substance of the proposed experts' testimony, and he presumes the experts would have testified favorably to the defense. <u>See</u> <u>Sullivan v. DeLoach</u>, 459 F.3d 1097, 1109 (11th Cir. 2006) (noting that where a petitioner alleges ineffective assistance of counsel for failure to call a witness, the "prejudice burden is heavy . . . because often allegations of what a witness would have testified to are largely speculative.") (quotation marks and citation omitted); <u>Holt v. Sec'y, Fla. Dep't of Corr.</u>, 489 F. App'x 336, 338 (11th Cir. 2012) (holding that petitioner's claim that counsel was ineffective for failing to retain an expert witness to testify about the cause of the victim's injuries was speculative); <u>Finch v. Sec'y, Dep't of Corr.</u>, 643 F. App'x 848, 852 (11th Cir. 2016) (finding that ineffective assistance of counsel claim for failure to call an expert witness was speculative and conclusory where

petitioner provided no evidence that he had contacted an expert and failed to allege an expert had reviewed the evidence in the case). Therefore, based on the above, the Court finds that Moore's claims are not substantial such that his failure to exhaust them should be excused under <u>Martinez</u>. Moore has failed to establish deficient performance or prejudice, and, therefore, has failed to establish he is entitled to relief. Accordingly, Ground Six is due to be denied.

## G. Ground Seven

Next, Moore argues that counsel was ineffective when he failed to investigate and develop "crucial" evidence for the penalty phase trial, including about Moore's (A) difficult childhood, (B) exposure to lead, and (C) substance abuse. Amended Petition at 44. As Subclaim A, Moore alleges available mitigating evidence demonstrated that "the rosy picture of [] Moore's childhood and upbringing presented by defense counsel was far from the horrid reality that [] Moore lived with." <u>Id.</u> at 45. In Subclaim B, he alleges counsel failed to investigate and present the impact of long-term lead poisoning. <u>Id.</u> at 45. Moore avers multiple Jacksonville neighborhoods were built on harmful incinerator trash containing lead, and one of those sites "is less than a mile from the house where [he] was raised." <u>Id.</u> According to Moore, he suffered from symptoms of chronic lead exposure, such as migraines and "month-long bouts of vomiting."

66

Id. at 45-46. Moore's exposure to lead allegedly affected his learning ability and metabolism, as well as damaged his nervous system. Id. at 46.

As Subclaim C, he argues that counsel failed to investigate and present evidence regarding the long-term effect of substance abuse on Moore's mental state. Id. at 46-47. Moore alleges he had a history of substance abuse, and his intoxication on the day of the murder "constituted an extreme mental disturbance in his mind, and/or substantially impaired his capacity to conform his conduct to the requirements of the law." Id. at 46-47.

Respondents contend that Moore presented claims substantially similar to Subclaims A, B, and C in his Rule 3.851 Motion, but the postconviction court denied them as facially insufficient. Response at 80-81. According to Respondents, Moore only appealed the postconviction court's disposition of Subclaim C; however, the Florida Supreme Court declined to address Subclaim C on appeal because it was facially insufficient. Id. at 81. Respondents concede that the Florida Supreme Court's ruling constitutes a decision on the merits, so Subclaim C is not barred from federal review. Id. at 83. Nevertheless, they argue Moore abandoned Subclaims A and B on appeal; therefore, he did not properly exhaust them. Id. at 82. Since Moore cannot return to state court,

Respondents contend those claims are procedurally barred from federal review. Id.

The record reflects that Moore raised claims similar to Subclaims A and C in his Rule 3.851 Motion. Resp. Ex. 30 at 33-40. However, Moore did not present Subclaim B. Id. The postconviction court denied relief, determining:

> The defendant claims that he was not provided with an adequate mental health evaluation, and that counsel was ineffective in providing his mental health experts with adequate background information with which to conduct an adequate mental health evaluation. The defendant also claims that counsel failed to present available mitigating evidence, to challenge the State's evidence and to make eight[h] amendment arguments. The defendant entirely fails to provide any facts in support of these allegations. This Court finds these claims to be facially insufficient as a matter of law. Kennedy, supra.[30]

Resp. Ex. 34 at 536. In his initial brief on appeal, Moore raised the entirety of Ground Seven as subclaim d of ground two.[31] Resp. Ex. 36 at 33-36. The Florida Supreme Court affirmed the postconviction court's denial of relief, stating in pertinent part:

> We decline to address claim (2) and the associated subclaims contained therein. First, the trial court

---

[30] Kennedy v. State, 547 So. 2d 912 (Fla. 1989).

[31] In ground two, Moore argued that the trial court erred when it summarily denied his "meritorious" claims without the benefit of an evidentiary hearing. Resp. Ex. 36 at 25.

68

properly found that Moore failed to allege the factors prerequisite to relief on a newly discovered evidence claim and, thus, was not entitled to an evidentiary hearing. See Davis v. State, 736 So. 2d 1156, 1158-59 (Fla. 1999) ("To be entitled to an evidentiary hearing on a newly discovered evidence claim, Davis must, in addition to satisfying the due diligence requirement of rule 3.851(b), allege that he has discovered evidence which is 'of such nature that it would probably produce an acquittal on retrial.'"). Second, a defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing, as did Moore here. See Ragsdale v. State, 720 So. 2d 203, 207 (Fla. 1998); Kennedy v. State, 547 So. 2d 912, 913 (Fla. 1989).

Moore, 820 So. 2d at 203 n.4. On this record, the Court finds Moore did not properly exhaust Subclaim B. Moore neither presented the issue to the postconviction court, nor raised it on appeal to the Florida Supreme Court. In his Reply, Moore asserts postconviction counsel's ineffective assistance constitutes cause and prejudice to overcome the procedural bar. Reply at 75. In order to determine whether this claim is substantial under Martinez, the Court turns to the merits of the claim.

Moore's claim that counsel was ineffective when he failed to investigate and develop evidence of exposure to hazardous waste is entirely speculative. Wilhelmina Moore testified at the penalty phase trial that although Moore suffered from migraines and bouts of vomiting as he grew up, doctors could not

determine any cause. Resp. Ex. 13 at 1479. Further, the penalty phase testimony contradicts Moore's assertion that his alleged exposure to toxic waste affected his learning ability. Witnesses described Moore as exceptionally smart. Id. at 1473-74, 1479, 1482, 1492, 1512. Wilhelmina Moore noted that Moore made the honor roll, and the elementary school wanted him to skip a grade. Id. at 1473. Such evidence demonstrates that any exposure to hazardous waste apparently did not impact Moore's learning ability. His speculation otherwise cannot form the basis of an ineffective assistance of counsel claim. See Tejada, 941 F.2d at 1559. Accordingly, the Court finds that, even assuming Moore can demonstrate that postconviction counsel's ineffective assistance caused his procedural default, Subclaim B is not substantial such that his failure to exhaust it should be excused under Martinez. Moore has failed to establish deficient performance or prejudice, and, therefore, has failed to establish he is entitled to relief under Martinez.

As to Subclaims A and C, they are not procedurally barred as the state supreme court's decision qualifies as a ruling on the merits. See Pope v. Sec'y for Dep't of Corr., 680 F.3d 1271, 1286 (11th Cir. 2012) ("[A] Florida state court's dismissal of a post-conviction claim for facial insufficiency constitutes – at least for purposes of the procedural default analysis – a ruling 'on the merits'

70

that is not barred from [] review."). As such, the Court will address the claims in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of the claims was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of Subclaims A and C.

Even assuming the state supreme court's adjudication of these claims is not entitled to deference, they do not have merit. For the reasons detailed in Ground Seven, the presentation of evidence concerning Moore's childhood, allegedly "filled with degrading and senseless violence," or evidence of his substance abuse clearly would have undercut the defense's apparent strategy at the penalty phase trial. Amended Petition at 45. Moreover, reasonably competent counsel can choose not to present evidence of alcohol or drug abuse as it may become a "'two-edged sword.'" Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1217 (11th Cir. 2007) (quoting Housel v. Head, 238 F.3d 1289, 1296

(11th Cir. 2001)). The Eleventh Circuit Court of Appeals has noted the following about such evidence:

> We have repeatedly recognized that evidence of a defendant's alcohol or drug abuse holds little mitigating value and may have the counterproductive effect of alienating the jury. See, e.g., Haliburton v. Sec'y for Dept. of Corr., 342 F.3d 1233, 1244 (11th Cir. 2003) ("[E]vidence [of substance abuse] can often hurt the defense as much or more than it can help."); Crawford,[32] 311 F.3d at 1321 ("[S]uch evidence often has little mitigating value and can do as much or more harm than good in the eyes of the jury."); Grayson,[33] 257 F.3d at 1227 ("[W]e note that emphasizing [the petitioner's] alcoholic youth and intoxication may also have been damaging to [the petitioner] in the eyes of the jury.").
>
> Rarely, if ever, will evidence of a long history of alcohol and drug abuse be so powerful that every objectively reasonable lawyer who had the evidence would have used it. Cf. Van Poyck,[34] 290 F.3d at 1324 (concluding that evidence of childhood abuse is not so powerful that every reasonable lawyer would have presented it to a jury).

Id. Moore has failed to demonstrate that counsel was deficient when he declined to present such evidence, especially in light of counsel's apparent

---

[32] Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002).
[33] Grayson v. Thompson, 257 F.3d 1194 (11th Cir. 2001).
[34] Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318 (11th Cir. 2002).

72

penalty phase strategy to present Moore as an intelligent, kind individual with a strong family support system.

With respect to the prejudice prong, Moore "must show that but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence. To assess that probability, [the Court must] consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" Porter v. McCollum, 558 U.S. 30, 41 (2009) (quoting Williams, 529 U.S. at 397-398); see also Sears v. Upton, 561 U.S. 945, 955-56 (2010) (finding that a proper prejudice analysis must take into account the newly uncovered mitigating evidence, along with the mitigation evidence introduced during the defendant's penalty phase trial, to assess whether there is a reasonable probability that the defendant "would have received a different sentence after a constitutionally sufficient mitigation investigation") (citations omitted). Here, even assuming arguendo deficient performance by defense counsel, Moore has not shown the resulting prejudice. Moore has not shown that a reasonable probability exists that the outcome of the case would have been different if defense counsel had presented the proposed mitigation evidence. Therefore, Moore's ineffectiveness claim is without merit since he

73

has neither shown deficient performance nor resulting prejudice. As such, relief on the claims in Ground Seven is due to be denied.

## H. Ground Eight

Next, Moore argues that counsel was ineffective when he failed to investigate and call an exculpatory witness, David Hallback. Amended Petition at 48-59; Amended Memorandum at 29. He contends that a note from trial counsel's file (Hallback Note) shows that individuals from the Public Defender's Office interviewed Hallback in July 1993. Amended Petition at 49-50. Hallback was incarcerated in the "juvenile pod" at the Duval County Jail with Clemons. Id. at 51. According to the Hallback Note, Clemons told Hallback that Moore "didn't do it." Id. at 50. Moore maintains counsel should have further investigated Hallback, and counsel's failure to take such action "was the result of pure 'inattention' or a conflict of interest in that the public defender's office also represented [] Hallback." Amended Memorandum at 30. He alleges if counsel had interviewed Hallback, he would have discovered other exculpatory witnesses from the juvenile pod, including Raimundo Hogan, Mandell Rhodes, and Charles Simpson. Id. at 31. Hogan, Rhodes, and Simpson testified at the 2011 evidentiary hearing that they heard either Clemons or Gaines make inculpatory statements in 1993. Amended Petition at 53-54.

74

Moore also alleges collateral counsel was ineffective when he failed to investigate Hallback based on the note from trial counsel's file. Id. at 51.

Finally, Moore asserts that trial counsel and collateral counsel were ineffective when they "fail[ed] to be familiar with the police reports regarding Randy Jackson's allegations against Moore and the time of those allegations in relationship to the Timothy B[rinkley][35] incident." Id. at 57. During trial, Jackson testified that Moore confessed to killing the victim when they were incarcerated together in the Duval County Jail. Id. at 88. To demonstrate bias and motive, the defense elicited testimony from Jackson about an incident in which Jackson claimed Moore hit him on the head with a hammer. Id. The State questioned Jackson on redirect examination about another incident where Jackson and Moore committed a battery on Brinkley, specifically whether Jackson remembered he and Moore having contact with Brinkley after Moore hit Jackson on the head with a hammer. Id. at 88. Jackson responded that he remembered such an incident. Id. On cross-examination and after reviewing the arrest and booking report, Moore confirmed that after the hammer incident, he and Jackson were arrested for committing a crime

---

[35] Moore refers to Brinkley as "Bunkley" in his Amended Petition; however, the Court identifies him as Brinkley in accordance with the trial transcript and the arrest and booking reports.

together. Id. at 89. The prosecutor referenced the incidents during closing argument and rebuttal argument, implying that the Brinkley incident occurred after the hammer incident. Id. at 89. According to Moore, the arrest and booking reports demonstrate that the hammer incident occurred after the Brinkley incident. Id. Therefore, Moore argues trial counsel should have known about the arrest and booking reports to "thwart" the State's inaccurate representation of the timeline. Id. at 57. Similarly, collateral counsel should have known about the arrest and booking reports, so he could raise a Giglio claim in Moore's initial Rule 3.851 Motion.[36] Id. at 59.

Respondents assert that the claim in Ground Eight is procedurally barred. Response at 96. According to Respondents, Moore raised a similar claim in his Second Successive Rule 3.851 Motion, but he presented it as newly discovered evidence of Clemons's inculpatory statements in the juvenile pod. Id. They maintain Moore did not allege with specificity that trial counsel and collateral counsel were ineffective when they failed to investigate the Hallback Note. Id. The postconviction court denied the claim presented as untimely, and the Florida Supreme Court affirmed the decision on that same basis. Id. Respondents argue that the state court's judgment relies on an independent

---

[36] Moore also raises this issue as a Giglio claim in Ground Fourteen.

and adequate state procedural ground, and Moore is barred from federal habeas relief. <u>Id.</u> at 97.

The record reflects that Moore raised an ineffective assistance of counsel claim in ground two of his Second Successive Rule 3.851 Motion. Resp. 76 at 116. In a footnote, he argued:

> To the extent that Mr. Moore's trial counsel was aware or should have been aware of individuals who knew of exculpatory statements made by Mr. Clemons, but failed to learn of such statements or conduct follow up investigation upon such statements because counsel's office represented the witnesses in their own criminal cases, counsel's performance was deficient because of a known or unknown conflict of interest.

<u>Id.</u> at 117. Moore did not refer to the Hallback Note or name Hallback as one of the "individuals who knew of exculpatory statements" in ground two. <u>Id.</u> The postconviction court determined Moore's ineffective assistance of counsel claim was untimely and procedurally barred because Moore did not specify which facts counsel failed to discover or why the failure to discover such facts was unreasonable. Resp. Ex. 90 at 394. In affirming the postconviction court's denial of relief, the Florida Supreme Court held:

> To the extent that Moore is attempting to raise an ineffective assistance of counsel claim within this second successive postconviction motion, we affirm the postconviction court's ruling that such a claim is untimely.

Moore, 132 So. 3d at 722 n.3. Both the postconviction court and the state supreme court properly applied a regularly followed procedural default principle and found Moore's claim to be untimely. See Fla. R. Crim. P. 3.851(d)(1) (prohibiting the filing of a motion for postconviction relief in a capital case more than one year after the judgment and sentence become final); Hunter v. State, 29 So. 3d 256, 267 (Fla. 2008) ("Rule 3.851 requires motions filed beyond the time limitations to specifically allege that the facts on which the claim is predicated were unknown or could not have been ascertained by the exercise of due diligence.") (citing Fla. R. Crim. P. 3.851(d)(2)(A)). Therefore, his claim is procedurally barred for purposes of federal habeas review.

Moore asserts that the ineffective assistance of collateral counsel constitutes cause and prejudice to overcome the procedural bar. Reply at 79. However, Respondents contend that Moore does not raise a substantial claim under Martinez. Response at 98. In order to determine whether the claim is substantial, the Court looks to the merits of Moore's argument. At the 2011 evidentiary hearing on Moore's Second Successive Rule 3.851 Motion, Hallback testified that law enforcement arrested him in October 1992. Resp. Ex. 94 at 709. The State charged him with robbery, and he was transferred to the Duval

78

County Jail in November 1992. Id. According to Hallback, he was incarcerated with Clemons in the juvenile pod beginning in February 1993. Id. at 700. At the postconviction court evidentiary hearing, Hallback testified Clemons discussed the murder with him:

> Q:   But did – did Carlos Clemmons[37] mention Thomas Moore to you?
>
> A:   Well, when we discussed about the case, you know.
>
> Q:   What did he tell you about Thomas Moore?
>
> A:   Well, basically he was saying that he wasn't – I asked him myself like, you know, where was – where was this other guy at and he was like, well, he had left because he had to wait for him to leave.
>
> Q:   Okay. And did he explain why they needed to wait for him to leave? Well, let me back up. Where did he leave from, according to Mr. Clemmons?
>
> A:   He left from – I guess from the scene of the crime or whatever.
>
> Q:   Okay.
>
> A:   He left before all this had happened.
>
> Q:   Okay.

---

[37] The transcript of the 2011 evidentiary hearing uses "Clemmons;" however, consistent with the trial transcript, the Court uses "Clemons."

A:      Because basically he was saying that that was –
        Thomas was the old man's best friend, they was
        always hanging out together, always around
        there.

Q:      Okay. And so then after he left, then what did
        Mr. Clemmons – after Thomas Moore left, what
        did Mr. Clemmons say happened?

A:      Well, basically say they – I guess they went back
        to the house or whatever. They didn't say, you
        know, what – what they did or anything. He
        didn't go on and say that, you know, he did
        anything. He just said that Thomas had to leave,
        they had to wait on him to leave because they –
        you know, Thomas wasn't going to let them do
        that.

Q:      Okay. And did he indicate that Thomas Moore
        didn't have anything to do with the crime?

A:      Yeah. Well, basically he said he wasn't there.

Q:      Okay.

A:      When it happened.

Id. at 705-06. Hallback testified that Clemons told him that Clemons went into

the victim's house because there was a safe in the house. Id. at 706. Hallback

testified he did not know how Clemons knew the victim had a safe. Id. At the

hearing, Moore also submitted the Hallback Note, dated July 2, 1993, as an

exhibit. Doc. 56-3 at 68.

80

As to Moore's claim that trial counsel was ineffective when he failed to investigate and call Hallback as a witness, it does not have merit because Moore can not demonstrate counsel was deficient.[38] According to Hallback, he told his grandmother about Clemons's statement, and she "sent a PD to talk to [him]." Resp. Ex. 94 at 714. Based on Hallback's testimony and the note, counsel apparently investigated Hallback. Id. at 714-15; Doc. 56-3 at 68.

Counsel's decision not to call Hallback as a witness also was not unreasonable. By the time of trial, the State had certified Hallback as an adult and charged him with three counts of armed robbery. Resp. Ex. 94 at 709. Hallback was Moore's cousin, and he had known Moore "all [his] life." Id. at 713. The State likely would have argued Hallback had a motive to lie about Clemons's statement based on his familial ties to Moore. Further, according to the Hallback Note, Hallback "was not sure of all that was said," but that Clemons admitted he and Moore were inside the victim's house. Doc. 56-3 at 68. If Hallback had testified to that detail at trial, not only would it have placed Moore at the scene of the crime with Clemons, but it also would have

---

[38] To the extent Moore raises a ineffective assistance of collateral counsel claim based on the Hallback Note as a ground for relief, such a claim is not cognizable in a federal habeas petition. See 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

contradicted Moore's own trial testimony. Moore did not admit to entering the victim's house with Clemons. Resp. Ex. 6 at 1038-1125. Rather, Moore testified he warned the victim that Clemons and Gaines had a gun because he had seen them chasing a boy with it earlier that day. Id. at 1104. The victim told Moore that Clemons and Gaines should stay away from his house because he had a gun. Id. Moore testified he then approached Clemons and Gaines to reprimand them about chasing the boy. Id. at 1105. Moore did not admit to any other interaction with Clemons after that discussion. Accordingly, it was not unreasonable for counsel to not call Hallback as a witness.

Moore's contention that if trial counsel had further interviewed Hallback, he would have discovered other witnesses from the juvenile pod to whom Clemons and Gaines made inculpatory statements, is also speculative. At the 2011 hearing, Hallback testified that he believed Clemons confided in him because they knew each other from school and Clemons did not know anyone else in the juvenile pod. Resp. Ex. 94 at 700, 703, 707. According to Hallback, Clemons told him about the murder after he went into Clemons's cell. Id. at 704. Hallback noted Clemons was in a cell by himself. Id. Based on

Hallback's testimony, trial counsel would have no reason to conclude Clemons talked about his case to other inmates in the juvenile pod.[39]

Regardless, the Court finds no reasonable probability exists that the introduction of Hallback's testimony would have changed the results of the proceeding. At trial, the State proposed the theory that Moore asked Gaines and Clemons to help him steal money from the victim's house. While Gaines acted as "lookout" outside the house, Clemons and Moore went inside the house and Moore shot the victim. Moore set the house on fire to destroy any evidence.

At trial, Clemons testified that, on the day of the murder, he and Gaines stopped in the Grand Park neighborhood to talk with a group of boys that included Moore. Resp. Ex. 5 at 784-85. Javon Graves, Clemons's friend, introduced Gaines and Clemons to Moore. Id. at 785. Moore then took Gaines and Clemons away from the group and asked the two boys whether they had any money. Id. at 786-87. Gaines and Clemons responded that they did not have any money, and Moore pointed to the victim's house, telling them that he knew where to get it. Id. at 786-87. Gaines and Clemons agreed to stand

---

[39] Moore also proposes that trial counsel did not further investigate or call Hallback as a witness because of a conflict of interest. Amended Petition at 54. The Public Defender's Office represented Moore and Hallback in their respective, unrelated cases. It is unclear how this would result in a conflict of interest as Hallback was not Moore's codefendant or a potential State witness. Moreover, Hallback's hypothetical testimony would not have implicated him in any crime.

outside and act as "lookouts" while Moore went inside the victim's house. Id. at 788.

Clemons testified he and Moore approached the house after the group of boys dispersed, and Moore told Clemons to go inside it with him. Id. at 790. Gaines stood outside the house as a "lookout." Id. Moore knocked on the door, told the victim that Clemons was his cousin, and asked him for more moonshine.[40] Id. at 792-93. The victim led them inside the house and down a hallway, where he got them moonshine. Id. at 793. As the group walked back towards the front of the house, Moore took out a gun and asked the victim where he had the money. Id. at 796. The victim did not answer, and Moore shot him in the chest. Id. After Moore shot the victim again, Clemons tried to run out the door. Id. at 303-04. Moore pointed a gun at Clemons and told him that they had not finished. Id. at 304. Clemons continued to run out the door and down the street. Id. at 304.

Several other boys from the group, Graves, Willie Reese, and Michael Dean, confirmed that they saw Moore pull Gaines and Clemons away from the group to talk with them. Id. at 515, 603, 632. Michael Dean testified Moore

---

[40] Moore testified that he drank moonshine with the victim earlier that day. Resp. Ex. 6 at 1100-01.

asked him to rob the victim that same day, but he declined. Id. at 510. The victim's neighbor, Alan Dean, testified he observed Moore grab Clemons by the arm and take him away from the group of boys. Id. at 456-57. He testified after the group of boys dispersed, Moore, Clemons, and Gaines stood by the corner in front of the victim's house. Id. at 458. Reese and Graves confirmed that they saw Moore, Clemons, and Gaines on the corner by the victim's house. Id. at 606, 634. Larry Ewing testified that when he walked by the victim's house on the day of the murder, he saw Moore "standing between the two rails by the door" with Clemons. Id. at 656. Moore and Clemons were talking to each other. Id. at 656-57. Ewing saw Gaines standing on the corner. Id.

The State also called Christopher Shorter, Moore's friend, as a witness. Shorter testified, on the evening of the murder, Moore stopped at his house with a bag of clothes. Id. at 994. Moore asked Shorter if he had a lighter so he could burn the bag, but Shorter agreed to throw it away. Id. at 995-96. Shorter noticed Moore had changed clothes from when he saw him earlier that day.[41] Id. at 994. The next day, Moore told Shorter that he had killed the victim. Id. at 999. Shorter testified Moore later provided him with details of the murder.

---

[41] Reese and Graves confirmed Moore wore different color "Dickie's" work suits before the murder and later that day. Resp. Ex. 5 at 607, 636.

Id. at 1000.  According to Shorter, Moore told the victim "to give it up," and shot him in the chest and head. Id. at 1001. Moore stated after the first shot, the victim slumped to the side. Id. at 1002. He told Shorter that Clemons went inside the house with him and ran out of the house after Moore shot the victim. Id. at 1002-03. Moore searched the house and took a .38 revolver from underneath a mattress in the back bedroom. Id. at 1003. He then used trash from inside the house as kindling and took the top off of a lawn mower to start a fire. Id. Shorter testified Moore started the fire to remove fingerprints. Id. at 1003-04. Moore locked the front door to the house with the keys and left out of the side door. Id. at 1004.

Dr. Bonafacio Floro, the medical examiner, confirmed the victim sustained a gunshot wound to his left temple and chest. Id. at 736. Solomon Fields, a passerby who attempted to rescue the victim from the fire, testified the burglar bar door was unlocked, but the front door was locked when he tried to enter the house. Id. at 720-22. Law enforcement ultimately found keys in the debris from the hallway. Id. at 875.

The victim's friend, Ethel Singleton, testified she previously saw a .38 revolver in the house when she visited the victim. Id. at 727-28. She testified the victim kept his burglar bar door locked, and "if he didn't know you he

86

wouldn't let you in." Id. at 727. Audrey McCray, Moore's neighbor, testified the victim never allowed strangers into his house, but he did permit Moore into the house. Id. at 1036. Shorter also told her that Moore brought a bag of clothes to Shorter so he could bury them in the backyard; Shorter then threw the clothes out at a Texaco. Id. at 1042.  Moore admitted he knew the victim and drank moonshine with him earlier that day. Resp. Ex. 6 at 1089, 1100-01. Moore also testified that the victim would not allow strangers into the house, and he kept the burglar bar door locked. Resp. Ex. 6 at 1126. Clemons and Gaines testified that they did not know the victim. Resp. Ex. 5 at 539, 786.

In his defense, Moore testified that although he saw the victim earlier that day, he did not shoot him. Resp. Ex. 6 at 1121. According to Moore, he walked around Division Street after he left the victim's house and went to Shorter's house to smoke marijuana. Id. at 1108-09. Moore testified he called his girlfriend, and returned home for approximately twenty minutes. Id. at 1109. His aunt telephoned, and he returned to Shorter's house. Id. at 1109. At that time, Shorter gave him a bag with a blue Dickie's work uniform and told Moore to throw it away. Id. at 1110. Before he left Shorter's house, Moore noticed smoke from the victim's house. Id. Moore disposed of the clothes in a Texaco dumpster while his friend, Eddie Storey, went inside the convenience

87

store to buy beer. Id. at 1111-12. Moore testified he and Shorter's relationship primarily involved "dope dealing." Id. at 1093. He admitted that he owed $3,000 to Shorter. Id. Moore's girlfriend confirmed that she talked to him between 4:30 p.m. and 5:30 p.m. on the day of the murder. Id. at 1159-60. Moore's aunt testified that she called the house at 5:00 p.m. that day. Id. at 1164. She spoke with Moore's mother, but she heard Moore's voice in the background. Id.

The defense also called Thomas Pulley, a Florida Department of Law Enforcement firearms examiner, as a witness. He examined a .38 caliber projectile that law enforcement recovered from the victim's house. Id. at 180-82. The defense submitted a firearms transaction record showing the victim had purchased a Smith and Wesson .38 caliber revolver. Id. at 1183. Pulley opined that such a revolver could not have fired the projectile recovered from the victim's house. Id. at 1184. Considering the totality of the evidence, especially the testimony of Shorter and the corroborative witness testimony, the Court finds no reasonable probability exists that if counsel had called Hallback as witness, his testimony would have changed the outcome of trial. As such, Moore cannot establish counsel's failure to call Hallback as a witness prejudiced him.

Moore next claims that trial counsel was ineffective when he failed to review the arrest and booking reports about Jackson and Moore.[42] However, such a claim also does not have merit because he cannot demonstrate prejudice based on the evidence discussed in Ground Fourteen. The Court finds that Moore's claims are not substantial such that his failure to exhaust them should be excused under <u>Martinez</u>. Moore has failed to establish deficient performance or prejudice, and, therefore, has failed to establish he is entitled to relief under <u>Martinez</u>. Accordingly, relief on Ground Eight is due to be denied.

## I. Ground Nine

In Ground Nine, Moore contends that counsel was ineffective when he failed to object to the prosecutor's improper and prejudicial references to Moore as the devil during closing argument at the guilt phase and penalty phase trials. Amended Petition at 59-60. According to Moore, the comments were inflammatory and were not a fair comment on the evidence. <u>Id.</u> at 60-61. He also alleges that counsel was ineffective for failing to object when the prosecutor "injected personal opinion and nonrecord evidence into her argument . . . [by] suggesting to the jury that she had done her job by giving

---

[42] To the extent Moore claims that collateral counsel was ineffective when he failed to review the arrest and booking reports about Jackson and Moore, such a claim is not cognizable in a federal habeas petition. <u>See</u> 28 U.S.C. § 2254(i).

89

co-defendants [Gaines and Clemons] what they deserved." Id. at 60. However, the prosecutor did not reveal the details of Gaines and Clemons's plea deals or how their deals compared to the sentence that the State sought for Moore. Id. at 60.

According to Respondents, while Moore raised a similar claim in his Rule 3.851 Motion, the Florida Supreme Court found the claim to be procedurally barred because he could have raised it on direct appeal. Response at 108-09. Respondents assert that the Florida Supreme Court's denial of the claim rests on an independent and adequate state law ground. Id. at 109. They therefore argue the claim is barred from federal review. Id. Respondents also contend that since Moore has not shown cause or prejudice for his failure to properly exhaust the claim, it is procedurally defaulted. Id. at 110.

In reply, Moore asserts that the Florida Supreme Court addressed his ineffective assistance of counsel claim on the merits when it affirmed the postconviction court's order. Reply at 1220. According to Moore, Respondents' argument relies on a footnote in the Florida Supreme Court's opinion, which determined the claim that the comments prejudiced Moore was procedurally barred. Id. at 124. However, Moore clarifies "[h]is claim was that his trial attorney's failure to object to the improper comments was ineffective

assistance." <u>Id.</u> He further contends, to the extent Respondents attempt to separate the ineffectiveness aspect of the claim from the challenge to the prosecutor's argument, the state court's ruling intertwined the two claims. <u>Id.</u> at 125. Any procedural bar does not constitute an independent bar because the state supreme court also had to consider whether the comments were objectionable in its ineffective assistance analysis. <u>Id.</u> at 125.

The record shows Moore raised a substantially similar claim in his Rule 3.851 Motion. Resp. Ex. 30 at 23-27. In affirming the postconviction court's denial of relief, the Florida Supreme Court determined:

> Lastly, Moore claims that defense counsel was ineffective for failing to object to the following remarks made by the prosecutor during the State's guilt and penalty phase arguments:
>
> > Crime conceived in hell will not have any angels as witnesses. And, ladies and gentleman, as true as that statement is, Grand Park is hell. And that man right there is the devil....
> >
> > Ladies and gentlemen, deals. Yes, ma'am, yes, ma'am, yes, sir, to all of you. I have dealt with [co-defendant 1] and I have dealt with [co-defendant 2]. I did that as an Assistant State Attorney. I did that the best I knew how. But, ladies and gentlemen, sometimes you have to deal with sinners to get the devil. And I would submit to you what the State did was we

91

dealt with this sinner and we dealt with
this sinner to get this devil.

In order to prevail on a claim of ineffective assistance
of counsel, however, a defendant must demonstrate
that (1) counsel's performance was deficient and (2)
there is a reasonable probability that the outcome of
the proceeding would have been different. See
Strickland v. Washington, 466 U.S. 668, 687, 694, 104
S.Ct. 2052, 80 L.Ed.2d 674 (1984). As to the first
prong, the defendant must establish that "counsel
made errors so serious that counsel was not
functioning as the 'counsel' guaranteed the defendant
by the Sixth Amendment." Strickland, 466 U.S. at 687,
104 S.Ct. 2052; see Cherry v. State, 659 So. 2d 1069,
1072 (Fla. 1995). For the prejudice prong, the
reviewing court must determine whether there is a
reasonable probability that, but for the deficiency, the
result of the proceeding would have been different. See
Strickland, 466 U.S. at 695, 104 S.Ct. 2052; see also
Valle v. State, 705 So. 2d 1331, 1333 (Fla. 1997).
"Unless a defendant makes both showings, it cannot
be said that the conviction or death sentence resulted
from a breakdown in the adversary process that
renders the result unreliable." Strickland, 466 U.S. at
687, 104 S.Ct. 2052.

First, it should be recognized that this Court has
continually expressed its intolerance for improper
prosecutorial arguments and comments, especially in
death cases.[]However, the two isolated references to
Moore as "the devil" in this instance, although ill
advised, appear to be less problematic than the
pervasive and extensive conduct condemned in
Brooks[43] and Urbin.[44] Rather, this case appears to

---

[43] Brooks v. State, 762 So. 2d 879 (Fla. 2000).
[44] Urbin v. State, 714 So. 2d 411 (Fla. 1998).

be more akin to <u>Chandler v. State</u>, 702 So. 2d 186, 191 n.5 (Fla. 1997), where this Court held that a prosecutor's isolated comments that defense counsel engaged in "cowardly" and "despicable" conduct and that the defendant was a "malevolent ... a brutal rapist and conscienceless murderer" was not so prejudicial as to vitiate the entire trial. <u>See also</u> <u>Carroll v. State</u>, 815 So. 2d 601 (Fla. 2002) (finding prosecutor's isolated statements that defendant was the "boogie man" and a "creature that stalked the night" who "must die" not so egregious or cumulative in scope to be error). Further, given the evidence in this case and the finding of three aggravating circumstances and only one statutory mitigating circumstance given slight weight, there is no reasonable probability that, but for the deficiency, the result of the proceeding would have been different. <u>See</u> <u>Strickland</u>, 466 U.S. at 695, 104 S.Ct. 2052. Accordingly, we deny Moore's claim.[]

<u>Moore</u>, 820 So. 2d at 207-08 (footnotes omitted). In a footnote, the Florida Supreme Court disposed of Moore's claim that the prosecutor's comments prejudiced him:

Also, Moore's claim that he was improperly prejudiced by the prosecutor's remarks could have been raised on direct appeal and, therefore, the trial court correctly found this claim to be procedurally barred. <u>See</u> <u>Hardwick</u>, 648 So. 2d at 100.[45]

---

[45] <u>Hardwick v. Dugger</u>, 648 So. 2d 100 (Fla. 1994).

93

Id. at 208 n.10. The Court is of the view that this record is sufficient to warrant a conclusion that Moore exhausted his claim that counsel was ineffective when he did not object to the prosecutor's comments.

To the extent that the state supreme court denied his ineffective assistance of counsel claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the Florida Supreme Court's adjudication of the claim is not entitled to deference, Moore's claim is without merit. While the comments referring to Moore as the devil were impermissible, the prosecutor only used the term on two occasions. Resp. Exs. 9 at 1262; 14 at 1520. The improper comments did not pervade the proceedings. Therefore, even assuming arguendo counsel should have objected to the comments, they did not "so infect[] the trial with unfairness as to make the resulting conviction a denial

94

of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 644 (1974). Further, given the evidence against Moore, as well as the significant aggravating factors and the minimal mitigating evidence, there is no reasonable probability that, in the absence of the improper remarks, the outcome of the guilt phase and the penalty phase trials would have been different.

Counsel also was not ineffective when he failed to object to the prosecutor's comments about her "dealing" with Clemons and Gaines. Moore contends counsel's failure to object resulted in prejudice because the prosecutor did not reveal the details of the plea deals. However, during trial, the jury heard details of Clemons's former plea deal. Resp. Ex. 5 at 810-12. Moreover, on cross-examination, defense counsel emphasized that Clemons's plea agreement only subjected him to juvenile sanctions. <u>Id.</u> at 817. Gaines also testified that he entered into a plea deal with the State for three-and-one-half years. <u>Id.</u> at 554-56. Because the jury heard details of the plea deals, counsel's failure to object did not prejudice the defense. Accordingly, Moore is not entitled to habeas relief on Ground Nine.

## J. Ground Ten

Next, Moore asserts the Florida Supreme Court's harmless error analysis on direct appeal did not meet constitutional standards. Amended

Petition at 62. According to Moore, the trial court allowed Larry Dawsey, "a neighborhood acquaintance," to testify that he saw Moore a few days after the murder. Id. Dawsey testified that Moore said, "he was going to kill someone because he was tired of everybody telling him he killed that man." Id. Dawsey further testified that Moore showed him a "black, brown-like pistol" as he made the statement. Id. Moore contends the Florida Supreme Court found on direct appeal that Dawsey's testimony about the gun was irrelevant and inadmissible. Id. at 63. However, he argues the Florida Supreme Court's harmless error analysis did not account for the improper admission of the testimony in conjunction with the prosecutor's reference to Moore as the devil or the manner in which the testimony impacted Moore's penalty phase trial. Id. at 63.

The record reflects on direct appeal, Moore challenged the admission of Dawsey's testimony. Resp. Ex. 21 at 20-22. The Florida Supreme Court rejected the claim, stating in pertinent part:

> Claim four, in which Moore argues that it was error to admit a witness's testimony that Moore possessed a firearm two days after the victim's death, has merit, but we find that the error was harmless. Before witness Dawsey testified that Moore waved a gun at him, defense counsel objected to the question and had the State proffer testimony. The State advised that Dawsey was expected to say that the "defendant

96

showed him a gun and said, 'If they don't stop saying that I killed the victim, somebody is going to be dead for real,' and he showed him a black snub-nosed—long-nosed .33." Defense counsel objected, arguing that there was no evidence that the gun had anything to do with the victim's death and all it would show was that the defendant habitually carried a gun for no purpose. The State argued that it showed a guilty mind and that he had threatened a witness. The judge allowed the question, stating, "If it's all the same incident, he showed it to him and testified to it and made the statement to him, I'm going to let him testify to that. Verbal acts or demonstrative acts by the defendant, they are certainly admissible against him I think." The substance of Dawsey's testimony matched the proffer.

Although a party's own statement, offered against the party, can satisfy the admissions exception to the prohibition against hearsay, it is still subject to the general requirement that only relevant evidence may be admitted. See § 90.803(18)(a), Fla. Stat. (1995); § 90.402, Fla. Stat. (1995). Here, the evidence was not relevant to whether or not Moore committed the murder, so it was error to admit it. Evidence which tends only to show bad character or propensity is not relevant and should not be admitted. § 90.404(2)(a), Fla. Stat. (1995); Bryan v. State, 533 So. 2d 744, 746 (Fla. 1988). The evidence could only show that Moore was upset because people were accusing him of committing the crime or that he regularly carried a gun. Neither piece of information helps establish whether or not he killed the victim.

However, the erroneously admitted testimony was harmless. Error is harmless where "there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So. 2d 1129, 1135 (Fla. 1986). Because there was direct evidence from

97

> other witnesses that Moore possessed a gun on the
> actual day of the murder and direct evidence that
> Moore shot the victim, there is no reasonable
> possibility that the error contributed to the conviction
> here.

Moore, 701 So. 2d at 549-50. After a review of the record and the applicable

law, the Court concludes that the Florida Supreme Court conducted the

appropriate harmless error analysis pursuant to Chapman v. California.[46]

Although the Florida Supreme Court did not explicitly detail its consideration

of the record, it cited to State v. Diguilio, which notes:

> The harmless error test, as set forth in Chapman and
> progeny, places the burden on the state, as the
> beneficiary of the error, to prove beyond a reasonable
> doubt that the error complained of did not contribute
> to the verdict or, alternatively stated, that there is no
> reasonable possibility that the error contributed to the
> conviction. See Chapman, 386 U.S. at 24, 87 S.Ct. at
> 828. Application of the test requires an examination of
> the entire record by the appellate court including a
> close examination of the permissible evidence on
> which the jury could have legitimately relied, and in
> addition an even closer examination of the
> impermissible evidence which might have possibly
> influenced the jury verdict.

---

[46] 386 U.S. 18, 24 (1967) (finding that if a state appellate court undertakes a
harmless error analysis, "the court must be able to declare a belief that [the error]
was harmless beyond a reasonable doubt.").

98

491 So. 2d at 1135. Moreover, the United States Supreme Court does not require "a particular formulaic indication by state courts before their review for harmless federal error will pass federal scrutiny," but only requires "a plain statement that the judgment survives on such an enquiry." Sochor v. Florida, 504 U.S. 527, 540 (1992). Here, the Florida Supreme Court correctly conducted a Chapman analysis when it determined no reasonable probability existed that the admission of Dawsey's testimony contributed to the jury's verdict. Therefore, the Court finds that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the Florida Supreme Court erred in its analysis, the Court finds that the admission of Dawsey's testimony was harmless error. On federal habeas review, harmless error is determined by applying the standard set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993).

> On collateral review, we apply the harmless-error standard as articulated in Brecht v. Abrahamson, which dictates that a federal court may grant habeas relief on account of a constitutional error only if it

determines that the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (internal quotation marks omitted); see Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1110–12 (11th Cir. 2012) (outlining Brecht analysis on federal habeas review), cert. denied, Trepal v. Crews, -- U.S. --, 133 S.Ct. 1598, 185 L.Ed.2d 592 (2013). Under the Brecht standard, the petitioner should prevail when the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error." O'Neal v. McAninch, 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995); see Caldwell v. Bell, 288 F.3d 838, 842 (6th Cir. 2002) ("When faced with a Sandstrom error a court should not assume it is harmless but must review the entire case under the harmless-error standard the Supreme Court most recently expounded in Brecht...."). "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to the conviction or sentence." Trepal, 684 F.3d at 1114 (internal quotation marks omitted).

Owens v. McLaughlin, 733 F.3d 320, 328 (11th Cir. 2013). Applying Brecht, "a federal constitutional error is harmless unless there is 'actual prejudice,' meaning that the error had a 'substantial and injurious effect or influence' on the jury's verdict." Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1307 (11th Cir. 2012) (quoting Brecht, 507 U.S. at 637). "To show prejudice under Brecht, there must be more than a reasonable possibility that the error contributed to

the conviction or sentence." <u>Mason v. Allen</u>, 605 F.3d 1114, 1123 (11th Cir. 2010) (internal quotation marks and alteration omitted).

In this case, the admission of Dawsey's testimony that Moore had a gun two days after the murder was harmless error. Considering the totality of the evidence as detailed in Ground Eight, Dawsey's testimony could not have had a substantial and injurious effect on the jury's verdict even in the context of the prosecutor's reference to Moore as the devil. To the extent Moore contends Dawsey's improper testimony affected the penalty phase trial, the Court finds it also did not have a substantial and injurious effect on the jury's recommendation given the mitigation and the significant aggravating factors (prior violent felony, pecuniary gain, and avoid arrest). Resp. Exs. 12; 13. Accordingly, Moore is not entitled to federal habeas relief as to the claim in Ground Ten.

## K. Ground Eleven

As Ground Eleven, Moore raises multiple subclaims of ineffective assistance of appellate counsel. Amended Petition at 64-83.

### 1. Subclaim A

Moore alleges appellate counsel was ineffective when he failed to raise on direct appeal the claim that the State used its peremptory challenges to

101

strike jurors because of race and thereby violated Moore's rights pursuant to the Sixth and Fourteenth Amendments to the United States Constitution. Id. at 64-65. Moore asserts that the State struck four African American veniremen: Dunbar, Pitts, Washington, and Carter. Id. at 65-75. According to Moore, the trial court accepted the State's race-neutral reasons for striking the veniremen and found that the State did not engage in purposeful discrimination despite contrary evidence. Id. at 65.

Respondents contend that Moore raised a similar claim in his First State Petition, and the Florida Supreme Court found the claim to be procedurally barred because Moore could have raised the claim on direct appeal or in a Rule 3.851 motion. Response at 119. According to Respondents, the Florida Supreme Court's rejection of the claim relies on an independent and adequate state ground that bars the claim from federal review. Id. at 119-20. In his Reply, Moore argues that the Florida Supreme Court's application of the procedural bar "is a legal fallacy which it does not consistently apply, for if it did, it would utterly eliminate the existence of a Sixth Amendment challenge to the effectiveness of appellate counsel. . . ." Reply at 129.

The record reflects that Moore raised a substantially similar claim in his First State Petition. Resp. Ex. 41 at 20-26. The Florida Supreme Court denied relief in a footnote:

> Claim (3) is an issue that could have been raised on direct appeal or in a 3.851 motion and, therefore, it is procedurally barred. See Atwater v. State, 788 So. 2d 223, 227 (Fla. 2001).

Moore, 820 So. 2d at 209 n.12. Based on the above, it appears that the Florida Supreme Court's procedural bar does not rest on an adequate ground. See Card, 911 F.2d at 1516. Moore brought a claim of ineffective assistance of appellate counsel. Such a claim can not be brought on direct appeal or in a Rule 3.851 Motion because "habeas petitions are the proper vehicle to advance claims of ineffective assistance of appellate counsel." Rutherford v. Moore, 774 So. 2d 637, 643 (Fla. 2000).

Nevertheless, Moore's claim does not have merit. In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the government from challenging potential jurors based solely on their race or on the assumption that African American jurors would be unable to impartially consider the evidence against an African American defendant. A court must employ a three-step analysis to evaluate

claims that a prosecutor used peremptory challenges in violation of the Equal

Protection Clause:

> First, a defendant must make a prima facie showing
> that a peremptory challenge has been exercised on the
> basis of race. Second, if that showing has been made,
> the prosecution must offer a race-neutral basis for
> striking the juror in question. Third, in light of the
> parties' submissions, the trial court must determine
> whether the defendant has shown purposeful
> discrimination.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (citations omitted).

In this case, defense counsel requested that the trial court conduct a

Batson inquiry after the State exercised three peremptory challenges on

African American veniremen. Resp. Ex. 2 at 355. As a race-neutral reason for

striking Dunbar, the prosecutor asserted that Dunbar's brother-in-law was a

criminal defense attorney against whom she had tried cases. Id. at 356. The

prosecutor sought to use her peremptory challenge on Pitts because she "was

very reluctant about giving responses." Id. at 359. According to the prosecutor,

Pitts said she could not tell defense counsel her feelings on the death penalty,

and she opined that the judge, not the jury, should sentence criminal

defendants. Id. The prosecutor similarly argued that Washington expressed

reservations about imposing the death penalty and stated she would only

impose it in extreme cases involving children or decapitation. Id. at 360. After

104

thorough consideration and questioning of the prosecutor, the trial court found the State had not engaged in purposeful discrimination. Id. at 356-62.

Following additional challenges, the prosecutor sought to exercise a peremptory challenge on Carter. The trial court requested a race-neutral reason. Id. at 365. According to the prosecutor, Carter stated that she had "problems" with the death penalty, and she did not want to be a member of the panel. Id. at 365. Carter's cousin also was a potential witness. Id. at 365-66. The trial court again found the State had not engaged in purposeful discrimination. Id. at 365-68.

On this record, the Court finds that the State offered clear and reasonably specific explanations for exercising peremptory challenges against the four veniremen, and the record supported those reasons. Dunbar stated his brother-in-law was a criminal defense attorney. Resp. Ex. 2 at 184, 284. To demonstrate the State's discriminatory intent, Moore argues that, while the prosecutor challenged Dunbar, she did not challenge Fross, a venirewoman who knew an attorney in the Public Defender's Officer. However, the trial court rejected such an argument during its evaluation of the prosecutor's race-neutral reason. It determined that Fross stated she only vaguely knew the

attorney, and, unlike Dunbar, she did not have a familial relationship to him. Id. at 357-58.

The remaining veniremen expressed reservations about imposing the death penalty. Id. at 212-13, 289-901, 365. Based on their answers during voir dire, the State had a rational basis for the determination that their views on the death penalty, regardless of race, would undermine its position in the case. See Bowles v. Sec'y for Dept. of Corr., 608 F.3d 1313, 1317 (11th Cir. 2010) ("Because clearly established federal law, as determined by holdings in Supreme Court decisions, does not prohibit prosecutors from using their peremptory strikes to remove venire members who are not ardent supporters of the death penalty, the district court correctly denied Bowles relief on this claim."). Moore has failed to establish the State violated Batson; therefore, appellate counsel was not ineffective when he failed to raise a meritless claim. See Chandler v. Moore, 240 F.3d 907, 917 (11th Cir. 2001) (finding appellate counsel was not ineffective for failing to raise a nonmeritorious issue on appeal). As such, he is not entitled to relief on the claim in Subclaim A.

## 2. Subclaim B

Moore contends appellate counsel was ineffective when he failed to raise the claim that Moore was denied a fair trial where the trial court allowed the

106

State to access the criminal history records of potential jurors for voir dire. Amended Petition at 70. He argues the Jacksonville Sherriff's Office disclosure of records to the State gives an unfair advantage to the prosecution. Id. at 71. According to Moore, the State never asked prospective jurors about prior arrests or convictions, so "it can only be assumed that potential jurors' criminal history records were used in such a way as to eliminate jurors without cause (or by illegitimate causes) or at least targeted for elimination by the State." Id. at 72. Respondents argue that Moore did not properly exhaust the instant claim. Id. They assert that Moore cannot now return to state court to exhaust the claim, and therefore it is procedurally barred. Id. at 128-29. Moore did not address Respondents' argument in his Reply. See generally Reply.

The record demonstrates Moore raised a similar claim in his First State Petition, Resp. Ex. 40 at 35-39; however, he did not include the claim when he amended it, see generally Resp. Ex. 41. In denying relief, the Florida Supreme Court only considered those claims brought in the First State Petition as amended. Moore, 820 So. 2d at 209 n.11. Thus, Moore did not complete the state court process, and the claim is unexhausted. See Boerckel, 526 U.S. at 845. Because Moore cannot return to state court to exhaust the claim, it is procedurally barred. Moore has alleged neither cause and prejudice nor a

miscarriage of justice to overcome his failure to exhaust. Accordingly, the claim for relief in Subclaim B is due to be denied as unexhausted.

However, even if Moore properly exhausted the instant claim, he still would not be entitled to relief because he cannot demonstrate prejudice. As Moore concedes in his Amended Petition, the trial court allowed the State to use potential jurors' criminal history records, but "ordered the State to turn over any criminal history records of potential jurors it had to the defense." Amended Petition at 70; see also Resp. Ex. 1 at 350; Doc. 54-8 at 88-90. Therefore, the defense presumably had access to the records, and the State did not receive an unfair advantage. Further, Moore's assertion that the State improperly used the records is speculative. See Tejada, 941 F.2d at 1559. As such, Moore cannot demonstrate prejudice, and relief on the claim in Subclaim B is due to be denied.

### 3. Subclaim C

Moore asserts appellate counsel was ineffective when he failed to raise the claim that the trial court erred by admitting victim impact evidence during the penalty phase trial.[47] Amended Petition at 72. According to Moore, the trial

---

[47] Moore presents Subclaim C as a trial court error claim. Amended Petition at 72-73. However, because Moore includes Subclaim C in Ground Eleven, which details ineffective assistance of appellate counsel claims, and he does not clarify the basis of

court allowed the State to present victim impact evidence through the testimony of the victim's daughter, Doris Parrish. Id. Moore contends that the evidence was improper because Doris Parrish's testimony did not have any relevance to the aggravating circumstances and did not demonstrate the victim's uniqueness as an individual pursuant to the standard set forth in Florida Statutes section 921.141(7). Id. at 73.

According to Respondents, while Moore raised the instant claim in his First State Petition, the Florida Supreme Court denied it as procedurally barred. Response at 130. Respondents argue the Florida Supreme Court's rejection of the claim relies on independent and adequate state law grounds and, therefore, bars it from federal review. Id.

The record shows Moore raised a similar claim in his First State Petition. Resp. Ex. 41 at 35-39. Citing to Rutherford, 774 So. 2d at 645, the Florida Supreme Court found the claim to be procedurally barred because Moore already raised it on direct appeal. Moore, 820 So. 2d at 209 n.12. The Florida Supreme Court's decision was based on state law grounds and not intertwined with an interpretation of federal law. Because the state court's decision rested

---

Subclaim C in his Reply, the Court considers it as an ineffective assistance of appellate counsel claim.

on adequate and independent state grounds, the claim in Subclaim C is due to be denied as procedurally barred. Moore cannot now return to state court to raise the claim. He has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, he has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming the claim was not procedurally barred, it is meritless. Florida Statutes section 921.141(7) provides for the admission of victim impact evidence "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." As noted by the Florida Supreme Court,

> [T]he boundaries of relevance under the statute include evidence concerning the impact to family members. Family members are unique to each other by reason of the relationship and the role each has in the family. A loss to the family is a loss to both the community of the family and to the larger community outside the family.

Bonifay v. State, 680 So. 2d 413, 420 (Fla. 1996).

In response to the State's question about how her father was unique, Doris Parrish testified that he was a "good man" and "free-hearted." Resp. Ex. 12 at 1466. She noted that he did not bother other people. Id. Doris Parrish's

testimony clearly fell within the parameters of Florida law; therefore, appellate counsel was not ineffective for failing to raise a meritless issue on appeal. See Chandler, 240 F.3d at 917. Accordingly, Moore is not entitled to relief on Subclaim C.

### 4. Subclaim D

Moore contends appellate counsel was ineffective when he failed to raise the claim that the trial court fundamentally erred by allowing the admission of irrelevant and prejudicial details about Moore's prior violent felony. Amended Petition at 73. He avers that the State called Detective Goff to testify about the details of his prior armed robbery. Id. According to Moore, the jury learned irrelevant and prejudicial details through Detective Goff's testimony, specifically that Moore had a pistol when he committed the robbery and that the victim was a white woman. Id. at 75.

Respondents allege that Moore raised the instant claim in his First State Petition, and the Florida Supreme Court denied it as procedurally barred. Response at 133. They argue, therefore, it is barred from federal review. Id. Moore does not address Respondents' argument in his Reply. See generally Reply. Regardless, the record does not support Respondents' argument. In denying relief, the Florida Supreme Court disposed of the claim on the merits:

> Likewise, we find claim (6)[48] to be without merit because we have held it is permissible for a neutral witness to give hearsay testimony as to the details of a prior violent felony, provided it is not made a feature of the trial. See Rodriguez v. State, 753 So. 2d 29, 44-45 (Fla. 2000).

Moore, 820 So. 2d at 209. Because the Florida Supreme Court did not apply a procedural bar to Moore's claim, he has properly exhausted it. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

After a review of the record and the applicable law, the Court concludes that the Florida Supreme Court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the Florida Supreme Court's adjudication of the claim is not entitled to deference, the claim does not have merit. As the Court noted in Ground Three, Florida law allows the admission of hearsay testimony in

---

[48] The Florida Supreme Court's reference to ground six appears to be a scrivener's error because Moore raised the instant claim as ground seven.

capital sentencing proceedings. See Waterhouse, 596 So. 2d at 1016.  The State is permitted to introduce the details of a prior violent felony conviction "rather than the bare admission of the conviction in order to assist the jury in evaluating the character of the defendant and the circumstances of the crime." Hudson, 708 So. 2d at 261. To the extent Moore argues the details of the prior armed robbery became a "feature" of the penalty phase trial, his argument is unavailing as Detective Goff testified briefly and provided few details of the crime. Resp. Ex. 12 at 1460-62. As the underlying claim does not have merit, appellate counsel was not ineffective when he failed to raise it on direct appeal. Therefore, Moore is not entitled to federal habeas relief as to Subclaim D.

### 5. Subclaim E

Moore alleges that appellate counsel was ineffective when he failed to raise the claim that the trial court denied Moore's right to a fair penalty phase trial by refusing to instruct the jury that it may consider mercy in its sentencing decision. Amended Petition at 75. Respondents contend that the Court should dismiss the instant claim because it fails to meet the pleading requirements for a federal habeas petition. Response at 136. However, the Court finds Moore provides facts sufficient to satisfy the pleading requirements governing federal habeas petitions. See Mayle v. Felix, 545 U.S. 644, 648 (2005)

113

(noting that Rule 2(c) of the Rules Governing Habeas Corpus Cases requires a detailed statement that specifies all the grounds for relief and states facts in support of each ground).

Moore raised a similar claim in his First State Petition. Resp. Ex. 41 at 44-46. In denying relief, the Florida Supreme Court disposed of it on the merits:

> We have also held appellate counsel is not ineffective for failing to argue that the trial court erred in refusing to give a penalty phase jury instruction that the jury could properly consider mercy during its deliberations when the court gives the standard penalty phase jury instructions and advises the jury that it can consider any other aspect of the defendant's character and any other circumstances of the offense. See Correll v. Dugger, 558 So. 2d 422, 42[5] (Fla. 1990). Accordingly, we find claim (8) to be meritless.

Moore, 820 So. 2d at 210. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination

114

of the facts in light of the evidence presented in the state court proceedings. Accordingly, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, the claim does not have merit. "[T]he 'catch-all' standard jury instruction on nonstatutory mitigation when coupled with counsel's right to argue mitigation is sufficient to advise the jury on nonstatutory mitigating circumstances." Downs v. Moore, 801 So. 2d 906, 913 (Fla. 2001). Where a trial court issues the instruction, it need not instruct the jury on mercy. See id. at 912-13.

Here, the trial court used the "catch-all" standard instruction when it instructed the jury as follows:

> Among the mitigating circumstances you may consider, if established by the evidence are:
>
> 1. The age of the Defendant at the time of the crime.
>
> 2. Any other aspect of the defendant's character or record, and any other circumstances of the offense.

Resp. Ex. 16 at 445 (emphasis added). As such, Moore was not entitled to a mercy instruction. Appellate counsel was not ineffective when he failed to raise a meritless claim. See Chandler, 240 F.3d at 917. Therefore, relief on Subclaim E is due to be denied.

115

## 6. Subclaim F

Moore asserts appellate counsel was ineffective when he failed to brief and argue that Moore's death sentence was not proportionate to sentences of other defendants who committed similar crimes and presented similar aggravating factors and mitigating factors. Amended Petition at 75. According to Moore, while the Florida Supreme Court must conduct a proportionality analysis, appellate counsel did not provide "the 'partisan scrutiny of a zealous advocate' and demonstrate why [] Moore's sentence of death was, in fact, not proportional." Id. at 76 (quoting Wilson v. Wainwright, 474 So. 2d 1162, 1165 (Fla. 1985)). Moore contends the trial court did not properly account for his age at the time of the offense, specifically his lack of maturity and responsible judgment; his home environment; or alcoholism. Id. at 78-79. He also notes, in contrast to his sentence, co-defendant Clemons only received commitment to the custody of the Department of Health and Rehabilitative Services for a term not to exceed Clemons's nineteenth birthday, as well as community control after his release. Id. at 79.

Moore raised a substantially similar claim in his First State Petition. Resp. Ex. 41 at 10-20. The Florida Supreme Court denied relief, stating in pertinent part:

116

> Claim (2) is without merit because this Court
> addressed proportionality in Moore's direct appeal and
> held that the death sentence was proportionate. See
> Moore v. State, 701 So. 2d at 551. Appellate counsel
> cannot be ineffective for failing to raise a
> nonmeritorious claim. See Freeman v. State, 761 So.
> 2d 1055, 1070-71 (Fla. 2000). Moreover, this Court has
> already rejected Moore's argument in Ferguson v.
> Singletary, 632 So. 2d 53, 58 (Fla. 1993).

Moore, 820 So. 2d at 209. To the extent that the Florida Supreme Court denied

this claim on the merits, the Court will address the claim in accordance with

the deferential standard for federal court review of state court adjudications.

After a review of the record and the applicable law, the Court concludes that

the state court's adjudication of this claim was not contrary to clearly

established federal law, did not involve an unreasonable application of clearly

established federal law, and was not based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceedings.

Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not

entitled to deference, the claim does not have merit. The United States

Supreme Court has held that the Eighth Amendment does not require a state

appellate court to conduct a proportionality review of a death sentence. Pulley

v. Harris, 465 U.S. 37, 43-44 (1984); see also Mills v. Singletary, 161 F.3d 1273,

117

1281-82 (11th Cir. 1998) (noting that the Eleventh Circuit has instructed district courts to refuse requests to conduct a proportionality review of this type); Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) ("The Constitution does not require a proportionality review."). As such, Moore cannot demonstrate prejudice on federal habeas review, and Subclaim F is due to be denied.

### 7. Subclaim G

Moore alleges appellate counsel was ineffective when he failed to raise the claim that the jury instructions improperly shifted the burden of proof to the defense to demonstrate the appropriateness of a life sentence. Amended Petition at 80. According to Moore, the trial court instructed the jury it must sentence Moore to death unless he demonstrated mitigating circumstances sufficient to outweigh the aggravating circumstances. Id. at 80. Moore contends the trial court should have instructed the jury that they could sentence Moore to death only if the aggravating circumstances outweighed the mitigating circumstances. Id. at 80-81.

Respondents argue that the Court should dismiss the instant claim for failure to comply with the pleading requirements for a federal habeas petition. Response at 142. Based on a review of the Amended Petition, the Court finds

118

Moore pleads facts sufficient to satisfy the pleading requirements governing federal habeas petitions. See Mayle, 545 U.S. at 648.

Moore raised a similar claim in his First State Petition. Resp. Ex. 41 at 39-44. The Florida Supreme Court denied relief, holding:

> Claim (7) is without merit because we have consistently rejected Moore's burden shifting argument, see, e.g., Demps v. Dugger, 714 So. 2d 365, 368 (Fla. 1998), and issues that would have been nonmeritorious in the direct appeal are not the basis for ineffective assistance of appellate counsel. See Freeman, 761 So. 2d at 1070-71.[49]

Moore, 820 So. 2d at 210. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

---

49 Freeman v. State, 761 So. 2d 1055 (Fla. 2000).

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, the claim fails. The Florida Supreme Court has determined the standard penalty phase jury instructions do not improperly shift the burden of proof. See Shellito v. State, 701 So. 2d 837, 842-43 (Fla. 1997). Appellate counsel cannot be deficient for failing to raise a meritless argument. See Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1142 (11th 2005) (finding appellate counsel was not ineffective for failing to bring a claim that did not have merit pursuant to Florida law). Accordingly, Moore is not entitled to federal habeas relief on his ineffectiveness claim in Subclaim G.

### 8. Subclaim H

Moore contends appellate counsel was ineffective when he failed to discover and remedy omissions in the record that denied Moore a "proper appeal." Amended Petition at 81. Specifically, Moore alleges that he was absent from a critical stage of the proceedings where trial counsel waived his right to a speedy trial. Id. at 82. According to Moore, appellate counsel failed to obtain the transcript of the June 22, 1993 proceeding at which the waiver occurred. Id.

Respondents argue that Moore raised a similar claim in his First State Petition, and the Florida Supreme Court found it to be procedurally barred

120

because Moore simply re-argued a claim raised in the appeal of his Rule 3.851 Motion as a claim of ineffective assistance of appellate counsel. Response at 143. They note that the Florida Supreme Court also found the claim in Moore's Rule 3.851 Motion to be procedurally barred. Id. at 144. According to Respondents, the state court's rejection of the claim on procedural grounds bars it from federal review. Id. Moore does not address Respondents' argument in his Reply. See generally Reply.

The record shows Moore raised a substantially similar claim in his First State Petition. Resp. Ex. 41 at 6-10. The Florida Supreme Court denied the claim as procedurally barred, detailing its rationale in a footnote:

> Claim (1) is a reargument of claims (5) and (6) of Moore's 3.851 postconviction appeal couched in an ineffective assistance of appellate counsel argument and, to the extent Moore is attempting to use this habeas petition as a substitute or an additional appeal of his postconviction motion, we deny relief. See Hardwick, 648 So. 2d at 105.[50]

Moore, 820 So. 2d at 209 n.12.

---

[50] Hardwick v. Dugger, 648 So. 2d 100, 105 (Fla. 1994) (instructing that "habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.851 motion, or on matters that were not objected to at trial") (quotation marks and citation omitted).

The Florida Supreme Court's decision was based on state law grounds and not intertwined with an interpretation of federal law. Indeed, the court's decision rested on adequate and independent state grounds that were independent of a federal question. See Harris, 489 U.S. at 263. Therefore, the claim in Subclaim H is due to be denied as procedurally barred. Moore has not shown either cause excusing the default or actual prejudice resulting from the bar. Moreover, he has failed to identify any fact warranting the application of the fundamental miscarriage of justice exception.

Even assuming the claim was not procedurally barred, Moore is not entitled to relief. The Court initially notes that Moore signed a waiver of speedy trial on May 11, 1993. Resp. Ex. 1 at 210. Nevertheless, under Florida law, counsel may waive speedy trial on his client's behalf without consultation and outside of his presence. State ex rel. Gutierrez v. Baker, 276 So. 2d 470, 471 (Fla. 1973); MacPhee v. State, 471 So. 2d 670, 671 (Fla. 2d DCA 1985); Nelson v. State, 450 So. 2d 1223, 1225-26 (Fla. 4th DCA 1984). Appellate counsel was not ineffective when he failed to bring a meritless claim. See Diaz, 402 F.3d at 1142. Accordingly, Moore is not entitled to relief on Subclaim H.

## L. Ground Twelve

As Ground Twelve, Moore argues both that the jury received inadequate instruction on the aggravating circumstances, and that Florida's statute setting forth the aggravating circumstances for consideration in capital cases is facially vague and overbroad in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Amended Petition at 83. According to Moore, the trial court erred when it: (A) instructed the jury on three aggravating factors but did not advise the jury of the aggravating factors' elements which the state had to prove beyond a reasonable doubt; (B) did not provide the jury with a limiting instruction on the pecuniary gain aggravator, specifically that the primary purpose of the crime must be for pecuniary gain; and (C) improperly instructed the jury on both the pecuniary gain and avoid arrest aggravators because the murder could not have two primary purposes. Id. at 84-85.

Respondents assert that Moore raised Subclaims A and B in his Rule 3.851 Motion. Response at 150. According to Respondents, the postconviction court rejected Subclaims A and B as procedurally barred because Moore did not raise them on direct appeal. Id. at 151. Respondents contend "Florida's rule barring claims available for direct review is firmly established and regularly

123

followed by the Florida courts." <u>Id.</u> They assert Moore did not present cause for his default, and he cannot return to state court to exhaust Subclaims A and B. <u>Id.</u> at 152. Therefore, they are procedurally barred. <u>Id.</u> Moore did not reply to this argument. <u>See generally</u> Reply.

Moore raised claims substantially similar to Subclaims A and B in his Rule 3.851 Motion. Resp. Ex. 30 at 46-50. The postconviction court summarily denied relief, stating in pertinent part:

> The defendant claims that the statute providing for the sentencing aggravating circumstances is unconstitutionally vague and overbroad, and that this Court's instructions on these aggravators failed to properly inform the jury regarding the elements of the aggravating factors. First, this Court finds that this issue could and should have been raised in the defendant's direct appeal and that the claim is, therefore, procedurally barred. <u>Cherry</u>,[51] <u>supra</u>; <u>Straight</u>,[52] <u>supra</u>. Second, given that this Court used the standard jury instructions provided by the Supreme Court of Florida, this Court also finds the defendant's claim to be facially void of legal merit.

Resp. Ex. 34 at 539. The Florida Supreme Court affirmed the postconviction court's ruling, disposing of it in a footnote as one of many claims that were "either procedurally barred, facially or legally insufficient, clearly without

---

[51] <u>Cherry v. State</u>, 659 So. 2d 1069, (Fla. 1995).
[52] <u>Straight v. State</u>, 488 So. 2d 530 (Fla. 1986).

merit as a matter of law, or moot." <u>Moore</u>, 820 So. 2d at 203 n.4. Based on the record, the Court concludes that the Florida Supreme Court's determination of Subclaims A and B "rested on an independent and adequate state ground that precludes federal habeas consideration of the issue[s]." <u>LeCroy v. Sec'y, Fla. Dep't of Corr.</u>, 421 F.3d 1237, 1260 (11th Cir. 2005).

Further, Moore failed to raise Subclaim C in state court. Because Moore failed to exhaust Subclaim C and he cannot return to state court, it is procedurally barred. <u>See</u> <u>Boerckel</u>, 526 U.S. at 845. Moore has not demonstrated cause or prejudice regarding his failure to properly exhaust, and he has not otherwise alleged that a fundamental miscarriage of justice will occur if the Court does not review the merits of the claim

Nevertheless, Subclaim C is also without merit. To the extent Moore argues the State's use of the pecuniary gain and avoid arrest aggravator constituted improper "doubling," Florida courts have consistently rejected such a claim. <u>See</u> <u>Spann v. State</u>, 857 So. 2d 845, 857 (Fla. 2003); <u>Card v. State</u>, 803 So. 2d 613, 626 (Fla. 2001); <u>Thompson v. State</u>, 648 So. 2d 692, 695 (Fla. 1994). Similarly, Subclaims A and B do not have merit. The United States Supreme Court has held that trial courts "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and

125

that make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980) (footnotes and citation omitted). Here, the trial court used Florida's standard jury instructions.[53] The instructions do not violate the standard set forth in Godfrey. Therefore, Moore is not entitled to federal habeas relief on Ground Twelve.

## M. Ground Thirteen

In Ground Thirteen, Moore alleges Florida Statutes section 931.141 violates Ring[54] because "(1) death is not authorized by a finding of guilt of first-degree murder, 2) jury findings are not unanimous, 3) the jury is not required to find "sufficient" aggravators beyond a reasonable doubt . . . and 4) the jury is not required to find insufficient mitigations to outweigh aggravators beyond a reasonable doubt." Amended Petition at 86. He contends Ring applies to his case under Fiore's retroactivity analysis. Id. at 87.

Moore raised this claim as the sole ground of his Successive Rule 3.851 Motion, Resp. Ex. 44, and the postconviction court denied relief, Resp. Ex. 46.

---

[53] Under Florida law, the standard instructions are presumed correct and preferred over special instructions. Stephens v. State, 787 So. 2d 747, 755 (Fla. 2001).

[54] In Ring, the United States Supreme Court held that capital defendants are entitled to a jury determination of any fact that increases their maximum punishment. 536 U.S. at 589

The Florida Supreme Court affirmed the postconviction court's order denying relief, stating:

> Thomas James Moore appeals the circuit court's order summarily denying his successive motion to vacate judgment and sentence wherein he challenges the validity of his death sentence under <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). This Court has rejected similar claims in <u>Bottoson v. Moore</u>, 833 So. 2d 693 (Fla.), <u>cert. denied</u>, 537 U.S. 1070 (2002), and <u>King v. Moore</u>, 831 So. 2d 143 (Fla.), <u>cert. denied</u>, 537 U.S. 1067 (2002), and subsequent cases. Furthermore, of the aggravating circumstances found by the trial court in this case was prior conviction of a violent felony, "a factor which under <u>Apprendi</u>[55] and <u>Ring</u> need not be found by the jury." <u>Jones v. State</u>, 855 So. 2d 611, 619 (Fla. 2003). The circuit court's order is hereby affirmed.

Resp. Ex. 52. Respondents assert that the postconviction court's denial of relief relied on an independent and adequate state law ground because it determined Moore's claim to be untimely and facially insufficient, and, therefore, the claim is procedurally barred. Response at 155. Moore does not reply to Respondents' argument. Reply at 131-38.

The Eleventh Circuit established a three-part test to determine when a state court's procedural ruling relies on an independent and adequate state ground. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). "First, (1) the <u>last</u>

---

[55] <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000).

127

state court rendering judgment must clearly and expressly state it is relying on a state procedural rule to resolve the federal claim. . . . Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. . . . Third, the state procedural rule must be adequate." Id. (citations omitted and emphasis added). Here, the Florida Supreme Court, the last state court to render judgment did not clearly and expressly rely on the determination that Moore's claim was untimely and facially insufficient. Therefore, the Court finds that the instant clam is not procedurally barred.

To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

128

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, the claim is meritless. Moore's convictions and sentences became final on April 20, 1998. Resp. Ex. 28. The Supreme Court decided <u>Ring</u> on June 24, 2002, and has held that <u>Ring</u> does not apply retroactively to cases already final on direct review. <u>See</u> <u>Schriro</u>, 542 U.S. at 358. Likewise, <u>Hurst v. State</u>, 577 U.S. 92 (Fla. 2016), does not apply retroactively to Moore's case. <u>See</u> <u>Lambrix v. Sec'y, DOC</u>, 872 F.3d 1170, 1182-83 (11th Cir. 2017).

Moore further argues that <u>Hurst</u> applies retroactively to his case because the statutory factual findings set forth in <u>Hurst</u> constitute the elements of "capital murder," as distinguished from first-degree murder, within the meaning of the Due Process Clause. Reply at 131-32. According to Moore, "[w]hen a court construes a statute and identifies the elements of a statutorily-defined criminal offense, the ruling constitutes substantive law and dates to the statute's enactment." <u>Id.</u> at 134 (emphasis omitted). Essentially, Moore focuses on a distinction between first-degree murder and capital murder, which requires additional findings pursuant to Florida's capital sentencing statute.

However, the Florida Supreme Court has rejected such an argument, determining "<u>Hurst</u> penalty phase findings are not elements of the capital

129

felony of first-degree murder;" instead," they are findings required of a jury: (1) before the court can impose the death penalty for first-degree murder, and (2) only after a conviction or adjudication of guilt for first-degree murder has occurred." Foster v. State, 258 So. 3d 1248, 1252 (Fla. 2018). It further held:

> [A] conviction for first-degree murder, a capital felony, solely consists of the jury having unanimously found the elements set forth in the substantive first-degree murder statute and the relevant jury instruction. The conviction for first-degree murder must occur before and independently of the penalty-phase findings required by Hurst and its related legislative enactments. The Florida Statutes clearly establish the elements of first-degree murder required for a conviction, and upon conviction, the required findings in order to sentence a defendant to the death penalty. There is no, as Foster asserts, greater offense of "capital first-degree murder." Foster's guilt-phase jury considered all of the elements necessary to convict him of first-degree murder, a capital felony. Thus, his due process argument fails.

Id. (emphasis in original); see also Wright v. State, 312 So. 3d 59, 60 (Fla. 2021) (agreeing with the holding in Foster that Hurst did not change the elements of first-degree murder or create another offense of capital first-degree murder). Accordingly, Hurst and amended legislation regarding penalty phase proceedings in capital cases did not reinterpret or clarify the essential elements necessary to convict a defendant of first-degree murder at the time Moore's

conviction became final. Moore's claim is without merit, and relief on the claim in Ground Thirteen is due to be denied.

## N. Ground Fourteen

As Ground Fourteen, Moore alleges the State violated <u>Giglio</u>[56] when prosecutors[57] knowingly presented false and misleading evidence, as well as made false and misleading arguments at Moore's trial. Amended Petition at 87-88; Amended Memorandum at 39. He also contends that prosecutors failed to correct the false and misleading evidence and argument. Amended Petition at 88.

"To establish a <u>Giglio</u> claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." <u>Guzman v. Sec'y, Dep't of Corr.</u>, 663 F.3d 1336, 1348 (11th Cir. 2011) (quotation marks and ellipsis omitted). Mere inconsistency in

---

[56] In <u>Giglio</u>, the United States Supreme Court held that a prosecutor violates a defendant's due process rights where he or she knowingly presented false testimony. 405 U.S. at 154-55.

[57] Assistant State Attorneys Angela Corey and Linda McCallum represented the State.

testimony is insufficient to establish a <u>Giglio</u> claim. <u>United States v. Stein</u>, 846 F.3d 1135, 1149 (11th Cir. 2017).

## 1. Randy Jackson

According to Moore, prosecutors violated <u>Giglio</u> when they knowingly presented and failed to correct Jackson's false testimony. Amended Petition at 88-89. Jackson testified at trial that while he and Moore were incarcerated together at the Duval County Jail, Moore admitted to killing the victim. <u>Id.</u> at 88. On cross-examination, the defense elicited testimony about an incident in which Jackson claimed Moore hit him on the head with a hammer. <u>Id.</u> The State questioned Jackson on redirect examination about whether he remembered he and Moore battering Brinkley after Moore hit Jackson on the head with a hammer. <u>Id.</u> at 88. Jackson responded that he remembered such an incident. <u>Id.</u> Moore confirmed on cross-examination that he and Jackson were arrested for committing a crime together after the hammer incident. <u>Id.</u> at 89. The prosecutors referenced the incidents during closing argument and rebuttal argument:

> Supposedly Randy Jackson is harboring this animosity and resentment because [Moore] had hit Randy Jackson in the head before with a gun or a hammer. And, yet, you heard that two weeks after that incident of being hit in the head the two of them were back consorting together, getting arrested for

something else. So, obviously that animosity didn't last that long.

. . . .

Now, ladies and gentlemen, this stuff about Randy and him not being friends, – even after them getting into this little altercation where Randy Jackson took the gun or a hammer, whatever, – they still went out together and got arrested together. They are still friends. . . .

Resp. Exs. 7 at 1233-34; 9 at 1276.

Moore asserts the prosecutors presented an inaccurate timeline of the incidents. Amended Petition at 89. According to Moore, the arrest and booking reports reflect that the Brinkley incident occurred on January 30, 1991, and the hammer incident occurred on February 10, 1991.[58] Id. Law enforcement arrested Moore for the Brinkley incident on February 26, 1991, and Jackson for the same incident on March 22, 1991. Id. Moore argues that, during his cross-examination, the prosecutor had "the police report in question" that demonstrated the altercation between Moore and Jackson occurred weeks after the Brinkley incident, yet she did not correct the record. Id.

---

[58] Moore includes the arrest and booking reports for both incidents as attachments to his Reply. Doc. 60 at 56-80.

Respondents note that Moore raised the instant claim in his Second Successive Rule 3.851 Motion. Response at 162. According to Respondents, the Florida Supreme Court affirmed the postconviction court's finding that the claim was untimely. Id. at 163. They argue the claim is procedurally defaulted from federal habeas review because Moore failed to satisfy the basic pleading requirements to overcome the one-year time limitation set forth in Rule 3.851(d)(2)(A). Id. at 167. Respondents also assert that Moore does not allege cause and prejudice for the procedural default; however, assuming Martinez or Trevino v. Thaler, 569 U.S. 413 (2013), apply to the claim, he does not demonstrate counsel's failure to raise the claim was unreasonable or that it prejudiced Moore. Id. at 168. Moore replies that collateral counsel's ineffective assistance constitutes cause and prejudice to overcome the procedural bar because he did not investigate and raise the claim in the initial Rule 3.851 Motion. Reply at 152.

The record shows that Moore raised a substantially similar claim in his Second Successive Rule 3.851 Motion. Resp. Ex. 76 at 111-16. The Florida Supreme Court affirmed the postconviction court's order denying relief, stating in pertinent part:

> As an initial matter, the State alleges that Moore's Giglio claim pertaining to witness Jackson is untimely

134

because it is based upon facts that were known to Moore and Moore's counsel at the trial itself, and thus, this claim does not satisfy the exception in rule 3.851(d)(2)(A). Moore does not contest that this claim is untimely, but alleges that to the extent that his trial counsel did not realize this error, Moore was denied the effective assistance of trial counsel, and since postconviction counsel did not raise an ineffective assistance of counsel claim in the initial postconviction motion based on this error, Moore was also deprived of effective assistance of postconviction counsel and is entitled to relief under <u>Martinez v. Ryan</u>, -- U.S. --, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).

The record pertaining to this subclaim reflects that during the trial, the State called Jackson, who testified that he was friends with Moore and that at one point while Moore and Jackson were incarcerated with each other, Moore admitted that he killed the victim. On cross-examination, in an attempt to demonstrate that Jackson had a motive to testify falsely against Moore, Moore's counsel elicited information from Jackson that Jackson and Moore had an altercation prior to the alleged confession. The State then questioned Jackson during redirect, asking him whether he and Moore were involved in a battery against another man, Timothy Brinkley, after this altercation with each other. The State also asked Moore himself about the order of these events, and Moore agreed that the State's time frame sounded correct to him.

Moore now asserts that the State knowingly presented false evidence because Moore and Jackson first committed the battery upon Brinkley, and subsequently, Jackson and Moore had a physical altercation with each other. The postconviction court denied this claim, holding that the claim was procedurally barred because "[t]he facts ... were

readily available to trial counsel at the time of trial, as they were contained in police reports which existed in 1991. Further, there is no reason why this claim could not have been raised in the Defendant's first postconviction motion." We affirm this ruling.

During the trial, the State questioned both witness Jackson and defendant Moore as to the chronological order of the battery and the altercation. Both witnesses agreed with the State's erroneous timeline of the incidents that indicated the altercation occurred before the battery. However, the correct information that the battery preceded the altercation was available to defense counsel during the trial, as well as to the defendant himself since Moore had direct knowledge of the events in which he was involved. Neither trial counsel nor initial postconviction counsel raised this issue. Thus, as this claim was based on information that the defendant and defense counsel had at the time of trial, the claim is procedurally barred. See Byrd v. State, 14 So.3d 921, 926-27 (Fla.2009) (holding that the defendant's Giglio claim was procedurally barred where it was based on a 1981 police report that was provided to trial counsel prior to trial); Jimenez v. State, 997 So.2d 1056, 1070 (Fla.2008) (holding that the defendant's Giglio claim was procedurally barred because it was based entirely on a pretrial deposition that defense counsel possessed and was not based on newly discovered evidence).

Further, this Court has not recognized a claim of ineffective assistance of postconviction counsel, see Kokal v. State, 901 So.2d 766, 777 (Fla.2005), and has rejected the claim that Martinez, 132 S.Ct. 1309, creates a new and independent cause of action for ineffective assistance of collateral counsel in our state courts' system. See Gore v. State, 91 So.3d 769, 778

136

(Fla.), cert. denied, -- U.S. --, 132 S.Ct. 1904, 182 L.Ed.2d 661 (2012).

Moreover, even if the claim had been timely raised, Moore is not entitled to relief. In order to establish a Giglio violation, it must be shown that: (1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Guzman v. State, 868 So.2d 498, 505 (Fla.2003). The evidence is considered material "if there is any reasonable possibility that it could have affected the jury's verdict." Tompkins v. State, 994 So.2d 1072, 1091 (Fla.2008) (quoting Rhodes v. State, 986 So.2d 501, 508–09 (Fla.2008)). "The State, as the beneficiary of the Giglio violation, bears the burden to prove that the presentation of false testimony at trial was harmless beyond a reasonable doubt." Guzman, 868 So.2d at 506. Giglio claims present mixed questions of law and fact. This Court defers to those factual findings supported by competent, substantial evidence, but reviews de novo the application of the law to the facts. Green v. State, 975 So.2d 1090, 1106 (Fla.2008).

Assuming that Moore was able to establish the first two prongs of Giglio, he nevertheless cannot show that the evidence is material, that is, that there was "any reasonable possibility that it could have affected the jury's verdict." Tompkins, 994 So.2d at 1091 (quoting Rhodes, 986 So.2d at 508-09). The erroneous information presented at trial involved the issue of whether Jackson may have had a personal motive to provide false testimony against Moore because the two had a prior fight or whether Jackson and Moore had repaired their friendship after this incident and together committed a battery against Brinkley. However, the information provided a possible ground for questioning the credibility of only Jackson. The

137

> State also presented testimony from another
> unrelated witness, Chris Shorter, who heard Moore
> confess on multiple occasions and discuss significant
> details regarding the murder. In addition, Moore's
> codefendant Clemons testified that he witnessed
> Moore shoot the victim, and codefendant Gaines
> testified that he saw Clemons and Moore walk into the
> victim's home shortly before the shooting. After a full
> review of the evidence presented at trial, we conclude
> that there was no reasonable possibility that this error
> in the chronological order pertaining to the battery on
> Brinkley and the altercation between Moore and
> Jackson could have affected the jury's verdict.
> Therefore, we deny relief on this subclaim.

Moore, 132 So. 3d at 723-25. The Florida Supreme Court properly applied a regularly followed procedural default principle and found Moore's claim to be untimely. See Tompkins v. State, 994 So. 2d 1072, 1080 (Fla. 2008) ("Florida Rule of Criminal Procedure 3.851 governs the filing of postconviction motions in capital cases. Rule 3.851(d)(1) generally prohibits the filing of a postconviction motion more than one year after the judgment and sentence become final. An exception permits filing beyond this deadline if the movant alleges that 'the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence.'") (quoting Fla. R. Crim. P. 3.851(d)(2)(A)). Therefore, his claim is procedurally defaulted for purposes of federal habeas review.

138

To the extent Moore argues the ineffective assistance of collateral counsel as cause and prejudice to overcome the procedural default, his argument is without merit. <u>Martinez</u> applies only to procedurally defaulted claims of ineffective assistance of trial counsel not raised in an initial collateral review proceeding. <u>See</u> <u>Martinez</u>, 566 U.S. at 9 ("This opinion qualifies <u>Coleman</u> by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."); <u>Gore v. Crews</u>, 720 F.3d 811, 816 (11th Cir. 2013) ("By its own emphatic terms, the Supreme Court's decision in <u>Martinez</u> is limited to claims of ineffective assistance of trial counsel that are otherwise procedurally barred due to the ineffective assistance of post-conviction counsel."). Because Moore does not present an ineffective assistance of counsel claim, <u>Martinez</u> does not excuse his procedural default. Moore has failed to establish cause or demonstrate prejudice and has not demonstrated a claim of actual innocence. Therefore, relief on this claim is due to be denied as any such claim is procedurally defaulted.

Even assuming the claim were not procedurally defaulted, Moore is not entitled to relief. According to the arrest and booking reports, the Brinkley incident occurred on January 30, 1991. Doc. 60 at 65. Law enforcement

arrested Moore for the aggravated battery arising from that incident on February 27, 1991. Id. at 64. The hammer incident occurred on February 10, 1991. Id. at 57. Law enforcement arrested Moore for the aggravated battery arising from that altercation on February 11, 1991. Id. at 56. Therefore, the Brinkley incident does appear to have occurred before the hammer incident.

However, even if the prosecutors knowingly presented false or misleading testimony, its use was not material.[59] The State used the timeline of the Brinkley incident and hammer incident to establish that Jackson did not harbor any animus towards Moore because of the hammer incident and, thus, did not have a motive to lie about Moore's confession. However, Moore testified that he considered Jackson to be his "enemy," and that he never told Jackson that he killed the victim. Resp. Ex. 6 at 1118-19. On cross-examination, Jackson also conceded that the State Attorney's Office had dropped two charges for escape and robbery since Jackson's conversation with Moore. Resp. Ex. 5 at 975-76. The State Attorney's Office also reduced the charge for which he was incarcerated on January 29, 1993, from aggravated battery to improper

---

[59] During an exchange with the trial court outside the presence of the jury, the prosecutor represented to the trial court and to the defense that the Brinkley incident occurred after the hammer incident. Resp. Ex. 6 at 1122-24. The Court will not speculate as to whether the prosecutor made the statement with knowledge to the contrary or negligently represented the timeline without verifying the accuracy of her statement.

exhibition of a firearm. Id. at 976-77. Because other evidence established Jackson's motive to lie about the confession, the Court finds the timeline of the Brinkley and hammer incidents was not material.

The State also presented a more significant witness, Christopher Shorter, who testified that Moore confessed to killing the victim. Id. at 999. Notably, Moore's confession to Shorter was considerably more detailed than his confession to Jackson. Jackson testified that Moore stated he did not mean to kill the victim, but "just had to kill him because he kn[ew] [Moore]." Id. at 967. Moore did not provide any further details to Jackson. In contrast, Shorter testified that, on the day of the murder, Moore came to his house with a paper bag that contained clothes. Id. at 994. Shorter noted that Moore had changed clothes from when he saw Moore earlier that day. Id. Moore asked Shorter for a lighter so he could burn the clothes, but ultimately, he gave the bag to Shorter so Shorter could dispose of it. Id. at 995-96. According to Shorter, two days later, Moore admitted he shot the victim in the head and chest. Id. at 1001. Shorter testified that Moore said the victim slumped to the side after the first shot. Id. Moore told him that Clemons also went into the victim's house and after Moore shot the victim, Clemons ran out of the house. Id. at 1002-03. Shorter testified that Moore stated he then searched the victim's house and

found a .38 revolver. Id. at 1003. Moore took the revolver and used trash from around the house as kindling to start a fire. Id. Moore left the house through the side door after he had locked the front door. Id. at 1004. Based on the above, no reasonable likelihood exists that any misrepresentation about the timeline of the Brinkley incident and the hammer incident affected the judgment. Therefore, Moore is not entitled to relief on this claim.

### 2. Carlos Clemons

Moore alleges prosecutors violated Giglio when they knowingly presented and failed to correct Clemons's false testimony about his plea agreement with the State. Amended Petition at 101-02. According to Moore, in March 1993, Clemons pled guilty to second-degree murder and attempted armed robbery in exchange for juvenile sanctions. Id. at 93-94. However, the trial court found Clemons's plea agreement to be illegal and vacated it before trial. Id. at 95. Moore asserts that Clemons represented at trial that he "had no deal with the State and did not know what he might be able to plead to and/or what his sentence would be." Id. at 97. However, during the 2011 evidentiary hearing on Moore's Second Successive Rule 3.851 Motion, Clemons's testimony revealed an undisclosed plea deal in effect at the time of trial. Id. at 98-101. Moore argues the State's failure to disclose the plea deal,

142

presentation of false testimony about the nonexistence of a plea deal in effect at the time of trial, and assertion at trial that Clemons testified without a plea deal violated due process. Id. at 102.

Moore raised a substantially similar claim in a Motion to Amend his Second Successive Rule 3.851 Motion. Resp. Ex. 87 at 286-94. The Florida Supreme Court affirmed the postconviction court's denial of relief:

> Moore contends that the State violated Giglio because the State failed to correct codefendant Clemons' false testimony at trial when Clemons stated that he did not have a plea deal with the State at the time of trial. In support, Moore asserts that during the postconviction evidentiary hearing, Clemons admitted that he had a plea agreement with the State at the time of trial. As this subclaim rests on allegedly newly discovered evidence that Moore did not obtain until this proceeding, we address this claim on the merits. However, after a full review of the trial record and the testimony presented at the postconviction evidentiary hearing, we disagree that the record shows such an admission from Clemons.
>
> To the contrary, the record from trial reflects that Clemons initially entered into a plea bargain with the State, agreeing to testify against Moore in exchange for the opportunity to plead to second-degree murder and be sentenced as a juvenile. Days before Moore's trial, however, Moore's attorney objected to the plea agreement between Clemons and the State, notifying the parties and the court that the plea deal was illegal. Based on this issue, Clemons was permitted to withdraw his guilty plea, so at the time of Moore's trial, no plea deal was in place.

143

At Moore's trial, the State called Clemons to testify and then questioned Clemons as to the former plea agreement, at which point Clemons informed the jury that he had previously agreed to testify against Moore in exchange for juvenile sanctions, but the plea agreement was found to be illegal. On cross-examination, Moore's defense counsel attacked Clemons' credibility, at which time Clemons recognized that he had been involved in other prior criminal activity and even lied to the police, letting a different person take "the rap" for him in order to avoid punishment. In addition, defense counsel questioned Clemons about his motive in testifying against Moore, as well as about Clemons' desire to obtain an equally generous plea deal as the one that he had been previously promised.

Moore alleges that during the evidentiary hearing pertaining to the second successive motion for postconviction relief, Clemons acknowledged that a secret plea agreement was in place at the time of Moore's trial. However, the record does not support Moore's allegations. In denying relief, the postconviction court noted that the testimony at the evidentiary hearing was ambiguous and that "when Mr. Clemons testified regarding his plea agreement, he was never asked to clarify whether he was referring to the plea agreement entered into before or after the Defendant's trial." We agree.

With respect to this Giglio claim, Moore failed to meet his burden to demonstrate that the State knowingly presented false testimony at trial when Clemons testified that there was no valid plea agreement in place at the time of trial. The testimony at the evidentiary hearing pertaining to this claim was not specifically addressed to only the narrow window of

144

time during which Clemons did not have a plea agreement in place with the State at the time of the trial. Instead, the postconviction evidentiary hearing testimony simply established that Clemons had a plea deal "in this case" and had initially agreed to testify against Moore in exchange for a very lenient sentence that did not require a prison term and would permit Clemons to be sentenced as a juvenile.

Moreover, even if Clemons' statement at the evidentiary hearing could be interpreted to mean that a valid plea deal existed at the time of Moore's trial, the statement pertaining to the plea deal would not be material because there is no reasonable possibility that it could have affected the jury's verdict. See Tompkins, 994 So. 2d at 1091. During the trial, Clemons candidly discussed that the State had offered him a very favorable plea agreement and admitted that he was hoping that the State would offer a similar plea agreement to him in the future. Accordingly, the jury was aware that Clemons was initially offered extremely favorable terms in the initial plea agreement and further knew that Clemons was attempting to curry favor with the State in hopes that the State would offer the same terms to him again once the legality of the prior plea agreement had been resolved. This posture could provide an even greater incentive for Clemons to testify favorably for the State than simply having a deal in place. In addition, during Moore's trial itself, defense counsel performed a thorough job of impeaching Clemons' credibility, eliciting information that Clemons had previously lied to the police and permitted codefendant Gaines to take the rap for him in another criminal matter because he did not want to be punished. Accordingly, we deny relief on this subclaim.

145

<u>Moore</u>, 132 So. 3d at 725-26. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, it is without merit. In support of his claim, Moore relies on the following exchange from the 2011 evidentiary hearing:

> Q:  Mr. Clemmons, how old were you at the time you were arrested for this murder?
>
> A:  13.
>
> Q:  How old?
>
> A:  13.
>
> Q:  13. And how old were you by the time it went through adult court after you got certified?
>
> A:  When I got released or . . .

Q:     No, by the time it went to trial, were you still 13 or at most 14?

A:     14.

Q:     Now you had a lawyer representing you?

A:     Yes, ma'am.

Q:     Was that Ms. Watson?

A:     Yes, ma'am.

Q:     Denise Watson. Can you relate to the Court your memory of the plea agreement between you and Ms. Watson and the State of Florida?

A:     That I would go to a juvenile facility, either from – till I turn 18 or 21. It's didn't really speculate.

Q:     Okay. What charges did you enter a plea to?

A:     Manslaughter.

. . . .

Q:     Now, I believe you were asked on direct that you understood that if you didn't testify truthfully you would go to jail.

A:     Yes, sir.

Q:     Was that pursuant to the plea agreement?

A:     No, sir. It was – they already knew.

Q:     You already knew that. Is that who you said?

147

> A:    Yes, sir.
>
> Q:    But was there an agreement to testify truthfully
>        in the case?
>
> A:    Yes, sir.
>
> Q:    And what were the terms of the plea agreement?
>        Do you recall?
>
> A:    I just know I was going to a juvenile facility and
>        didn't state no time. It just –
>
> Q:    So in exchange for testifying against Mr. Moore
>        you would be able to plea to manslaughter and
>        go to a juvenile facility?
>
> A:    Yes, sir.
>
> Q:    That was your understanding?
>
> A:    Yes, sir.

Resp. Ex. 94 at 860-61, 863-64. The above exchange does not demonstrate Clemons offered false testimony at trial or that the State knowingly presented false testimony. Given the State and postconviction counsel's ambiguous questions to the witness, it is unclear if Clemons understood whether the question referred to the pretrial plea agreement or the posttrial plea agreement. Further, the record supports the conclusion that a deal did not exist at the time of trial. Before Clemons testified, his attorney, Denise Watson, represented to the trial court that the plea agreement was vacated, and

148

Clemons currently had charges pending for second-degree murder and attempted armed robbery. Resp. Ex. 5 at 771-72. She stated that the State had agreed only not to use Clemons's trial testimony against him. Id. at 774. Therefore, Moore does not demonstrate that the State presented false testimony.

Nevertheless, even assuming the State knowingly presented false testimony, its use was not material. The defense extensively cross-examined Clemons about his vacated plea agreement. Id. at 816-22. Clemons admitted he had sought out the plea agreement. Id. at 816-17. Since the trial court vacated his plea agreement, he testified that he "hope[d] that whenever something is worked out . . . it will be close to the same thing [he] had originally signed up for." Id. at 823. The defense also questioned Clemons about the State's agreement that it would not use his testimony against him in other proceedings and, specifically, that the State would not charge him with perjury. Id. at 823-24, 826. The defense also impeached Clemons's credibility when counsel questioned him about a prior "criminal situation" in which Gaines lied about Clemons's involvement. Id. at 814. Because the jury heard that Clemons had a vacated plea agreement and sought another one, no

reasonable likelihood exists that any misrepresentation affected the judgment. Therefore, Moore is not entitled to relief on this claim.

### 3. Vincent Gaines

Moore contends that the prosecutors violated <u>Giglio</u> when they knowingly presented and failed to correct Gaines's false testimony about whether he and Clemons chased Ashley with a gun on the day of the murder. Amended Petition at 108. According to Moore, Gaines testified at trial that he and Clemons did not chase Little Terry with a gun on that day. <u>Id.</u> at 103-04. Moore asserts, in contrast, Gaines testified at the 2011 evidentiary hearing that he and Clemons chased Little Terry with a gun. <u>Id.</u> at 106-08. He argues that Gaines's 2011 testimony contradicts his trial testimony and demonstrates the prosecutors violated <u>Giglio</u> because "by offering [Gaines's] testimony in 2011 and relying on it, [they] implicitly conceded that his contrary testimony at [] Moore's 1993 trial was false." <u>Id.</u> at 108.

Moore raised a substantially similar claim in a Motion to Amend his Second Successive Rule 3.851 Motion. Resp. Ex. 87 at 294-99. Affirming the postconviction court's denial of relief, the Florida Supreme Court stated, in pertinent part:

> In Moore's final alleged <u>Giglio</u> violation, he contends that the State violated <u>Giglio</u> by knowingly presenting

150

false testimony that codefendant Gaines did not chase Little Terry with a gun shortly before the crime. In support, Moore relies on a statement from the postconviction evidentiary hearing where Gaines admitted that he did chase Little Terry, but still denied having a gun. We first review facts relating to this claim.

At Moore's trial, the issue of whether Clemons possessed a gun on the day of the murder was critical to the defense. During cross-examination, defense counsel asked Gaines whether he was at Grand Park with Clemons around noon on the day of the murder and whether he saw Clemons with a gun in his possession. Gaines denied both allegations and further testified that he did not remember seeing Little Terry that day. However, Clemons testified at trial that he thought he and Gaines had seen Little Terry before the murder and chased him, but Clemons denied having a gun. Little Terry also testified, asserting that he saw Clemons and Gaines around 10:30 a.m. that day and ran away when he thought one of them was reaching down to his side for a gun. At the evidentiary hearing, Moore's counsel questioned Gaines about his interactions with Little Terry, at which point Gaines testified that he remembered chasing Little Terry with Clemons, but could not recall whether this happened on the same day as the murder. Gaines explicitly denied having a weapon on him when the chase occurred.

We affirm the denial of relief as to this subclaim because Moore has failed to establish that a <u>Giglio</u> violation occurred. In order to establish a Giglio violation, the defendant must first establish that the testimony given was false. <u>Guzman</u>, 868 So. 2d at 505. The testimony at trial clearly showed that the evidence was in dispute as to whether either Clemons

151

or Gaines saw Little Terry on the day of the murder. Gaines testified at trial that he could not recall whether he saw Little Terry that day. During the evidentiary hearing in this case, Gaines testified that he and Clemons chased Little Terry, but still could not recall whether this occurred on the day of the murder. Thus, Moore has failed to show that false testimony was presented at trial. Likewise, Moore has failed to establish that the State knew the testimony was false – the second requirement to establish a <u>Giglio</u> violation. <u>See</u> <u>Guzman</u>, 868 So. 2d at 505. Accordingly, we deny this subclaim.

<u>Moore</u>, 132 So. 3d at 726-27. To the extent that the Florida Supreme Court denied this claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of this claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, it is without merit because Moore has not established Gaines's trial testimony was false. Gaines testified at trial that he did not observe Clemons with a gun on the day of the murder, and he could not

152

remember whether they chased Little Terry that same day. Resp. Ex. 5 at 568-69. At the 2011 evidentiary hearing, Moore called Daniel Ashton, the defense's investigator as a witness. Ashton testified that he interviewed Gaines in 2005. Resp. Ex. 94 at 828. Gaines admitted to Ashton that he and Clemons chased Little Terry with a gun on the day of the murder. Id. at 828-29. Ashton testified Gaines told him that, at trial, "a male courthouse bailiff told [Gaines] that Angela Corey was pissed at him for lying." Id. at 841. Gaines volunteered that "the only thing he lied about was chasing [Little Terry] with a gun." Id. at 841-42.

However, the State called Gaines to testify at the evidentiary hearing. Gaines stated that he told the truth at trial. Id. at 871. He similarly testified at the evidentiary hearing that he and Clemons chased Little Terry at some time, but they did not have a gun. Id. at 877. He could not remember whether they chased Little Terry on the day of the murder. Id. Gaines averred that he never told Ashton that they chased Little Terry with a gun. Id. at 877. Based on the above, the Court finds Gaines's evidentiary hearing testimony did not materially contradict his trial testimony.

Even assuming Moore demonstrated that the prosecutor knowingly presented Gaines's false testimony about the incident with Little Terry, no

153

reasonable probability exists that its use affected the jury's verdict. The details of the Little Terry incident were already in dispute. During trial, Terry Ashley testified that Clemons and Gaines confronted him with a gun on the day of the murder. Resp. Ex. 6 at 1188-89. According to Ashley, Clemons reached in his pocket for a gun; Ashley only saw "the chrome piece" on the bottom of the handle before he ran away. Id. at 1189-90. Moore also testified that he witnessed the incident and warned the victim that Clemons had a gun. Id. at 1094, 1104. Clemons admitted he and Gaines chased Little Terry on the day of the murder. Resp. Ex. 5 at 827-28. He also testified that he and Gaines threatened to shoot Little Terry, but it was not on the day of the murder. Id. at 829. Because the details of the Little Terry incident were already before the jury, no reasonable probability exists that Gaines's testimony could have affected the jury's verdict. Therefore, Moore is not entitled to federal habeas relief on this claim, and Ground Fourteen is denied.[60]

---

[60] To the extent Moore asserts the cumulative effect of the alleged Giglio errors entitles him to habeas relief, the Court will dispose of that claim in Ground Fifteen.

## O. Ground Fifteen

As Ground Fifteen, Moore alleges that the State violated <u>Brady v.</u> <u>Maryland</u>[61] when it willfully withheld favorable evidence from Moore. Amended Petition at 110. According to Moore, the State failed to disclose that Clemons had a plea deal in effect at the time of trial and that Gaines had falsely testified about the Little Terry incident.[62] <u>Id.</u> at 111-14. Moore also maintains the State did not disclose <u>Brady</u> material about Randy Jackson. <u>Id.</u> at 114. At the 2011 evidentiary hearing, investigator Ashton testified Jackson disclosed to him that the State paid Jackson, Alan Dean, and Michael Dean to testify against Moore. <u>Id.</u> Moore further contends that the State did not disclose <u>Brady</u> material about Audrey McCray, who told investigator Ashton that law enforcement threatened her before she testified at trial. <u>Id.</u> at 115-16.

Respondents assert that Moore did not properly exhaust Ground Fifteen in state court, and it is procedurally barred. Response at 181-86. According to Respondents, Moore's <u>Brady</u> claim in his Second Successive Rule 3.851 Motion only concerned Audrey McCray. <u>Id.</u> at 182. The postconviction court rejected Moore's claim as facially insufficient and untimely. <u>Id.</u> at 182-83. On appeal,

---

[61] 373 U.S. 83, 87 (1963) (finding that a prosecutor violates a defendant's due process rights when she withholds material, exculpatory evidence).

[62] Moore raised these claims pursuant to <u>Giglio</u> in Ground Fourteen.

Moore raised the entirety of the allegations that he now raises in Ground Fifteen. Id. at 183. The Florida Supreme Court rejected Moore's claims as insufficiently pled. Id. Respondents assert that the state supreme court's disposition relied on an independent and adequate state ground. Id. at 184. Further, they contend that Moore's claims are procedurally barred because he cannot return to state court to raise them. Id. at 185.

Moore replies that the state supreme court and the postconviction court's rejections of his claims are not based on firmly established or regularly followed state rules of procedure. Reply at 182. According to Moore, the postconviction court did not grant him leave to amend his facially insufficient motion as required by Spera v. State, 971 So. 2d 754 (Fla. 2007). Id. Therefore, the state supreme court's refusal to consider his Brady claims was contrary to its own precedent. Id. at 183.

The record reflects that Moore raised the allegations regarding McCray in his Second Successive Rule 3.851 Motion. Resp. 76 at 120-23. The postconviction court denied relief, determining that Moore failed to plead a prima facie Brady claim. Resp. Ex. 90 at 403. In his initial brief on appeal, Moore included the entirety of the allegations that he now raises in Ground

156

Fifteen. Resp. Ex. 95 at 96-100. In affirming the postconviction court's denial

of relief, the Florida Supreme Court held:

> Moore briefly asserts that he is entitled to
> postconviction relief because trial witness Audr[ey]
> McCray allegedly stated that she was threatened with
> the loss of custody of her child. However, Moore did not
> support this claim in more detail or allege what
> portion of McCray's trial testimony was not true.
> Moore failed to allege exactly who threatened McCray
> with the loss of custody of her child or how her
> testimony was inaccurate. In fact, it is possible that
> McCray was simply advised that she was required to
> appear in court to testify pursuant to a subpoena and
> that she faced legal consequences if she failed to
> appear and testify. The parameters of this claim are
> vague and unclear.
>
> As this Court has held, a defendant is not
> automatically entitled to an evidentiary hearing but
> must allege specific facts, not conclusively refuted by
> the record, which demonstrate entitlement to relief. "A
> summary or conclusory allegation is insufficient to
> allow the trial court to examine the specific allegations
> against the record." Ragsdale v. State, 720 So. 2d 203,
> 207 (Fla. 1998); see also Jones v. State, 845 So. 2d 55,
> 64 (Fla .2003) ("Postconviction relief cannot be based
> on speculative assertions."); Freeman v. State, 761 So.
> 2d 1055, 1061 (Fla. 2000) (holding that "[t]he
> defendant bears the burden of establishing a prima
> facie case based upon a legally valid claim" and that
> conclusory allegations are not sufficient). Thus, we
> affirm the denial of relief.

Moore, 132 So. 3d at 734. On this record, the Court finds the Florida Supreme

Court's disposition of the McCray claim constitutes a ruling on the merits. See

Pope, 680 F.3d at 1286 ("[A] dismissal of a post-conviction claim for facial insufficiency constitutes – at least for purposes of the procedural default analysis – a ruling 'on the merits' that is not barred from [] review.").

To the extent that the Florida Supreme Court denied the claim on the merits, the Court will address it in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of the claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Therefore, Moore is not entitled to relief on the basis of his claim.

Even assuming the state supreme court's adjudication of the claim is not entitled to deference, it is without merit. To establish a Brady claim, a petitioner must demonstrate: (1) the government possessed evidence favorable to the defendant; "'(2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have

been different.'" <u>Riechmann v. Fla. Dep't of Corr.</u>, 940 F.3d 559, 580 (11th Cir. 2019) (quoting <u>Stein</u>, 846 F.3d at 1145-46). Notably, the holding in <u>Brady</u> only applies to information in the possession of the prosecutor or anyone under his authority that defense counsel could not have obtained by exercising reasonable diligence. <u>United States v. Naranjo</u>, 634 F.3d 1198, 1212 (11th Cir. 2011); <u>United States v. Griggs</u>, 713 F.2d 672, 674 (11th Cir. 1983) ("Where defendants, prior to trial, had within their knowledge the information by which they could have ascertained the alleged <u>Brady</u> material, there is no suppression by the government."). And, "a <u>Brady</u> claim fails when it is only speculative that the materials at issue would have led to exculpatory information." <u>Wright v. Sec'y Fla. Dep't of Corr.</u>, 761 F.3d 1256, 1281 (11th Cir. 2014).

Moore only speculates that McCray's statement constitutes impeachment evidence or exculpatory material. <u>See Wright</u>, 761 F.3d at 1281. The Florida Supreme Court correctly noted that "it is possible that McCray was simply advised that she was required to appear in court to testify pursuant to a subpoena and that she faced legal consequences if she failed to appear and testify." <u>Moore</u>, 132 So. 3d at 734. Moore's assertion that the State "made her

say things that weren't true" is vague and unclear as he does not specify which parts of her testimony were false. Resp. Ex. 75 at 247.

The Court also finds that even assuming the State had disclosed the alleged <u>Brady</u> material, no reasonable probability exists that the outcome of trial would have been different. McCray only testified briefly at trial. Resp. Ex. 5 at 1034-48. While she confirmed that Shorter had told her about the bag of clothes that Moore asked him to throw away, other witnesses corroborated Shorter's testimony. Reese and Graves testified Moore changed clothes on the day of the murder. <u>Id.</u> at 607, 636. Further, Shorter testified that Moore admitted to shooting the victim one time each in the chest and head. <u>Id.</u> at 1001. According to Shorter, after Moore shot the victim, he locked the front door of the victim's house with the keys and left out the back door. <u>Id.</u> at 1004. Dr. Floro, the medical examiner, confirmed the victim had two gunshot wounds to his head and chest. <u>Id.</u> at 736-37. Officer J.A. Anstett testified that he saw keys in the hallway away to the front door of the victim's house. <u>Id.</u> at 875, 894. The front door was also locked when passersby attempted to rescue the victim. <u>Id.</u> at 722. Based on such evidence, no reasonable probability exists that the outcome of trial would have been different.

As for Moore's <u>Brady</u> claims regarding Clemons, Gaines, and Jackson, he has failed to exhaust them and he cannot return to state court, so they are procedurally barred. <u>See</u> <u>Boerckel</u>, 526 U.S. at 845. Moore has not demonstrated cause or prejudice regarding his failure to properly exhaust, and he has not otherwise alleged that a fundamental miscarriage of justice will occur if the Court does not review the merits of these portions of the claim. Nevertheless, even if Moore had exhausted the claims, they do not have merit. As the Court previously determined in Ground Fourteen, Moore failed to establish the existence of a plea deal between Clemons and the State at the time of trial or that Gaines falsely testified about the Little Terry incident. Moreover, the Court finds based on the evidence, no reasonable probability exists that the alleged <u>Brady</u> material would have changed the outcome of trial. <u>See</u> <u>Guzman v. Sec'y, Dep't of Corr.</u>, 663 F.3d 1336, 1348 (11th Cir. 2011) ("<u>Giglio</u>'s materiality standard is 'more defense-friendly' than <u>Brady</u>'s.") (quoting <u>Hammond v. Hall</u>, 586 F.3d 1289, 1306 n.4 (11th Cir. 2009)).

Moore also fails to present a viable <u>Brady</u> claim concerning Randy Jackson. During the 2011 evidentiary hearing, Moore attempted to elicit from investigator Ashton the nature of Jackson's statements made to him. Resp. Ex.

94. at 827. The postconviction court sustained the State's objection to such testimony as hearsay. Id. It later allowed Moore to proffer Ashton's testimony:

> Q: And what did Mr. Jackson relay to you about Mr. Parrish's murder?
>
> A: What I specifically remember him telling me was that he wanted to be paid for his testimony, that he was previously paid for his testimony by the State, that his brother [Michel Dean] and father [Alan Dean] were also paid for their testimony, and that if I showed him the money he would tell me what I wanted to know. And then I remember him making a statement about Thomas, that there were people a lot guiltier than Thomas out on the street, and that was pretty well where the conversation ended, I believe.

Resp. Ex. 94 at 832. Moore only speculates that Jackson's statement constitutes impeachment evidence or exculpatory material. See Wright, 761 F.3d at 1281. Moreover, based on Chris Shorter's considerably more detailed testimony about Moore's confession to him, no reasonable probability exists that that the outcome would have been different if the State disclosed such information to Moore. Therefore, Moore is not entitled to federal habeas relief.

To the extent Moore asserts the cumulative effect of the alleged Brady and Giglio errors entitles him to habeas relief, such a claim is also meritless. The Eleventh Circuit has stated:

The Supreme Court held in <u>Kyles</u> that the third component of the <u>Brady</u>/<u>Bagley</u> test, which is the materiality analysis, must be conducted in a way that considers the cumulative impact of all of the undisclosed evidence favorable to the defense. <u>Kyles</u>, 514 U.S. at 436, 115 S.Ct. at 1567 ("The fourth and final aspect of <u>Bagley</u> materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item.").[63] The Court explained: "We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way. We evaluate its cumulative effect for purposes of materiality separately and at the end of the discussion." <u>Id.</u> at 437 n. 10, 115 S.Ct. at 1567 n. 10; <u>see also</u> <u>Brown v. Head</u>, 272 F.3d 1308, 1316 (11th Cir. 2001) (In performing a cumulative materiality analysis, "the collective impact of all of the suppressed evidence must be considered against the totality of the circumstances") (citing <u>Kyles</u>, 514 U.S. at 441, 115 S.Ct. at 1569).

<u>Smith v. Sec'y, Dep't of Corr.</u>, 572 F.3d 1327, 1346 (11th Cir. 2009). A materiality analysis need not consider procedurally barred <u>Brady</u> claims. <u>Id.</u> at 1342. Here, Moore has not established that any of the evidence at issue involves a violation of <u>Brady</u> or <u>Giglio</u>. Because Moore does not establish the alleged violations were errors, they cannot support a cumulative error claim. Therefore, Moore is not entitled to federal habeas relief.

---

[63] <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995).

## P. Ground Sixteen

Lastly, Moore contends his "conviction stands in violation of due process given that new evidence establishes that he is actually innocent of the crime." Amended Petition at 118. According to Moore, when considering the testimony of Clemons, Gaines, and other witnesses from the 2011 evidentiary hearing, as well as other evidence, "the totality of the evidence establishes reasonable doubt as to [] Moore's convictions and meets the 'no reasonable juror test.'" Id. at 119.

Respondents assert that Moore raised a similar claim as ground three of his Second Successive Rule 3.851 Motion, but it merely incorporated ground two, his newly discovered evidence claim. Response at 191. According to Respondents, the postconviction court denied ground two, but chose not to separately address ground three. Id. Respondents argue that Moore did not raise ground three on appeal to the Florida Supreme Court, so he did not properly exhaust the claim. Id. Since he cannot return to state court to raise the issue, the claim is procedurally barred. Id. Moore does not address the Respondents' argument in his Reply. See generally Reply.

164

Moore raised the instant claim as ground three of his Second Successive Rule 3.851 Motion. Resp. Ex. 76 at 126-129. In denying relief, the postconviction court determined:

> In Claim Three, the Defendant argues that his conviction stands in violation of due process because he is actually innocent of this crime. This claim merely incorporates the Defendant's newly discovered evidence claims, rather than raising another claim. Thus, this Court, having denied the newly discovered evidence claims, will not separately address Claim Three.

Resp. Ex. 90 at 403. Moore did not raise the claim on appeal of the denial of his Second Successive Rule 3.851 Motion. See generally Resp. Ex. 95. Based on the record, the Court finds that Moore failed to raise the claim in a procedurally correct manner and the claim is, therefore, procedurally barred. See Atwater v. Crosby, 451 F.3d 799, 810 (11th Cir. 2006) (finding a claim was not exhausted and was procedurally defaulted where petitioner did not raise it in his initial brief on appeal from the denial of his Rule 3.851 motion after a hearing, but only raised it in his reply brief, and Florida law treats such a claim as abandoned); see also Brown v. State, 304 So. 3d 243, 267 (Fla. 2020), (holding that, by "failing to challenge the circuit court's primary bases for denying relief" in his initial brief on appeal of his Rule 3.851 motion, Brown waived the argument).

165

Nevertheless, even if the claim were properly exhausted, Moore is not entitled to relief. It is not apparent whether a freestanding actual innocence claim is cognizable in a capital case on federal habeas review. Johnson v. Warden, Ga. Diagnostic & Classification Prison, 805 F.3d 1317, 1324 (11th Cir. 2015) (citing Herrera v. Collins, 506 U.S. 390, 417 (1993); In re Davis, 565 F.3d 810, 816 (2009); Jordan v. Sec'y Dep't of Corr., 485 F.3d 1351, 1356 (11th Cir. 2007)). However, assuming arguendo such a claim is cognizable, the Eleventh Circuit has stated:

> The Supreme Court in Herrera[64] assumed, but did not hold, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417, 113 S.Ct. 853. But the Court made clear that the required "truly persuasive demonstration" should, and would, be very difficult to make. Id. It acknowledged the "very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States." Id. That is why the Court emphasized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." Id. (emphasis added).

---

[64] Herrera v. Collins, 506 U.S. 390 (1993).

In re Dailey, 949 F.3d 553, 560 (11th Cir. 2020). Based on a review of the record and the pleadings, the Court finds Moore has not met such a standard. Therefore, Moore is not entitled to federal habeas relief on his actual innocence claim in Ground Sixteen.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Moore seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Moore "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

167

See <u>Slack</u>, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Amended Petition (Doc. 15) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment denying the Amended Petition and dismissing this case with prejudice.

3.    If Moore appeals the denial of the Amended Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.     The Clerk of the Court is directed to close this case and terminate

any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 12th day of

September, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-9 8/23
C:     Counsel of record

169